**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

ETHICAL SOCIETY OF POLICE; NAACP
ST. LOUIS COUNTY; MISSIONARY
BAPTIST STATE CONVENTION OF
MISSOURI; TWO WRASSLIN' CATS
ACCORD; OUT ACCOUNTABILITY
PROJECT; BERKSHIRE RESOURCES FOR
INTEGRATION OF DIVERSE GROUPS
AND EDUCATION; NAACP STATE
CONFERENCE COLORADO-MONTANA-
WYOMING; PEACEMAKERS LODGE;
PIKES PEAK SOUTHERN CHRISTIAN
LEADERSHIP CONFERENCE 1;
WELLSPRING HEALTH ACCESS; and
HAITIAN COMMUNITY HELP & SUPPORT
CENTER,

                       ***Plaintiffs*,**

   v.

PAMELA J. BONDI, in her official capacity
as Attorney General of the United States; and
U.S. DEPARTMENT OF JUSTICE,

                       ***Defendants*.**

Case No. 25-CV-___

---

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### NATURE OF THIS ACTION

1)     Plaintiffs are civic organizations from around the country that are committed to civil rights, community engagement, and fulfilling this Nation's promise of equality and dignity under the law. Plaintiffs bring this action for declaratory and injunctive relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the U.S. Constitution, to challenge Defendants' unlawful actions to dismantle the Community Relations Service.

2)     The Community Relations Service ("CRS"), an agency within the U.S. Department of Justice ("DOJ" or "Justice Department"), was created by Title X of the Civil

Rights Act of 1964 and has the statutory mandate to "provide assistance to communities and persons therein in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin. . . ." 42 U.S.C. § 2000g-1. Over the years, Congress has expanded CRS's jurisdiction to include preventing and responding to hate crimes, addressing matters related to the free exercise of religion, and combating threats based on gender, gender identity, sexual orientation, religion, or disability, among other things.

3)    CRS is known as "America's Peacemaker." Over the last sixty years, the agency has worked to prevent violence during many of the most pivotal and fraught moments in American history. Today, CRS facilitates dialogue, conducts mediation and training, and consults with local governments, community organizations, faith leaders, law enforcement, and other stakeholders. CRS conciliators work quietly and without publicity to preserve and restore peace, including by resolving divisive civil rights conflicts. CRS provides all of its services free of charge to communities and organizations that request assistance.

4)    As the diverse array of Plaintiffs demonstrates, CRS does not help one type of community. Instead, CRS provides critical services to organizations across the political, social, and ideological spectrum—including religious organizations, tribal entities, local governments, and LGBTQ+ groups, to name just a few. That is why CRS has consistently received considerable bipartisan support in Congress.

5)    The current Administration has expressed hostility to CRS's very existence. Defendants have stated in writing that "[t]he CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities." Rather than engage with Congress to amend the law, however, Defendants have decided to unilaterally dismantle CRS. But the Constitution assigns *to Congress* the power to make laws and establish or eliminate

agencies.  Defendants' unilateral dismantlement of CRS violates the Civil Rights Act of 1964, the APA, and the separation of powers.

6)    Defendants made the decision to abolish CRS behind closed doors, without input from affected stakeholders, and then buried the announcement of their decision in obscure budget documents, in what appears to be an effort to shield the decision from public scrutiny.

7)    But there is no ambiguity about what Defendants are doing: They are destroying CRS.  The Office of Management and Budget's Technical Supplement to the President's FY2026 Budget states, on page 607 of 1215, that "**[t]he Justice Department's reorganization will eliminate the Community Relations Service (CRS) and its functions**."  Between March and September of 2025, CRS began to withdraw ongoing assistance to communities and organizations and deny new requests for assistance at the direction of DOJ leadership and part of a concerted effort to eliminate the agency and its functions.  Then, on September 29, 2025, the Department of Justice sent Reduction in Force ("RIF") notices to 14 of the remaining 15 employees of CRS, including the career official in charge of the agency, with an effective date of October 31, 2025.  The stated reason for the RIF was the "**the dissolution of the Community Relations Service (CRS)**."

8)    Plaintiffs are a diverse collection of organizations from around the country.  They rely on CRS's services but have had those services denied and withdrawn as a result of CRS's unlawful dissolution.  For example, three of the Plaintiffs were involved in a CRS-facilitated mediation among community groups and law enforcement over a race-related policing incident when CRS abruptly withdraw from the process, leaving them without a mediator or any final agreement among the parties.  But for Defendants' unlawful actions, Plaintiffs would continue to leverage CRS's services to carry out their individual missions and advance their respective goals,

to the benefit of the communities they serve.  Plaintiffs now face immediate irreparable harm from Defendants' unilateral and unlawful decision to refuse to carry out CRS's statutory mission and responsibilities.  Indeed, once CRS is completed dissolved, it will be all but impossible to reconstitute.  Plaintiffs therefore bring this lawsuit and request the Court immediately prevent Defendants from taking any action to unlawfully dissolve or disband CRS, including the planned termination of its employees on October 31, 2025.

## JURISDICTION AND VENUE

9)      The Court has subject matter jurisdiction under 28 U.S.C § 1331 because this action arises under federal law, including the APA, 5 U.S.C. § 551 et *seq.*, and the United States Constitution.

10)      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1).  A substantial part of the events or omissions giving rise to this Complaint occurred within the District of Massachusetts.  Additionally, at least one plaintiff is a resident of this judicial district, and Defendants include a United States officer sued in her official capacity.

## PARTIES

11)      Plaintiff Ethical Society of Police ("ESOP") is a St. Louis, Missouri-based organization founded in 1972 by African-American police officers to address race-based discrimination in policing.  ESOP works to cultivate and maintain police-community relations, increase diversity within police departments, and enhance accountability and professionalism in law enforcement.

