**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

ETHICAL SOCIETY OF POLICE; NAACP
ST. LOUIS COUNTY; MISSIONARY
BAPTIST STATE CONVENTION OF
MISSOURI; TWO WRASSLIN' CATS
ACCORD; OUT ACCOUNTABILITY
PROJECT; BERKSHIRE RESOURCES FOR
INTEGRATION OF DIVERSE GROUPS
AND EDUCATION; NAACP STATE
CONFERENCE COLORADO-MONTANA-
WYOMING; PEACEMAKERS LODGE;
PIKES PEAK SOUTHERN CHRISTIAN
LEADERSHIP CONFERENCE 1;
WELLSPRING HEALTH ACCESS; and
HAITIAN COMMUNITY HELP & SUPPORT
CENTER,

                  ***Plaintiffs*,**

    v.

PAMELA J. BONDI, in her official capacity
as Attorney General of the United States; and
U.S. DEPARTMENT OF JUSTICE,

                  ***Defendants*.**

**Case No. 25-CV-___**

---

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER**</u>

**INTRODUCTION**

This is a case about preserving a critical institution established by the Civil Rights Act of

1964 that, without this Court's immediate intervention, will be irrevocably destroyed on October

31, 2025.  In the Civil Rights Act of 1964, Congress created and charged the Community

Relations Service ("CRS") with providing dispute and conflict resolution assistance to

communities around the country.  Today, CRS is housed within the Department of Justice and is

known as "America's peacemaker."  For decades, this cherished institution has worked quietly

and without publicity to preserve and restore peace during periods of community divide and

unrest, including some of our nation's more divisive civil rights conflicts.  In 1965, for example, CRS personnel were on the ground in Selma, Alabama in the wake of "Bloody Sunday."  Nearly sixty years later, CRS personnel were on the streets in Milwaukee and Chicago to help city officials navigate the Republican and Democratic National Conventions and prevent violence.

As the diverse array of Plaintiffs—all of whom received services from CRS— demonstrates, CRS does not serve any one racial, religious, ideological, or ethnic group.  Instead, it provides irreplaceable government services to partner organizations and community members of every creed and color, as well as to law enforcement and local governments, in the best tradition of our Federal government.

The current Administration is fundamentally hostile to CRS's existence and intends to destroy the institution.  But rather than engage with Congress to amend the laws that empower CRS, Defendants have decided to unilaterally abolish the agency, without any input from the People's elected representatives, and in direct conflict with the statutes on the books.  Defendants have made that decision behind closed doors and without engagement with the stakeholders who rely on CRS's assistance.  Yet there is no ambiguity about Defendants' goal.  In their own words, Defendants have vowed to "eliminate" CRS and "its functions."  Since March, CRS has declined all new requests for services and assistance and has systematically withdrawn existing services to communities nationwide.  On September 29, 2025, the Department of Justice sent reduction in force notices to 14 of the remaining 15 remaining active employees of CRS to effectuate "the dissolution of the Community Relations Service."  Unless this Court grants a temporary restraining order ("TRO"), those terminations will go into effect on October 31, 2025.

Plaintiffs have brought this lawsuit to halt CRS's unlawful dissolution.  This Court's intervention before October 31 is urgently needed to preserve the status quo and ensure

-2-

meaningful judicial review.  Defendants' actions are plainly unlawful.  The executive branch cannot eliminate agencies, nor disregard the laws that Congress enacted, based on a policy disagreement with those laws.  But if the Court does not intervene before October 31, CRS will be irreparably dismantled, and it will be functionally impossible to put the pieces back together, even if the Court orders the government to do so later.  All the while, Plaintiffs and other similar entities around the country will lose the invaluable services that Congress deemed essential and directed CRS to perform.  This Court should grant the TRO and immediately pause the government's lawless action, to give the parties time to brief a preliminary injunction.

**FACTUAL BACKGROUND**

### A.  Statutory Background of CRS

CRS was established by the Civil Rights Act of 1964, which provides that "[i]t shall be the function of the Service to provide assistance to communities and persons therein in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin which impair the rights of persons in such communities under the Constitution or laws of the United States or which affect or may affect interstate commerce."  42 U.S.C. § 2000g-1.  CRS is authorized to offer such assistance "whenever, in its judgment, peaceful relations among the citizens of the community involved are threatened thereby."  42 U.S.C. § 2000g-1.

By law, CRS must conduct "conciliation assistance. . .in confidence and without publicity," "hold confidential any information acquired in the regular performance of its duties," and may not "engage in the performance of investigative or prosecuting functions of any department or agency in any litigation arising out of a dispute" handled by CRS.  42 U.S.C. § 2000g-2.

CRS has a specific statutory mandate to assist in federal judicial proceedings.  In public accommodation cases, District Courts may refer parties to CRS so the agency can conduct settlement proceedings where the "court believes there is a reasonable possibility of obtaining voluntary compliance."  42 U.S.C. § 2000a-3(d).  Once a District Court refers a matter to CRS, the agency "is authorized to make a full investigation. . .and may hold such hearings with respect thereto as may be necessary" as part of "bring[ing] about a voluntary settlement between the parties."  42 U.S.C. § 2000a-4.

CRS is required to submit "a report of the activities of the Service during the preceding fiscal year" . . . "on or before January 31 of each year."  42 U.S.C. § 2000g-3.

The Civil Rights Act originally placed CRS within the Department of Commerce and established the CRS Director as a Presidentially-appointed and Senate-confirmed position for a term of four years.  42 U.S.C. § 2000g.  As part of the Reorganization Plans of 1966 and pursuant to congressional authorization set forth in the Reorganization Act of 1949, 63 Stat. 203, as amended, President Lyndon B. Johnson transferred CRS to the Justice Department.  In his explanatory message to Congress regarding this transfer, President Johnson stated: "The Attorney General will provide for the organization of the Community Relations Service as a separate unit within the Department of Justice," "with full regard for" the Civil Rights Act's provisions requiring "(1) cooperation with appropriate State or local, public, or private agencies; (2) the confidentiality of information acquired with the understanding that it would be so held; and (3) the limitation on the performance of investigative or prosecutive functions by personnel of the Service."  Message of the President Accompanying Reorganization Plan No. 1 of 1966, Eff. Apr. 22, 1966, 31 F.R. 6187, 80 Stat. 1607, 5 U.S.C. app. at 164 (Feb. 10, 1966).

