**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

ETHICAL SOCIETY OF POLICE; NAACP
ST. LOUIS COUNTY; MISSIONARY
BAPTIST STATE CONVENTION OF
MISSOURI; TWO WRASSLIN' CATS
ACCORD; OUT ACCOUNTABILITY
PROJECT; BERKSHIRE RESOURCES FOR
INTEGRATION OF DIVERSE GROUPS
AND EDUCATION; NAACP STATE
CONFERENCE COLORADO-MONTANA-
WYOMING; PEACEMAKERS LODGE;
PIKES PEAK SOUTHERN CHRISTIAN
LEADERSHIP CONFERENCE 1;
WELLSPRING HEALTH ACCESS; and
HAITIAN COMMUNITY HELP & SUPPORT
CENTER,

     ***Plaintiffs***,

 **v.**


PAMELA J. BONDI, in her official capacity
as Attorney General of the United States; and
U.S. DEPARTMENT OF JUSTICE,

     ***Defendants***.

Case No. 25-CV-___

---

**<u>EXHIBIT 1</u>**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ETHICAL SOCIETY OF POLICE; NAACP
ST. LOUIS COUNTY; MISSIONARY
BAPTIST STATE CONVENTION OF
MISSOURI; TWO WRASSLIN' CATS
ACCORD; OUT ACCOUNTABILITY
PROJECT; BERKSHIRE RESOURCES FOR
INTEGRATION OF DIVERSE GROUPS
AND EDUCATION; NAACP STATE
CONFERENCE COLORADO-MONTANA-
WYOMING; PEACEMAKERS LODGE;
PIKES PEAK SOUTHERN CHRISTIAN
LEADERSHIP CONFERENCE 1;
WELLSPRING HEALTH ACCESS; and
HAITIAN COMMUNITY HELP & SUPPORT
CENTER,

**Case No. 25-CV-___**

      ***Plaintiffs***,

  v.

PAMELA J. BONDI, in her official capacity
as Attorney General of the United States; and
U.S. DEPARTMENT OF JUSTICE,

      ***Defendants***.

## DECLARATION OF JULIUS J. NAM

I, Julius J. Nam, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

  1)  I am a former Associate Director of the Community Relations Service ("CRS") of

the United States Department of Justice ("DOJ"). I joined CRS as the Associate Director on

December 29, 2024, after serving for nearly nine years as an Assistant United States Attorney

("AUSA") in the United States Attorney's Office for the Central District of California ("USAO-

CAC"). As a member of the Criminal Division and the National Security Division of the USAO-

CAC, I served in the Public Corruption and Civil Rights, Criminal Appeals, Terrorism and

Export Crimes, Post-Conviction and Special Litigation, and General Crimes Sections.  I also served as a Deputy Chief of the Riverside Branch.

2)　　In January-October 2024, while I was serving as an AUSA in USAO-CAC, I was detailed to CRS as Senior Counsel Performing the Duties of the Deputy Director and as Acting Supervisory Program Manager.  In those roles, I directly oversaw CRS's headquarters operations, which included administration, finance, human resources, IT, records management, public affairs, and training and program development.  Moreover, I assisted the Acting Director of CRS in the overall management of CRS, especially in reaching strategic decisions about the agency's organization, recruitment and hiring, professional standards and development, and deployment of inter-regional teams for high-stakes conflict resolution and de-escalation work.  On December 29, 2024, I left USAO-CAC and joined CRS on a permanent basis as the career Associate Director (GS-15).

3)　　On January 20, 2025, the incoming DOJ leadership under the new Presidential Administration designated me as the Supervisory Official (or component head) of CRS.  From that date through October 11, 2025, I was the highest-ranking career employee of CRS, as positions of the Director (a Presidentially Appointed, Senate-confirmed ("PAS") position) and the Deputy Director (a Senior Executive Service position) were and remained vacant.  I left DOJ on October 11, after receiving a Reduction-in-Force ("RIF") notice from DOJ on September 29, 2025 and submitting my resignation to DOJ leadership on October 9, 2025.  In my role as CRS's Supervisory Official, I oversaw the entire operation of CRS—both the headquarters operations in Washington, D.C., and the field work in communities through CRS's 30 field offices across the United States.  In particular, I oversaw and provided directions on CRS's operational framework of conflict resolution services provided to communities and federal, state, and local

governmental entities.  I provided guidance, support, and direction to CRS's regional supervisors and staff regarding various approaches to address jurisdictional issues and casework.  I also advised and made recommendations to the Attorney General, Deputy Attorney General, and Associate Attorney General, as well as their staff, on policy and strategic planning regarding CRS.

4)       My duties in CRS throughout my tenure included oversight of the preparation, revision, management, retention, and submission for DOJ leadership's approval of CRS's statutorily required annual reports to Congress and weekly reports to DOJ leadership offices. Both reports were based on the reports submitted to CRS leadership by each of CRS's regions describing each region and field office's activities conducted during the previous week and anticipated in the upcoming weeks.  Preparing and submitting annual reports to Congress, weekly reports to DOJ leadership, and weekly regional reports to CRS leadership were all part of CRS's regular practice, and each report was kept in the course of a regularly conducted activity within CRS.

5)       Before joining DOJ through the Honors Program in 2015, I served as a judicial law clerk to a Magistrate Judge and a District Judge in the United States District Court for the Central District of California, and a Circuit Judge in the United States Court of Appeals for the Ninth Circuit.  I am a graduate of UCLA School of Law.

6)       Prior to my legal career, I served as a Christian minister in churches in California, Michigan, and South Korea for about six years, and as a professor of religion in Christian colleges in California for about nine years.  I hold a Ph.D. in religion from Andrews University Theological Seminary.

**CRS Structure, Services, and Programs**

7)     Based on my experience overseeing CRS's case work, field operations, stakeholder relations, and training and program development, I am aware of the following.

8)     CRS is headed by a PAS Director who reports to the Associate Attorney General. CRS is organized into the headquarters office and five regions (which consist of field offices within the regions) throughout the United States.  The CRS Director supervises the Deputy Director who oversees the headquarters office in Washington, D.C.  The headquarters office has administrative, finance, human resources, IT, records management, public affairs, training and program development, and legal staff.  The Director also supervises the Associate Director who oversees the five regions, which are the Atlantic North Region, Midwest Region, Mountain Central Region, South Region, and West Region.  Each region is supervised by a Regional Director.  The field offices are staffed mainly by Conciliation Specialists.

9)     A conciliation specialist is a conflict resolution professional for the Community Relations Service who works toward restoring peaceful relations in communities by providing mediation, facilitation of dialogues, training, and consultation and technical assistance to community groups and governmental entities facing conflict relating to alleged civil rights violations and violent hate crimes.

10)     CRS's services to federal, state, and local governments as well as to communities can be divided into four areas: facilitation of dialogue, mediation, training, and consultation. These services are provided at no cost, offered both in-person and virtually, and tailored to each community's needs.

        a.     Facilitation of Dialogue: CRS facilitates the development of mutual understanding and agreements as alternatives to coercion, violence, or litigation.  CRS

conciliators help open lines of communication among diverse groups, enabling them to learn about each other's perspectives and the underlying issues of their conflicts. These dialogues typically involve local agencies, institutions, and community members and may address topics such as racial tensions, police-community relations, perceived hate crimes, tribal conflicts, and protests and demonstrations. CRS-facilitated dialogues also help stakeholder groups develop action plans to improve communication and promote partnerships.

b. Mediation: CRS conciliators serve as impartial third-party mediators, helping diverse stakeholders resolve community-based conflicts. Mediation is a structured process designed to address misunderstandings, establish mutual trust, and empower communities to independently prevent and resolve future conflict. These sessions are confidential, fostering candid discussion of issues, interests, values, and sustainable solutions. The goal of mediation is not to determine fault but to identify ways to improve collaboration and strengthen partnerships among parties. The results of mediation are often recorded in written documents, such as memorandums of understanding or mediation agreements.

c. Training: CRS conducts training sessions that develop locally based, long term mechanisms for communities to deescalate tensions, address conflicts, and prevent or respond to violent hate crimes. CRS training programs provide representatives from government, faith organizations, law enforcement, civil rights groups, and other community organizations with the knowledge and skills needed to increase understanding and improve collaboration among diverse stakeholders.

d. Consultation: CRS conciliators offer consultation and technical assistance services that educate and empower communities, refining their conflict resolution strategies and

5

addressing underlying issues.  These services provide stakeholders with insights into best practices and resources designed to alleviate tensions and prevent future conflict.

