**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ETHICAL SOCIETY OF POLICE, *et al.*, <br><br>                Plaintiffs, <br><br>    v. <br><br> PAMELA J. BONDI, in her official capacity as Attorney General of the United States, *et al*., <br><br>                Defendants. | No. 1:25-cv-13115-IT |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................i

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................3

   I.   CRS's Creation and Functions.........................................................................3

   II.   The Transfer of CRS and its Functions to the Department of Justice ...............5

   III.   Reorganization of the Department of Justice and Transfer of CRS to EOUSA ............6

   IV.   This Litigation....................................................................................................7

LEGAL STANDARD...............................................................................................7

ARGUMENT ...........................................................................................................8

   I.   PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM. .................................8

   II.   PLAINTIFFS CANNOT ESTABLISH LIKELIHOOD OF SUCCESS ON THE MERITS.....................12

   A.   Plaintiffs lack standing to challenge the internal transfer of CRS's functions and the reductions in force................................................................................13

   B.   The internal transfer of CRS's functions and the RIF are lawful. ....................15

   C.   Whether to provide particular services is committed to CRS discretion by law. ............18

   D.   Plaintiffs' APA claims fail because they are all premised on a false theory that Defendants are unilaterally dissolving CRS. ..........................................19

   E.   Plaintiffs cannot show a likelihood of success on their constitutional claims.................20

   III.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST CUT AGAINST A TRO. .....22

CONCLUSION.........................................................................................................23

## INTRODUCTION

Plaintiffs seek an emergency TRO to halt the purported "decision to eliminate the Community Relations Service (CRS) and its functions." Pls' Proposed Order at 2. But no such decision has been made, and neither CRS nor its functions are being eliminated. Rather, as acknowledged by Plaintiffs' lead declarant—who spearheaded the implementation of the plan until he left the Department of Justice (DOJ) just weeks ago—CRS is being internally *transferred* to the Executive Office for United States Attorneys (EOUSA). CRS's current spot in the DOJ organizational chart is being eliminated—but not its functions, or its status as a unit within EOUSA. To be sure, the President has proposed that Congress eliminate CRS altogether. But unless and until Congress takes that step, DOJ will retain CRS, its leadership, and its functions, consistent with federal law.

Reorganization within the Executive Branch is hardly a novel concept. Indeed, the Civil Rights Act originally housed CRS in the Department of Commerce; it only moved to DOJ by virtue of an internal Executive Branch reorganization, which vested the Attorney General with the responsibility of ensuring that CRS's statutory mandates were fulfilled. Now, as a part of another such internal reorganization to increase efficiency and streamline operations, CRS is being realigned as a unit within EOUSA rather than a standalone component. This is simply a matter of reporting lines, which are not dictated by anything in federal law and which fall within the discretion of the Attorney General. Once within EOUSA, CRS will continue to exist, operate, and fulfill its statutory obligations. In light of the Administration's priorities and discretionary nature of most of CRS's statutory functions, CRS will also be smaller than it was historically: 14 Reduction in Force (RIF) notices are set to take effect in the coming days. But agency RIFs are entirely lawful, as the Supreme Court and First Circuit have recently reiterated.

The Court should deny Plaintiffs' motion for multiple reasons. At the outset, they cannot show the requisite irreparable harm for a TRO, particularly in light of their delay in filing suit. Plaintiffs' principal injury seems to be that CRS has declined to provide certain services to them. But they admit that this service reduction has been happening for many months, and in any case their motion does not seek to mandate that CRS resume providing those services, since they are expressly subject to agency discretion. Instead, their motion targets RIF notices to 14 employees that were issued nearly a month ago and that threaten no imminent harm to Plaintiffs regardless, since reinstating those (furloughed) employees will not resume any services that CRS decided to cease providing. Plaintiffs should not be rewarded for their delay and should not be permitted to use the impending effective date of a RIF to manufacture an emergency.

Nor are Plaintiffs likely to succeed on the merits. For one thing, Plaintiffs have no Article III standing. Again, their injury (if any) flows from CRS's reduction of discretionary services under the new Administration, which has been ongoing over the past nine months—not from the realignment or RIF notices. Accordingly, enjoining the internal realignment or the RIF would have no effect on restoring the services that Plaintiffs seek. Put differently, halting the transfer of CRS to EOUSA, or stopping the RIF of 14 employees, would not redress Plaintiffs' injury—the desire for a certain level of CRS's services. And Plaintiffs do not and cannot challenge CRS's reduction or elimination of services, because CRS is vested with broad statutory discretion to determine when, "in its judgment," to provide those services. Even if Plaintiffs could establish standing, the internal realignment is lawful because nothing in federal statute requires that CRS retain its current spot on the organizational chart; and the RIF is lawful too, because the law empowers agencies to conduct RIFs under these circumstances, and Plaintiffs do not argue otherwise. Plaintiffs' claims fail at every conceivable level.

