UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ETHICAL SOCIETY OF POLICE; NAACP ST. LOUIS COUNTY; MISSIONARY BAPTIST STATE CONVENTION OF MISSOURI; TWO WRASSLIN' CATS ACCORD; OUT ACCOUNTABILITY PROJECT; BERKSHIRE RESOURCES FOR INTEGRATION OF DIVERSE GROUPS AND EDUCATION; NAACP STATE CONFERENCE COLORADO-MONTANA-WYOMING; PEACEMAKERS LODGE; PIKES PEAK SOUTHERN CHRISTIAN LEADERSHIP CONFERENCES 1; WELLSPRING HEALTH ACCESS; and HAITIAN COMMUNITY HELP & SUPPORT CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> PAMELA J. BONDI, in her official capacity as Attorney General of the United States; and U.S. DEPARTMENT OF JUSTICE, <br><br> Defendants. | Civil Action No. 1:25-cv-13115-IT |

MEMORANDUM & ORDER

October 30, 2025

TALWANI, D.J.

In this action, Plaintiffs Ethical Society of Police, NAACP St. Louise County, Missionary Baptist State Convention of Missouri, Two Wrasslin' Cats Accord, Out Accountability Project, Berkshire Resources for Integration of Diverse Groups and Education, NAACP State Conference Colorado-Montana-Wyoming, Peacemakers Lodge, Pikes Peak Southern Christian Leadership Conferences 1, Wellspring Health Access, and Haitian Community Help & Support Center seek to enjoin Defendants Attorney General Pamela J. Bondi and the U.S. Department of Justice

("DOJ") "from taking any action to unlawfully dissolve or disband" the Community Relations Service ("CRS"), an agency within DOJ. See Compl. for Injunctive and Declaratory Relief [Doc. No. 1]. Pending before the court is Plaintiffs' Motion for Temporary Restraining Order [Doc. No. 2] seeking, on an emergency basis, an order enjoining Defendants "from implementing their decision to 'eliminate the Community Relations Service . . . and its functions,'" including a "temporary restraint of the Reduction in Force ('RIF') of CRS employees scheduled to become effective on October 31, 2025." Mot. for TRO 1–2 [Doc. No. 2]. For the reasons explained below, the motion seeking emergency relief prior to the effective date of the October 31, 2025 RIF is DENIED.

I.  **Background**

The Community Relations Service is an agency that was established by Congress in the Civil Rights Act of 1964. Its "function [is] to provide assistance to communities and persons therein in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin" and to offer such services "whenever, in its judgment, peaceful relations among the citizens of the community involved are threatened thereby." 42 U.S.C. § 2000g-1.[1] CRS's services include facilitation of dialogue, mediation, training, and consultation. Julius J. Nam Decl. ("Nam Decl.") ¶ 10 [Doc. No. 2-3]. These services are provided at no cost to federal, state, and local governments as well as to communities and are tailored to each community's needs. Id. Examples of CRS's facilitated dialogue and training

---

[1] CRS was originally placed within the Department of Commerce. Id. § 2000g. As part of the Reorganization Plans of 1966 and pursuant to congressional authorization set forth in the Reorganization Act of 1949, 63 Stat. 203, as amended, President Lyndon B. Johnson transferred CRS to DOJ. In his message to Congress, President Johnson explained that the Community Relations Service would be "a separate unit" within the DOJ. Message of the President Accompanying Reorganization Plan No. 1 of 1966, 31 F.R. 6187 ("Message of the President"), 5 U.S.C. app. 189 (Feb. 10, 1966).

2

programs include: bias incidents and hate crimes forums; protecting places of worship forums; strengthening police and community partnerships; contingency planning; maintaining safety during public events; programs to familiarize community members with customs and cultural aspects of different communities, including their beliefs, identity, practices, and civil rights-related issues that impact the community; and programs to engage student and campus leaders, administrators, law enforcement, and other school community members in identifying and resolving issues affecting their schools and campuses. Id. ¶ 11. "As reported in CRS's 1965 Annual Report to Congress, between October 1964 and September 1965, CRS addressed conciliation needs in 564 separate matters arising in 178 communities across 31 states." Id. ¶ 14. CRS has continued to be active in the intervening decades in a range of nationally significant disputes in communities throughout the United States. See generally id. ¶ 18.