12)      Plaintiff Missionary Baptist State Convention of Missouri ("MBSC"), based in Columbia, Missouri, is a network of more than 120 Baptist churches in Missouri that work

together to carry out their ministries.  Part of MBSC's mission is to promote justice and fairness in Missouri communities, which includes equal treatment of all persons as children of God.

13)    Plaintiff NAACP St. Louis County, also located in St. Louis, Missouri, works to achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color.

14)    Plaintiff Two Wrasslin' Cats Accord ("TWCA") is a nonprofit organization that empowers and supports local initiatives in eastern Connecticut and beyond that champion inclusion of all peoples, racial and social justice, reproductive freedom, and LGBTQ+ rights.

15)    Plaintiff Out Accountability Project ("OAP") is a private organization based in Connecticut that connects parents and caregivers of LGBTQ+ youth and their allies. OAP facilitates the sharing of resources, provision of mutual support, and the identification and pursuit of opportunities to build safe, affirming learning environments for all students.

16)    Plaintiff Berkshire Resources for Integration of Diverse Groups and Education, doing business as Multicultural Bridge ("BRIDGE"), is a grassroots organization headquartered in Lee, Massachusetts, dedicated to advancing equity and justice by promoting cultural competence, positive psychology, and mutual understanding and acceptance.  BRIDGE connects vulnerable community members with key resources and networks and provides educational programming to local institutions and the community at large.

17)    Plaintiff NAACP State Conference Colorado-Montana-Wyoming ("Tri-State NAACP"), headquartered in Aurora, Colorado, helps to spearhead human and civil rights issues in the Rocky Mountain region by providing leadership and resources for the Colorado, Montana, and Wyoming local units of the NAACP.  Tri-State NAACP's mission is to achieve equity,

political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color.

18)     Plaintiff Peacemakers Lodge is an organization located in Fort Washakie, Wyoming, within the Wind River Indian Reservation in Wyoming, focused on reclaiming ancestral justice practices for the Shoshone people.  It offers various programs based on Shoshone values and practices, including educational workshops and support gatherings for survivors of various traumas.

19)     Plaintiff Pikes Peak Southern Christian Leadership Conference 1 ("Pikes Peak SCLC") is a branch of the Southern Christian Leadership Conference located in Colorado Springs, Colorado.  The Southern Christian Leadership Conference was founded by Dr. Martin Luther King, Jr. to coordinate civil rights protests through nonviolent action.  Like its national counterpart, Pikes Peak SCLC is focused on civil rights issues such as racial profiling, police brutality, hate crimes, and discrimination, and promotes Dr. King's philosophy of nonviolent protest against injustice.

20)     Plaintiff Wellspring Health Access is a reproductive a reproductive rights organization that operates a healthcare clinic located in Casper, Wyoming, providing contraceptive care, gynecological care, abortion services, and gender-affirming care.

21)     Plaintiff Haitian Community Help & Support Center, also doing business as Haitian Support Center, is a non-profit organization founded in 2023 in Clark County, Ohio, with the goal of guiding and assisting refugees and immigrants, especially Haitian nationals residing in and around Clark County, with housing, interpreting, job search, welfare assistance, and other services.

22)     Defendant U.S. Department of Justice is a Department of the Executive Branch of the United States Government and an agency within the meaning of 5 U.S.C. § 551(1) and has responsibility for implementing the federal program at issue in this action.

23)     Defendant Pamela J. Bondi is the Attorney General for the United States and the federal official in charge of the Justice Department.  The Attorney General is sued in her official capacity.

## FACTUAL ALLEGATIONS

I.      <u>Congress Created CRS and Repeatedly Expanded Its Jurisdiction</u>

24)     The Civil Rights Act of 1964 established CRS "to provide assistance to communities and persons therein in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin" and to offer such services "whenever, in its judgment, peaceful relations among the citizens of the community involved are threatened thereby."  42 U.S.C. § 2000g-1.

25)     By law, CRS must conduct "conciliation assistance . . . in confidence and without publicity," "hold confidential any information acquired in the regular performance of its duties," and may not "engage in the performance of investigative or prosecuting functions of any department or agency in any litigation arising out of a dispute" handled by CRS.  42 U.S.C. § 2000g-2.

26)     CRS has a specific statutory mandate to assist in federal judicial proceedings.  In public accommodation cases, District Courts may refer parties to CRS so the agency can conduct settlement proceedings where the "court believes there is a reasonable possibility of obtaining voluntary compliance."  42 U.S.C. § 2000a-3(d).  Once a District Court refers a matter to CRS, the agency "is authorized to make a full investigation . . . and may hold such hearings with

respect thereto as may be necessary" as part of "bring[ing] about a voluntary settlement between the parties."  42 U.S.C. § 2000a-4.

27)    CRS is required to submit "a report of the activities of the Service during the preceding fiscal year" . . . "on or before January 31 of each year."  42 U.S.C. § 2000g-3.

28)    The Civil Rights Act originally placed CRS within the Department of Commerce and established the CRS Director as a Presidentially-appointed and Senate-confirmed ("PAS") position for a term of four years.  42 U.S.C. § 2000g.  As part of the Reorganization Plans of 1966 and pursuant to congressional authorization set forth in the Reorganization Act of 1949, 63 Stat. 203, as amended, President Lyndon B. Johnson transferred CRS to the Justice Department with congressional approval.  In his explanatory message to Congress regarding this transfer, President Johnson stated: "The Attorney General will provide for the organization of the Community Relations Service as a separate unit within the Department of Justice . . . with full regard for" the Civil Rights Act's provisions requiring "(1) cooperation with appropriate State or local, public, or private agencies; (2) the confidentiality of information acquired with the understanding that it would be so held; and (3) the limitation on the performance of investigative or prosecutive functions by personnel of the Service."  Message of the President Accompanying Reorganization Plan No. 1 of 1966, Eff. Apr. 22, 1966, 31 F.R. 6187, 80 Stat. 1607, 5 U.S.C. app. at 164 (Feb. 10, 1966).