Four subsequent statutes expanded the role of CRS in violence prevention, hate crimes prevention, and civil rights conflict resolution. *First*, in 1968, the Fair Housing Act recognized CRS's role in preventing and eliminating discriminatory housing practices, and directed the Secretary of Housing and Urban Development to assist CRS with that work.  42 U.S.C. § 3608(e)(4).  *Second*, in 1996, the Church Arson Prevention Act directed CRS to "prevent, and respond to potential violations" of 18 U.S.C. §§ 247 and 844, involving damage to religious property and interference with the free exercise of religion, and destructive conduct using fire, bombs, or other explosives.  Pub. L. 104-155, § 6, 110 Stat. 1392, 1394 (1996).  *Third*, in 2007 and 2016, respectively, the Emmett Till Unsolved Civil Rights Crime Act and the Emmett Till Unsolved Civil Rights Crimes Reauthorization Act simultaneously directed DOJ's Civil Rights Division to investigate unsolved civil rights–era homicides and directed CRS to "provide technical assistance by bringing together law enforcement agencies and communities to address tensions raised by" those same crimes.  Pub. L. 114-325, § 2, 130 Stat. 1965, 1967; *see also* Pub. L. 110-344, 122 Stat. 3934 (2007).  *Fourth*, in 2009, the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act directed CRS to "prevent and respond to alleged violations" of 18 U.S.C. § 249, a newly established federal hate crime for causing bodily injury or attempted/threatened bodily injury based on race, color, national origin, gender, gender identity, sexual orientation, religion, or disability.  Pub. L. 111-84, §§ 4706, 4707, 123 Stat. 2190, 2838 (2009).

**B.  CRS Has Served as "America's Peacemaker" for More Than Sixty Years**

CRS has quietly and without fanfare played an important role in some of the most significant moments in this country's history over the last sixty years.  Consider just a few highlights.

In March 1965, CRS conciliators were dispatched to Selma, Alabama, following the "Bloody Sunday" attack on peaceful marchers seeking to cross the Edmund Pettus Bridge. CRS conciliators coordinated with civil rights leaders, the Justice Department, and state officials by shuttle diplomacy to negotiate a safe path for the subsequent marches to Montgomery. These efforts prevented the outbreak of further violence, bloodshed, and injuries; enabled the resumption of a peaceful march to Montgomery, Alabama; and helped establish CRS's credibility as an impartial peacemaker. Ex. 1 ¶ 15.

In the 1970s, CRS became significantly involved in mediating school desegregation conflicts. CRS conciliators played a critical role when Boston faced a challenging period of desegregation and a busing crisis. A CRS team facilitated engagement between and among school district officials, the mayor's office, the police department, and various community groups, including the NAACP, which brought the lawsuit that resulted in the District Court's desegregation order. *Id.* ¶ 16.

CRS also de-escalated violent situations in individual schools during that crisis. For example, a CRS conciliator singlehandedly calmed a fight that had broken out between Black and White students at South Boston High School. Recognizing CRS's important role, this Court brought CRS into the desegregation process and required all parties to cooperate with CRS's efforts. *Id.* Over the following years, CRS actively worked in Boston to prevent violence, organize interracial parent councils, and sustain dialogue among governmental and community stakeholders. On December 6, 1978, this Court wrote to President Jimmy Carter regarding CRS's work in Boston, saying: "At the outset of school desegregation here, and on several occasions thereafter, local officials simply didn't know which way to turn. CRS was able to . . .

provide counsel and leadership not only to school officials but to the police and other municipal departments as well, and to avoid widespread violence." *Id.*

In 1973, CRS served as a neutral intermediary and communication channel between the 200 members of the American Indian Movement and Oglala Lakota activists that had occupied Wounded Knee, South Dakota. CRS's work to mediate and maintain lines of communication contributed to prevention of bloodshed and, ultimately, to the end of the standoff.

In 1977, CRS successfully led a negotiation between a neo-Nazi group seeking to march in Skokie, Illinois (a Chicago suburb with a large Jewish population), the Jewish community (including many Holocaust survivors), city officials, and civil rights advocates that resulted in the prevention of violence and a successful resolution of the impasse, while ensuring First Amendment rights and community safety. *Id.* ¶ 17.

In 1981, CRS successfully mediated a tense confrontation between White and Vietnamese immigrant fishermen in Galveston, Texas, where the White shrimpers, supported by the Ku Klux Klan, accused the Vietnamese shrimpers of overfishing in violation of local customs. In addition to mediating between the two groups, CRS coordinated with local and federal officials, civil rights attorneys, and the broader Asian American community. *Id.*

Throughout the 1980s, CRS was central in improving and reforming relationships between law enforcement and minority communities. CRS helped found the National Association of Police-Community Relations Officers, convened symposiums on reductions in the use of force, and supported minority recruitment in policing. *Id.*

Between 1991 and 1994, following the widely televised beating of Rodney King, the acquittal of the Los Angeles Police Department ("LAPD") officers who participated in the beating, and the rioting and civil unrest that followed, CRS deployed conciliation teams to Los

Angeles within hours of the verdict to help defuse violence and restore communication between

and among racial and community groups.  CRS served as a neutral liaison between city officials,

police, civil-rights organizations, business leaders, and residents; worked with the mayor's

office, LAPD, local clergy, and community coalitions to coordinate peaceful responses and

reduce retaliation; and helped establish community-based recovery and dialogue programs aimed

at healing relationships among Black, Latino, Korean, and other ethnic communities.  *Id.*

CRS was instrumental in the federal government's response to a string of church burnings

throughout the United States, many of which targeted Black congregations in the South.  In June

1996, Attorney General Janet Reno and Treasury Secretary Robert Rubin jointly established the

National Church Arson Task Force, which included federal law enforcement agencies and CRS.