11)     The goals of all CRS programs are to help parties in conflict understand different perspectives, share information about resources and best practices, and support communities as they identify and implement solutions.  Examples of CRS's facilitated dialogue and training programs are as follows.

a.     Bias Incidents and Hate Crimes Forums: These forums educate community members and law enforcement about the Shepard-Byrd Hate Crimes Prevention Act as well as state and local hate crimes laws.  They involve local and federal law enforcement, district attorneys, civil rights organizations, and community organizations in discussions aimed at developing strategies to effectively address and respond to bias incidents and hate crimes.

b.     Protecting Places of Worship Forums: These programs provide strategies to help communities safeguard their places of worship against potential threats.  Experts from federal, state, and local law enforcement agencies, along with faith-based organizations, provide information and resources related to hate crime laws, handling active shooter situations, and ensuring physical security at religious buildings.

c.     Strengthening Police and Community Partnerships (SPCP): These programs convene law enforcement and diverse community leaders in problem-solving discussions aimed at improving public safety by fostering trust and building partnerships.  SPCP programs are designed to boost local capacity and develop solutions to improve police-community relations.

d.     Contingency Planning: CRS works to strengthen participants' knowledge around the planning of safe public events such as demonstrations or rallies, focusing on ways to

reduce the risk of violence. These programs include sessions for developing safety plans and addressing potential safety concerns.

e.    Event Marshals: Maintaining Safety During Public Events: This training prepares community members to act as event marshals, ensuring the safety and success of public events. Participants learn about the roles and responsibilities of marshals, discuss how to handle real-life scenarios, and receive a reference guide with essential information.

f.    "Understanding" and "Engaging and Building Partnerships" with Communities Series – Arab American, Hindu American, Jewish, Muslim American, and Sikh American Communities: These programs are designed to familiarize community members with customs and cultural aspects of each community, including their beliefs, identity, practices, and civil rights-related issues that impact the community. The programs provide best practices for collaboration with these communities for peaceful co-existence and public safety.

g.    Dialogue on Race (renamed in 2025 as Dialogue on Community Conflict): This initiative fosters understanding by bringing together diverse community members to share information, personal stories, viewpoints, and experiences. Through the dialogue process, participants identify commonalities and strategies to enhance community relations.

h.    Facilitating Meetings Around Community Conflict ("FMACC"): FMACC programs provide community leaders with the skills and tools needed to facilitate meetings effectively in tense or conflicted environments. They enhance facilitators' effectiveness, improve their listening and observation skills, and provide resources for planning, conducting and following up on meetings aimed at resolving community conflict.

i.      School-Student Problem Identification and Resolution of Issues Together (School-SPIRIT): School-SPIRIT programs engage student leaders, school administrators, and other school community members in identifying and resolving issues affecting their schools.

j.      City-Site Problem Identification and Resolution of Issues Together (City-SPIRIT): This program convenes diverse community stakeholders—such as public officials, law enforcement, members of the faith-based community, and community groups—to identify and address issues impacting their community, thereby reducing conflict, improving communication, and minimizing the potential for future conflict.

k.      Campus-Site Problem Identification and Resolution of Issues Together (Campus-SPIRIT): Campus-SPIRIT programs help student leaders, campus administrators, faculty, staff, campus law enforcement, and external community leaders identify and address issues impacting their college or university communities.

**<u>Historical Highlights of CRS's Work</u>**

12)    Based on my review and knowledge of CRS's annual reports to Congress from 1965 through 2022, published historical documents over the same time period, and field activities since 2022, I am aware of the following.

13)    Since its establishment by the Civil Rights Act of 1964, CRS has worked toward preventing violence in many of America's tense moments in civil rights history.  Abiding by the confidentiality mandate in the CRA, CRS's conciliators have worked quietly and without publicity, focusing on resolving divisive conflicts and preserving and restoring peace.

14)    As reported in CRS's 1965 Annual Report to Congress, between October 1964 and September 1965, CRS addressed conciliation needs in 564 separate matters arising in 178 communities across 31 states.  Seven of these matters were court referrals for settlement

proceedings as provided for in the 1964 Civil Rights Act.  The leading categories of matters that CRS conciliated were public accommodation, school desegregation, access to public facilities, housing and employment discrimination, and voter registration.

15)     In March 1965, CRS's conciliators were dispatched to Selma, Alabama, following what has come to be known as the "Bloody Sunday" attack on peaceful marchers seeking to cross the Edmund Pettus Bridge.  The conciliators coordinated with civil rights leaders, the Justice Department, and state officials in shuttle diplomacy to negotiate a safe path for the subsequent marches to Montgomery, Alabama.  These efforts contributed to the prevention of outbreak of further violence, bloodshed, and injuries, enabled the resumption of a peaceful march to Montgomery, and helped established CRS's credibility as an impartial peacemaker.

16)     In the 1970s, CRS became significantly involved in mediating school desegregation conflicts, especially major U.S. cities such as Boston, Detroit, and Dayton. Notably, as reported in CRS's 1974-1976 Annual Reports, CRS conciliators played a critical role in Boston that faced a challenging desegregation and busing crisis.  Over the years that followed U.S. District Judge W. Arthur Garrity's June 1974 desegregation order of Boston schools, a CRS team worked with the school district officials, mayor's office, police department, and various community groups, including NAACP that had brought the lawsuit seeking desegregation. CRS's work also included engaging in de-escalation of violent situations in individual schools, such as during a "melee" that occurred in South Boston High School where a conciliator singlehandedly calmed a fight that had broken out between Black and White students. Recognizing CRS's important role, Judge Garrity brought CRS into the desegregation process and required all parties to cooperate with CRS's coordination and peacemaking efforts.  Over the following years, CRS actively worked in Boston to prevent violence, organize interracial parent

councils, and sustain dialogues among governmental and community stakeholders.  On

December 6, 1978, Judge Garrity wrote President Jimmy Carter regarding CRS's work in Boston

as follows: "At the outset of school desegregation here, and on several occasions thereafter, local

officials simply didn't know which way to turn.  CRS was able to . . . provide counsel and

leadership not only to school officials but to the police and other municipal departments as well,

and to avoid widespread violence."

17)    As detailed in CRS's annual reports throughout its history, CRS had similar

successes in a range of other nationally significant disputes in communities throughout the

United States, each demonstrating CRS's neutrality, adaptability, and capacity for high-stakes

shuttle diplomacy.

a.    In 1973, CRS served as a neutral intermediary and communication

channel between the 200 members of the American Indian Movement and Ogla Lakota activists

that had occupied Wounded Knee, South Dakota.  CRS's work to mediate and maintain lines of

communication contributed to the prevention of bloodshed and ultimately helped end the

standoff.

b.    In 1977, CRS successfully led a negotiation between a neo-Nazi group

seeking to march in Skokie, Illinois (a Chicago suburb with a large Jewish population), the

Jewish community (including many Holocaust survivors), city officials, and civil rights

advocates that resulted in the prevention of violence and a successful resolution of the impasse,

while balancing First Amendment rights and community safety.

c.    In 1981, CRS successfully mediated a tense confrontation between White

and Vietnamese immigrant fishermen in Galveston, Texas, where the White shrimpers (with

support from Ku Klux Klan) accused the Vietnamese shrimpers of overfishing and other

violations of local customs.  In addition to mediating between the two groups, CRS coordinated

with local and federal officials, civil rights attorneys, and the broader Asian American

community, leading to long-term stabilization of relationships among communities.

       d.     Throughout the 1980s, CRS was central in reforming relationships

between law enforcement and minority communities.  CRS helped found the National

Association of Police-Community Relations Officers, convened symposiums to reduce use of

force, and supported minority recruitment in policing.

       e.     In 1991-1994, following the Rodney King beating in 1991 and the April

1992 acquittal of the Los Angeles Police Department ("LAPD") officers who participated in the

beating, which sparked massive rioting and civil unrest, CRS deployed conciliation teams to Los

Angeles within hours of the verdict to help defuse violence and restore communication between

racial and community groups. CRS served as a neutral liaison between city officials, police,

civil-rights organizations, business leaders, and residents, worked with the mayor's office,

LAPD, local clergy, and community coalitions to coordinate peaceful responses and reduce

retaliation, helped establish community-based recovery and dialogue programs aimed at healing

relationships among African American, Latino, Korean, and other ethnic communities.

       f.     As reported in CRS's 1996-1998 Annual Reports and the National Church

Arson Task Force Reports to the President (1997-2000), CRS was instrumental in the federal

government's response to a string of church burnings taking place throughout the United

States—many of them targeting African American congregations in the South.  In June 1996,

Attorney General Janet Reno and Treasury Secretary Robert Rubin jointly established the

National Church Arson Task Force ("NCATF"), bringing together the FBI, the ATF, the DOJ

Civil Rights Division, and CRS.  While the other members of the NCATF focused on criminal

investigation, CRS worked on community stabilization, healing, and prevention of further violence.

g.     After the terrorist attacks of September 11, 2001, CRS worked under the direction of Attorney General John Ashcroft to prevent hate-based retaliation against Arab, Muslim, Sikh, and South Asian communities.  In April 2003, Attorney General John Ashcroft announced that CRS had held more than 250 town and community meetings and forums on backlash issues and developed best practices for law enforcement to prevent and respond to hate incidents against Arab Americans, Muslim Americans, South Asian Americans, and Sikh Americans.  Throughout this time, CRS trained law enforcement, organized dialogues, and established working groups nationwide to protect targeted populations and maintain community trust.