2

# BACKGROUND

## I. CRS's Creation and Functions

CRS was established by the Civil Rights Act of 1964, originally as a unit within the Department of Commerce. *See* 42 U.S.C. § 2000g. The statute provides that CRS "shall be headed by a Director who shall be appointed by the President with the advice and consent of the Senate for a term of four years"; the Director is "authorized to appoint" other personnel "as may be necessary to enable to the Service to carry out its functions and duties." *Id*.

The statute instructs that "[i]t shall be the function of the Service to provide assistance to communities and persons therein in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin which impair the rights of persons in such communities under the Constitution or laws of the United States or which affect or may affect interstate commerce." *Id.* § 2000g-1. CRS has broad discretion in carrying out that function: CRS "may offer in cases of such disputes, disagreements, or difficulties *whenever, in its judgment,* peaceful relations among the citizens of the community involved are threatened thereby, and it *may* offer its services either upon its own motion or upon the request of an appropriate State or local official or other interested person." *Id*. (emphases added).

CRS's only true statutory mandate is that its Director "shall, on or before January 31 of each year, submit to the Congress a report of the activities of the Service during the preceding fiscal year." *Id.* at § 2000g-3. The statute also provides some parameters around CRS's conduct when it chooses to engage in resolving disputes, disagreements, or difficulties. For example, when CRS does choose to provide its services, "[t]he activities of all officers and employees of [CRS] shall be conducted in confidence and without publicity." *Id.* at § 2000g-2(b). Similarly, "the Service shall hold confidential any information acquired in the regular performance of its

3

duties upon the understanding that it would be so held." *Id.* The statute also provides that CRS *cannot* do certain things: namely, engage in "investigative or prosecuting functions" for any "department or agency in any litigation arising out of a dispute in which [they] acted on behalf of the Service." *Id.* (imposing misdemeanor liability for a violation of the subsection).

Over the years, although other statutes have addressed CRS, none has imposed additional statutory requirements on CRS, leaving CRS's broad discretion intact.[1] For example, federal district courts *may* refer parties to CRS to conduct settlement proceedings where the "court believes there is a reasonable possibility of obtaining voluntary compliance." 42 U.S.C. § 2000a-3(d). If a district court refers a matter to CRS, the agency "is *authorized* to make a full investigation . . . and *may* hold such hearings with respect thereto as may be necessary" as part of "bring[ing] about a voluntary settlement between the parties," but is not *required* to do so. 42 U.S.C. § 2000a-4 (emphases added). And in 1968, the Fair Housing Act instructed the Secretary of Housing and Urban Development to "cooperate with and render such technical and other assistance to the Community Relations Service as may be appropriate to further its activities in preventing or eliminating discriminatory housing practices." 42 U.S.C. § 3608(e)(4).

---

[1] Plaintiffs cite several other statutes, but those are all appropriations statutes or authorizations of appropriations that are no longer in effect and imposed no significant statutory mandate in any event. *See* Church Arson Prevention Act, Pub. L. 104-155, § 6, 110 Stat. 1392, 1394 (1996) (authorizing appropriations "to the Department of the Treasury and the Department of Justice, including the Community Relations Service, in fiscal years 1996 and 1997 such sums as are necessary to increase the number of personnel, investigators, and technical support personnel to investigate, prevent, and respond to potential violations of" 18 U.S.C. §§ 247 and 844); Emmett Till Unsolved Civil Rights Crime Act, Pub. L. 110-344, 122 Stat. 3934 (2007) (authorizing additional appropriations to CRS of $1.5 million per year to "provide technical assistance by bringing together law enforcement agencies and communities to address tensions raised by" certain crimes); Emmett Till Unsolved Civil Rights Crimes Reauthorization Act, Pub. L. 114-325, § 2, 130 Stat. 1965, 1967 (2016) (same); Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act, Pub. L. 111-84, § 4706, 123 Stat. 2190, 2838 (2009) (authorizing appropriations to CRS for 2010, 2011, and 2012 to "prevent and respond to alleged violations" of the Act).

## II.    The Transfer of CRS and its Functions to the Department of Justice

Although the Civil Rights Act originally placed CRS within the Department of Commerce, 42 U.S.C. § 2000g, CRS was moved elsewhere in the Executive Branch in 1966. As part of the Reorganization Plan of 1966, pursuant to congressional authorization set forth in the Reorganization Act of 1949, 63 Stat. 203, as amended, President Lyndon B. Johnson transferred CRS to DOJ. The Reorganization Plan made clear that "[a]ll functions of the Community Relations Service, and all functions of the Director of the Community Relations Service, together with all functions of the Secretary of Commerce and the Department of Commerce with respect thereto, are hereby transferred to the Attorney General." *Id.*