Congress has repeatedly endorsed CRS's role; for example, it expanded CRS's jurisdiction to include preventing and responding to violent hate crimes under the Church Arson Prevention Act of 1996 and the Shepard-Byrd Hate Crimes Prevention Act of 2009, and it authorized directed funding for CRS to "increase the number of personnel" to perform the additional mandates. Nam Decl. ¶ 35 [Doc. No. 2-3] (citing Pub. L. 104-155, § 6; Pub. L. 111-84, § 4706). Between 2023 and 2025, Congress appropriated $24 to $25 million each fiscal year for CRS. See Att. B to Kyle Freeny Decl. (DOJ FY 2026 Budget and Performance Summary) at CM/ECF p. 177 [Doc. No. 2-4]. In 2023 and 2024, CRS employed 118 personnel, including two attorneys; and in 2025, CRS employed 56 personnel, including two attorneys. See id. In 2025, CRS had its headquarters in Washington, D.C. and operated 30 field offices across the United States. Nam Decl. ¶ 3 [Doc. No. 2-3].

Plaintiffs are eleven community organizations from around the country that have received CRS's services. They report that "[b]etween March and June of 2025, CRS withdrew all its engagements with communities. During that period, CRS did perform services or assessments for services with approximately 150 community stakeholders, but none were continued beyond June 2025. The stakeholders from whom CRS discontinued, withdrew, and/or withheld services as a result of the planned closure of CRS included" each of the Plaintiff organizations. Nam Decl. ¶ 28 [Doc. No. 2-3]; see also Pls.' Mem. ISO Mot. for TRO ("Pls.' Mem.") 16–20 [Doc. No. 2-1] (detailing withdrawal or termination of CRS services to Plaintiff organizations); Exhibits 3–13 [Doc. Nos. 2-5–2-15] (declarations from Plaintiff organizations).

On June 13, 2025, DOJ published a Budget and Performance Summary for the 2026 fiscal year, stating "[t]he Department will eliminate CRS and its functions, a total of 56 positions. The CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities." Att. B to Freeny Decl. at CM/ECF p. 71 [Doc. No. 2-4].[2] DOJ did not recommend any funding for CRS for the upcoming fiscal year. See id. at CM/ECF p. 177 ("The FY 2026 budget reflects the elimination of the Community Relations Service (CRS) as part of the Department of Justice's reorganization plan. CRS will formally close all its offices by the end of FY 2025. . . . The CRS's direct authorized positions for FY 2026 total 0 positions, including a decrease of -56 positions from the FY 2025 Enacted of 56 direct authorized positions.").

---

[2] That CRS's mission—as set out by Congress—differs from law enforcement and litigation priorities is not surprising where CRS's "function . . . [is] to provide assistance . . . in resolving disputes[,]" 42 U.S.C. § 2000g-1, and to "provid[e] conciliation assistance[,]" id. § 2000g-2(b), not to engage in law enforcement or litigation. CRS was placed in DOJ "[a]s a . . . step for strengthening the operation and coordination of . . . civil rights programs, . . . [and its placement there would] enhance the ability of the Justice Department to mediate and conciliate[.]" Message of the President, 5 U.S.C. app. 189.

On September 29, 2025, DOJ sent RIF notices to fourteen of the remaining fifteen active CRS employees, with an effective date of October 31, 2025. Compl. ¶ 62 [Doc. No. 1].³ Plaintiffs report that the notice stated the reason for the RIF was "the dissolution of the Community Relations Service (CRS) in accordance with the reorganization and reconsolidation of the Department of Justice." Id.

II.     Discussion

"The standard for issuing a TRO is 'the same as for a preliminary injunction.'" Orkin v. Albert, 557 F. Supp. 3d 252, 256 (D. Mass. 2021) (citation omitted). To be entitled to such relief, a plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).

Plaintiffs have made a strong showing that they are likely to succeed on the merits, where Defendants concede that only Congress, and not the executive branch, may eliminate a Congressionally created agency; the RIF notice reportedly stated that the reason for the RIF was "the dissolution of the Community Relations Service"; the RIF would result in only one remaining CRS employee (and two empty positions); and the only Declaration offered by Defendants is silent as to any functions that the sole remaining CRS employee would fulfill and concedes that if Congress continues funding CRS, DOJ would need to "reassess and consider how to comply with any funding enactment[,]" Jolene Ann Lauria Decl. ¶ 13 [Doc. No. 15-1].

---

³ The notices themselves are not part of the record before the court.

Nonetheless, as to the request for emergency relief before October 31, the request must be denied where Plaintiffs have not demonstrated irreparable harm, an "essential prerequisite for equitable relief[.]" Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc., 622 F.3d 36, 41 (1st Cir. 2010) (citation omitted). "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).