29)    Four subsequent statutes expanded the role of CRS in violence prevention, hate crimes prevention, and civil rights conflict resolution.

a.    In 1968, the Fair Housing Act recognized CRS's role in preventing and eliminating discriminatory housing practices and directed the Secretary of Housing and Urban Development to assist CRS with that work.  42 U.S.C. § 3608(e)(4).

b.      In 1996, the Church Arson Prevention Act provided additional protection and deterrence against harm directed at religious properties and communities.  That Act directed CRS to "prevent, and respond to potential violations" of 18 U.S.C. § 247 (damage to religious property and interference with free exercise of religion) and § 844 (destructive conduct using fire, bombs, or other explosives).  Pub. L. 104-155, § 6, 110 Stat. 1392, 1394 (1996).

c.      In 2007 and 2016, respectively, the Emmett Till Unsolved Civil Rights Crime Act and the Emmett Till Unsolved Civil Rights Crimes Reauthorization Act directed the DOJ Civil Rights Division to investigate unsolved civil rights–era homicides.  In the process, Congress required CRS to "provide technical assistance by bringing together law enforcement agencies and communities to address tensions raised by Civil Rights era crimes" being investigated by the Civil Rights Division.  Pub. L. 114-325, § 2, 130 Stat. 1965, 1967; *see also* Pub. L. 110-344, 122 Stat. 3934 (2007).

d.      In 2009, Congress passed the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act, which enacted a new federal hate crime law in 18 U.S.C. § 249 (addressing bodily injury or attempted/threatened bodily injury based on race, color, national origin, gender, gender identity, sexual orientation, religion, or disability).  In that law, Congress required CRS to "prevent and respond to alleged violations" of 18 U.S.C. § 249.  Pub. L. 111-84, §§ 4706, 4707, 123 Stat. 2190, 2838 (2009).

II.      <u>CRS Has Served as "America's Peacemaker" for More Than Sixty Years</u>

30)      CRS has played an important role in some of the most significant moments in civil rights history.  Consider just a few highlights.

31)      In March 1965, CRS conciliators were dispatched to Selma, Alabama, following the "Bloody Sunday" attack on peaceful marchers seeking to cross the Edmund Pettus Bridge.

CRS conciliators coordinated with civil rights leaders, the Justice Department, and state officials by shuttle diplomacy to negotiate a safe path for the subsequent marches to Montgomery. These efforts prevented the outbreak of further violence, bloodshed, and injuries; enabled the resumption of a peaceful march to Montgomery, Alabama; and helped establish CRS's credibility as an impartial peacemaker.

32)     In the 1970s, CRS became significantly involved in mediating school desegregation conflicts. CRS conciliators played a critical role when Boston faced a challenging period of desegregation and a busing crisis. A CRS team facilitated engagement between and among school district officials, the mayor's office, the police department, and various community groups, including the NAACP, which brought the lawsuit that resulted in the District Court's desegregation order.

33)     CRS also de-escalated violent situations in individual schools during that crisis. For example, a CRS conciliator singlehandedly calmed a fight that had broken out between Black and White students at South Boston High School. Recognizing CRS's important role, this Court brought CRS into the desegregation process and required all parties to cooperate with CRS's efforts. Over the following years, CRS actively worked in Boston to prevent violence, organize interracial parent councils, and sustain dialogue among governmental and community stakeholders. On December 6, 1978, this Court wrote to President Jimmy Carter regarding CRS's work in Boston, saying: "At the outset of school desegregation here, and on several occasions thereafter, local officials simply didn't know which way to turn. CRS was able to . . . provide counsel and leadership not only to school officials but to the police and other municipal departments as well, and to avoid widespread violence." Ltr. from Judge W. Arthur Garrity, Jr.,

to President Jimmy Carter (Dec. 6, 1978), printed in Betram J. Levine, *Resolving Racial Conflict: The Community Relations Service and Civil Rights, 1964-1989*, 245 (2005).

34)    In 1973, CRS served as a neutral intermediary and communication channel between the 200 members of the American Indian Movement and Oglala Lakota activists who had occupied Wounded Knee, South Dakota.  CRS's work to mediate and maintain lines of communication contributed to the prevention of bloodshed and, ultimately, the end of the standoff.

35)    In 1977, CRS successfully led a negotiation between a neo-Nazi group attempting to march in Skokie, Illinois (a Chicago suburb with a large Jewish population), the Jewish community (including many Holocaust survivors), city officials, and civil rights advocates that resulted in the prevention of violence and a successful resolution of the impasse, all while ensuring First Amendment rights and community safety.

36)    In 1981, CRS successfully mediated a tense confrontation between White and Vietnamese immigrant fishermen in Galveston, Texas, where the White shrimpers, supported by the Ku Klux Klan, accused the Vietnamese shrimpers of overfishing in violation of local customs.  In addition to mediating between the two groups, CRS coordinated with local and federal officials, civil rights attorneys, and the broader Asian American community.

37)    Throughout the 1980s, CRS played a central role in improving and reforming relationships between law enforcement and minority communities.  CRS helped to found the National Association of Police-Community Relations Officers, convened symposiums on reductions in the use of force, and supported minority recruitment in policing.