In that role, CRS focused on stabilizing the community and preventing further violence.  *Id.*

After the terrorist attacks of September 11, 2001, CRS worked under the direction of

Attorney General John Ashcroft to prevent hate-based retaliation against Arab, Muslim, Sikh,

and South Asian communities.  In April 2003, Ashcroft announced that CRS had held more than

250 town and community meetings and forums on backlash issues and developed best practices

for law enforcement to prevent and respond to hate incidents against Arab-Americans, Muslim-

Americans, South Asian-Americans, and Sikh-Americans.  Throughout this time, CRS trained

law enforcement, organized dialogues, and established working groups nationwide to protect

targeted populations and maintain community trust.  *Id.*

CRS performed a conflict-resolution and liaison role in the aftermath of Hurricane

Katrina.  Its interventions focused on reducing racial and ethnic tensions, facilitating

communication between disaster victims and authorities, and, in the context of post-disaster

disputes and inequalities that emerged in the storm's chaotic aftermath, ensuring equitable access to relief and recovery resources. *Id.* ¶ 18(a).

CRS played a pivotal role in helping communities recover and rebuild trust following the August 5, 2012, mass shooting at the Sikh Gurdwara in Oak Creek, Wisconsin, in which six Sikh worshippers were killed and several others injured. CRS conciliators were deployed to Oak Creek immediately after the shooting to assist local, state, and federal officials in engaging with grieving community members and restoring calm. CRS provided on-site crisis mediation and facilitation between Sikh community leaders, law enforcement, and local government to promote trust and open communication. *Id.* ¶ 18(b).

After the 2012 killing of Trayvon Martin and the not-guilty jury verdict of George Zimmerman, CRS mediators worked day and night to maintain calm between protesters, local officials, and law enforcement. CRS also convened an interdenominational group of local clergy to decrease misinformation and maintain peace. *Id.* ¶ 18(c).

After the killing of Michael Brown, a young, unarmed Black man, by a White police officer, sparking months of protests and civil unrest, CRS worked with officials from various law enforcement agencies, as well as local community leaders, to develop viable working relationships and establish a coalition of civic and community leaders to address the underlying issues of the conflict and begin to develop long-term solutions to the community tension. *Id.* ¶ 18(d).

CRS helped facilitate a peaceful outcome to the mandatory evacuation of a Native American camp through which the Dakota Access Pipeline was being planned. *Id.* ¶ 18(e). The evacuation order triggered a protest and resistance from the tribes and their supporters who vowed to stay at the camp. CRS met with representatives from federal, state, and local

government; social service groups; and the Native American tribe to facilitate dialogue, resolution, and provision of services for Native Americans.  With support from CRS and other stakeholders, most protesters left the camp peacefully by the deadline and without incident.  *Id.*

After an armed attacker perpetrated a mass shooting at the Pulse Nightclub in Orlando, Florida, resulting in the massacre of 49 people and the wounding of many more (with most victims reportedly identifying as LGBTQ+), CRS convened a coalition of civic and community leaders to provide immediate support for victims and prevent retaliation or escalation of bias-related tensions.  *Id.* ¶ 18(f).  To maintain peace amid heightened emotions, CRS worked with the Orlando Emergency Operations Center and local law enforcement to prepare for counter-protests from anti-LGBTQ+ and anti-Muslim groups during vigils and funerals.  *Id.*

Following the murder of George Floyd, CRS deployed field teams to coordinate communication between law enforcement, activists, clergy, and neighborhood leaders.  *Id.* ¶ 18(l).  By combating misinformation and encouraging cooperation, CRS reduced the likelihood of additional violence.  Local leaders credited the mediators' neutrality with preventing wider destruction.  *Id.*

CRS deployed to Milwaukee and Chicago for the Republican National Convention and the Democratic National Convention, as CRS had done every four years.  *Id.* ¶ 18(o).  Working with law enforcement, protest organizers, and municipal leaders, CRS helped both cities manage demonstrations and prevent major violence while ensuring that constitutional rights were protected.  Throughout both conventions, CRS conciliators were on the streets of the two cities engaging in de-escalation efforts between pro-Palestinian protesters and pro-Israeli protesters and between the protesters and police officers to prevent riots and help maintain peace and order, in coordination with federal, state, and city law enforcement.

**C.  CRS's Critical Services to Communities, Local Governments, and Other Stakeholders**

CRS has a headquarters office in Washington, D.C. and field offices across five different regions of the United States.  *Id.* ¶ 19.  One of those regions, the Atlantic North Region, has been served by a field office located in Boston, Massachusetts, whose services have been utilized by multiple Plaintiffs. Ex. 6–8.  The CRS Director supervises the Deputy Director who oversees the headquarters office in Washington, D.C., and the Associate Director who oversees the five regions, each of which is supervised by a Regional Director.  The headquarters office houses CRS's administrative, finance, training and program development, and legal staff. Ex. 1 ¶ 19.

Pursuant to its statutory mandate, CRS currently provides four categories of services to state and local governments and partner organizations like Plaintiffs in advancement of its mission: facilitation of dialogue, mediation, training, and consultation.  These services are provided both in-person and virtually, at no cost, and tailored to each community's needs.

1)    *Facilitation of Dialogue.*  CRS facilitates the development of mutual understanding and agreements as alternatives to coercion, violence, and litigation.  CRS conciliators create lines of communication among diverse groups, enabling them to learn about each other's perspectives and resolve issues that may be causing conflict.  These dialogues typically involve local agencies, institutions, and community members and may address topics such as racial tensions, police-community relations, perceived hate crimes, tribal conflicts, and protests and demonstrations.  CRS-facilitated dialogues help stakeholder groups develop action plans to improve communication and promote partnerships. Ex. 1 ¶ 10.