18)     Over the past two decades, including during President Donald J. Trump's first term, CRS has continued to play significant roles to defuse conflict, promote public safety, and enable community healing in numerous flashpoints and community crises, including in and relating to:

a.     Hurricane Katrina (2005): CRS performed a conflict-resolution and liaison role in the aftermath of Hurricane Katrina.  Its interventions focused on reducing racial and ethnic tensions, facilitating communication between disaster victims and authorities, and, in the context of post-disaster disputes and inequalities that emerged in the storm's chaotic aftermath, ensuring equitable access to relief and recovery resources.

b.     Oak Creek, Wisconsin (2012): CRS played a pivotal role in helping communities recover and rebuild trust following the August 5, 2012, mass shooting at the Sikh Gurdwara in Oak Creek, in which six Sikh worshippers were killed and several others injured.

CRS conciliators were deployed to Oak Creek immediately after the shooting to assist local, state, and federal officials in engaging with grieving community members and restoring calm. CRS provided on-site crisis mediation and facilitation between Sikh community leaders, law enforcement, and local government to promote trust and open communication.

      c.     Sanford, Florida (2013): After the 2012 killing of Trayvon Martin, a young Black man, and the not-guilty jury verdict of George Zimmerman, a mixed-race, White and Hispanic man, CRS mediators worked day and night to maintain calm between protesters, local officials, and law enforcement. In particular, CRS helped bring together a group of Christian pastors and other religious leaders of Sanford to form a "God Squad" for peace and non-violence. These interfaith leaders worked effectively with CRS to prevent disorder and the deepening of racial divisions.

      d.     Ferguson, Missouri (2014): After the killing of Michael Brown, a young, unarmed, African American man, by a White police officer, sparking months of protests and civil unrest, CRS worked with officials from various law enforcement agencies, as well as local community leaders, to develop viable working relationships and establish a coalition of civic and community leaders to address the underlying issues of the conflict and begin the process of developing long-term solutions to the divisions.

      e.     Dakota Access Pipeline (2016): CRS helped to facilitate a peaceful outcome to the mandatory evacuation of a Native American camp through which the Dakota Access Pipeline was being planned. The evacuation order triggered a protest and resistance from the tribes and their supporters who vowed to stay at the camp. CRS met with representatives from federal, state, and local government; social service groups; and the Native American tribe to facilitate dialogue, resolution, and provision of services for Native Americans. With support

from CRS and other stakeholders, most protesters left the camp peacefully by the deadline imposed and without incident.

      f.    Orlando, Florida (2016): After an armed attacker perpetrated a mass shooting at the Pulse Nightclub, resulting in the massacre of 49 people and the wounding of many more (with the majority of victims reportedly identifying as LGBTQ+), CRS deployed to facilitated a rapid needs assessment for the victimized community and convened a coalition of civic and community leaders to provide immediate support for victims and prevent retaliation or escalation of bias-related tensions.  To maintain peace amid heightened emotions, CRS worked with the Orlando Emergency Operations Center and local law enforcement to prepare for counter-protests from anti-LGBTQ+ and anti-Muslim groups during vigils and funerals.

      g.    Sheridan, Wyoming (2017-2018): Between November 2017 and February 2018, CRS assisted a local college where anti-Native American hate incidents had targeted two female Native American students.  These incidents included online racial slurs and vandalism, which heightened tensions due to perceived inaction by campus law enforcement.  Responding to a request from college officials, CRS facilitated dialogues among tribal leaders, victims, law enforcement, and college administrators to rebuild trust and address community concerns, while supporting trauma counseling for the affected students.  CRS also hosted a Hate Crimes Forum on campus, with participation from law enforcement and tribal representatives, to share strategies for combating bias and improving educational access and collaboration between tribal communities and the college.

      h.    Pittsburgh, Pennsylvania (2018): Following the October 2018 Tree of Life synagogue massacre, where 11 worshipers were killed and 7 were wounded, CRS quickly mobilized to assist local and national faith communities, facilitating trust-rebuilding dialogues

and community safety programs. CRS worked with civic, faith, and school leaders to assess

needs, coordinate with federal and local agencies, create forums addressing bias and safety

concerns, and establish a working group to address the fears and tensions caused by the attack.

In addition, CRS implemented School-SPIRIT programs in two local high schools, helping

students identify and address discrimination and tension through dialogue. Across the United

States, CRS organized Protecting Places of Worship and Hate Crimes Forums, helping diverse

communities—Jewish, Muslim, Sikh, and others—develop action plans, improve communication

with law enforcement, and strengthen their capacity to prevent and respond to hate crimes and

bias-motivated violence.

      i.     Sacramento, California (2018): After the police shooting of Stephon Clark,

a young Black man, in March 2018, Sacramento faced widespread protests and community

outrage. Within 24 hours, CRS deployed conciliators to help de-escalate tensions and mediate

between residents, city officials, and law enforcement. CRS used its existing relationships to

dispel misinformation and advised city leaders on managing the crisis. After the unrest was

stabilized, CRS and the city launched the Neighborhood Engagement Strategy Talks program,

which brought together residents, business leaders, faith representatives, and city officials to

address neighborhood-specific concerns about policing and civic accountability. The process led

to new police policies on body cameras and foot pursuits, improved communication, and lasting

mechanisms for community feedback.

      j.     Macomb County, Michigan (2018): After reports of harassment and abuse

targeting autistic individuals, CRS facilitated efforts to address growing community tensions.

Incidents included verbal abuse of non-verbal autistic students by a teacher and harassment of an

autistic man by grocery store employees. CRS partnered with a local disability rights

organization to convene dialogues among city, county, and state officials, law enforcement, and school representatives. Together, they organized a disability resource forum to discuss ways to prevent and respond to such incidents. After the forum, which featured presentations from federal and state civil rights officials, local participants agreed to strengthen coordination and meet regularly to support individuals with disabilities.

      k.     Salt Lake City, Utah (2019): Following a November 2018 hate crime against three Latino men in Salt Lake County, Utah, Latino business owners and community leaders reported ongoing racial harassment and a lack of confidence in law enforcement's response. In response to the business owners' request, CRS facilitated a dialogue between Latino leaders and the local District Attorney's Office. The dialogue focused on hate crime definitions, prosecution procedures, and community protections, as well as ways to address barriers such as fear linked to immigration status and language differences that discouraged reporting. CRS shared strategies for community responses, including forums and clergy networks. The District Attorney's Office pledged improved communication and access to resources, leading to greater community confidence in law enforcement.

      l.     Minneapolis, Minnesota (2020): Following the murder of George Floyd, CRS deployed field teams to coordinate communication between law enforcement, activists, clergy, and neighborhood leaders. By combating misinformation and encouraging cooperation, CRS reduced the likelihood of additional violence. Local leaders credited the mediators' neutrality for preventing wider destruction. With CRS's facilitation of communications, the civic and community leaders were able to identify action steps for reducing conflict that included an updated Memorandum of Understanding between law enforcement and community groups.

m.      Brunswick, Georgia (2021): In 2021, during the trials of the three White men who were ultimately convicted of the hate-motivated murder of Ahmaud Arbery, a Black man, CRS helped manage community tensions and promote peaceful engagement.  CRS worked with local officials, law enforcement, clergy, and civil rights leaders to establish a Community Coordination Center ("CCC")—a neutral space for sharing accurate information, coordinating responses, and ensuring safe interactions between demonstrators and police.  As a result, throughout the trial, protests and prayer vigils remained peaceful, with participation from local and visiting protest groups.  Following the defendants' guilty verdicts, the community remained calm, reflecting the CCC's success in fostering trust and cooperation.

n.      Seattle, Washington (2023): CRS facilitated a dialogue between the Seattle Police Department ("SPD") and a local business leaders' association to address rising fears and tensions in the Chinatown International District after business owners complained of ongoing anti-Asian graffiti and harassment and what they perceived to be a lack of robust police response.  During the CRS-facilitated meeting, SPD agreed to increase patrols and maintain greater visible police presence in the Chinatown International District, which led to a sharp decline in harassment incidents.  CRS followed up in the community with education on reporting bias crimes and ways to strengthen trust between businesses and law enforcement.

o.      Milwaukee, Wisconsin, and Chicago, Illinois (2024): During a time of unprecedented political polarization, CRS deployed to Milwaukee and Chicago for the Republican National Convention and the Democratic National Convention, as CRS had done every four years.  Working with law enforcement, protest organizers, and municipal leaders, CRS helped both cities manage demonstrations without major violence while ensuring constitutional rights were protected.  Throughout both conventions, CRS conciliators were on the streets of the

two cities engaging in de-escalation efforts between pro-Palestinian protesters and pro-Israeli protesters and between the protesters and police officers to prevent riots and help maintain peace and order, in coordination with federal, state, and city law enforcement.

**The Planned "Dissolution" of CRS**

19)      On or about January 20, 2025, coinciding with the departure of President Biden's political appointees to CRS and the start of President Trump's second term, the DOJ leadership appointed me as the Supervisory Official (or component head) of CRS.  On this date, CRS had approximately 57 employees serving in the headquarters office in Washington, D.C., and 30 field locations throughout the United States.  That day, during his Inaugural Address, President Trump declared: "My proudest legacy will be that of a peacemaker and unifier. That's what I want to be: a peacemaker and a unifier."