In his explanatory message to Congress regarding the transfer, President Johnson stated that "[a]fter careful review of the activities of the Federal agencies involved in the field of civil rights, it became clear that the elimination of duplication of undesirable overlap required the consolidation of certain functions." Message of the President Accompanying Reorganization Plan No. 1 of 1966, Eff. Apr. 22, 1966, 31 F.R. 6187, 80 Stat. 1607, 5 U.S.C. app. at 164 (Feb. 10, 1966). He explained that the "accompanying reorganization plan would transfer the functions of the Community Relations Service and of its Director to the Attorney General" and "vest[] all the transferred powers in the head of the department." *Id.* "[T]he reorganization will permit the most efficient and effective utilization of resources in this field," President Johnson explained. *Id.* CRS, "brought into closer relationship with the Attorney General . . . will gain by becoming a primary resource in a coordinating effort in civil rights under the leadership of the Attorney General." *Id.* "Together the Service and the Department will have a larger capacity for accomplishment than they do apart," and "will in the future allow the performance of the affected functions at lower costs than would otherwise be possible." *Id.*

**III.    Reorganization of the Department of Justice and Transfer of CRS to EOUSA**

Since the 1966 Reorganization Plan, CRS has functioned as a standalone component within DOJ. Upon taking office in 2025, President Trump issued an Executive Order instructing agency heads to identify, among other things, whether any agency subcomponents should be eliminated or consolidated. 90 F.R. 8441 (Jan. 29, 2025).

Pursuant to that instruction, DOJ ultimately determined to transfer CRS to EOUSA, where it will remain as a unit headed by a Director, but with different reporting lines. "As part of a government-wide effort since January 2025 to streamline federal agencies, DOJ is realigning CRS and its functions to [EOUSA], a component of DOJ. CRS will remain a 'unit' of the Department as specified by the Reorganization Plan of 1966." Lauria Decl. at ¶ 6. "It will report to the Deputy Attorney General—and ultimately the Attorney General—through EOUSA rather than through the Associate Attorney General, as it currently does." *Id.* "The position of Director of CRS (which is filled through presidential appointment with the advice and consent of the Senate), the position of first assistant to the Director, and one current employee, are expected to transfer to EOUSA, which is the minimum number of employees required to perform CRS's statutory functions." *Id.* "The other CRS employees will be subject to a [RIF]." *Id.*

"DOJ has determined that realigning CRS, along with other reorganization actions undertaken by DOJ, will make DOJ more efficient by reducing bureaucracy, lowering costs, and reducing the number of DOJ components and employees, while ensuring that DOJ's organizational structure and continued functions align with Departmental and Administration priorities and comport with federal law." *Id.* at ¶ 7. DOJ has notified Congress that it intends to realign CRS to EOUSA and to issue RIF notices to CRS employees as a part of that realignment. *Id.* at ¶ 10.

6

IV.    **This Litigation**

On October 24, 2025, Plaintiffs—a set of organizations that had received or sought CRS services in the past—sued DOJ and Attorney General Bondi in her official capacity. ECF No. 1. Plaintiffs purport to bring six claims under the APA and the Constitution, but all of them rest on the premise that Defendants are eliminating CRS without congressional authority.

On the same day, Plaintiffs moved for a TRO, arguing that Defendants are unilaterally and unlawfully dismantling CRS. Pls' Mot. at 21, ECF No. 2. The TRO motion does not seek to force CRS to resume providing any particular services to Plaintiffs or otherwise. Instead, Plaintiffs seek to enjoin Defendants from implementing (1) "the decision to 'eliminate the Community Relations Service (CRS) and its functions,'" and (2) "the Reduction in Force ('RIF') of CRS employees scheduled to go into effect on October 31, 2025." Pls' Proposed Order, ECF No. 2-2 at 2.

## LEGAL STANDARD

Injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (quotation omitted). To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Gillan v. Town of Carver*, No. 24-CV-12212-AK, 2025 WL 1836609, at *1 (D. Mass. July 3, 2025) (explaining that "[c]ourts apply the same standard in assessing motions for a temporary restraining order and motions for a preliminary injunction"). The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

**I.    PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM.**

The Court need not consider the merits of Plaintiffs' claims on this expedited timeline, because they have failed to demonstrate that they will suffer irreparable harm absent the TRO they request. That failure alone compels denial of their motion. Irreparable harm is an "essential prerequisite for equitable relief." *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010); *see also Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm."); *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (explaining that injunctive relief is an "extraordinary and drastic remedy" (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

"The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (quoting *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 217 F.3d 8, 18 (1st Cir. 2000)). To meet this burden, Plaintiffs must demonstrate a "likelihood of substantial and immediate irreparable injury, as opposed to speculative claims of future injury." *Nunez-Soto v. Alvarado*, 956 F.2d 1, 3 (1st Cir. 1992) (citing *Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983)). And the irreparable harms pleaded must be harms *to the Plaintiffs*; Plaintiffs may not rely on alleged harms to third parties in requesting a preliminary injunction. *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) ("the issuance of a preliminary injunction requires a showing of irreparable harm *to the movant* rather than to one or more third parties" (emphasis in original)).