The court focuses on the potential harm that Plaintiffs state would occur if the RIFs proceed as scheduled. Plaintiffs have described needs and services provided by CRS in the past and argue that they "will have nowhere else to turn to receive these critical government services[.]" Pls.' Mem. 26 [Doc. No. 2-1]. But Plaintiffs have not detailed services their organizations currently need such that the deprivation of these services while this litigation is pending would cause them irreparable injury. Plaintiffs' showing here stands in contrast to other recent cases granting preliminary injunctions based on the alleged dismantling of agencies. See, e.g., Rhode Island v. Trump, 781 F. Supp. 3d 25, 52–54 (D.R.I. 2025); New York v. Kennedy, 789 F. Supp. 3d 174, 211–12 (D.R.I. 2025).

Plaintiffs argue instead that the impact of the RIF notices going into effect, where fourteen of the fifteen remaining CRS employees are being terminated, is to effectively shutter CRS's operations permanently. Plaintiffs contend that "[i]f the scheduled RIF is permitted to take effect on October 31, 2025, it may be impossible for Plaintiffs—who rely on CRS and have already seen ongoing essential services suspended—to receive effective relief from this Court, even if they ultimately prevail in this litigation." Pls.' Mem. 26–27 [Doc. No. 2-1]. The former Associate Director of CRS states that when CRS sought to increase its staffing level from approximately 50 to 98, it took "a full year of [] non-stop recruiting, application review, and

interviews" to net fourteen employees by January 2025, and he therefore opines that "staffing a federal agency is a slow and arduous process and CRS will likely not be able to function effectively as an agency for more than a year, at a minimum, even under the most favorable conditions." Nam Decl. ¶¶ 1, 36 [Doc. No. 2-3].

The court acknowledges that these difficulties may occur. Nonetheless, if Plaintiffs were to prevail on a final judgment, or even on a renewed motion for a preliminary injunction supported by an immediate need for CRS's services after the government shutdown ends, the court could order Defendants to rescind its shuttering of CRS, including as necessary to restaff the agency by rehiring employees terminated by the RIFs, or by transferring employees from other divisions of DOJ and the United States Attorney's Offices to CRS. See, e.g., Lauria Decl. ¶ 13 [Doc. No. 15-1] ("If funding is provided for CRS for fiscal year 2026 through a Continuing Resolution or full-year appropriation, . . . [DOJ] may consider entering into reimbursable agreements with United States Attorney's Offices to continue the CRS work with the enacted funding."). Indeed, the First Circuit has recently denied the government's application for stay of a preliminary injunction that requires the government to, among other things, "restore all IMLS, MBDA, and FMCS employees and personal service contractors, who were involuntarily placed on leave or involuntarily terminated due to the implementation of [the EO], to their status before March 14, 2025." See, e.g., Rhode Island v. Trump, __ F.4th __, 2025 WL 2621593, at *2, 11 (1st Cir. Sept. 11, 2025).[4]

---

[4] The First Circuit noted that the Supreme Court had stayed a preliminary injunction in another case that provided, among other things, that "the Department and Secretary 'shall reinstate federal employees whose employment was terminated or otherwise eliminated on or after January 20, 2025, as part of the RIF announced on March 11, 2025, to restore the Department to the status quo such that it is able to carry out its statutory functions[,]'" Somerville Pub. Sch. v. McMahon, 139 F.4th 63, 68 (1st Cir. 2025) (denying stay of preliminary injunction); McMahon v. New York, 606 U.S. __, 145 S. Ct. 2643 (2025) (granting stay). See Rhode Island, 2025 WL

7

Accordingly, Plaintiffs have not met their burden of showing that they would face irreparable harm absent a TRO halting the RIFs. The court need not consider the remaining factors for a TRO.

### III. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Temporary Restraining Order [Doc. No. 2] is DENIED. This order is without prejudice to Plaintiffs filing a motion for preliminary relief demonstrating the likelihood that they will suffer irreparable harm before this matter may be resolved on the merits.

IT IS SO ORDERED.

October 30, 2025                                  /s/ Indira Talwani
                                                  United States District Judge

---

2621593, at *4. But because the Supreme Court did not explain the grounds on which it issued the stay, and because "the appellants in McMahon disputed the district court's finding there that the RIF at issue had disabled DOE from performing the statutorily assigned functions by pointing to the fact that a large number of DOE employees remained" whereas "[h]ere, by contrast, the District Court found that nearly all the employees at the defendant agencies had been terminated, reassigned, or placed on administrative leave, and the appellants do not suggest otherwise[,]" the First Circuit found that it "cannot conclude from the Court's order in McMahon that this is a 'like' case, such that [it] must grant the stay requested here because the Court granted one there." Id.