38)    Between 1991 and 1994, following the widely televised beating of Rodney King, the acquittal of the Los Angeles Police Department ("LAPD") officers who participated in the

beating, and the rioting and civil unrest that followed, CRS deployed conciliation teams to Los Angeles. They arrived hours of the verdict to help defuse violence and restore communication between and among racial and community groups. CRS served as a neutral liaison between city officials, police, civil-rights organizations, business leaders, and residents; worked with the mayor's office, LAPD, local clergy, and community coalitions to coordinate peaceful responses and reduce retaliation; and helped establish community-based recovery and dialogue programs aimed at healing relationships among Black, Latino, Korean, and other ethnic communities.

39)    CRS was instrumental in the federal government's response to a string of church burnings throughout the United States, many of which targeted Black congregations in the South in the 1990s. In June 1996, Attorney General Janet Reno and Treasury Secretary Robert Rubin jointly established the National Church Arson Task Force, which included federal law enforcement agencies and CRS. In that role, CRS focused on stabilizing the community and preventing further violence.

40)    After the terrorist attacks of September 11, 2001, CRS worked under the direction of Attorney General John Ashcroft to prevent hate-based retaliation against Arab, Muslim, Sikh, and South Asian communities. In April 2003, Ashcroft announced that CRS had held more than 250 town and community meetings and forums on backlash and developed best practices for law enforcement to prevent, and respond to, hate incidents against Arab Americans, Muslim Americans, South Asian Americans, and Sikh Americans. CRS trained law enforcement, organized dialogues, and established working groups nationwide to protect targeted populations and maintain community trust.

41)    CRS also performed a conflict-resolution and liaison role in the aftermath of Hurricane Katrina. Its interventions focused on reducing racial and ethnic tensions, facilitating

communication between disaster victims and authorities, and, in the context of post-disaster disputes and inequalities that emerged in the storm's chaotic aftermath, ensuring equitable access to relief and recovery resources.

42)     CRS played a pivotal role in helping communities recover and rebuild trust following the August 5, 2012, mass shooting at the Sikh Gurdwara in Oak Creek, Wisconsin, in which six Sikh worshippers were killed and several others injured.  CRS conciliators were deployed to Oak Creek immediately after the shooting to assist local, state, and federal officials in engaging with grieving community members and restoring calm.  CRS provided on-site crisis mediation and facilitation between Sikh community leaders, law enforcement, and local government to promote trust and open communication.

43)     After the 2012 killing of Trayvon Martin and the not-guilty jury verdict of George Zimmerman, CRS mediators worked day and night to maintain calm between protesters, local officials, and law enforcement.  CRS also convened an interdenominational group of local clergy to decrease misinformation and maintain peace.

44)     After the protests and unrest that followed the killing of Michael Brown, a young, unarmed Black man, by a White police officer, CRS worked with officials from various law enforcement agencies, as well as local community leaders, to develop viable collaboration. CRS established a coalition of civic and community leaders to address the underlying issues of the conflict and begin to develop long-term solutions to the community tension.

45)     CRS helped facilitate a peaceful outcome to the mandatory evacuation of a protest camp near the Standing Rock Indian Reservation, through which the Dakota Access Pipeline was being planned.  The evacuation order triggered additional protest and resistance from the Standing Rock Sioux and their supporters who vowed to stay at the camp.  CRS met with

representatives from federal, state, and local government; social service groups; and the Sioux to facilitate dialogue, resolution, and provision of services for local Native Americans.  With support from CRS and other stakeholders, most protesters left the camp peacefully by the deadline and without incident.

46)     After an armed attacker perpetrated a mass shooting at the Pulse Nightclub in Orlando, Florida, resulting in the massacre of 49 people and the wounding of many more (with most victims reportedly identifying as LGBTQ+), CRS convened a coalition of civic and community leaders to provide immediate support for victims and prevent retaliation.  To maintain peace amid heightened emotions, CRS worked with the Orlando Emergency Operations Center and local law enforcement to prepare for counter-protests from anti-LGBTQ+ and anti-Muslim groups during vigils and funerals.

47)     Following the murder of George Floyd, CRS deployed field teams to coordinate communication between law enforcement, activists, clergy, and neighborhood leaders.  By combating misinformation and encouraging cooperation, CRS reduced the likelihood of additional violence.  Local leaders credited the mediators' neutrality with preventing wider destruction.

48)     During the 2024 election, CRS deployed to Milwaukee and Chicago for the Republican National Convention and the Democratic National Conventions, as CRS had done every four years.  Working with law enforcement, protest organizers, and municipal leaders, CRS helped both cities manage demonstrations and prevent major violence while ensuring that constitutional rights were protected.  Throughout both conventions, CRS conciliators were on the streets of the two cities, engaging in de-escalation efforts between pro-Palestinian protesters and

pro-Israel protesters, and between the protesters and police officers, to prevent riots and help maintain peace and order, in coordination with federal, state, and city law enforcement.

III.    CRS's Critical Services to Communities, Local Governments, and Other Stakeholders

49)    CRS has a headquarters in Washington, D.C., and field offices across five different regions of the United States.  One of those regions, the Atlantic North Region, has been served by a field office located in Boston, Massachusetts.  The CRS Director supervises the Deputy Director, who oversees the headquarters office in Washington, D.C., and the Associate Director, who oversees the five regions, each of which is supervised by a Regional Director.  The headquarters office houses CRS's administrative, finance, training, and program development departments, as well as its legal staff.

50)    Pursuant to its statutory mandate, CRS provides four categories of services to state and local governments and community members to advance  its mission: facilitation of dialogue, mediation, training, and consultation.  These services are provided both in-person and virtually, at no cost, and tailored to each community's needs.