2)    *Mediation.*  CRS conciliators serve as impartial third-party mediators, helping diverse stakeholders resolve community-based conflicts.  Mediation is a structured process designed to address misunderstandings, establish mutual trust, and empower communities to

independently prevent and resolve future conflict.  By law, these sessions are confidential. That confidentiality fosters candid discussion of issues, interests, values, and sustainable solutions. The goal of mediation is not to determine fault but to identify ways to improve collaboration and strengthen partnerships among parties.  The results of mediation are commonly memorialized in written documents, such as memorandums of understanding or mediation agreements.  *Id.*

3)      *Training.*  CRS conducts training sessions that develop locally based, long-term mechanisms for communities to deescalate tensions, address conflicts, and prevent or respond to violent hate crimes.  CRS training programs provide representatives from government, faith organizations, law enforcement, civil rights groups, and other community organizations with the knowledge and skills needed to increase understanding and improve collaboration among diverse stakeholders.  *Id.*

4)      *Consultation.*  CRS conciliators offer consultation services to educate and empower communities. These services provide stakeholders with insights into best practices and resources designed to alleviate tensions and prevent future conflict.  *Id.*

The goals of all CRS programs are to help parties in conflict understand different perspectives, share information about resources and best practices, and support communities as they identify and implement solutions.  Consider just a sample of CRS's facilitated dialogue and training programs.

*Bias Incidents and Hate Crimes Forums.*  CRS's organizes forums to educate community members and law enforcement about the Shepard-Byrd Hate Crimes Prevention Act, as well as state and local hate crimes laws.  These forums gather local and federal law enforcement, district attorneys, civil rights organizations, and community organizations to develop strategies to effectively respond to bias incidents and hate crimes.  *Id.* at 11.

*Protecting Places of Worship Forums.* CRS's organizes programs to help communities safeguard places of worship against potential threats. Experts from federal, state, and local law enforcement agencies, along with faith-based organizations, provide information and resources related to hate crime laws, the handling of active shooter situations, and the physical security at religious buildings. *Id.*

*Strengthening Police and Community Partnerships ("SPCP").* These CRS programs convene law enforcement and diverse community leaders in problem-solving discussions aimed at improving public safety by fostering trust and building partnerships. They are designed to boost local capacity and develop solutions to improve police-community relations. *Id.*

*Contingency Planning.* CRS hosts workshops to strengthen participants' knowledge around the planning of safe public events, such as demonstrations or rallies, focusing on ways to reduce the risk of violence. These programs include sessions for developing safety plans and addressing potential safety concerns. *Id.*

*Event Marshals: Maintaining Safety During Public Events.* This CRS training program teaches community members to act as event marshals, ensuring the safety and success of public events. Participants learn about the roles and responsibilities of marshals, discuss how to handle real-life scenarios, and receive a reference guide with essential information. *Id.*

*"Understanding" and "Engaging and Building Partnerships" with Communities Series – Arab American, Hindu American, Jewish, Muslim American, and Sikh American Communities.* These CRS programs familiarize participants with customs and cultural aspects of each community, including their beliefs, identity, practices, and civil rights-related issues that impact the community. The programs provide best practices for collaboration with these communities for peaceful co-existence and public safety. *Id.*

*School-Student Problem Identification and Resolution of Issues Together ("School-SPIRIT").* School-SPIRIT programs engage student leaders, school administrators, and other school community members in identifying and resolving issues affecting their schools. *Id.*

### D. Defendants Decided to Stealthily Dissolve CRS Due to Hostility to its Congressionally Assigned Mission

Defendants are fundamentally hostile to CRS and its mission. Behind closed doors, they decided to abolish CRS, resulting in a gradual cessation of services to Plaintiffs and other stakeholders and leading to the planned termination of CRS's workforce effective October 31, 2025. This decision was not a mere reorganization, but, in Defendants' own words, represents a wholesale dissolution of the agency and its functions.

On March 25, 2025, Deputy Attorney General Todd Blanche issued a memorandum entitled "Soliciting Feedback for Agency Reorganization Plan and RIF" to all DOJ department and component heads, soliciting feedback on proposed staffing reductions and agency reorganizations. Among the proposals in that memorandum was "eliminating the Community Relations Service and moving some or all impacted employees to U.S. Attorneys' Offices."

The President's FY 2026 budget request for DOJ includes no funding for CRS. Buried within OMB's Technical Supplement to that budget request, it states, without providing a rationale, that "[t]he Justice Department's reorganization **will eliminate the Community Relations Service (CRS) and its functions** in FY 2025, so no funding is requested in FY 2026 for CRS." Ex. 2, Attachment A at p. 607.

The justification behind Defendants' elimination of CRS is set forth in another obscure document, a FY 2026 Budget and Performance Summary that DOJ published on June 13, 2025, in connection with the President's FY 2026 budget. That document stated that "**[t]he Department will eliminate CRS and its functions**, a total of 56 positions, going on to state that

"[t]he CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities."  Ex. 2, Attachment B at p. 9.

Between March and September 2025, CRS declined to accept new requests for—and actively withdrew from—mediation and/or conflict resolution/de-escalation services that fell within CRS's jurisdictions.  This wholesale cessation of the services mandated by the Civil Rights Act was done at the direction of DOJ leadership in connection with Defendants' unlawful elimination of the CRS in its entirety.  Ex. 1 ¶ 27.

Among the consequences of this unlawful elimination of CRS and its functions were: (a) the cancellation of CRS-facilitated Protecting Places of Worship programs and religious community security consultations that had been planned with Chrisitan, Hindu, Jewish, Muslim, and Sikh communities throughout the country, many of which had been requested by religious leaders in response to specific security concerns such as a bomb threats, vandalism, and threats of physical violence against religious communities; (b) the withholding of CRS's training and consultation services to law enforcement agencies, universities, and tribal communities facing conflict due to divisions and disagreements related to the Israel-Hamas conflict, LGBTQ+ issues, and racial vandalism; (c) the discontinuation or early cessation of CRS's School-SPIRIT programs that school districts and individual public schools in Kansas, Missouri, Montana, Virginia, and Wyoming had requested; (d) the withdrawal from a series of mediation programs CRS led with the participation of municipal leaders, local law enforcement agencies, civil rights organizations, and community groups to address incidents of alleged excessive use of force by law enforcement, leading to unresolved mediations; and (e) the unavailability of CRS's antisemitism programming, titled "Understanding and Building Relationships with Jewish

Communities," which CRS had recently developed in partnership with major national Jewish organizations.  Compl. ¶ 61.