20)      On February 11, 2025, President Trump issued the Executive Order Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative ("Executive Order").  In Section 3(c) of the Executive Order, the White House addressed the RIF measures that agencies must implement, but provided that the RIF measures "shall not apply to functions related to public safety, immigration enforcement, or law enforcement."  The Executive Order is available on the White House website at: https://www.whitehouse.gov/presidential-actions/2025/02/implementing-the-presidents-department-of-government-efficiency-workforce-optimization-initiative/ (last accessed Oct. 23, 2025).

21)      On February 26, 2025, the Office of Management and Budget ("OMB") and the Office of Personnel Management ("OPM") issued the Guidance on Agency RIF and Reorganization Plans ("ARRP Guidance") to federal agencies, including DOJ.  The ARRP Guidance provided also that the Guidance does not have any application to positions "that are

necessary to meet law enforcement, border security, national security, immigration enforcement, or public safety responsibilities." The ARRP Guidance further provided that those agency functions that are excepted from furlough "in the Agency Contingency Plans submitted to OMB in 2019" offered an important dividing line between functions and positions that would be subject to RIF and those that would not be. The ARRP Guidance is available on the OPM website at: https://www.opm.gov/chcoc/transmittals/2025/OPM_OMB%20-%20guidance%20on%20DOGE%20workforce%20EO%202.26.25%20FINAL.pdf (last accessed Oct. 23, 2025).

22)      DOJ's Fiscal Year ("FY") 2019 Agency Contingency Plan (dated September 11, 2018) stated that "CRS provides critical assistance in resolving and preventing racial, ethnic and national origin community conflicts, violence, and civil disorder, and it helps communities struggling to recover in the aftermath of alleged violent hate crimes." Thus, in the event of a lapse in appropriations, DOJ's FY 2019 Contingency Plan stated that "[a] minimum number of employees are necessary to provide a rapid response to emergency situations to protect the safety of human life or the protection of property."

23)      Attached as Exhibit A of this Declaration is a copy of DOJ's FY 2019 Contingency Plan, dated September 11, 2018, which I downloaded from the Internet Archive Wayback Machine's capture of DOJ's website on November 28, 2018. Earlier this year, while I was working for CRS, I obtained a copy of DOJ's FY 2019 Contingency Plan from JMD and reviewed it thoroughly while preparing memoranda for JMD. Based on my recollection of the document I obtained from JMD, I believe Exhibit A is an authentic copy of DOJ's FY 2019 Contingency Plan. The Internet Archive Wayback Machine is a digital archive of the internet that allows users to view historical versions of websites. By entering a particular website address

within the Wayback Machine, users can see and navigate a website, including documents posted to the website, as it appeared on specific dates, enabling users to access content that is no longer available from the current state of the website. Although DOJ's FY 2019 Contingency Plan does not appear to be available on the DOJ website currently, I was able to locate it in the Wayback Machine's November 28, 2018 capture of the DOJ website.

24) As DOJ's FY 2019 Contingency Plan asserted, CRS is a public safety component that exists to provide "a rapid response to emergency situations to protect the safety of human life or the protection of property" where "community conflicts, violence, and civil disorder" had occurred or communities need to recover in "the aftermath of alleged violent hate crimes." This identification of CRS as a necessary public safety component and a critical incident responder is consistent with the Civil Rights Act's mandate for CRS to intervene with and de-escalate violence and threats of violence in situations where "peaceful relations among the citizens of the community involved" are threatened. 42 U.S.C. § 2000g-1. It is also consistent with CRS's mandate under (1) the Church Arson Prevention Act of 1996, which directed CRS to prevent and respond to violations of federal criminal statutes that prohibit (a) destructive conduct using fire, bombs, or other explosives (18 U.S.C. § 844), and (b) damage to religious properties and interference with the free exercise of religion (18 U.S.C. § 247); and (2) the Shepard-Byrd Hate Crimes Prevention Act of 2009 to prevent and respond to violent hate crimes where alleged assailants caused, or threatened or attempted to cause, bodily injury upon victims bearing protected traits under the Act (18 U.S.C. § 249).

25) Nonetheless, in a March 25, 2025 internal memorandum, the Deputy Attorney General proposed eliminating CRS and transferring CRS employees to United States Attorneys' Offices. Although the memorandum was not issued publicly, the New York Times obtained and

published a copy, which I have downloaded and attached as Exhibit B and have used to refresh my recollection of the content of the Deputy Attorney General's memorandum.

26)     On or about April 1, 2025, under DOJ leadership's direction, I began meeting with the members of JMD's newly formed ARRP Working Group on a weekly basis to coordinate the implementation of the plan described in the above memorandum.

27)     Based on the Deputy Attorney General's March 25 memorandum, direction from DOJ leadership, and the coordination with the ARRP Working Group, I began instructing CRS's regional staff in late March to withdraw from engagement with stakeholders and close all cases in which we were providing services under CRS's jurisdictional statutes. I understood this shutdown of CRS services was part and parcel of DOJ's plan to close CRS. I communicated my instructions directly to all the conciliation specialists as well as the regional directors who supervised them. During my weekly meetings with the regional directors, I monitored the progress of the discontinuation and withdrawal of services across the United States.

28)     Between March and June of 2025, CRS withdrew all its engagements with communities. During that period, CRS did perform services or assessments for services with approximately 150 community stakeholders, but none were continued beyond June 2025. The stakeholders from whom CRS discontinued, withdrew, and/or withheld services as a result of the planned closure of CRS included: Ethical Society of Police; NAACP St. Louis County; Missionary Baptist State Convention of Missouri; Two Wrasslin' Cats Accord; Out Accountability Project; Berkshire Resources for Integration of Diverse Groups and Education; NAACP State Conference Colorado-Montana-Wyoming; Peacemakers Lodge; Pikes Peak Southern Christian Leadership Conference 1; Wellspring Health Access; and Haitian Community Help & Support Center.

29)     With each of the above stakeholders, in March 2025, CRS was in the process of

providing, or planning for the provision of, the services that the stakeholders had requested.  Had

it not been for CRS's planned dissolution and DOJ leadership's direction to implement the

elimination process quickly, CRS would have continued to provide each stakeholder with the

requested services, including continuing consultation on the services provided during the

following year.  At my direction, CRS regional staff communicated the discontinuation of

services to the stakeholders by stating that CRS's mission, mandate, and programs were not

viewed to be in line with the current Administration's priorities, and that CRS was no longer able

to engage with communities or offer services.  I did not direct regional staff to disclose to

stakeholders that a formal decision had been made to close CRS, because I was hopeful that CRS

might ultimately be retained in some form.  As I recall, the withdrawal and denial of services to

existing stakeholders was complete by June 2025, and CRS did not accept any new cases after

March 2025.

30)     Based on my recollection of the JMD ARRP Working Group's communication to

me on or about September 18, 2025, I understand that the Attorney General authorized the

closure of CRS and a RIF of CRS employees, effective no later than October 31, 2025, and the

transfer of a single CRS employee to the Executive Office for United States Attorneys

("EOUSA"), purportedly to fulfill CRS's statutory functions alone—effective November 2,

2025.  (I am also aware of an October 2, 2025 article in which Reuters claimed to have reviewed

DOJ documents showing the Attorney General's approval of the closure and RIF of CRS.)  By

this point, however, DOJ had already disclosed in its FY 2026 Budget and Performance

Summary, dated June 13, 2025, that "[t]he Department will eliminate CRS and its functions,"

going on to state that "[t]he CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities."

31)    On or about September 18 and 22, 2025, the content of the above-described communication that I had received from the JMD ARRP Working Group was shared with all CRS employees, including the 35 employees who were participating in the Deferred Resignation Program ("DRP").  I am aware that one of my emails to CRS employees was reported by Bloomberg Law News on October 1, 2025, including that one employee was expected to transfer to EOUSA, purportedly to carry out CRS's statutorily mandated functions.

32)    On or about September 29, 2025, I received a RIF notice from JMD Human Resources, notifying me that a RIF of CRS would "be conducted effective October 31, 2025," as "a result of the dissolution of the Community Relations Service (CRS) in accordance with the reorganization and reconsolidation of the Department of Justice," and that my "position of Associate Director is being abolished and will be a part of the reduction in force action."  Based on my conversations with JMD Human Resources personnel and other CRS employees, I am aware that, altogether, 14 of the 15 active CRS employees received RIF notices on September 29, in connection with the planned "dissolution" of CRS.  Thus, if the RIF process is allowed to proceed, by October 31, CRS will have lost 56 of its 57 employees since Inauguration Day.

33)    Given CRS's broad mission and mandates as codified in CRS's jurisdictional statutes, and based on my experience serving in CRS leadership for nearly two years, including as the head of the component, and my understanding of CRS's conciliation work in communities throughout the United States, it is very clear that CRS's statutory requirements cannot be met by a single person.  Accordingly, even if the decision to "eliminate" and "dissol[ve]" CRS were enjoined or reversed *after* it is fully consummated and goes into full effect on October 31, 2025,

CRS would be unable to meaningfully resume and deliver the services set forth in the Civil Rights Act of 1964 and other CRS jurisdictional statutes. CRS's statutory mandates cannot be fulfilled by a single person.