None of the alleged harms that Plaintiffs identify in their motion amounts to the requisite irreparable harm sufficient to justify a TRO. First, the harms are not imminent or irreparable. Second, in any case, the TRO they request would not actually redress those harms. Third, Plaintiffs' months-long delay in filing suit fatally undermines any showing of irreparable harm.

Plaintiffs' alleged harms are as follows:

- Plaintiffs Ethical Society of Police, Missouri Baptist Convention, and NAACP St. Louis County's alleged harm is that CRS "withdrew its services in May 2025 before a final agreement" in a mediation had been reached. Pls' Mot. at 16-17.

- Plaintiff Two Wrasslin' Cats Accord's alleged injury is CRS's failure to provide services like community listening and dialogue sessions since May 2025. *Id.* at 17.

- Plaintiff Out Accountability Project's alleged injury is CRS's lack of engagement after "early 2025." *Id.* Out Accountability Project had reached out to CRS to discuss different services that CRS could provide. *Id.*

- Plaintiff Berkshire Resources for Integration of Diverse Groups and Education's ("BRIDGE") alleged injury is CRS's declining to provide "an additional School-SPIRIT program." *Id.* at 18.

- Plaintiff NAACP State Conference Colorado-Montana-Wyoming's ("Tri-State NAACP") alleged injury is that CRS "terminated planning" for a dialogue. *Id.*

- Plaintiff Pikes Peak Southern Christian Leadership Conference 1's ("Pike's Peak SCLC") alleged injury is that "CRS declined [a] request" to facilitate a dialogue in June 2025. *Id.* at 18-19.

- Plaintiff Peacemakers Lodge's alleged injury is that CRS "ceased providing services" after May 2025. *Id.* at 19.

- Plaintiff Wellspring Health Access's alleged injury is that CRS "withdrew its assistance to Wellspring on or about May 2025." *Id.* at 19-20.

- Plaintiff Haitian Community Help & Support Center's alleged injury is that CRS "withdrew the provision" of its services, which "prevent[ed]" a Memorandum of Understanding between the Springfield Policy Department and the Center from being signed. *Id.* at 20.

In short, all Plaintiffs' harms stem from CRS's determinations to stop or otherwise not provide certain services that Plaintiffs would like to receive. That is insufficient.

*First*, although Plaintiffs allege that CRS declined to provide them with certain services, Plaintiffs do not explain how failing to receive any of these services actually caused Plaintiffs "*substantial* and *immediate irreparable* injury." *Nunez-Soto*, 956 F.2d at 3 (emphasis added). For example, Plaintiffs have not explained how CRS declining a request to facilitate a dialogue for Pike's Peak SCLC—the only injury claimed by Pike's Peak SCLC—resulted in substantial and irreparable harm to that Plaintiff. Plaintiffs could also seek assistance from other sources for their requests if CRS has decided not to grant their requests. None of the alleged injuries Plaintiffs claim are sufficiently weighty to support the entry of a TRO.

*Second*, even if the failure to provide these services caused irreparable harm, the TRO that Plaintiffs request would not remedy those harms. The TRO does not require CRS to provide any particular services, to Plaintiffs or otherwise.[2] Plaintiffs do not challenge CRS's reduction or declination of certain services. Instead, they challenge CRS's realignment (which Plaintiffs misleadingly refer to as CRS's "elimination") and the RIF—even though Plaintiffs never claim that they are actually harmed by either. Plaintiffs' motion and corresponding declarations make this point clear. *See* Pls' Mot. at 16-20. Whether the realignment and RIF proceed or not, CRS has declined to provide the services that Plaintiffs want. Enjoining the internal transfer to EOUSA or keeping 14 (currently furloughed) employees on the payroll would not somehow entitle Plaintiffs to the services that CRS has declined to provide. Because the TRO would not remedy Plaintiffs' alleged injuries, they cannot make the requisite showing of irreparable harm to justify that extraordinary relief.

---

[2] Nor could it, because Plaintiffs are not entitled to any particular services. As explained further below, CRS is authorized to provide services if and when it determines that such services are warranted.  It is not obliged to continue providing mediation assistance, or prepare training programs, simply because it has done so in the past. *See infra* at II.C.

*Third*, even assuming Plaintiffs' identified harm was substantial, their delay in filing suit undermines their irreparable harm showing. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). Plaintiffs have not. This lawsuit and Plaintiffs' motion challenges CRS's actions from the beginning of the year. Indeed, the latest identified harm occurred in June 2025. Pls' Mot. 16-20. If Plaintiffs truly believed they faced irreparable harm that justified a temporary restraining order, there was no reason to wait five to nine months to seek this purportedly time-sensitive relief.