51)    *Facilitation of Dialogue.*  CRS facilitates the development of mutual understanding and collaborative agreements as alternatives to coercion, violence, and litigation.  CRS conciliators create lines of communication among diverse groups, enabling them to learn about each other's perspectives and resolve issues that may be causing conflict.  These dialogues typically involve local agencies, institutions, and community members and may address topics such as racial tensions, police-community relations, perceived hate crimes, tribal conflicts, and protests and demonstrations.  CRS-facilitated dialogues help stakeholder groups develop action plans to improve communication and promote partnerships.

52)    *Mediation.*  CRS conciliators serve as impartial third-party mediators, helping diverse stakeholders resolve community-based conflicts.  Mediation is a structured process designed to address misunderstandings, establish mutual trust, and empower communities to independently prevent and resolve future conflicts.  By law, these sessions are confidential, which fosters candid discussion of issues, interests, values, and sustainable solutions.  The goal of mediation is not to determine fault but to identify ways to improve collaboration and strengthen partnerships among parties.  The results of mediation are commonly memorialized in written documents, such as memorandums of understanding or mediation agreements.

53)    *Training.*  CRS conducts training sessions that develop locally based, long-term mechanisms for communities to deescalate tensions, address conflicts, and respond to violent hate crimes.  CRS training programs provide representatives from government, faith organizations, law enforcement, civil rights groups, and other community organizations with the knowledge and skills needed to increase understanding and improve collaboration among diverse stakeholders.

54)    *Consultation.*  CRS conciliators offer consultation services to educate and empower communities. These services provide stakeholders with insights into best practices and resources designed to alleviate tensions and prevent future conflict.

55)    The goals of all CRS programs are to help parties in conflict understand different perspectives, share information about resources and best practices, and support communities as they identify and implement solutions.  Consider just a few of CRS's facilitated dialogue and training programs.

a.    *Bias Incidents and Hate Crimes Forums.*  CRS organizes forums to educate community members and law enforcement about the Shepard-Byrd Hate Crimes

Prevention Act, as well as state and local hate crime laws. These forums gather local and federal law enforcement, district attorneys, civil rights organizations, and community organizations to develop strategies that effectively address and respond to bias incidents and hate crimes.

       b.    *Protecting Places of Worship Forums.* CRS organizes programs to help communities safeguard places of worship against potential threats. Experts from federal, state, and local law enforcement agencies, along with faith-based organizations, provide information and resources related to hate crime laws, the handling of active shooter situations, and the physical security of religious buildings.

       c.    *Strengthening Police and Community Partnerships ("SPCP").* These CRS programs convene law enforcement and diverse community leaders in problem-solving discussions aimed at improving public safety by fostering trust and building partnerships. SPCP programs are designed to boost local capacity and develop solutions to improve police-community relations.

       d.    *Contingency Planning.* CRS hosts workshops to strengthen participants' knowledge around the planning of safe public events, such as demonstrations or rallies, focusing on ways to reduce the risk of violence. These programs include sessions for developing safety plans and addressing potential safety concerns.

       e.    *Event Marshals: Maintaining Safety During Public Events.* This CRS training program teaches community members to act as event marshals, ensuring the safety and success of public events. Participants learn about the roles and responsibilities of marshals, discuss how to handle real-life scenarios, and receive a reference guide with essential information.

f. *"Understanding" and "Engaging and Building Partnerships" with Communities Series – Arab American, Hindu American, Jewish, Muslim American, and Sikh American Communities*. These CRS programs familiarize participants with customs and cultural aspects of each community, including their beliefs, identity, practices, and civil rights-related issues that impact the community. The programs provide best practices for collaboration with these communities for peaceful coexistence and public safety.

g. *Dialogue on Race (renamed in 2025 as Dialogue on Community Conflict).* This CRS initiative fosters understanding by convening diverse community members to share information, personal stories, viewpoints, and experiences. Through the dialogue process, participants identify commonalities and strategies to enhance community relations.

h. *Facilitating Meetings Around Community Conflict ("FMACC").* FMACC programs provide community leaders with the skills and tools needed to facilitate meetings effectively in tense or conflicted environments. They enhance facilitators' effectiveness, improve their listening and observation skills, and provide resources for planning, conducting and following up on meetings aimed at resolving community conflict.

i. *School-Student Problem Identification and Resolution of Issues Together ("School-SPIRIT").* School-SPIRIT programs engage student leaders, school administrators, and other school community members in identifying and resolving issues affecting their schools.

j. *City-Site Problem Identification and Resolution of Issues Together ("City-SPIRIT").* This program convenes diverse community stakeholders—such as public officials, law enforcement, members of faith-based communities, and community groups—to identify and address issues impacting their community, thereby reducing conflict, improving communication, and minimizing the potential for future conflict.

k.    *Campus-Site Problem Identification and Resolution of Issues Together*

*(Campus-SPIRIT).*  Campus-SPIRIT programs help student leaders, campus administrators,

faculty, staff, campus law enforcement, and external community leaders identify and address

issues impacting their college or university communities.

IV.    <u>Defendants Decide to Stealthily Dissolve CRS Due to Hostility to its Congressionally
       Assigned Mission</u>

56)    Defendants are fundamentally hostile to CRS and its mission.  Behind closed

doors, they decided to abolish CRS, resulting in a gradual cessation of services to Plaintiffs and

other stakeholders and leading to the planned termination of CRS's workforce effective October

31, 2025.  This decision was not a mere reorganization, but, in Defendants' own words,

represents a wholesale dissolution of the agency and its functions.