On September 29, 2025, the Justice Department sent RIF notices to fourteen of the remaining 15 remaining active employees of CRS, including the head of CRS, with an effective date of October 31, 2025.  Ex. 1 ¶ 32.  The stated reason for the RIF was the "**the dissolution of the Community Relations Service** (CRS) in accordance with the reorganization and reconsolidation of the Department of Justice."  *Id.*

### E.  Defendants Withdrew or Terminated Crucial Services to Plaintiffs as a Result of Their Decision to Dismantle the Agency

As detailed in the attached declarations, each of the Plaintiffs used to receive CRS's services—and would do so in the future—but have lost access to CRS's services pending the agency's dissolution.  *See* Ex. 3-13.

*Plaintiff Ethical Society of Police ("ESOP")*, *Missouri Baptist Convention ("MBC")*, and *NAACP St. Louis County*.  ESOP, MBC, and NAACP St. Louis County participated in CRS-led engagement with St. Louis County law enforcement in the wake of a September 2024 incident where a Black off-duty officer with the St. Louis County Police Department was beaten by three White construction workers in Clayton, Missouri.  Ex. 3–5.  When the responding officers, who worked in the same Department as the victim, arrived on the scene, they handcuffed the off-duty officer despite clear indications that he was the victim, and they failed to provide or ensure timely medical assistance to the injured officer.  The incident raised serious concerns within the community and among civil rights organizations about racial bias, officer treatment, and procedural failures within the police department.  Ex. 3 ¶ 5.  ESOP, MBC, and NAACP St. Louis County participated in a CRS-facilitated meeting with the St. Louis County Police Department and other stakeholders, as well as direct discussions with CRS.  *Id.* ¶ 7–10.  The parties agreed to

a mediation process led by CRS, culminating in a draft agreement to capture their joint decisions and plans for the future. *Id.* CRS withdrew its services in May 2025 before a final agreement had been reached, leaving the process without a mediator or a neutral party to monitor implementation of their eventual agreement. *Id.* ¶ 11–12.

Plaintiff *Two Wrasslin' Cats Accord ("TWCA")*. CRS's work with TWCA arose in the wake of rising racial tensions in Moodus, Connecticut, after the parents of a Black middle school student raised concerns that the student was being bullied because of his race. Ex. 6. As a result, the U.S. Attorney's Office for the District of Connecticut reached out to CRS's regional staff in Boston, Massachusetts, to ask for their help in addressing potential civil rights violations and hate crimes. In response, in summer 2024, CRS reached out to TWCA and other community organizations in Moodus and the greater East Haddam area to offer conciliation services. CRS held several community listening and dialogue sessions in Middletown, Connecticut, to understand community members' views and concerns about racial tensions, especially those of parents and students. *Id.* ¶ 4. These were followed by several "Dialogue on Race" sessions between January and May 2025. *Id.* ¶ 5. TWCA actively participated in and contributed to these sessions. CRS thereafter stopped providing all services, despite TWCA's request for continued CRS support. *Id.* ¶ 6–7.

Plaintiff *Out Accountability Project ("OAP")*. In the summer of 2024, OAP also attended several community listening and dialogue sessions in Middletown, Connecticut, as described above. Ex. 7 ¶ 6–7. OAP separately reached out to CRS in the fall of 2024 and early 2025 to discuss harassment and bullying concerns of LGBTQ+ students in Connecticut. *Id.* OAP and CRS discussed the different services CRS could provide, but as a result of CRS's dismantlement, CRS discontinued that engagement in early 2025. *Id.* ¶ 8.

*Plaintiff Berkshire Resources for Integration of Diverse Groups and Education,*

*("BRIDGE")*.  BRIDGE has sought and secured CRS services on several occasions in recent

years, including its School-SPIRIT program, which was held in conjunction with secondary

schools in Massachusetts.  Ex. 8 ¶ 4.  At BRIDGE's request and with their assistance, CRS

conducted a School-SPIRIT program in February 2025 at W.E.B. DuBois Middle School in

Great Barrington, Massachusetts.  School-SPIRIT is a proven program used by schools around

the country to empower students and divert them from involvement with law enforcement.  *Id.*

BRIDGE requested an additional School-SPIRIT program for public schools in Stockbridge,

Massachusetts, but CRS declined to provide those services.  CRS advised others involved in the

same project that this withdrawal of services was due to the Administration's policy

disagreement with CRS's mission and that CRS was no longer able to engage with the

community.  *Id.* ¶ 5.

*Plaintiff NAACP State Conference Colorado-Montana-Wyoming ("Tri-State NAACP")*.

CRS began assisting Tri-State NAACP in 2024 by facilitating a series of community and law

enforcement dialogues to build trust between police and diverse communities, strengthen

problem-solving communications, and to increase community member collaboration with law

enforcement.  Ex. 9 ¶ 4.  Two dialogues were held in January and July of 2024, resulting in the

creation of an action plan for future engagement, to include an October 25, 2025 community

dialogue with Tri-State NAACP.  *Id.*  CRS terminated planning for that dialogue as a result of its

impending dissolution.  *Id.* ¶ 5.

*Plaintiff Pikes Peak* Peak *Southern Christian Leadership Conference 1 ("Pike's Peak*

*SCLC")*.  Pikes Peak SCLC, a branch of the organization Martin Luther King, Jr. founded to

coordinate civil rights protests through nonviolent action, has partnered with CRS on multiple

occasions to address community tensions and conflicts arising from racial profiling incidents and excessive force by law enforcement in Colorado. Ex. 10 ¶ 3.  Recently, this effort included a dialogue that CRS convened between Pikes Peak SCLC and the District Attorney for the Fourth Judicial District in Colorado, an area that includes Colorado Springs.  *Id.* ¶ 4.  In June 2025, Pikes Peak SCLC requested CRS's assistance in facilitating another dialogue with law enforcement, in response to an incident involving allegations of excessive use of force against Black youth.  But because of the planned dissolution of the agency, CRS declined the request. *Id.* ¶ 5–6.