34)     For CRS to fulfill the CRA's mandates as established by Congress, CRS needs to maintain substantive and ongoing connections with and presence in hundreds of communities across the country so that trained CRS personnel can identify and assess the conflicts as they arise, deploy swiftly to help communities restore peaceful relations, and maintain the safety and security of the personnel being deployed, as many of the conflicts involve violence or threat of violence. That is why, according to CRS's FY 1968 Annual Report, CRS established within four years of its existence four regional offices (Atlanta, Chicago, San Francisco, and Washington, D.C.) and 19 field offices that together gave sustained assistance to 35 cities in 22 states just that year. Even with today's remote communications technology that allows for bridging of geographical gaps, CRS's community conflict resolution functions—which often involve sustained, multi-month, in-person engagement—cannot be fulfilled by just one person. Not only is it impossible, but it is also unsafe.

35)     That is likely why when Congress expanded CRS's jurisdiction to include preventing and responding to violent hate crimes under the Church Arson Prevention Act and the Hate Crimes Prevention Act, it explicitly authorized directed funding for CRS to "increase the number of personnel" to perform the additional mandates. Pub. L. 104-155, § 6; Pub. L. 111-84, § 4706. Responding to physical violence, threat of such violence, arson, bombs, and other high-powered explosives committed in the name of virulent hate in communities throughout the United States simply cannot be assigned to a single person. That is true especially in the face of the persistence of hate crimes across the United States, as reported annually by the FBI. As

announced last August, federal, state, tribal, and local agencies reported 11,679 hate crime

incidents (down only by 200 incidents from 2023's record-high level) and 14,243 victims of

those incidents during calendar year 2024.  *See* "FBI Releases 2024 Hate Crime Statistics,"

https://www.justice.gov/hatecrimes/hate-crime-statistics (last accessed Oct. 23, 2025).  Among

them, crimes based on bias against the victim's race/ethnicity/ancestry were 53.2%, those based

on the victim's religion made up 23.5%, and those based on the victim's sexual orientation were

17.2%.  Although CRS has well-developed, targeted, and readily deployable tools and resources

to combat and prevent race-based, religion-based, and sexual orientation-based hate crimes, they

depend on the skills, energies, and relationships of locally-based conciliators to implement.  And

yet, CRS's remaining conciliators will be RIF-ed effective October 31, 2025, as part of CRS's

dissolution, unless this Court grants a Temporary Restraining Order.

36)    Even if the Court were to later enjoin DOJ from closing CRS or mandate its

reopening, allowing the RIF to take place on October 31 will pose an irreparable harm to the

community organizations that rely on CRS, because staffing a federal agency is a slow and

arduous process and CRS will likely not be able to function effectively as an agency for more

than a year, at a minimum, even under the most favorable conditions.  For example, between

January 2024 and January 2025, CRS made concerted efforts to increase its staffing level from

approximately 50 to 98, as authorized by law.  However, after a full year of the non-stop

recruiting, application review, and interviews that it takes to hire high-quality conciliators, CRS

was able to net only 14 additional employees by January 2025.  Even if CRS is revived after the

RIFs go into place and it begins recruiting again, the length of time it will require to staff the

agency sufficiently will mean an irreparable harm for the community stakeholders that continue

to seek CRS's services, due to CRS's ongoing inability to provide statutorily required work.

37)     Moreover, losing all but one of CRS's remaining employees will mean a fatal loss of mediation expertise, peacemaking capacity, and deep institutional knowledge for CRS. Already, with the departure of more than 40 employees since January, CRS has lost more than 500 years of conflict resolution experience.  As discussed above, the intentional cessation of services, accompanied by the dramatic loss in personnel that was undertaken between the time DOJ proposed CRS's elimination and today, has already been devastating for communities.  If the scheduled RIF of remaining CRS employees (with the exception of one) is permitted to go into effect on October 31, 2025, communities throughout the United States will be irreparably harmed by the loss of the conciliation infrastructure, *even if* DOJ is somehow able to reconstitute CRS to its former numbers.  And that loss will be catastrophic.  CRS's institutional knowledge, capacity, and infrastructure have saved countless lives, protected religious liberty (especially against virulent anti-semitism), averted riots that can shatter local businesses, laid indispensable bridges between government agencies and communities groups, and helped America's communities navigate tensions to preserve peace and build more prosperous lives.

38)     In sum, if allowed to proceed, DOJ's plan to close CRS and RIF its employees will have a long-term, irrecoverably deleterious effect by depriving stakeholders of the conciliation services that CRS—as a peacemaker and a unifier—was statutorily empowered to provide, and America will be left without a powerful peacemaking and unifying force.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 24, 2025          _____
                                       Julius J. Nam

Exhibit A

**U.S. Department of Justice**
**FY 2019 Contingency Plan**
- September 11, 2018 -

This FY 2019 Contingency Plan covers Department of Justice (DOJ or the Department) operations during a lapse in appropriations.

The Antideficiency Act restricts the Federal Government's ability to obligate funds in advance of appropriations or beyond appropriated levels. During a lapse in appropriations, the Department will only continue the following categories of activities:

1. Those funded by a source that has not lapsed, such as permanent indefinite appropriations and carryover of no-year funds appropriated in a prior year;
2. Those for which there is an express authority to continue during an appropriations lapse;
3. Those for which authority to continue during an appropriations lapse arises by necessary implication;
4. Those related to the discharge of the President's constitutional duties and powers; and
5. Those related to "emergencies involving the safety of human life or the protection of property," *i.e.,* where there is a reasonable likelihood that the safety of human life or the protection of property would be compromised, in some significant degree, by delay in the performance of the function in question.

The Department of Justice is comprised of about 40 components that have a broad array of national security, law enforcement, and criminal justice system responsibilities. The Department's mission is to enforce the law and defend the interests of the United States according to the law; to ensure public safety against threats foreign and domestic; to provide federal leadership in preventing and controlling crime; to seek just punishment for those guilty of unlawful behavior; and to ensure fair and impartial administration of justice for all Americans.

Therefore, a significant portion of the Department's mission relates to the safety of human life and the protection of property, and primarily for this reason, the Department has a high percentage of activities and employees that are excepted from the Antideficiency Act restrictions and can continue during a lapse in appropriations. Other activities and employees are excepted because they are funded with multi-year or no-year appropriations, or because they are Presidential appointees, most of whom are excepted from furlough because they are not covered by the leave system in 5 U.S.C. Chapter 63.[1] Note that the contingency plan assumes that, at the time of a shur=tdown, all Components and Subcomponents normally headed by a Presidential Appointee are in fact headed by a Presidential Appointee.  If at the time of shutdown the

---

[1] Note: Former career Senior Executive Service (SES) appointees who receive a Presidential appointment that would normally convey an exemption from the leave system may be eligible to elect to retain SES leave benefits under 5 U.S.C. § 3392(c). If SES leave benefits are so elected, such a Presidential Appointee would be subject to furlough under 5 CFR part 359, subpart H, unless otherwise excepted.

Department does not have Presidential appointees in one or more of those positions, those who are acting in those positions, the Department will determine the excepted status of those who are acting in those positions in accordance with the criteria above

Agency Summary:

The total number of agency employees on-board at the time of the implementation of the Contingency Plan was 113,546[2] (see Table 2). Based on data as of June 23, 2018, for a lapse in appropriations for the first 5 calendar days of fiscal year 2019, 95,339 DOJ employees were excepted from furlough (see Table 1), representing 84% of DOJ on-board employees.

**Table 1: Department of Justice FY 2019 Contingency Plan Exceptions**
**Employees Excepted from Furlough**

| Categories | | Total Excepted Employees FY 2019 |
|---|---|---|
| Category 1[3] | Employees whose compensation is financed by a resource other than annual appropriation (also referred to as "exempt employees") | 6,411 |
| Category 2 | Employees necessary to perform activities expressly authorized by law to continue during a lapse in appropriations | 1,031 |
| Category 3 | Employees necessary to perform activities necessarily implied by law | 16,139 |
| Category 4 | Employees necessary to the discharge of the President's constitutional duties and powers | N/A |
| Category 5 | Employees necessary to protect life and property | 71,721 |
| **Total** | | **95,302** |

The Department's plan is consistent with Office of Legal Counsel (OLC) opinions and Office of Management and Budget (OMB) guidance and conforms to the following general principles:

- The law enforcement capacity of the U.S. Government should not be impaired or perceived to be impaired. To do so could constitute an imminent threat to the safety of human life and the protection of property.

- Component heads were directed to be conservative in designating employees as "excepted," especially those in headquarters or other "overhead" functions and occupations. Also, components may call some employees back to work if the need for their services becomes critical, and to furlough others as conditions change.

---

[2] Onboard staffing data are derived from DOJ's payroll system and reflect information from pay period 12, ending June 24, 2017.
[3] Note that this number includes employees funded with carryover, multi-year and no-year funding appropriated in prior years. The number of excepted employees in this category may decrease over the course of an appropriations lapse as carryover funding is depleted.