Courts in this District have held that an "unexplained delay in seeking injunctive relief belies . . . claims for irreparable harm." *Asymmetrx Med., Inc. v. McKeon*, 932 F. Supp. 2d 232, 237 (D. Mass. 2013) (denying motion for injunctive relief without considering the other preliminary injunction factors because plaintiff had "not demonstrated a risk of irreparable injury"); *see also Zavala-Santiago v. González-Rivera*, 553 F.2d 710, 712-13 (1st Cir. 1977) ("[A] a reasonable inference from the delay of [a party moving for injunctive relief] is that he has little interest in vindicating whatever rights he may have."). In one case, a court denied a preliminary injunction motion where the plaintiff delayed "nearly four months" in bringing it. *Fuchs v. Steel-Fab, Inc.*, 356 F. Supp. 385, 388 (D. Mass. 1973). The court reasoned that the delay "in seeking the injunction leads this Court to believe that the alleged harm petitioner complains of is not as immediate nor as irreparable, in fact, as petitioner has represented" and concluded that if the motion were denied, irreparable harm would not occur. *Id.*

Courts around the country have likewise relied on comparable (or shorter) delays to support the denial of preliminary relief. *See, e.g.*, *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1010, 1010 n.4 (8th Cir. 2019) (five-month delay fatal to request for injunctive relief); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in

seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm."); *Weight Watchers Int'l v. Luigino's*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction."); *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (affirming denial of preliminary injunction, calling six months "a long delay in seeking relief" that "indicates that speedy action is not required"); *Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (affirming denial of preliminary-injunction after plaintiffs "wait[ed] two months," because "[s]uch a delay is inconsistent with a claim of irreparable injury").

To be sure, Plaintiffs' TRO motion specifically challenges the RIF notices issued at the end of September. Even as to that, the TRO was late—it came only days before the end of the RIF notices' 30-day waiting period. But more fundamentally, the RIFs are not the cause of Plaintiffs' injuries, all of which long predated the RIF notices by Plaintiffs' own telling. Indeed, all of Plaintiffs' alleged injuries occurred before June 2025—months before the RIF notices were issued in late September. The RIF notices are factually and legally unconnected to Plaintiffs' alleged and pleaded harms. Plaintiffs' significant delay in seeking purportedly time-sensitive relief belies the assertion that any of the challenged actions truly caused irreparable harm that warrants the extraordinary remedy of a temporary restraining order.

## II. PLAINTIFFS CANNOT ESTABLISH LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiffs also fail to establish that they are likely to succeed on the merits of their claims. They lack standing to challenge the realignment and RIF, since those are not the cause of their injuries, and enjoining them would not redress their injuries. In all events, both the realignment and RIF are lawful—nothing in the statute requires that CRS retain a particular spot on the DOJ organizational chart, or that it retain a fixed number of employees.

### A. Plaintiffs lack standing to challenge the internal transfer of CRS's functions and the reductions in force.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). At the temporary or preliminary relief stage, lack of Article III standing is grounds for (at least) denial of the motion and can also justify outright dismissal of the suit. *See Munaf v. Geren*, 553 U.S. 674, 691 (2008) ("Review of a preliminary injunction is not confined to the act of granting the injunction, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of the bill, and, if so, to directing a final decree dismissing it." (cleaned up)); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Plaintiffs lack the "irreducible constitutional minimum of standing" required to maintain a suit for the sweeping relief that they seek. *Lujan*, 504 U.S. at 560. To meet that constitutional requirement, Plaintiffs must establish that they "[have] suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024).

Plaintiffs claim they are injured because they are not receiving certain CRS services due to the alleged "elimination" of CRS and its functions. *See, e.g.*, Mot at 16 ("Plaintiffs used to receive CRS's services—and would do so in the future—but have lost access to CRS's services pending the agency's dissolution."). But that fundamentally mischaracterizes the facts. Plaintiffs' injuries are not caused by the realignment or RIF, and would not be remedied by an injunction against those actions.

Plaintiffs' premise—that Defendants are eliminating CRS—is belied by the evidence in the record, including Plaintiffs' own evidence. For example, Plaintiffs' Nam Declaration explains that his understanding is that the Attorney General authorized "the transfer" of CRS to EOUSA. Nam Decl., ECF 2-3 at ¶ 30. The Lauria Declaration similarly explains that the realignment includes moving CRS to EOUSA and maintaining CRS as "a separate unit within EOUSA." Lauria Decl. at ¶ 9; *see also id.* at ¶ 12 (explaining that absent legislation, "CRS will continue to exist as a unit within EOUSA"). The notification that Defendants sent to Congress shows the same. For example, the Spend Plan that DOJ submitted to Congress on May 30, 2025, explains that the reorganization plan "includes the disestablishment of . . . CRS . . . as [a] standalone component[] in FY 2026." Exhibit A. In short, Defendants are not eliminating CRS; they are simply moving CRS from a standalone component to a unit within EOUSA.  (For clarity, the President has proposed that Congress fully abolish CRS, and some of the documents that Plaintiffs cite reflect that request. But the request has not been acted on by Congress.)