57)    Defendants made the decision to abolish CRS behind closed doors, without input

from or meaningful notice to affected stakeholders.  On March 25, 2025, Deputy Attorney

General Todd Blanche issued a memorandum entitled "Soliciting Feedback for Agency

Reorganization Plan and RIF" to all DOJ department and component heads, soliciting feedback

on proposed staffing reductions and agency reorganizations.  Among the proposals in that

memorandum was "eliminating the Community Relations Service and moving some or all

impacted employees to U.S. Attorneys' Offices."

58)    The President's FY 2026 budget request for the Justice Department includes no

funding for CRS.  Buried within OMB's Technical Supplement to that budget request, it states,

without providing a rationale, that "[t]he Justice Department's reorganization **will eliminate the

Community Relations Service (CRS) and its functions** in FY 2025, so no funding is requested

in FY 2026 for CRS."  As of the date of the filing of this Complaint, no budget has been

approved by Congress, and versions advanced within the Senate and House conflict on funding for CRS.

59)     The Justice Department published a FY 2026 Budget and Performance Summary dated June 13, 2025, in connection with the President's FY 2026 Budget.  That document stated that "**[t]he Department will eliminate CRS and its functions**, a total of 56 positions," going on to state that "[t]he CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities."

60)     Between March and September 2025, CRS declined to accept new requests for— and actively withdrew from—mediation and conflict resolution/de-escalation services that fell within CRS's jurisdiction.  Upon information and belief, this wholesale cessation of the services mandated by the Civil Rights Act was done at the direction of DOJ leadership in connection with Defendants' unlawful elimination of the CRS in its entirety.

61)     Among the consequences of this unlawful elimination of CRS and its functions were: (a) the cancellation of CRS-facilitated Protecting Places of Worship programs and religious community security consultations that had been planned with Chrisitan, Hindu, Jewish, Muslim, and Sikh communities throughout the country, many of which had been requested by religious leaders in response to specific security concerns such as a bomb threats, vandalism, and threats of physical violence against religious communities; (b) the withholding of CRS's training and consultation services to law enforcement agencies, universities, and tribal communities facing conflicts due to divisions and disagreements related to the Israel-Hamas conflict, LGBTQ+ issues, and racial vandalism; (c) the discontinuation or early cessation of CRS's School-SPIRIT programs that school districts and individual public schools in Kansas, Missouri, Montana, Virginia and Wyoming had requested; (d) the withdrawal of CRS from a series of

mediation programs it led with the participation of municipal leaders, local law enforcement agencies, civil rights organizations, and community groups to address incidents of alleged excessive use of force by law enforcement, leading to unresolved mediations; and (e) the unavailability of CRS's antisemitism programming, titled "Understanding and Building Relationships with Jewish Communities," which CRS had recently developed in partnership with major national Jewish organizations.

62)     On September 29, 2025, the Justice Department's Justice Management Division sent RIF notices to fourteen of the remaining 15 remaining active employees of CRS, including the head of CRS, with an effective date of October 31, 2025.  The stated reason for the RIF was the "**the dissolution of the Community Relations Service** (CRS) in accordance with the reorganization and reconsolidation of the Department of Justice."

63)     An October 1, 2025, article published by Bloomberg Law indicates that the Department of Justice intends to transfer a single CRS employee to the Executive Office for United States Attorneys, purportedly to "preserve the office's functions at the legally required minimum."  *See* Suzanne Monyak, *DOJ Terminates Staff at Peacemakers, Access to Justice Units*, BLOOMBERG L. NEWS (Oct. 1, 2025).  In light of Defendants' stated intent to "dissolve" not only CRS but also "its functions" on the basis of the Administration's hostility to its basic mission, to the extent this employee transfer is accurate, it is but a pretext for unlawful abandonment of CRS and its statutory mission and responsibilities.

V.    <u>Plaintiffs Have Been Injured by Defendants' Unlawful Actions and Will Be
Irreparably Harmed if Defendants Are Permitted to Consummate the Unlawful
Dissolution of CRS</u>

64)    As set forth in the paragraphs that follow, Plaintiffs have each already been
significantly harmed by Defendants' unlawful actions, as they have each suffered the loss of
important CRS services.

65)    *Plaintiff Ethical Society of Police ("ESOP"), Missionary Baptist State
Convention of Missouri ("MBSC"), and NAACP St. Louis County.*  ESOP, MBSC, and NAACP
St. Louis County participated in CRS-led engagement with St. Louis County law enforcement in
the wake of a September 2024 incident where a Black off-duty officer with the St. Louis County
Police Department was beaten by three White construction workers in Clayton, Missouri.  When
the responding officers, who worked in the same Department as the victim, responded to the
scene, they handcuffed the off-duty officer despite clear indications that he was the victim, and
they failed to provide or ensure timely medical assistance to the injured officer.  The incident
raised serious concerns within the community and among civil rights organizations about racial
bias, officer treatment, and procedural failures within the police department.  ESOP, MBSC, and
NAACP St. Louis County participated in a CRS-facilitated meeting with the St. Louis County
Police Department and other stakeholders, as well as direct discussions with CRS.  The parties
agreed to a mediation process led by CRS, culminating in a draft agreement to capture their joint
decisions and plans for the future.  CRS withdrew its services in May 2025 prior to finalization
and implementation of the agreement, leaving the process without a mediator.