*Plaintiff Peacemakers Lodge.*  In March 2025, Peacemakers Lodge, located on the Wind River Indian Reservation in Wyoming, requested CRS assistance in opening communications with a local school district, after the school district stopped engaging with the Lodge in a dialogue about the schools' disciplinary practices, which the Lodge was concerned were biased against Native American students. Ex. 11 ¶ 4–5.  CRS convened an initial meeting with the Lodge in March 2025 to hear their concerns, including about perceived lack of sensitivity within the school district to the concerns of Native Americans and the impact that can have on the learning environment for Native American students.  *Id.*  On or about May 2025, CRS convened a meeting between the Lodge and school officials to discuss ways to address these concerns.  But once again, because of the agency's impending dissolution, CRS thereafter ceased providing services to the Lodge.  *Id.* ¶ 6.

*Plaintiff Wellspring Health Access* ("Wellspring").  Wellspring operates a reproductive healthcare clinic located in Casper, Wyoming, that was the victim of an arson attempt in 2022 that delayed the clinic's opening. Ex. 12 ¶ 4.  Beginning that year, CRS provided facilitation and communications services between Wellspring and Casper law enforcement, following anti-

abortion protests at Wellspring. *Id.* ¶ 5. The aim of that dialogue was to identify ways to allow the clinic to safely operate and to manage protesters without interruption of the clinic's services. CRS withdrew its assistance to Wellspring on or about May 2025, despite ongoing safety concerns at the clinic, as a direct result of the agency's planned shutdown. *Id.* ¶ 6.

*Plaintiff Haitian Community Help & Support Center.* On or about February 2024, at the request of the U.S. Attorney's Office for the Southern District of Ohio, CRS convened a forum, dubbed "United Against Hate," to bring together faith-based leaders and members of the Haitian community to discuss issues arising from the conviction and sentencing of an African-American assailant for robberies and hate crime assaults against Haitian immigrations in Springfield, Ohio. Ex. 13 ¶ 6–9. Haitian Support Center participated in this forum. *Id.* CRS continued to engage with the Haitian community, including Haitian Support Center, through the end of 2024 and beginning of 2025, with the goal of supporting the Haitian community's desire to improve communications and relations with civic leaders and address concerns about the policing of the Haitian community. *Id.* This engagement was poised to culminate in a Memorandum of Understanding ("MOU") between the Springfield Police Department and the Center and other community groups regarding policing practices. *Id.* After agreeing to facilitate and consult on this MOU, however, CRS abruptly withdrew the provision of all services to the Center, preventing the MOU from being finalized.

## ARGUMENT

The standard for a TRO "mirrors that of a preliminary injunction." *New York v. Trump*, 764 F. Supp. 3d 46, 49 (D.R.I. 2025). The Court examines "1. likelihood of success on the merits; 2. potential for irreparable injury; 3. balance of the relevant equities; and 4. effect on the public interest if the Court grants or denies the TRO." *Id.* A TRO "is designed to preserve the

status quo until there is an opportunity to hold a hearing" regarding a "preliminary injunction."
11A *Wright, Miller & Kane*, Fed. Prac. & Proc. Civ. § 2951 (3d ed. 2013).

Here, every factor favors Plaintiffs, and it is critical that the Court grant relief before
October 31, 2025.  If the Court does not grant a TRO and preserve the status quo, it will be
impossible to later provide relief to Plaintiffs and preserve this important institution.  District
courts have provided relief in similar agency-dissolution, including in two decisions the First
Circuit recently declined to stay on appeal.  *See, e.g.*, *Rhode Island v. Trump*, 781 F. Supp. 3d 25,
52 (D.R.I. 2025), *stay denied on appeal by Rhode Island v. Trump*, ___ F.4th ___, 2025 WL
2621593 (Sep. 11, 2025); *New York v. Kennedy*, 789 F. Supp.3d 174, 213 (D.R.I. July 1, 2025),
*stay denied on appeal by New York v. Kennedy*, No. 25-1780, 2025 WL 2658233, at *4 (1st Cir.
Sept. 17, 2025); *see also Widakuswara v. Lake*, 773 F. Supp. 3d 46, 57 (S.D.N.Y. 2025); *Wiley v.
Kennedy*, 789 F.Supp.3d 447, 466-67 (S.D.W.Va. May 13, 2025).  The Court should grant the
motion.

## I.       Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits for two independent reasons.  First,
Defendants' unilateral dissolution of CRS violates the Administrative Procedures Act ("APA")
because it contravenes statutory law, exceeds the executive branch's statutory authority, and is
arbitrary and capricious.  Second, Defendants' action—usurping Congress's authority to
legislate—violates the separation of powers and is *ultra vires*.

### A.       The Dissolution of CRS Is Not in Accordance with Law, Is in Excess of Statutory Authority, and Is Arbitrary & Capricious

The APA requires a reviewing court to set aside agency action that is "arbitrary,
capricious, an abuse of discretion, or otherwise not in accordance with the law," or that is "in
excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C.

§ 706(2).  Defendants' dissolution of CRS—up to and including the termination of all but one of its employees—runs afoul of all these basic constraints on agency action.

The statutes are clear: the Executive Branch must fulfill the mandate of CRS "to provide assistance to communities and persons therein in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin," 42 U.S.C. § 2000g-1.  While the Civil Rights Act gives the executive branch certain discretion in *how* it carries out CRS's mission, both the existence of the agency and the need for it to perform its essential functions are mandatory rather than discretionary.  *See id*. §§ 2000g ("There is hereby established" "a Community Relations Service."); 2000g-1 ("It shall be the function of the Service to provide assistance").

The Court need not speculate whether Defendants are truly eliminating the agency contrary to the law—as opposed to simply downsizing and reorganizing it.  Defendants have openly admitted, albeit in publications designed not to garner significant public attention, that they "will eliminate the Community Relations Service (CRS)."  Ex. 2, Attachment A at 607.  Indeed, Defendants have said that they are not just eliminating CRS as a separate agency within the Department of Justice, but are also "eliminat[ing] . . . *its functions*."  Ex. 2, Attachment B at 9 (emphasis added).  Accordingly, there can be no question that Defendants are abolishing an entire agency established by statute without congressional approval—in violation of the APA— knowing and fully intending that, after the RIF effective October 31, 2025, the Administration will no longer be able, and will not endeavor, to carry out its congressionally-assigned functions.  *See* Ex. 1 ¶ 32 (RIF notice based on "dissolution" of CRS).