- Ancillary support services will be maintained only to the extent necessary to support excepted operations. These ancillary functions include very limited legislative affairs and other congressional support activities, public affairs activities, and community outreach, which may be conducted only to the extent the failure to perform those functions prevents or significantly damages the functioning of a funded component, the operations of other funded parts of the Government, or the performance of an excepted function. While mail will continue to be an excepted function, the number of staff on board to process mail will be reduced; therefore, the public should reasonably expect delays in mail delivery.

- Employees may not be reassigned or given new duties, and offices may not be restructured, in order to move individuals from a non-excepted function into an excepted function (although some rotational coverage of excepted positions will occur).

With respect to litigation, the Department's plan assumes that the Judicial Branch will continue to operate through the furlough.[4] Therefore:

- Criminal litigation will continue without interruption as an activity essential to the safety of human life and the protection of property.

- Civil litigation will be curtailed or postponed to the extent that this can be done without compromising to a significant degree the safety of human life or the protection of property. Litigators will continue to approach the courts and request that active cases, except for those in which postponement would compromise to a significant degree the safety of human life or the protection of property, be postponed until funding is available. If a court denies such a request and orders a case to continue, the Government will comply with the court's order, which would constitute express legal authorization for the activity to continue. The Department will limit its civil litigation staffing to the minimum level needed to comply with the court's order and to protect life and property. Receipt of summonses, pleadings and motions by mail may be delayed.

Assumptions relating to training activities (in components whose funding has lapsed) are as follows:[5]

- In order to ensure the proper execution of the Department's emergency functions, components may determine that the training of new employees in positions that have been designated as "emergency" is an excepted function.

---

[4] The federal courts are continuing to hear and decide cases during the lapse in appropriations utilizing fees and no-year appropriations. When this source of funding is exhausted, furloughs may impact the number of cases courts will hear.
[5] The Department of Homeland Security closed the Federal Law Enforcement Training Center (FLETC). DOJ staff assigned to FLETC and trainees at FLETC are furloughed unless they are directed to work on excepted activities.

-   To the extent that the training of new "emergency" employees is in process or about to begin when a lapse occurs, components should consider whether a short delay (for example, over the weekend) in the training will compromise emergency functions. If such a delay will not compromise emergency functions, components should consider keeping the employees at the training center but delaying the training itself, or not sending the employees to the training during the brief delay. If at any point the component determines that the delay in training might impact emergency functions, the training should resume.

-   New employees who are not in positions designated as "emergency" should not start work during the lapse and should not be trained.

-   In-service training of current employees, even those excepted from furlough, will be cancelled.

-   Training of state and local officers will be discontinued for the duration of the lapse in appropriations.

-   As a general rule, training for international law enforcement officers occurring in the United States will be cancelled. However, with respect to training of international law enforcement officers abroad (such as the training of officers who will be working in a combat zone), components will use their judgment to determine whether such training needs to occur immediately in order to protect human life or property. If so, such training may continue.

Department of Justice programs funded with permanent indefinite appropriations or other funding not subject to annual appropriation (e.g., Diversion Control, Health Care Fraud and Abuse Control, Debt Collection, Assets Forfeiture Fund, Federal Prison Industries, Special Counsel) are displayed in the plan as excepted positions (and are also referred to as "exempted positions" in other contexts), because their funding is not dependent upon an enacted appropriation. Also, the Bureau of Prisons' (BOP) Buildings and Facilities and Commissary accounts have multi-year authority and have adequate carryover funding to meet expenses during a lapse in appropriations. Employees paid from these funding sources are not dependent upon an enacted appropriation and are therefore considered excepted. Also included in the total are Presidential Appointees, most of whom are excepted from furlough because they are not covered by the leave system in 5 U.S.C. Chapter 63. This does not include non-career SES and Schedule C employees.

<u>Individual DOJ Component Summaries</u>:

Following is a synopsis of the components' plans for the Department of Justice, including the nature of the agency activities in which excepted employees will be engaged. The attached Table 2 provides the total number of employees in the component on-board when the plan was implemented; the total number of component employees excepted from furlough under each of the recognized exceptions; and the agency's legal basis for each of its determinations to except employees.

- **General Administration (GA)/Working Capital Fund (WCF)/Justice Information Sharing Technology (JIST):** Accounts include the Department's Leadership and Senior Policy/Management Offices. This includes Presidential Appointees, who are not subject to furlough by virtue of their appointment status, while a sizeable number of employees in these organizations will be furloughed. The excepted employees will provide overall Departmental leadership and policy management for ongoing operations that protect life and property and for other excepted activities during the lapse of appropriations.

  The GA account also funds a portion of the functions and staff of the Justice Management Division (JMD). The excepted GA-funded JMD employees will provide Department-wide direction for staffs providing support for ongoing operations that protect life and property; direct support, including IT support, for Department-wide operations that protect life and property; and building security at the Main Justice Building. The Working Capital Fund is funded by reimbursements from a variety of sources, but primarily from sources that are appropriated annually and would not be available if there is a lapse in appropriations; therefore, only JMD employees performing excepted functions are excepted from furloughs. In addition, a number of JMD employees are funded by the Three Percent Fund for debt collection, which is not subject to annual appropriation, and thus these employees may continue to work during a lapse in appropriations.

  JMD also oversees the JIST and the WCF Information Technology accounts. Excepted employees in these areas are needed to operate the 24/7 Justice Security Operations Center, which provides information security for the Department's systems. In addition, these employees are needed for information technology operations and systems that support ongoing law enforcement operations that will continue during any lapse in appropriations.

- **Executive Office for Immigration Review:** Excepted employees are needed to process all immigration cases and appeals involving detained aliens, including criminal aliens; provide Headquarters oversight of excepted functions; provide administrative support for excepted functions; and preserve jurisdictional viability of discrimination cases within the Administrative Law Judge function.

- **Office of the Pardon Attorney (OPA):** There are no employees excepted from furlough. However, OPA's mission is to assist the President in the exercise of his constitutional clemency power. Therefore, if an inmate facing execution in a capital case filed an application for commutation of sentence and appropriations lapsed, it is possible that some OPA employees would be excepted temporarily. Such applications for clemency are infrequent, but if one were to be pending during a lapse in appropriations, the exception for "discharge of the President's constitutional duties and powers" might in fact apply to OPA employees needed to timely investigate the application, prepare the report and recommendation on the case, and effectuate the President's decision under the Constitution to grant or deny clemency to the capital offender.

- **Office of the Inspector General:** As a Presidential Appointee, the Inspector General is not subject to furlough. The excepted employees are needed to investigate allegations of bribery, fraud, abuse, civil rights violations and violations of other criminal laws and administrative procedures arising from the conduct of Department employees, contractors and grantees; support law enforcement functions; oversee emergency operations and provide legal advice and issue subpoenas; continue work on time-sensitive national security investigations; and provide security and administrative support for excepted personnel and emergency services.

- **U.S. Parole Commission (USPC):** The excepted USPC employees are needed to respond to requests for emergency warrants and process parole certificates. Due to the constitutional prohibitions against the suspension of the writ of habeas corpus, this litigation has continued and is expected to continue in all judicial districts. Also, the USPC anticipates that the U.S. Probation Offices and the Court Services and Offender Supervision Agency for the District of Columbia (CSOSA) will continue to submit written requests for USPC action against offenders who have violated the conditions of their release. The Chairman and the Commissioners, as Presidential Appointees, are not subject to furlough. They will be available to approve each warrant before issuance. USPC has jurisdiction over federal offenders who committed offenses before November 1, 1987, as well as all District of Columbia (DC) offenders. Much of the DC caseload is driven by requests for warrants as a result of violations of the terms and conditions of parole.

- **National Security Division (NSD):** As a Presidential Appointee, the Assistant Attorney General is not subject to furlough. The excepted employees are needed to ensure the Department's national security investigations and prosecutions continue, that the Department's national security activities are coordinated both within the Department and with other government agencies, and to represent the Intelligence Community before the Foreign Intelligence Surveillance Court, which will remain open to facilitate the national security activities of United States in a manner consistent with the law. NSD will also provide legal advice to the Intelligence Community with respect to ongoing national security matters, and oversee the Department's administration of the U.S. Government's

authorities under the Foreign Intelligence Surveillance Act. In addition, excepted employees will continue work on pending counterterrorism, espionage, export control, and sanctions violations; coordinate and supervise the Department's international terrorism, domestic terrorism, and weapons of mass destruction matters; and continue to review Committee on Foreign Investment in the United States matters, including responding to time-sensitive inquiries regarding the national security implications of corporate conduct in compliance with National Security Agreements.