Stripped of the dissolution rhetoric, Plaintiffs' alleged harm amounts to nothing more than stale complaints about the reduction of CRS services. But as explained above, all of Plaintiffs' alleged harms relate to the reduction in CRS's services that occurred over the past nine months, before any realignment. Accordingly, the realignment did not cause Plaintiffs' injuries. Whether CRS is a standalone component or a unit within EOUSA is irrelevant to the amount and type of services that CRS renders. CRS can choose—as it did over the past nine months—to reduce services as a standalone component. And CRS can choose to reduce services as a unit within EOUSA. The realignment is beside the point. For the same reasons, Plaintiffs cannot show that their injury is redressable: Enjoining the realignment will do nothing to address CRS's reduction in services, which is Plaintiffs' real claimed harm.

14

So too for Plaintiffs' request that the Court enjoin the CRS RIF. Like the CRS realignment, the RIF notices—which were issued in late September—post-date Plaintiffs' claimed harms by many months. The RIF—which is not even effective yet—thus plainly did not cause Plaintiffs' injuries. The injuries that Plaintiffs allege flow instead from CRS's reduction in services—which is unconnected and inapposite to these RIF notices. Indeed, all of Plaintiffs' alleged injuries and the reduction of CRS's services occurred pre-RIF, when CRS had a fulsome staff. Enjoining the RIF would not cause CRS suddenly to increase its services or otherwise remedy Plaintiffs' alleged injuries. Because Plaintiffs fail to establish causation or redressability, Plaintiffs lack standing to challenge or enjoin the realignment or the RIF.

**B.  The internal transfer of CRS's functions and the RIF are lawful.**

Plaintiffs' challenge also fails on the merits. Plaintiffs' core theory is that Defendants are dismantling CRS and thereby violating the Civil Rights Act. But, as explained, their premise is mistaken. It is true that under the DOJ reorganization plan, CRS will no longer be a standalone, independent component. But it is not true that Defendants are eliminating CRS's functions or statutory mandates. Rather, CRS will be transferred to EOUSA, where it will remain a "unit" of DOJ as specified by the Reorganization Plan of 1966. *See* Lauria Decl. at ¶ 6. CRS will report to the Deputy Attorney General, and the (Acting) CRS Director, first assistant to the Director, and an employee who will transfer to EOUSA will carry out CRS's statutory functions. *Id.*

Plaintiffs fail to show that DOJ lacks the authority to reorganize and move a standalone component like CRS into another component like EOUSA. Nor could they. Congress has provided DOJ with discretion as to how it can internally organize its offices, to the extent that such reorganizations do not contravene the Department's enabling or other organizational statutes. *See* Congressional Research Service Report R48523, Organizing Executive Branch Agencies: Structure and Delegations of Authority, https://www.congress.gov/crs-

product/R48523 ("Although the executive branch cannot contravene a statute establishing an agency's organizational structure, Congress often provides agency heads with a degree of discretion concerning how they structure their offices internally"); *see also Trump v. Am. Fedn. of Govt. Employees*, No. 24A1174, 2025 WL 1873449, at *1 (U.S. July 8, 2025) (Sotomayor, J., concurring) ("The relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law'"). In particular, the government-wide agency "housekeeping statute," 5 U.S.C. § 301, provides each agency head with the authority to "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." The Attorney General also has broad authority under 28 U.S.C. § 510 to "make such provisions as [s]he considers appropriate authorizing the performance by any other officer, employee, or agency of [DOJ] of any function of the Attorney General."

This is not the first time that CRS has been subject to a reorganization, either. In 1966, an Executive Branch reorganization transferred CRS from the Department of Commerce to DOJ. As a part of that transfer, the Attorney General assumed responsibility for CRS and its statutory functions. Now, CRS is undergoing another realignment as a part of an internal reorganization at DOJ—moving from a standalone component to a unit within EOUSA.

Nothing in the original statute or the 1966 Reorganization Plan dictates where CRS should appear on an organizational chart or requires CRS to be a standalone component within DOJ. Likewise, nothing precludes DOJ from moving CRS from being a standalone component to being housed within another component. DOJ is not abandoning CRS or its functions. It is simply rehousing the unit. There will still be a Director position; there will still be a distinct CRS unit; and CRS's statutory functions will still be carried out.

The RIF is lawful too; Plaintiffs have not made the necessary showing that they are likely to prove otherwise. Agencies have broad statutory and regulatory authority to conduct RIFs. *See* 5 U.S.C. § 3502(a)(1)-(4); 5 C.F.R. §§ 351.201, 351.203 (providing that agencies may invoke RIF authority when there is a reorganization). Courts should afford agencies "wide discretion in conducting a reduction in force; absent a clear abuse of that discretion, a substantial departure from applicable procedures, a misconstruction of governing statutes, or the like, we do not upset a final agency decision." *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998).