66)    *Two Wrasslin' Cats Accord ("TWCA").*  CRS's work with TWCA arose in the
wake of rising racial tensions in Moodus, Connecticut, after the parents of a Black middle school
student raised concerns that the student was being bullied because of his race.  As a result, the

U.S. Attorney's Office for the District of Connecticut reached out to CRS's regional staff in Boston, Massachusetts, to ask for their help in addressing potential civil rights violations and hate crimes. In response, in summer 2024, CRS reached out to TWCA and other community organizations in Moodus and the greater East Haddam area to offer conciliation services. CRS held several community listening and dialogue sessions in Middletown, Connecticut, to understand community members' views and concerns about racial tensions, especially those of parents and students. These were followed by several "Dialogue on Race" sessions between January and May 2025. TWCA actively participated in and contributed to these sessions. CRS thereafter stopped providing all services, despite TWCA's request for continued CRS support.

67)    *Plaintiff Out Accountability Project ("OAP").*  In the summer of 2024, OAP also attended several community listening and dialogue sessions in Middletown, Connecticut, as described above. OAP separately reached out to CRS in the fall of 2024 and early 2025 to discuss harassment and bullying concerns of LGBTQ+ students in Connecticut. OAP and CRS discussed the different services CRS could provide, but as a result of CRS's dismantlement, CRS discontinued that engagement in early 2025.

68)    *Plaintiff Berkshire Resources for Integration of Diverse Groups and Education, ("BRIDGE").*  BRIDGE has sought and secured CRS services on several occasions in recent years, including its School-SPIRIT program, which was held in conjunction with secondary schools in Massachusetts. At BRIDGE's request and with its assistance, CRS conducted a School-SPIRIT program in February 2025 at W.E.B. DuBois Middle School in Great Barrington, Massachusetts. BRIDGE requested an additional School-SPIRIT program for public schools in Stockbridge, Massachusetts, but CRS declined to provide those services. CRS advised others involved in the same project that this withdrawal of services was due to the Administration's

policy disagreement with CRS's mission and that CRS was no longer able to engage with the community.

69)    *Plaintiff NAACP State Conference Colorado-Montana-Wyoming ("Tri-State NAACP").*  CRS began assisting Tri-State NAACP in 2024 by facilitating a series of community and law enforcement dialogues to build trust between police and diverse communities, strengthen problem-solving communications, and to increase community member collaboration with law enforcement.  Two dialogues were held in January and July of 2024, resulting in the creation of an action plan for future engagement, to include an October 25, 2025 community dialogue with Tri-State NAACP.   CRS terminated planning for that dialogue as a result of its impending dissolution.

70)    *Plaintiff Pikes Peak Southern Christian Leadership Conference 1 ("Pikes Peak SCLC").*  Pikes Peak SCLC has partnered with CRS on multiple occasions to address community tensions and conflicts arising from racial profiling incidents and excessive force by law enforcement in Colorado.  Recently, this included a dialogue that CRS convened between Pikes Peak SCLC and the District Attorney for the Fourth Judicial District in Colorado, an area that includes Colorado Springs.  In June 2025, Pikes Peak SCLC requested CRS's assistance in facilitating another dialogue with law enforcement, in response to an incident involving allegations of excessive use of force against Black youth.  But because of the planned dissolution of the agency, CRS declined the request.

71)    *Plaintiff Peacemakers Lodge.*  In March 2025, Peacemakers Lodge requested CRS assistance in opening communications with a local school district, after the school district stopped engaging with the Lodge in a dialogue about the schools' disciplinary practices, which the Lodge was concerned were biased against Native American students.  CRS convened an

initial meeting with the Lodge in March 2025 to hear their concerns, including about perceived lack of sensitivity within the school district to the concerns of Native Americans and the impact that can have on the learning environment for Native American students.  On or about May 2025, CRS convened a meeting between the Lodge and school officials to discuss ways to address these concerns.  But once again, because of the agency's impending dissolution, CRS then ceased providing services to the Lodge.

72)    *Plaintiff Wellspring Health Access ("Wellspring").* Wellspring is a reproductive healthcare clinic located in Casper, Wyoming, that provides contraceptive care, gynecological care, abortion services, and gender-affirming care.  Wellspring was the victim of an arson attempt in 2022 that delayed the clinic's opening.  Beginning in 2022, CRS provided facilitation and communications services between Wellspring and Casper law enforcement, following anti-abortion protests at Wellspring. The aim of that dialogue was to identify ways to allow the clinic to safely operate and to manage protesters without interruption of the clinic's services.  CRS withdrew its assistance to Wellspring on or about May 2025, despite ongoing safety concerns at the clinic, as a direct result of the agency's planned shutdown.

73)    *Plaintiff Haitian Community Help & Support Center.*  On or about February 2024, at the request of the U.S. Attorney's Office for the Southern District of Ohio, CRS convened a forum, dubbed "United Against Hate," to bring together faith-based leaders and members of the Haitian community together to discuss issues arising from the conviction and sentencing of an African-American assailant for robberies and hate crime assaults against Haitian immigrations in Springfield, Ohio.  Haitian Support Center participated in this forum.  CRS continued to engage with the Haitian community, including Haitian Support Center, through the end of 2024 and beginning of 2025, with the goal of supporting the Haitian community's desire to improve

communications and relations with civic leaders and address concerns about the policing of the

Haitian community.  This engagement was poised to culminate in a Memorandum of

Understanding ("MOU") between the Springfield Police Department and the Center and other

community groups regarding policing practices.  After agreeing to facilitate and consult on this

MOU, however, CRS abruptly withdrew the provision of all services to the Center, preventing

the MOU from being finalized.

74)    The denial of services to each of the Plaintiffs was based on the Defendants'

categorical refusal to execute the statutory mission of CRS and their intention to dissolve the

agency and its functions in its entirety.