The Court also need not speculate about why Defendants are closing CRS.  Defendants have again openly admitted, though without fanfare in an effort to evade scrutiny, that they are

eliminating the agency because "[t]he CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities."  Ex. 2, Attachment B at 9.  This statement is as close to an admission of a willful flouting of the law as one might expect to see.

It bears emphasis: Basic principles of administrative law prohibit this unilateral executive-branch elimination of an entire congressionally-established agency for policy reasons. Indeed, the government itself recently *agreed* in a filing before the Supreme Court that an agency established and empowered by Congress with statutory responsibilities "cannot be closed without an act of Congress."  Government Application at 6, *McMahon v. Trump*, No. 24A1203 (U.S. June 6, 2025).  Yet that is *precisely* what Defendants are attempting to do to CRS. Meanwhile, as then-Judge Kavanagh explained in *In re Aiken County*, an agency may not "decline to follow a statutory mandate or prohibition simply because of policy objections."  725 F.3d 255, 259 (D.C. Cir. 2013) (holding that the Nuclear Regulatory Commission had acted unlawfully in declining to continue a statutorily mandated licensing process).  The D.C. Circuit "reiterate[d]" that point a second time in its opinion: "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress."  *Id.* at 260; *TVA v. Hill*, 437 U.S. 153, 194 (1978) ("Once Congress . . . has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought.").  Again, that is precisely what Defendants are attempting to do here: They are eliminating this agency because they dislike the policy Congress enshrined into a statute.  That is the textbook example of action contrary to law that violates the APA.

Defendants' actions are also arbitrary and capricious, in violation of the APA, for much the same reason.  An agency's decision is arbitrary and capricious where, among other reasons,

-23-

the agency "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Here, Defendants' stated explanation for their closure of CRS—that they disagree with its mission—is a facially invalid one. Moreover, Defendants' decision to terminate all but one CRS employee is similarly arbitrary and capricious, without valid justification, in violation of the Civil Rights Act of 1964, and in excess of Defendants' authority. Defendants well know and intend that the terminations currently scheduled to become effective on October 31, 2025, will assuredly prevent CRS from discharging its statutory functions. *See generally* Ex. 1.

### B.        The Dissolution of CRS Violates the Separation of Powers

Plaintiffs are similarly likely to succeed in demonstrating that Defendants' actions violate the separation of powers and are *ultra vires.* This claim encompasses three distinct causes of action: First, Plaintiffs may assert their constitutional separation of powers claim through the APA, *see* 5 U.S.C. § 706(b)(2)(B), and, second, by seeking injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908). Third, when the "executive acts *ultra vires*," as it has here, Plaintiffs may bring a free-standing claim to "reestablish the limits" on the executive's authority. *Aid Ass'n for Lutherans v. USPC*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (quotation marks omitted); *R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002) ("The basic premise behind nonstatutory review is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is *ultra vires.*")

Our constitutional order is premised on the proposition that the "diffus[ion]" of "power" "secure[s] liberty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). "Even a cursory examination of the Constitution reveals" "that checks and balances were the foundation of a structure of government that would protect liberty." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986). The Framers understood this system "produces conflicts, confusion, and discordance at times," but its structure "assure[s] full, vigorous, and open debate on the great issues affecting the people and" "provide[s] avenues for the operation of checks on the exercise of governmental power." *Id.*

The "Constitution is neither silent nor equivocal" about which branch of government has the power to establish or dissolve agencies. *Youngstown*, 343 U.S. at 587. The "legislative Powers" are vested in Congress, which is empowered to "make all Laws" "necessary and proper" for the execution of the other two branches of government. U.S. Const. Art. I §§ 1, 8; *see id*. Art. II § 2 (confirming that executive branch offices "shall be established by Law"). "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). The President thus oversees the departments and executes the laws; he does not make, repeal, or abolish them. In short, under the separation of powers, "the Executive branch may not eliminate a *congressionally* created and funded agency without *congressional* authorization." *Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *7 (4th Cir. Mar. 28, 2025) (Gregory, J., concurring in the judgment).

But, again, that is precisely what the Executive Branch is attempting to do. Without any congressional authorization whatsoever—indeed, in direct defiance of the Civil Rights Act of 1964 and a half-dozen other statutes—the Executive Branch is unilaterally shuttering a landmark

institution which valiantly stood witness to civil rights history for more than half-a-century.  Nor can the Executive Branch claim to be acting in response to "congressional inertia, indifference or quiescence."  *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).  Over, over, and over again—at times on a unanimous or overwhelmingly bipartisan basis—Congress *expanded* CRS's functions and duties.  *See, e.g.*, 42 U.S.C. § 3608(e)(4); Pub. L. 104-155, § 6; Pub. L. 114-325, § 2; Pub. L. 110-344; Pub. L. 111-84, §§ 4706, 4707.  In other words, the People's representatives in Congress have repeatedly reaffirmed that CRS should exist.  In concluding otherwise, the executive branch is usurping *Congress's* authority—in violation of the separation of powers— and is acting *ultra vires*.

When one branch seeks to trample on the separation of powers, federal courts provide a remedy.  *See, e.g.*, *Seila L. LLC v. CFPB*, 591 U.S. 197, 211 (2020); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 492 (2010).  Courts, in particular, do not hesitate to intervene when the executive branch seeks to unlawfully destroy an agency—which is precisely what the Executive is attempting here.  *See, e.g.*, *Rhode Island*, 781 F. Supp. 3d at 52 (issuing preliminary injunction because the "[e]xecutive is usurping Congress's" "vested legislative authority to create and abolish federal agencies"); *Widakuswara*, 773 F. Supp. 3d at 57 (issuing temporary restraining order based, among other things, on separation of powers claim); *Does 4, 7, 22, 27, 28, & 29 v. Musk*, No. CV 25-0462-TDC, 2025 WL 2346258, at *20 (D. Md. Aug. 13, 2025) (denying motion to dismiss).