- **General Legal Activities (GLA)**: The Solicitor General and the Assistant Attorneys General are Presidential Appointees, and are not subject to furlough. The GLA account includes the following components: Office of the Solicitor General, Tax Division, Criminal Division, Civil Division, Environment and Natural Resources Division, Office of Legal Counsel, Civil Rights Division, and INTERPOL Washington. The excepted employees are necessary to provide legal advice on ongoing excepted functions of the Executive Branch, including matters of national security and presidential authority, to the Attorney General, the Deputy Attorney General, others within the Department, the White House, the National Security Council, and the Departments of State and Defense. Excepted employees will also review Attorney General Orders, Executive Orders and Proclamations, and presidential memoranda and directives; ensure that criminal litigation continues uninterrupted; seek continuances for civil and appellate litigation, except as necessary for the immediate protection of life or property; proceed with civil and appellate litigation should attempts to secure continuances fail; provide administrative advice and resource allocation guidance to Civil Rights Prosecution personnel and the Assistant Attorney General, Civil Rights Division, in the event of civil disorder; respond to and investigate complaints of alleged criminal civil rights violations involving endangerment of life or property and handle complaints from institutionalized persons concerning life-threatening situations. Also, excepted employees are needed to provide uninterrupted communications among federal, state, local and international law enforcement entities in furtherance of, among other things, criminal investigations and the apprehension of fugitives and criminal and illegal aliens. If a court denies a litigator's request to postpone a case and orders it to continue, the litigation will become an excepted activity that can continue during the lapse.

- **Antitrust Division (ATR)**: As a Presidential Appointee, the Assistant Attorney General is not subject to furlough. The excepted employees are needed to conduct or directly support ongoing criminal trials, prepare for criminal proceedings that have been scheduled for court (including the handling of arraignments, pleas, and sentencing hearings), and conduct or support ongoing civil litigation in which a continuance cannot be obtained. They will also prepare cases that must be filed due to Hart-Scott-Rodino or statute of limitations deadlines, only when an extension or waiver cannot be obtained and ATR leadership determines that allowing a proposed merger to go forward without objection would pose a reasonable likelihood of peril to property in which the United States has an immediate interest.

- **U.S. Attorneys:** As Presidential Appointees, U.S. Attorneys are not subject to furlough. Excepted employees are needed to address ongoing criminal matters and civil matters of urgency throughout the Nation. Criminal litigation will continue without interruption as an excepted activity to maintain the safety of human life and the protection of property. Civil litigation will be curtailed or postponed to the extent this can be done without compromising to a significant degree the safety of human life or the protection of property. If a court denies a litigator's request to postpone a case and orders it to continue, the litigation will become an excepted activity that can continue during the lapse. Headquarters support is maintained only to the extent necessary to support excepted operations.

- **U.S. Trustees Program:** Excepted employees are needed to protect bankruptcy estate property through the appointment and oversight of fiduciaries and through other means. Excepted employees are responsible for coordinating meetings of debtors and creditors, as well as civil and criminal matters, including cases with the U.S. Attorneys and the Federal Bureau of Investigation. Attempts will be made to curtail or postpone appearances before the Bankruptcy Courts. Excepted employees are limited to performing only those functions in which there is a definite risk of substantial property loss or violation of law.

- **Foreign Claims Settlement Commission:** As Presidential Appointees, the Commissioners are not subject to furlough. All staff are furloughed; therefore, staff activity related to the settlement of foreign claims is postponed.

- **U.S. Marshals Service (USMS):** The USMS is currently without a Director and the Acting Director is not a Presidential Appointee; as such, he is subject to furlough, unless otherwise excepted. The 94 U.S. Marshals in the Federal Districts are Presidential Appointees, but are subject to the Leave Act and, therefore, are also subject to furlough. However, since they all have duties directly related to the protection of life and property, they are excepted from furlough and will continue working. The excepted employees, including the Acting Director and the U.S. Marshals, are needed to carry out duties associated with judicial security; prisoner custody, security, and transportation; and fugitive apprehension. Some Headquarters personnel are also excepted as their functions are critical to the support of the U.S. Marshals and Deputy U.S. Marshals in the field – this support includes integrity assurance, oversight of investigative operations and judicial security, tactical operations, witness security, and management functions that include law and policy, budget and finance, procurement, information technology, human resource administration, and security.

- **Community Relations Service (CRS):** As a Presidential Appointee, the Director is not subject to furlough. CRS provides critical assistance in resolving and preventing racial, ethnic and national origin community conflicts, violence, and civil disorder, and it helps communities struggling to recover in the aftermath of alleged violent hate crimes. A

minimum number of employees are necessary to provide a rapid response to emergency situations to protect the safety of human life or the protection of property.

- **Special Counsel's Office (SCO)**:  The Special Counsel's Office is funded with a permanent indefinite appropriation. All direct employees are displayed as excepted positions because their funding is not dependent upon an enacted appropriation.

  One attorney left the Special Counsel's Office after pay period 13.  As of July 15, 2018, the SCO employs eight term employees directly, who are requested to be excepted in the FY 2019 contingency plan based on the exception justification provided above.

- **Interagency Crime and Drug Enforcement (ICDE):** DOJ components participating in the Organized Crime Drug Enforcement Task Force (OCDETF) program have excepted their ICDE-funded personnel from furlough as appropriate within their agency designations. OCDETF provides reimbursable funding to its member agencies to support the salaries and expenses of their participating personnel. A small number of Executive Office employees are needed to provide day-to-day administrative support to the nine member agencies of the OCDETF Co-Located Strike Forces and to the OCDETF Fusion Center (OFC), which also houses the Department's International Organized Crime Intelligence Operations Center (IOC-2). The nine Co-Located Strike Forces are designed to serve a dual purpose: they aggressively target the highest-level drug trafficking organizations; and they also function as a central point for gathering intelligence and disseminating investigative leads throughout the neighboring areas. The OFC is a comprehensive data center containing all drug and related financial intelligence information from all OCDETF- member investigative agencies and the Financial Crimes Enforcement Network.

- **Federal Bureau of Investigation (FBI):** As a Presidential Appointee, the Director is not subject to furlough. Excepted personnel are needed because all operations of the FBI are directed toward national security and investigations of violations of law involving protection of life and property. Thus, the FBI must be able to continue existing investigations, open new investigations, and respond to all contingencies which might arise during a lapse of appropriations. Accordingly, all FBI agents and support personnel in the field are considered excepted from furlough.

  At FBI headquarters, the excepted personnel will provide direction and investigative support to all field operations and excepted headquarters functions. This includes personnel in the Criminal Justice Information Services Division, which provides fingerprint identification services to criminal and national security investigations, and the Records Management Division, which provides name check services to criminal and national security investigations. Excepted personnel also include nearly all federal employees supporting the National Instant Criminal Background Check System (NICS).

- **Drug Enforcement Administration (DEA):** DEA's Administrator is a Presidential Appointee and is not subject to furlough. All agents in DEA field organizations are excepted from furlough because they support active counternarcotics investigations. This encompasses 23 domestic divisions, 7 regional foreign divisions, critical tactical support groups including the El Paso Intelligence Center and the Special Operations Division, forensic sciences, and technical surveillance support. DEA investigations need to continue uninterrupted so that cases are not compromised and the health and safety of the American public is not placed at risk. In addition, some headquarters personnel are critical to the support of agents actively engaged in investigative actions in the field – this support includes agency direction and priorities, legal support, integrity assurance and oversight of investigations, and critical support of emergency field functions, such as coordination of joint efforts involving other federal, state, local and foreign agencies; 24/7 tactical Command Center, tactical analytical support to investigations, programs and operations worldwide; as well as worldwide support in the areas of financial management, contract oversight, personnel, and basic training. Headquarters support will be maintained only to the extent necessary to support excepted operations.

  **DEA Diversion Control Fee Account:** All employees on-board are excepted since these positions are fully fee-funded; therefore, all drug diversion control activities will continue. These activities include preventing, detecting, and investigating the diversion of controlled substances from legitimate channels, while ensuring an adequate and uninterrupted supply of controlled substances to meet legitimate needs.

- **Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF):** As a Presidential Appointee, the Director of ATF is not subject to furlough. Excepted employees include: all agents in ATF's field divisions, who conduct the full range of criminal investigations in the firearms, arson, explosives, alcohol and tobacco program areas; Industry Operations Investigators who conduct compliance inspections of Federal firearms and Federal explosives licensees (including those mandated under the Safe Explosives Act), as well as application inspections; and other personnel who collect, review and analyze intelligence data in support of criminal investigations. Headquarters support will be maintained only to the extent necessary to support excepted operations.

- **Bureau of Prisons (BOP):** All staff at the Federal prisons, including Public Health Service Officers necessary to provide medical care of inmates, are considered excepted since they have direct daily inmate custody responsibilities. Employees are also needed to continue inmate custody responsibilities over some 34,317 inmates in contract facilities and process all new designations to federal prisons from the Courts. Regional and headquarters support will be maintained only to the extent necessary to support excepted operations. BOP's Buildings and Facilities, Prison Industries and Commissary accounts have multi-year authority and should have adequate carry over funding to meet expenses during a lapse in appropriations.