Plaintiffs fail to meaningfully challenge the validity of the RIF here. They identify no statutory or regulatory defect. And as the Supreme Court and the First Circuit have both recently recognized, it is permissible to downsize a component to streamline functions while ensuring that any statutory functions are maintained. *See McMahon v. New York*, 145 S. Ct. 2643 (2025) (staying a district court order enjoining a Department of Education RIF); *Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*, No. 25-1787, 2025 WL 2753708, at *5 (1st Cir. Sept. 29, 2025) (staying a district court order enjoining a RIF of the Department of Education's Office for Civil Rights); *Trump v. Am. Fed'n of Gov't Emps.*, 606 U.S. __, 2025 WL 1873449, at *1 (July 8, 2025) (Mem.).  Here, DOJ has concluded that CRS will be able to maintain its statutory functions notwithstanding this RIF, and especially in light of the very limited statutory mandates that Congress has imposed on CRS (*see supra* at Background at I), there is no basis at this juncture to cast doubt on that determination, even if Plaintiffs had standing to do so.[3]

---

[3] The employees subject to the RIF, by contrast, would have standing to challenge that adverse employment action—but comprehensive congressional schemes like the Civil Service Reform Act (CSRA) funnel any challenges to adverse employment actions through administrative channels, meaning federal district court is the wrong forum to bring these challenges in any event. *See, e.g.*, *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5 (2012) (explaining that the CSRA establishes a comprehensive system for reviewing personnel actions taken against federal employees).

### C.  Whether to provide particular services is committed to CRS discretion by law.

As noted above, Plaintiffs do not purport to challenge any decision to stop or decline particular CRS services, even though their only injuries are attributable to those decisions. But in any event, CRS's decision to engage in particular activities or services are "committed to agency discretion by law" and therefore unreviewable under the APA. 5 U.S.C. § 701(a)(2).

"In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. Federal Aviation Admin.*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, both factors show that CRS's provision of services are committed to agency discretion.

First, decisions about whether and how to engage in particular "disputes, disagreements, or difficulties," 42 U.S.C. § 2000g-1, fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" *Lincoln v. Vigil*, 508 U.S. 182, 191–92 (1993) (quoting 5 U.S.C. § 701(a)(2)). In *Lincoln*, the Supreme Court concluded that "allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion." *Id.* at 192. "After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* So too here. The statute governing CRS, *see* 42 U.S.C. § 2000g-1, gives CRS unfettered discretion on how and when to employ its services, vesting in CRS the decision-making authority to determine whether ongoing agency actions "best fit[] the agency's overall policies" and "whether agency resources are best spent on" particular projects. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-32.

18

Second, the statute's language and structure give complete discretion to CRS. CRS's governing statute states that CRS "may" provide services if certain conditions are satisfied "in its judgment." 42 U.S.C. § 2000g-1 (explaining that CRS "*may* offer in cases of such disputes, disagreements, or difficulties whenever, *in its judgment*, peaceful relations among the citizens of the community involved are threatened thereby, and it *may* offer its services either upon its own motion or upon the request of an appropriate State or local official or other interested person" (emphasis added)). That is the classic language of discretion. If CRS's judgment is that certain services should not be provided, a court is not permitted to second-guess that.

To override these principles and enjoin CRS from exercising its own judgment as to which services to provide and how to provide them would be an extraordinary violation of not only the APA, which immunizes such activities as "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), but also the separation of powers.

### D.  Plaintiffs' APA claims fail because they are all premised on a false theory that Defendants are unilaterally dissolving CRS.

Plaintiffs sue under the APA, arguing that "the dissolution of CRS is not in accordance with law, is in excess of statutory authority, and is arbitrary and capricious." Pls' Mot. at 21 (capitalization altered). But, as explained, Defendants are not dissolving CRS, and there has been no "decision" to eliminate CRS. At most, CRS is being eliminated from its current position in DOJ's organizational chart. There is therefore no "dissolution" decision that amounts to final agency action subject to APA review in the first place.

Plaintiffs cite the President's FY 2026 Budget, which states that DOJ "will eliminate the Community Relations Service." Pls' Mot. at 23. But the President's FY 2026 Budget is a *proposal to Congress* about upcoming fiscal year appropriations. Although the President is entitled to make such a proposal, Congress is under no obligation to pass it. Congress has not yet

19

enacted it, and it therefore does not represent present day reality. The Lauria Declaration makes clear that Defendants acknowledge that the President's FY 2026 Budget or other legislation would need to be enacted to eliminate CRS. Lauria Decl. at ¶ 12. Until that occurs, if it ever does, CRS will continue to exist. *Id*.

Accordingly, contrary to Plaintiffs' arguments, Defendants are not "abolishing an entire agency" or "eliminating [an] agency contrary to the law." Pls' Mot. at 22. Although Plaintiffs repeatedly claim that Defendants are unilaterally eliminating CRS, repetition does not make it true. Defendants *are* "downsizing and reorganizing" CRS, *see* Pls' Mot. at 22, consistent with the realignment plan that they notified Congress about, Exhibit A, and consistent with the evidence in this case, *see, e.g.*, Lauria Decl. at ¶¶ 6, 10. If Congress decides to eliminate CRS through legislation, that is its prerogative—just like it is the President's prerogative to advocate for certain legislative outcomes. But until Congress acts, CRS will remain operational as a unit within EOUSA. *See* Lauria Decl. at. ¶ 12. Because Plaintiffs' APA arguments rest on a false premise, their claims fail.