75)    While Plaintiffs have already suffered legally cognizable injuries as a result of

CRS's cessation of services and wind down, Plaintiffs' injuries will become irreparable if

Defendants are not enjoined from continuing to dismantle CRS, including through the

planned October 31, 2025, termination of all but one of its employees—an action that was

explicitly undertaken to effectuate the "dissolution" of CRS.  If Defendants are permitted to

proceed with those terminations, CRS will irrevocably lose crucial institutional knowledge and

capacity that cannot readily be recreated, even if the dissolution of CRS is ultimately reversed.

By extension, Plaintiffs will permanently lose the opportunity to avail themselves of CRS's

important, congressionally-assigned services.  And the public will lose

"America's Peacemaker."

## CLAIMS FOR RELIEF

### COUNT I
**The Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**(Arbitrary and Capricious, Not in Accordance with Law, in Excess of Statutory Authority)**

76)    Plaintiffs reallege and incorporate by reference the allegations set forth in each of

the preceding paragraphs.

77)    The Department of Justice is a federal agency subject to the requirements of the APA, 5 U.S.C § 701(b)(1).

78)    The APA provides a cause of action in federal district court for any person aggrieved by final agency action. *See* 5 U.S.C. §§ 702-704. Defendants' dissolution of CRS constitutes final agency action that is reviewable by this Court.

79)    The APA requires a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that is "without observance of procedure required by law." *Id.* § 706(2).

80)    To satisfy the arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). If an agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," the agency's decision is arbitrary and capricious. *Id.*

81)    Defendants' dissolution of CRS is arbitrary and capricious because Defendants failed to articulate a reasonable explanation for the decision, and, indeed, the cursory explanation provided—that "[t]he CRS mission does not comport with Attorney General and Administration

law enforcement and litigating priorities"—is a facially invalid basis to eliminate an agency created by Congress.

82)     Defendants' decisions to terminate all but CRS employees but one is similarly arbitrary and capricious, without valid justification, in violation of the Civil Rights Act of 1964, and in excess of Defendants' authority.  Defendants well know and intend that the terminations currently scheduled to become effective on October 31, 2025, will assuredly prevent CRS from discharging its statutory responsibilities.

83)     Defendants' unlawful acts are causing and will continue to cause irreparable harm to Plaintiffs and third parties.

## COUNT II
### The Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
### (Contrary to Constitutional Power)

84)     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

85)     By terminating CRS on the basis of hostility to its statutory missions, Defendants have usurped authority that properly belongs to Congress alone, contrary to constitutional power.

## COUNT III
### 5 U.S.C. § 706(1)
### (Unlawfully Withheld and Unreasonably Delayed Agency Action)

86)     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

87)     By withdrawing CRS services to Plaintiffs and denying Plaintiffs' requests for new CRS services on the basis of a disagreement with CRS's fundamental mission and an intent to disband the agency, Defendants have unlawfully withheld and unreasonably delayed agency action, in violation of the APA.

## COUNT IV
### Claim for Non-Statutory Review
### *(Ultra Vires* Conduct in Excess of the Statutory Authority)

88)     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

89)     Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

90)     Defendants may only exercise authority conferred by federal statute.  Defendants have no authority to amend or repeal statutes unilaterally, or to ignore Acts of Congress that are not to their liking.

91)     CRS was established by Congress by statute through the Civil Rights Act of 1964 and can be eliminated only by Congress.

92)     Defendants' actions to eliminate CRS exceeded executive authority and are *ultra vires*.

## COUNT V
### Claim for Non-Statutory Review
### (In Contravention of the Constitutional Separation of Powers)

93)     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

94)     Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is unconstitutional.

95)     Defendants' actions to eliminate CRS usurped legislative authority conferred upon Congress by the United States Constitution, in violation of the separation of powers enshrined in the United States Constitution.

## COUNT VI
### Declaratory Judgment Act
### (28 U.S.C. §§ 2201 and 2202)

96)     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

97)     Plaintiffs are entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between Plaintiffs and the Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that Defendants do not have the authority to unilaterally abolish CRS.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

a.  Issue preliminary injunctive relief preventing Defendants from dismantling CRS;

b.  Issue a declaratory judgment that Defendants' decision to dismantle CRS, including reductions in force, and their suspension of CRS's statutorily assigned activities, is arbitrary and capricious, an abuse of discretion, in excess of statutory authority, contrary to constitutional power, and otherwise not in accordance with the law.

c.  Issue a declaratory judgment that Defendants' declination and withdrawal of CRS services to the Plaintiffs constitutes agency action unlawfully denied and unreasonably delayed;

d.  Issue a declaratory judgment that Defendants' action to dismantle CRS and suspend its statutory functions is *ultra vires* and unconstitutional in violation of the separation powers;

e.  Issue an order vacating and setting aside Defendants' decision to dismantle CRS and permanently enjoining Defendants from taking any actions to effectuate or enforce that decision;

f.  Issue an order requiring Defendants provide to Plaintiffs those CRS services that have been unlawfully denied and unreasonably delayed;

g.  Award costs of this action and reasonable attorney's fees under the Equal Access to Justice Act or any other applicable law; and

h.  Grant any other and further relief that this Court may deem just and proper.


Dated: October 24, 2025                    Respectfully submitted,

/s/ Ana Muñoz
Ana Muñoz
(Mass. Bar No. 569233)
ZALKIND DUNCAN & BERNSTEIN LLP
2 Oliver Street, Suite 200
Boston, MA 02110
Telephone: (617) 742-6020
AMunoz@ZalkindLaw.com

Kyle R. Freeny*
(DC Bar No. 1684764)
WASHINGTON LITIGATION GROUP
1717 K Street NW
Washington, DC 20006
Telephone: (202) 521-8750
KFreeny@WashingtonLitigationGroup.org

*Counsel for Plaintiffs*

*\* Application for pro hac vice forthcoming*