### C.    Plaintiffs Face Serious Irreparable Harm

The Court's intervention is urgently needed to preserve the status quo pending its adjudication of a preliminary injunction motion.  If the scheduled RIF is permitted to take effect on October 31, 2025, it may be impossible for Plaintiffs—who rely on CRS and have already

seen ongoing essential services suspended—to receive effective relief from this Court, even if they ultimately prevail in this litigation.

Start with the harms Plaintiffs have *already* experienced because of Defendants' unlawful closure of the agency and withdrawal of services. For example, three Plaintiffs—the Ethical Society of Police, NAACP St. Louis County, and Missionary Baptist State Convention of Missouri—recently participated in a sensitive mediation led by CRS to address concerns about policing issues disproportionately affecting Black communities. The parties, including the St. Louis Police Department, had drafted an agreement on a way forward. As a direct result of the closure, however, CRS abruptly withdrew from the process in May 2025, before a final agreement had been reached. The withdrawal left the process without a mediator or a neutral party to monitor implementation of the parties' eventual agreement, undermining Plaintiffs' reliance interests. *See* Ex. 3 ¶ 11. Similarly, Plaintiff Haitian Support Center was posed to sign an MOU between the Springfield Police Department and the Center and other community groups regarding policing practices. Because of the agency's planned dissolution, CRS stopped providing services to the Center, preventing the MOU from being finalized. *See* Ex. 13 ¶ 10.

Moreover, as Plaintiffs declarations make clear, if CRS is dismantled, Plaintiffs will have nowhere else to turn to receive these critical government services, particularly at the level of skill and expertise that CRS possesses after sixty years of hard-earned experience. *See, e.g.*, Ex. 8 ¶ 8 (explaining that "no other governmental entity [] could provide" the withdrawn assistance). In some cases, CRS's withdrawal of services even compromises the safety of Plaintiff organizations and their staff. *See, e.g.*, Ex. 8 ¶ 7 (describing CRS's role in BRIDGE's safety plan, the loss of which "mak[es] it more difficult for us to safely carry out our work in the community"); Ex. 12

¶ 6 (describing withdrawal of CRS assistance, "despite ongoing concerns about safety" to the clinic, which CRS had been helping to address).

The declaration of Julius Nam, CRS's component head until a few weeks ago, makes clear that "allowing the RIF to take place on October 31 will pose an irreparable harm" to Plaintiffs and other entities that rely on CRS. Ex. 1 ¶ 36. "Even if the Court were to later enjoin DOJ from closing CRS or mandate its reopening," difficulties in restaffing the agency would mean "CRS will likely not be able to function effectively as an agency for more than a year, at a minimum, even under the most favorable conditions." *Id*. In that period, CRS will be unable "to provide statutorily required work." *Id*. In that year, Plaintiffs will be forced to do without much-needed assistance from CRS that Congress fully intended for CRS to provide—from help mediating conflict between police and the community, Ex. 3-5, to facilitation of proven programs to help divert students from involvement with law enforcement. Ex. 8 ¶ 6.

Indeed, should the government follow through on CRS's planned closure and termination of its staff, it may be impossible to replace the "mediation expertise, peacemaking capacity, and deep institutional knowledge" reflected in CRS's remaining employees. *Id*. In other words, it may be impossible for Plaintiffs to ever regain access to the type and quality of services that they previously received, if Defendants' actions are ultimately held to be unlawful. That loss will be "catastrophic," not just to Plaintiffs, but to entire communities. *Id*. at 21. "CRS's institutional knowledge, capacity, and infrastructure has saved countless lives, protected religious liberty (especially against virulent anti-semitism), averted riots that can shatter local businesses, laid indispensable bridges between government agencies and communities groups, and helped America's communities navigate tensions to preserve peace and build more prosperous lives." *Id*. All of that expertise and capacity will be lost should the RIF proceed on October 31, 2025.

### D.    The Remaining Factors Overwhelmingly Favor a TRO

Because "the Government is the opposing party," the "remaining factors" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  As the First Circuit recently reiterated in another agency-shutdown case, "there is generally no public interest in the perpetuation of unlawful agency action."  *New York*, 2025 WL 2658233, at *6.  Indeed, the government can hardly claim an interest in willfully violating any statute, let alone the Civil Rights Act of 1964—one of the most prominent statutes in modern history.

In this case, moreover, the harms to the public are particularly grave.  As the Trump Administration acknowledged during its first Term, "CRS provides critical assistance in resolving and preventing racial, ethnic and national origin community conflicts, violence, and civil disorder, and it helps communities struggling to recover in the aftermath of alleged violent hate crimes."  Ex. 1, Attachment A at p. 8.  The harm to the public in the absence of a TRO is all the more worrisome in the face of the persistence of hate crimes across the United States, as reported annually by the FBI.  Ex. 1 ¶ 35.  CRS has well-developed, targeted, and readily deployable tools and resources to combat and prevent race-based, religion-based, and sexual orientation-based hate crimes, but they depend on the skills, energies, and relationships of employees who are poised to be terminated on October 31, 2025, absent Court intervention.  *Id.* ¶ 35.

CRS has already lost more than 500 years of collective conflict resolution experience since the start of the year.  *Id.* ¶ 37.  The final and likely irrevocable dissolution of "America's peacemaker" on October 31, 2025, will mean heightened conflict in our communities, more interference with religious liberty, and less safe schools.  It will mean fewer paths to peace, more

to violence, and worse outcomes across the Nation.  Where, as here, a brief pause of the status quo will prevent those grave public harms, equity demands that it be granted.

## CONCLUSION

The Court should preserve the status quo and grant a Temporary Restraining Order.

Dated: October 24, 2025                    Respectfully Submitted,

/s/ Ana Muñoz
Ana Muñoz
(Mass. Bar No. 569233)
ZALKIND DUNCAN & BERNSTEIN LLP
2 Oliver Street, Suite 200
Boston, MA 02110
Telephone: (617) 742-6020
AMunoz@ZalkindLaw.com

Kyle R. Freeny*
(DC Bar No. 1684764)
WASHINGTON LITIGATION GROUP
1717 K Street NW
Washington, DC 20006
Telephone: (202) 521-8750
KFreeny@WashingtonLitigationGroup.org

*Counsel for Plaintiffs*

*\* Application for pro hac vice forthcoming*