- **Grant Programs (Office of Justice Programs, Office of Community Oriented Policing Services, Office on Violence Against Women):** As Presidential Appointees, the OVW and COPS Directors, and the Assistant Attorney General for OJP, are not subject to furlough. The grants awarded by the Department are funded from no-year appropriations, as are the employees who administer those grants. As a result, these activities may continue during a lapse as long as sufficient S&E carryover funds remain, and based upon input from Department leadership regarding mission requirements. However, for the sake of the FY 2019 contingency exercise and consistent with prior plans, OJP is reflecting the level of personnel who would be needed if they had to reduce the personnel to only those most critical during a shutdown, which is approximately 41 (or 6%). OVW and COPS anticipate sufficient carryover funding to support their full complement of employees on-board for some time during a lapse in appropriations, and display an excepted rate of 100% for planning purposes.

**Table 2: FY 2019 Department of Justice Contingency Plan**
**On-Board vs. Excepted Employees**

| Name | Total On Board | Excepted | | | | | |
|------|----------------|----------|--------|----------------|-----------|-------------|------------|
| | | Total | Agents | Intel Analysts | Attorneys | Other Staff | % Excepted |
| AFF | 22 | 22 | 0 | 0 | 0 | 22 | 100% |
| ATF | 5,061 | 4,260 | 2,614 | 144 | 54 | 1,448 | 84% |
| ATR | 655 | 264 | 0 | 0 | 144 | 120 | 40% |
| BOP | 36,361 | 35,287 | 16,988 | 0 | 189 | 18,110 | 97% |
| CIV | 1,382 | 1,673 | 0 | 0 | 538 | 135 | 49% |
| COPS | 93 | 93 | 0 | 0 | 8 | 85 | 100% |
| CRM | 955 | 764 | 0 | 0 | 516 | 248 | 80% |
| CRS | 39 | 1 | 0 | 0 | 0 | 1 | 3% |
| CRT | 595 | 174 | 0 | 0 | 118 | 56 | 29% |
| DEA | 8,923 | 7,673 | 4,365 | 596 | 88 | 2,624 | 86% |
| ENRD | 578 | 263 | 0 | 0 | 212 | 51 | 45% |
| EOIR | 1,684 | 809 | 0 | 0 | 327 | 482 | 48% |
| FBI | 36,594 | 31,839 | 13,108 | 2,917 | 139 | 15,675 | 87% |
| FCSC | 9 | 2 | 0 | 0 | 0 | 2 | 22% |
| GA/WCF | 987 | 202 | 0 | 0 | 24 | 178 | 20% |
| INTERPOL | 63 | 53 | 0 | 40 | 2 | 10 | 84% |
| JIST | 30 | 3 | 0 | 0 | 0 | 3 | 10% |
| NSD | 349 | 236 | 0 | 6 | 187 | 43 | 68% |
| OCDETF | 29 | 13 | 0 | 3 | 4 | 6 | 45% |
| OIG | 488 | 267 | 119 | 0 | 11 | 137 | 55% |
| OJP | 677 | 41 | 0 | 0 | 2 | 39 | 6% |
| OLC | 29 | 23 | 0 | 0 | 20 | 3 | 79% |
| OPA | 16 | 1 | 0 | 0 | 0 | 1 | 0% |
| OSG | 47 | 43 | 0 | 0 | 23 | 20 | 91% |
| OVW | 64 | 64 | 0 | 0 | 4 | 60 | 100% |
| SCO | 9 | 8 | 0 | 0 | 5 | 3 | 89% |
| TAX | 509 | 284 | 0 | 0 | 220 | 64 | 56% |
| USA | 10,982 | 6,963 | 39 | 54 | 4,907 | 1,963 | 63% |
| USMS | 5,118 | 4,614 | 3,588 | 40 | 10 | 976 | 90% |
| USPC | 55 | 22 | 0 | 0 | 2 | 20 | 40% |
| USTP | 978 | 341 | 0 | 0 | 158 | 183 | 35% |
| TOTAL | 113,381 | 95,302 | 40,821 | 3,800 | 7,913 | 42,768 | 84% |

**Table 3: FY 2019 Department of Justice Contingency Plan
Excepted Employees by Category**

| Categories | Employees Excepted from Furlough | | | | |
|---|---|---|---|---|---|
| | Total | Agent | Intel Analyst | Attorney | Other |
| Category 1 | 6,411 | 898 | 93 | 632 | 4,788 |
| Category 2 | 1,031 | 39 | 0 | 850 | 142 |
| Category 3 | 16,139 | 865 | 2,651 | 190 | 12,424 |
| Category 5 | 71,721 | 39,019 | 1,056 | 6,232 | 25,414 |
| **TOTAL** | **95,340** | **40,821** | **3,800** | **7,913** | **42,768** |

**Category 1** = Employees whose compensation is financed by a resource other than annual appropriations.

**Category 2** = Employees necessary to perform activities expressly authorized by law.

**Category 3** = Employees necessary to perform activities necessarily implied by law (including presidentially appointed and Senate-confirmed employees).

**Category 4** = Employees necessary to the discharge of the President's constitutional duties and powers.

**Category 5** = Employees necessary to protect life and property.

Exhibit B



**U.S. Department of Justice**

Office of the Deputy Attorney General

_____

The Deputy Attorney General                    *Washington, D.C. 20530*

March 25, 2025

MEMORANDUM FOR HEADS OF DEPARTMENT COMPONENTS

FROM:            THE DEPUTY ATTORNEY GENERAL

SUBJECT:        Soliciting Feedback for Agency Reorganization Plan and RIF

On March 13, 2025, the Office of the Deputy Attorney General and the Justice Management Division submitted a report to the Office of Personnel Management and the Office of Management and Budget, which included discussion of a potential Agency Reorganization Plan and Reductions In Force, pursuant to Sections 3(c) and 3(e) of Executive Order 14210, entitled *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative*. This memorandum summarizes pertinent aspects of the report to OPM and OMB, which are set forth below, in order to solicit written feedback from the components by April 2, 2025, and to allow the components to incorporate information from this summary into their proposed Reductions In Force and Agency Reorganization Plans. The responses should be addressed to the Assistant Attorney General for Administration, and they will be shared with the Office of the Deputy Attorney General. The components' feedback should include, at minimum, specific information regarding any concerns about these proposals, as well as additional proposals consistent with the strategic themes that are evident from these proposals.

1. <u>Consolidating Grantmaking Functions</u>: consolidating grantmaking work currently taking place in the Office of Justice Programs, the Office on Violence Against Women, Community Oriented Policing Services, Access to Justice, and the Office of Tribal Justice.

2. <u>Transferring Office of Executive Secretariat</u>: transferring the Office of Executive Secretariat into the Justice Management Division.

3. <u>Transferring INTERPOL Washington</u>: transferring INTERPOL Washington into the United States Marshals Service.

4. <u>Reorganizing OCDETF</u>: transferring the OCDETF Director to the Office of the Deputy Attorney General, and consolidating OCDETF's Fusion Center into the DEA's Special Operations Division.

5. <u>Eliminating CRS</u>: eliminating the Community Relations Service and moving some or all impacted employees to U.S. Attorneys' Offices.

6. <u>Consolidating Policy Offices</u>: consolidating into the Office of Legal Policy the resources currently assigned to policy offices within the litigating components, such as CRT's Policy and Strategy Section, ENRD's Law and Policy Section, ATR's Policy and Advocacy Section and Expert Analysis Group, CRM's Office of Policy and Legislation, and NSD's Office of Law and Policy.

7. <u>Consolidating Support Functions</u>: consolidating the support functions of certain components within JMD, such as human resources, security, facilities, procurement, financial management, equal employment opportunity, and information technology services. This potential consolidation would apply to, at minimum, support functions currently located in ATR, NSD, and all components funded by the General Legal Activities appropriation.

8. <u>Eliminating Field Offices</u>: eliminating Main Justice field offices around the country, such as ATR's field offices in Chicago and San Francisco, ENRD's field offices in Denver, Seattle, San Francisco, and Sacramento, and CIV's field offices in New York, Chicago, Raleigh, and San Francisco.

9. <u>Reducing TAX</u>: reassigning TAX personnel to U.S. Attorneys' Offices while maintaining a core team of supervisory attorneys to administer relevant provisions of the Justice Manual.

10. <u>Consolidating and Transferring Duplicative Litigation Units</u>: consolidating or transferring litigation units that are duplicative of other efforts in Main Justice or at U.S. Attorneys' Offices, such as:

    - reassigning PIN personnel to U.S. Attorneys' Offices while maintaining a core team of supervisory attorneys to administer relevant provisions of the Justice Manual;

    - transferring cyber-focused resources in CCIPS to NSD's Nat Sec Cyber unit;

    - moving units focused on criminal enforcement, such as CIV's Consumer Protection Branch, to CRM;

- consolidating civil appeals work in CIV and criminal appeals work in U.S. Attorneys' Offices;

- consolidating some or all of CRM's Narcotic and Dangerous Drug Section and Money Laundering and Asset Recovery Section; and

- reducing the number of attorneys assigned to CRM's Office of International Affairs, CRM's Fraud Section focused on FCPA matters, and NSD's Counterintelligence and Export Control Section focused on criminal Foreign Agents Registration Act issues.

11. Combining DEA and ATF: combining DEA and ATF into a single component agency to achieve efficiencies in resources, case deconfliction, and regulatory efforts.

JMD is available to discuss these proposals with components to assist in developing responses due April 2, 2025.