**E.  Plaintiffs cannot show a likelihood of success on their constitutional claims.**

Plaintiffs' constitutional claims also lack merit. First, Plaintiffs' ultra vires claim is meritless. An ultra vires claim is the judicial equivalent of "a Hail Mary pass," which "rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). To state such a claim, among other things, Plaintiffs must show that "the agency plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.'" *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C Cir. 2019) (quoting *Nyunt*, 589 F.3d at 449). That requirement is "especially demanding." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). "Only error that is patently a misconstruction of

the [statute], that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Id.* (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022)). This doctrine is thus reserved for the most "extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Fed. Express Corp.*, 39 F.4th at 764. "Said another way, garden-variety errors of law or fact are not enough." *Id.* (cleaned up).

Here, Plaintiffs fall far short of the "nearly insurmountable" showing necessary. *DOJ v. Fed. Lab. Rels. Auth.*, 981 F.2d 1339, 1343 (D.C. Cir. 1993). As a threshold matter, Plaintiffs failed to show that Defendants acted in excess of their statutory authority. Defendants are lawfully realigning CRS—*i.e.*, changing its place in the DOJ organizational chart—and issuing a lawful RIF as a part of that plan. CRS will still be able to maintain its statutory obligations post-RIF. *See* Lauria Decl. at ¶ 6. And in all events, Plaintiffs "basically dress up a typical statutory-authority argument as an ultra vires claim." *Texas*, 605 U.S. at 682. "That is a fairly common maneuver" in trying to bring an ultra vires claim—which the Supreme Court has now squarely rejected. *Id.*

Plaintiffs' separation-of-powers claim similarly lacks merit. Like its ultra vires claim, Plaintiffs' asserted separation-of-powers claim is the same APA claim discussed above, dressed up in constitutional language. The Supreme Court has explained that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation of powers doctrine." *Id.* at 471. Not "every action by the President, or

by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id*. at 472. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute. *Id.* at 473 & n.5. Here, Plaintiffs' claims focus entirely on their contentions that Defendants have not acted consistent with statutory obligations. ECF No. 3 at 33–37. Under *Dalton*, such claims cannot succeed.

## III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST CUT AGAINST A TRO.

A TRO is also not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). Here, granting the TRO that Plaintiffs seek would disrupt DOJ's realignment efforts and impermissibly impose on the Executive Branch's ability to manage its internal operations—including its ability to decide where on the organizational chart a particular unit should go and the appropriate size and scope of that unit. "[T]hwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020). *See also See McMahon*, 145 S. Ct. at 2643 (staying a district court order enjoining a Department of Education RIF); *Victim Rts. L. Ctr.*, 2025 WL 2753708, at *5 (staying a district court order enjoining a RIF of the Department of Education's Office for Civil Rights); *Am. Fed'n of Gov't Emps.*, 2025 WL 1873449, at *1.

Plaintiffs' argument about the equities rests solely on the claim that CRS is being dissolved and that "the government can hardly claim an interest in willfully violating any statute." Pls' Mot. at 29. As an initial matter, Plaintiffs' argument rests on a false premise—that CRS is

being dissolved. It is not. Once more, Defendants agree that only Congress, through legislation, can dissolve or eliminate CRS. Lauria Decl. at ¶ 12. CRS is merely being transferred to EOUSA and being downsized in the process. *Id.* at ¶ 6. Plaintiffs' principle that there is no "interest in willfully violating [a] statute" or "there is generally no public interest in the perpetuation of unlawful agency action," Pls' Mot. at 29, flows from Plaintiffs' false premise and also assumes the merits.

If anything, a TRO would impair the public interest by forcing DOJ to maintain 14 non-party employees on the payroll even though it has concluded that the reorganization has made their roles unnecessary, and even though—as Plaintiffs concede—CRS is not currently providing the type of services that would require their continued employment. Not only does that fail to advance Plaintiffs' interests; it also fails to advance the public interest.

## CONCLUSION

For all the reasons discussed herein, the Court should deny the Plaintiffs' Motion. If the Court does grant any injunctive relief, it should also order Plaintiffs to post security to account for the added cost of keeping the 14 employees on the government payroll during the pendency of the litigation. *See* Fed. R. Civ. P. 65(c).


Dated: October 28, 2025                    Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General

                                           YAAKOV M. ROTH
                                           Principal Deputy Assistant Attorney General

                                           ERIC J. HAMILTON
                                           Deputy Assistant Attorney General
                                           Civil Division, Federal Programs Branch

                                           DIANE KELLEHER

Branch Director
Federal Programs Branch


/s/ *Abigail Stout*
ABIGAIL STOUT
(DC Bar No. 90009415)
*Counsel*
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: Abigail.Stout@usdoj.gov

*Attorney for Defendants*