# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ETHICAL SOCIETY OF POLICE; NAACP
ST. LOUIS COUNTY; MISSIONARY
BAPTIST STATE CONVENTION OF
MISSOURI; TWO WRASSLIN' CATS
ACCORD; OUT ACCOUNTABILITY
PROJECT; BERKSHIRE RESOURCES FOR
INTEGRATION OF DIVERSE GROUPS
AND EDUCATION; NAACP STATE
CONFERENCE COLORADO-MONTANA-
WYOMING; PEACEMAKERS LODGE;
PIKES PEAK SOUTHERN CHRISTIAN
LEADERSHIP CONFERENCE 1;
WELLSPRING HEALTH ACCESS; and
HAITIAN COMMUNITY HELP & SUPPORT
CENTER,

                *Plaintiffs*,

   v.

PAMELA J. BONDI, in her official capacity
as Attorney General of the United States; and
U.S. DEPARTMENT OF JUSTICE,

                *Defendants*.

**Case No. 25-CV-13115 (IT)**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 3

   A.   Statutory Background of CRS ............................................................................... 3

   B.   CRS Has Served as "America's Peacemaker" for More Than Sixty Years ...................................... 5

   C.   CRS's Critical Services to Communities, Local Governments, and Other Stakeholders ............. 10

   D.   Defendants Decided to Stealthily Dissolve CRS Due to Hostility to its Congressionally Assigned Mission ....................................................................................................... 12

   E.   Defendants Withdrew or Terminated Crucial Services to Plaintiffs as a Result of Their Decision to Dismantle the Agency ..................................................................................... 15

ARGUMENT ....................................................................................................................... 19

   I.   Plaintiffs Are Likely to Succeed on the Merits ...................................................... 20

   A.   The Dissolution of CRS Is Not in Accordance with Law and in Excess of Statutory Authority .. 20

   B.   The Dissolution of CRS Is Arbitrary & Capricious ............................................... 22

   C.   The Dissolution of CRS Violates the Separation of Powers .................................. 24

   D.   Defendants' Challenges to the Justiciability of this Case Are Without Merit ......... 26

   i.   Plaintiffs Have Standing ...................................................................................... 26

   ii.   The CSRA Does Not Preclude Jurisdiction ........................................................ 27

   iii.   The "Narrow" Exception to APA Review in § 701(a)(2) Does Not Apply .................... 28

   II.   Plaintiffs Face Serious Irreparable Harm .............................................................. 30

   III.   The Remaining Factors Overwhelmingly Favor a PI ............................................ 33

CONCLUSION .................................................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*Aid Ass'n for Lutherans v. USPC*, 321 F.3d 1166 (D.C. Cir. 2003)...............................24

*Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70 (D. Me. 2008).  ...........................30

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023)  ...............................................28

*Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.* 622 F.3d 36 (1st Cir. 2010) ........30

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,* 419 U.S. 281 (1974) ...............23

*Bowsher v. Synar*, 478 U.S. 714 (1986)........................................................25

*Clinton v. City of New York*, 524 U.S. 417 (1998) ...........................................25

*Dep't of Com. v. New York,* 588 U.S. 752 (2019) .......................................22, 28

*Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) ..........25

*Does 4, 7, 22, 27, 28, & 29 v. Musk*, No. CV 25-0462, 2025 WL 2346258  (D. Md.

   Aug. 13, 2025) .............................................................................26

*EEOC v. Astra USA, Inc.,* 94 F.3d 738 (1st Cir.1996)  ......................................30

*Ex parte Young*, 209 U.S. 123 (1908) ..........................................................24

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010) ...........................................26

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) .........................................22

*Lincoln v. Vigil,* 508 U.S. 182 (1993)...........................................................29

*McMahon v. New York*, 606 U.S. __, 145 S. Ct. 2643 (2025) ...........................27

*Michigan v. EPA,* 576 U.S. 743 (2015)  .......................................................22

*New York v. Kennedy*, 789 F. Supp.3d 174 (D.R.I. July 1, 2025), *stay denied on appeal by*

   *New York v. Kennedy*, 155 F.4th 67 (1st Cir. 2025)...................................*passim*

*New York v. Trump*, 764 F. Supp. 3d 46 (D.R.I. 2025)....................................20

*Nken v. Holder*, 556 U.S. 418 (2009)....................................................19, 33

*Ohio v. EPA,* 603 U.S. 279 (2024)  ............................................................22

*See R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-cv-342, 2025 WL 2988705

   (D.R.I. Oct. 23, 2025)   ..................................................................23

*R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31 (1st Cir. 2002).................24

*Rhode Island v. Trump*, 781 F. Supp. 3d 25 (D.R.I. 2025), *stay denied on appeal by*

   *Rhode Island v. Trump*, 155 F.4th 35, 50 (1st Cir. 2025)...........................*passim*

*Rhode Island v. Trump,* No. 25-CV-128, 2025 WL 3251113 (D.R.I. Nov. 21, 2025) ........... 23, 29

*Robbins v. Reagan,* 780 F.2d 37 (D.C. Cir. 1985) ........................................................... 30

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12 (1st Cir. 1996) ...................... 30, 32

*Seila L. LLC v. CFPB,* 591 U.S. 197 (2020) .................................................................. 26

*Somerville Public Schools v. McMahon,* 139 F.4th 63 (1st Cir. 2025) ............................... 27

*Thunder Basin Coal Co. v. Reich,* 510 U.S. 200 (1994) .................................................... 28

*TVA v. Hill,* 437 U.S. 153 (1978) ............................................................................... 22

*Union of Concerned Scientists v. Wheeler,* 954 F.3d 11 (1st Cir. 2020) .............................. 29

*Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.,* 586 U. S. 9 (2018) ............................... 28

*Widakuswara v. Lake,* 773 F. Supp. 3d 46 (S.D.N.Y. 2025) .............................................. 21, 26

*Wiley v. Kennedy,* 789 F.Supp.3d 447 (S.D.W.Va. May 13, 2025) ..................................... 21

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008) ................................................ 30

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952) ........................................ 25, 26

## STATUTES

42 U.S.C. § 2000a-3(d) ............................................................................................ 4

42 U.S.C. § 2000a-4 ................................................................................................ 4

42 U.S.C. § 2000g ................................................................................................... 22

42 U.S.C. § 2000g-1 ............................................................................................ 3, 22, 29

42 U.S.C. § 2000g-2 ................................................................................................ 3

42 U.S.C. § 2000g-3 ................................................................................................ 4

42 U.S.C. § 3608(e)(4) ......................................................................................... 5, 26

5 U.S.C. § 706(2) .................................................................................................... 22

5 U.S.C. § 706(b)(2)(B) .......................................................................................... 24

Pub. L. 104-155, § 6, 110 Stat. 1392, 1394 (1996) ....................................................... 5, 26

Pub. L. 110-344, 122 Stat. 3934 (2007) ...................................................................... 5, 26

Pub. L. 111-84, §§ 4706, 4707, 123 Stat. 2190, 2838 (2009) ........................................... 5, 26

Pub. L. 114-325, § 2, 130 Stat. 1965, 1967 (2016) ....................................................... 5, 26

Public Law No. 119-3 § 120(e) (2025) ....................................................................... 23, 29

Reorganization Act of 1949, 63 Stat. 203, as amended .................................................... 4

## OTHER AUTHORITIES

Message of the President Accompanying Reorganization Plan No. 1 of 1966, Eff. Apr. 22, 1966,
31 F.R. 6187, 80 Stat. 1607, 5 U.S.C. app. at 164 (Feb. 10, 1966)............................................. 4

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. I §§ 1, 8............................................................................................................ 25
U.S. Const. Art. II § 2 ................................................................................................................ 25

**INTRODUCTION**

This case concerns the Executive Branch's efforts to dismantle a congressionally-created civil rights agency and then rewrite history to hide the government's nakedly unlawful actions. In the Civil Rights Act of 1964, Congress established the Community Relations Service ("CRS") and charged it with providing dispute- and conflict-resolution assistance to communities across the Nation. CRS has long been known as "America's peacemaker." For decades, CRS has worked—quietly and without publicity—to preserve and restore peace in moments of deep division, from its work in Selma in the aftermath of "Bloody Sunday" to its deployment nearly sixty years later in Milwaukee and Chicago during the Republican and Democratic National Conventions.

The current Administration is fundamentally hostile to CRS's existence. Rather than pursue legislation to eliminate the agency, however, Defendants set out to destroy CRS unilaterally. Defendants did so behind closed doors, without notice or public input, and without consulting the communities that depend on CRS. When called out in this Court, Defendants protested they were only reorganizing the agency—an excuse plainly disproven by Defendants' own contemporaneous admissions that they would "eliminate CRS and its functions."

At the Temporary Restraining Order ("TRO") stage, this Court recognized Plaintiffs had made "a strong showing" that they are likely to succeed on the merits of their claims. The Court denied the TRO, but only because Plaintiffs at that time had not yet "detailed services their organizations currently need," and because the Court "could order Defendants to rescind its shuttering of CRS" as part of a preliminary injunction. Doc. No. 22 at 5-7.

Consistent with the Court's TRO stage decision, Plaintiffs file this "motion for a preliminary injunction supported by an immediate need for CRS's services after the government

shutdown." *Id*. at 7. It bears emphasis: Defendants' actions are even *more* unlawful today than they were when this Court found Plaintiffs would likely succeed on the merits at the TRO stage. In the continuing resolution passed to reopen the government, Congress funded CRS *and* directed that the Executive Branch rescind all reductions in force (RIFs) implemented after October 1, 2025. That means Congress declined to shutter CRS *and* required the Executive Branch to rescind the RIF gutting CRS, which was implemented on October 31, 2025.

As this Court noted in the TRO hearing, Congress had a choice. Congress could ratify the government's actions or disapprove them. Congress' message was clear: It said "no" to the Administration's efforts to eliminate CRS. But the Department of Justice refuses to follow the law—and it cannot offer any coherent explanation for its actions. Instead, the Executive Branch is brazenly defying Congress.

Meanwhile, as the supplemental declarations submitted with this motion confirm, Plaintiffs will be irreparably harmed absent a preliminary injunction from this Court. So long as CRS remains unlawfully shuttered, Plaintiff Berkshire Resources for Integration of Diverse Groups and Education ("BRIDGE") needs but cannot receive services from CRS in the form of a school-SPIRIT program—which CRS had previously offered and which CRS would have provided absent its unlawful closure. Meanwhile, Plaintiff Missionary Baptist State Convention of Missouri needs CRS's services as a mediator and consultant, the absence of which is materially undermining Plaintiff's ability to enforce an agreement reached with local police in the wake of a racially charged incident. These and other ongoing harms from the continued loss of CRS's services cannot be remedied by money, after the fact. But these harms *will* be remedied if this Court enters a preliminary injunction. Plaintiffs respectfully request the Court do so.

# FACTUAL BACKGROUND

## A. Statutory Background of CRS

CRS was established by the Civil Rights Act of 1964, which provides that "[i]t shall be the function of the Service to provide assistance to communities and persons therein in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin which impair the rights of persons in such communities under the Constitution or laws of the United States or which affect or may affect interstate commerce." 42 U.S.C. § 2000g-1. CRS is authorized to offer such assistance "whenever, in its judgment, peaceful relations among the citizens of the community involved are threatened thereby." *Id.*

By law, CRS must conduct "conciliation assistance. . .in confidence and without publicity," "hold confidential any information acquired in the regular performance of its duties," and may not "engage in the performance of investigative or prosecuting functions of any department or agency in any litigation arising out of a dispute" handled by CRS. 42 U.S.C. § 2000g-2.

CRS has a specific statutory mandate to assist in federal judicial proceedings. In public accommodation cases, District Courts may refer parties to CRS so the agency can conduct settlement proceedings where the "court believes there is a reasonable possibility of obtaining voluntary compliance." 42 U.S.C. § 2000a-3(d). Once a District Court refers a matter to CRS, the agency "is authorized to make a full investigation. . .and may hold such hearings with respect thereto as may be necessary" as part of "bring[ing] about a voluntary settlement between the parties." 42 U.S.C. § 2000a-4.

CRS is required to submit "a report of the activities of the Service during the preceding fiscal year" . . . "on or before January 31 of each year." 42 U.S.C. § 2000g-3.

The Civil Rights Act originally placed CRS within the Department of Commerce and established the CRS Director as a Presidentially-appointed and Senate-confirmed position for a term of four years. 42 U.S.C. § 2000g. As part of the Reorganization Plans of 1966 and pursuant to congressional authorization set forth in the Reorganization Act of 1949, 63 Stat. 203, as amended, President Lyndon B. Johnson transferred CRS to the Justice Department. In his explanatory message to Congress regarding this transfer, President Johnson stated: "The Attorney General will provide for the organization of the Community Relations Service as a separate unit within the Department of Justice," "with full regard for" the Civil Rights Act's provisions requiring "(1) cooperation with appropriate State or local, public, or private agencies; (2) the confidentiality of information acquired with the understanding that it would be so held; and (3) the limitation on the performance of investigative or prosecutive functions by personnel of the Service." Message of the President Accompanying Reorganization Plan No. 1 of 1966, Eff. Apr. 22, 1966, 31 F.R. 6187, 80 Stat. 1607, 5 U.S.C. app. at 164 (Feb. 10, 1966).

Four subsequent statutes expanded the role of CRS in violence prevention, hate crimes prevention, and civil rights conflict resolution.[1] *First*, in 1968, the Fair Housing Act recognized CRS's role in preventing and eliminating discriminatory housing practices, and directed the Secretary of Housing and Urban Development to assist CRS with that work. 42 U.S.C. § 3608(e)(4). *Second*, in 1996, the Church Arson Prevention Act directed CRS to "prevent, and respond to potential violations" of 18 U.S.C. §§ 247 and 844, involving damage to religious

---

[1] In their TRO opposition, the government disputed that these statutes expanded the jurisdiction of CRS. This is contrary to the position previously taken by the Trump Administration, *see* Supp. Nam Decl. ¶ 16, Doc. No 33-11 at 8, and the government has not explained the basis for its sudden reversal in course. The provisions in question were not merely standalone, background funding provisions; they were tethered to the creation of new federal crimes and thus manifestly substantive and continuing.

property and interference with the free exercise of religion, and destructive conduct using fire, bombs, or other explosives.  Pub. L. 104-155, § 6, 110 Stat. 1392, 1394 (1996).  *Third*, in 2007 and 2016, respectively, the Emmett Till Unsolved Civil Rights Crime Act and the Emmett Till Unsolved Civil Rights Crimes Reauthorization Act simultaneously directed DOJ's Civil Rights Division to investigate unsolved civil rights–era homicides and directed CRS to "provide technical assistance by bringing together law enforcement agencies and communities to address tensions raised by" those same crimes.  Pub. L. 114-325, § 2, 130 Stat. 1965, 1967; *see also* Pub. L. 110-344, 122 Stat. 3934 (2007).  *Fourth*, in 2009, the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act directed CRS to "prevent and respond to alleged violations" of 18 U.S.C. § 249, a newly established federal hate crime for causing or threatening bodily injury based on race, color, national origin, gender, gender identity, sexual orientation, religion, or disability.  Pub. L. No. 111-84, §§ 4706, 4707, 123 Stat. 2190, 2838 (2009).

## B.  CRS Has Served as "America's Peacemaker" for More Than Sixty Years

CRS has quietly and without fanfare played an important role in some of the most significant moments in this country's history over the last sixty years.  Consider just a few highlights.

In March 1965, CRS conciliators were dispatched to Selma, Alabama, following the "Bloody Sunday" attack on peaceful marchers seeking to cross the Edmund Pettus Bridge.  CRS conciliators coordinated with civil rights leaders, the Justice Department, and state officials by shuttle diplomacy to negotiate a safe path for the subsequent marches to Montgomery.  These efforts prevented the outbreak of further violence, bloodshed, and injuries; enabled the resumption of a peaceful march to Montgomery, Alabama; and helped establish CRS's credibility as an impartial peacemaker.  Nam Decl., Doc. No. 33-10 at 9.

In the 1970s, CRS became significantly involved in mediating school desegregation conflicts. CRS conciliators played a critical role when Boston faced a challenging period of desegregation and a busing crisis. A CRS team facilitated engagement between and among school district officials, the mayor's office, the police department, and various community groups, including the NAACP, which brought the lawsuit that resulted in the District Court's desegregation order. *Id.*

CRS also de-escalated violent situations in individual schools during that crisis. For example, a CRS conciliator singlehandedly calmed a fight that had broken out between Black and White students at South Boston High School. Recognizing CRS's important role, this Court brought CRS into the desegregation process and required all parties to cooperate with CRS's efforts. *Id.* Over the following years, CRS actively worked in Boston to prevent violence, organize interracial parent councils, and sustain dialogue among governmental and community stakeholders. On December 6, 1978, this Court wrote to President Jimmy Carter regarding CRS's work in Boston, saying: "At the outset of school desegregation here, and on several occasions thereafter, local officials simply didn't know which way to turn. CRS was able to . . . provide counsel and leadership not only to school officials but to the police and other municipal departments as well, and to avoid widespread violence." *Id.*

In 1973, CRS served as a neutral intermediary and communication channel between the 200 members of the American Indian Movement and Oglala Lakota activists that had occupied Wounded Knee, South Dakota. CRS's work to mediate and maintain lines of communication contributed to prevention of bloodshed and, ultimately, to the end of the standoff. *Id.* at 10-11.

In 1977, CRS successfully led a negotiation between a neo-Nazi group seeking to march in Skokie, Illinois (a Chicago suburb with a large Jewish population), the Jewish community

(including many Holocaust survivors), city officials, and civil rights advocates that resulted in the prevention of violence and a successful resolution of the impasse, while ensuring First Amendment rights and community safety. *Id.*

Throughout the 1980s, CRS was central in improving and reforming relationships between law enforcement and minority communities. CRS helped found the National Association of Police-Community Relations Officers, convened symposiums on reductions in the use of force, and supported minority recruitment in policing. *Id.* at 11.

Between 1991 and 1994, following the widely televised beating of Rodney King, the acquittal of the Los Angeles Police Department ("LAPD") officers who participated in the beating, and the rioting and civil unrest that followed, CRS deployed conciliation teams to Los Angeles within hours of the verdict to help defuse violence and restore communication between and among racial and community groups. CRS served as a neutral liaison between city officials, police, civil-rights organizations, business leaders, and residents; worked with the mayor's office, LAPD, local clergy, and community coalitions to coordinate peaceful responses and reduce retaliation; and helped establish community-based recovery and dialogue programs aimed at healing relationships among Black, Latino, Korean, and other ethnic communities. *Id.*

CRS was instrumental in the federal government's response to a string of church burnings throughout the United States, many of which targeted Black congregations in the South. In June 1996, Attorney General Janet Reno and Treasury Secretary Robert Rubin jointly established the National Church Arson Task Force, which included federal law enforcement agencies and CRS. In that role, CRS focused on stabilizing the community and preventing further violence. *Id.*

After the terrorist attacks of September 11, 2001, CRS worked under the direction of Attorney General John Ashcroft to prevent hate-based retaliation against Arab, Muslim, Sikh,

and South Asian communities.  In April 2003, Ashcroft announced that CRS had held more than 250 town and community meetings and forums on backlash issues and developed best practices for law enforcement to prevent and respond to hate incidents against Arab-Americans, Muslim-Americans, South Asian-Americans, and Sikh-Americans.  Throughout this time, CRS trained law enforcement, organized dialogues, and established working groups nationwide to protect targeted populations and maintain community trust.  *Id.* at 12.

CRS performed a conflict-resolution and liaison role in the aftermath of Hurricane Katrina.  Its interventions focused on reducing racial and ethnic tensions, facilitating communication between disaster victims and authorities, and, in the context of post-disaster disputes and inequalities that emerged in the storm's chaotic aftermath, ensuring equitable access to relief and recovery resources.  *Id.*

CRS played a pivotal role in helping communities recover and rebuild trust following the August 5, 2012, mass shooting at the Sikh Gurdwara in Oak Creek, Wisconsin, in which six Sikh worshippers were killed and several others injured.  CRS conciliators were deployed to Oak Creek immediately after the shooting to assist local, state, and federal officials in engaging with grieving community members and restoring calm.  CRS provided on-site crisis mediation and facilitation between Sikh community leaders, law enforcement, and local government to promote trust and open communication.  *Id.* at 12-13.

After the 2012 killing of Trayvon Martin and the not-guilty jury verdict of George Zimmerman, CRS mediators worked day and night to maintain calm between protesters, local officials, and law enforcement.  CRS also convened an interdenominational group of local clergy to decrease misinformation and maintain peace.  *Id.* at 13.

After the killing of Michael Brown, a young, unarmed Black man, by a White police officer, sparking months of protests and civil unrest, CRS worked with officials from various law enforcement agencies, as well as local community leaders, to develop viable working relationships and establish a coalition of civic and community leaders to address the underlying issues of the conflict and begin to develop long-term solutions to the community tension. *Id.*

After an armed attacker perpetrated a mass shooting at the Pulse Nightclub in Orlando, Florida, resulting in the massacre of 49 people and the wounding of many more (with most victims reportedly identifying as LGBTQ+), CRS convened a coalition of civic and community leaders to provide immediate support for victims and prevent retaliation or escalation of bias-related tensions. *Id.* ¶ 18(f). To maintain peace amid heightened emotions, CRS worked with the Orlando Emergency Operations Center and local law enforcement to prepare for counter-protests from anti-LGBTQ+ and anti-Muslim groups during vigils and funerals. *Id.* at 14.

Following the murder of George Floyd, CRS deployed field teams to coordinate communication between law enforcement, activists, clergy, and neighborhood leaders. *Id.* ¶ 18(l). By combating misinformation and encouraging cooperation, CRS reduced the likelihood of additional violence. Local leaders credited the mediators' neutrality with preventing wider destruction. *Id.* at 16-17.

CRS deployed to Milwaukee and Chicago for the Republican National Convention and the Democratic National Convention, as CRS had done every four years. *Id.* ¶ 18(o). Working with law enforcement, protest organizers, and municipal leaders, CRS helped both cities manage demonstrations and prevent major violence while ensuring that constitutional rights were protected. Throughout both conventions, CRS conciliators were on the streets of the two cities engaging in de-escalation efforts between pro-Palestinian protesters and pro-Israeli protesters

and between the protesters and police officers to prevent riots and help maintain peace and order, in coordination with federal, state, and city law enforcement. *Id.* at 17-18.

## C. CRS's Critical Services to Communities, Local Governments, and Other Stakeholders

CRS has a headquarters office in Washington, D.C. and field offices across five different regions of the United States. *Id.* at 18. One of those regions, the Atlantic North Region, has been served by a field office located in Boston, Massachusetts, whose services have been utilized by multiple Plaintiffs. *See* Supp. Nam Decl. ¶ 10, Doc. No. 33-11 at 6.

Pursuant to its statutory mandate, CRS currently provides four categories of services to state and local governments and partner organizations like Plaintiffs in advancement of its mission: facilitation of dialogue, mediation, training, and consultation. These services are provided both in-person and virtually, at no cost, and tailored to each community's needs.

1)  *Facilitation of Dialogue.* CRS conciliators create lines of communication among diverse groups, enabling them to learn about each other's perspectives and resolve issues causing conflict. These dialogues typically involve local agencies, institutions, and community members and may address topics such as racial tensions, police-community relations, perceived hate crimes, tribal conflicts, and protests and demonstrations. CRS-facilitated dialogues help stakeholders develop action plans to improve communication and promote partnerships. *Id.* at 4.

2)  *Mediation.* CRS conciliators serve as impartial third-party mediators, helping stakeholders resolve community-based conflicts. Mediation is a structured process designed to address misunderstandings, establish mutual trust, and empower communities to independently prevent and resolve future conflict. By law, these sessions are confidential. That confidentiality fosters candid discussion of issues, interests, values, and sustainable solutions. The goal of mediation is not to determine fault but to identify ways to improve collaboration and strengthen

partnerships among parties.  The results of mediation are commonly memorialized in written documents, such as memorandums of understanding or mediation agreements.  *Id.* at 5.

3)      *Training.*  CRS conducts training sessions that provide representatives from government, faith organizations, law enforcement, civil rights groups, and other community organizations with the knowledge and skills needed to increase understanding and improve collaboration among diverse stakeholders.  *Id.*

4)      *Consultation.*  CRS conciliators offer consultation services to educate and empower communities. These services provide stakeholders with insights into best practices and resources designed to alleviate tensions and prevent future conflict.  *Id.*

The goals of all CRS programs are to help parties in conflict understand different perspectives, share information about resources and best practices, and support communities as they identify and implement solutions.  Consider just a sample of CRS's facilitated dialogue and training programs.

*Bias Incidents and Hate Crimes Forums.*  CRS organizes forums to educate community members and law enforcement about the Shepard-Byrd Hate Crimes Prevention Act, as well as state and local hate crimes laws.  These forums gather local and federal law enforcement, district attorneys, civil rights organizations, and community organizations to develop strategies to effectively respond to bias incidents and hate crimes.  *Id.* at 6.

*Protecting Places of Worship Forums.*  CRS organizes programs to help communities safeguard places of worship against potential threats.  Experts from federal, state, and local law enforcement agencies, along with faith-based organizations, provide information and resources related to hate crime laws, the handling of active shooter situations, and physical security at religious buildings.  *Id.*

*Strengthening Police and Community Partnerships ("SPCP").* These programs convene law enforcement and diverse community leaders in problem-solving discussions aimed at improving public safety by fostering trust, building partnerships, and boosting local capacity. *Id.*

*Contingency Planning.* CRS hosts workshops to strengthen participants' knowledge around the planning of safe public events, such as demonstrations or rallies, focusing on ways to reduce the risk of violence. These programs include sessions for developing safety plans and addressing potential safety concerns. *Id.* at 6-7.

*Event Marshals: Maintaining Safety During Public Events.* This CRS training program teaches community members to act as event marshals, ensuring the safety and success of public events. Participants learn about the roles and responsibilities of marshals, discuss how to handle real-life scenarios, and receive a reference guide with essential information. *Id.* at 7.

*"Understanding" and "Engaging and Building Partnerships" with Communities Series – Arab American, Hindu American, Jewish, Muslim American, and Sikh American Communities.* These CRS programs familiarize participants with customs and cultural aspects of each community, including their beliefs, identity, practices, and civil rights-related issues that impact the community. The programs provide best practices for collaboration with these communities for peaceful co-existence and public safety. *Id.*

*School-Student Problem Identification and Resolution of Issues Together ("School-SPIRIT").* School-SPIRIT programs engage student leaders, school administrators, and other school community members in identifying and resolving issues affecting their schools. *Id.* at 8.

## D. Defendants Decided to Stealthily Dissolve CRS Due to Hostility to its Congressionally Assigned Mission

Defendants are fundamentally hostile to CRS and its mission. Behind closed doors, they decided to abolish CRS, resulting in a gradual cessation of services to Plaintiffs and other

stakeholders and leading to the planned termination of CRS's workforce effective October 31, 2025.  This decision was not a mere reorganization, but, in Defendants' own words, represents a wholesale dissolution of the agency and its functions.

On March 25, 2025, Deputy Attorney General Todd Blanche issued a memorandum entitled "Soliciting Feedback for Agency Reorganization Plan and RIF" to all DOJ department and component heads, soliciting feedback on proposed staffing reductions and agency reorganizations.  *Id.* at 43.  Among the proposals in that memorandum was "eliminating the Community Relations Service and moving some or all impacted employees to U.S. Attorneys' Offices."  *Id.* at 44.

The President's FY 2026 budget request for DOJ includes no funding for CRS.  Buried within OMB's Technical Supplement to that budget request, it states, without providing a rationale, that "[t]he Justice Department's reorganization **will eliminate the Community Relations Service (CRS) and its functions** in FY 2025, so no funding is requested in FY 2026 for CRS."  Ex. 1 to Freeny Decl. at p.607, Doc. No. 33-1 at 19.

The justification behind Defendants' elimination of CRS is set forth in another obscure document, a FY 2026 Budget and Performance Summary that DOJ published on June 13, 2025, in connection with the President's FY 2026 budget.  That document stated that "**[t]he Department will eliminate CRS and its functions**, a total of 56 positions," going on to state that "[t]he CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities."  Ex. 2 to Freeny Decl. at p.20, Doc. No. 33-2 at 9.

Between March and September 2025, CRS declined to accept new requests for—and actively withdrew from—mediation and/or conflict resolution/de-escalation services that fell within CRS's jurisdictions.  This wholesale cessation of the services mandated by the Civil

Rights Act was done at the direction of DOJ leadership in connection with Defendants' unlawful elimination of the CRS in its entirety. Nam Decl. ¶ 27, Doc. No. 33-10 at 21.

Among the consequences of this unlawful elimination of CRS and its functions were: (a) the cancellation of CRS-facilitated Protecting Places of Worship programs and religious community security consultations that had been planned with Christian, Hindu, Jewish, Muslim, and Sikh communities throughout the country, many of which had been requested by religious leaders in response to specific security concerns such as bomb threats, vandalism, and threats of physical violence against religious communities; (b) the withholding of CRS's training and consultation services to law enforcement agencies, universities, and tribal communities facing conflict due to divisions and disagreements related to the Israel-Hamas conflict, LGBTQ+ issues, and racial vandalism; (c) the discontinuation or early cessation of CRS's School-SPIRIT programs that school districts and individual public schools in Kansas, Missouri, Montana, Virginia, and Wyoming had requested; (d) the withdrawal from a series of mediation programs CRS led with the participation of municipal leaders, local law enforcement agencies, civil rights organizations, and community groups to address incidents of alleged excessive use of force by law enforcement, leading to unresolved mediations; and (e) the unavailability of CRS's antisemitism programming, titled "Understanding and Building Relationships with Jewish Communities," which CRS had recently developed in partnership with major national Jewish organizations. Supp. Nam. Decl. ¶ 5, Doc. No. 33-11 at 3.

On September 29, 2025, the Justice Department sent RIF notices to fourteen of the remaining 15 active employees of CRS, including the head of CRS, with an effective date of October 31, 2025. Ex. 1 ¶ 32. The stated reason for the RIF was the "**the dissolution of the**

**Community Relations Service** (CRS) in accordance with the reorganization and reconsolidation of the Department of Justice." *Id.*

### E. Defendants Withdrew or Terminated Crucial Services to Plaintiffs as a Result of Their Decision to Dismantle the Agency

As detailed in the attached declarations, each of the Plaintiffs had been receiving CRS's services until CRS ceased providing assistance to the public; and they would like to resume these services once CRS resumes operations.

*Plaintiff Ethical Society of Police ("ESOP"), Missionary Baptist State Convention of Missouri ("MBSC"), and NAACP St. Louis County.* ESOP, MBSC, and NAACP St. Louis County participated in a CRS-led engagement with St. Louis County law enforcement in the wake of a September 2024 incident where a Black off-duty officer with the St. Louis County Police Department was beaten by three White construction workers in Clayton, Missouri. *See generally* Doc. Nos. 12–14. When the responding officers, who worked in the same Department as the victim, arrived on the scene, they handcuffed the off-duty officer despite clear indications that he was the victim, and they failed to provide or ensure timely medical assistance to the injured officer. The incident raised serious concerns within the community and among civil rights organizations about racial bias, officer treatment, and procedural failures within the police department. Decl. of Rev. Duvall ¶ 10, Doc. No. 33-24 at 3. ESOP, MBSC, and NAACP St. Louis County participated in CRS-led discussions with the St. Louis County Police Department about addressing these concerns, but CRS withdrew from the engagement before its completion. *Id.* at 4. CRS's withdrawal meaningfully hampered the ability of the Plaintiffs to have their concerns addressed by the police department, resulting in the department's failure, to date, to carry through on its commitments. *Id.* at 5-7.

*Plaintiff Two Wrasslin' Cats Accord ("TWCA").* CRS's work with TWCA arose in the wake of rising racial tensions in Moodus, Connecticut, after the parents of a Black middle school student raised concerns that the student was being bullied because of his race. Thiede Decl. ¶ 4–7, Doc. No. 33-15 at 2-3. As a result, the U.S. Attorney's Office for the District of Connecticut reached out to CRS's regional staff in Boston, Massachusetts, to ask for their help in addressing potential civil rights violations and hate crimes. *Id.* In response, in summer 2024, CRS reached out to TWCA and other community organizations in Moodus and the greater East Haddam area to offer conciliation services. CRS held several community listening and dialogue sessions in Middletown, Connecticut, to understand community members' views and concerns about racial tensions, especially those of parents and students. *Id.* These were followed by several "Dialogue on Race" sessions between January and May 2025. *Id.* TWCA actively participated in and contributed to these sessions. CRS thereafter stopped providing all services, despite TWCA's request for continued CRS support and interest in continuing to partner with CRS. *Id.*

*Plaintiff Out Accountability Project ("OAP").* OAP reached out to CRS in the fall of 2024 and early 2025 to discuss harassment and bullying concerns of LGBTQ+ students in Connecticut. Combs Decl. ¶ 7, Doc. No. 33-16 at 3. OAP and CRS discussed the different services CRS could provide, but as a result of CRS's dismantlement, CRS discontinued that engagement in early 2025. *Id.* OAP continues to regard CRS's service as important to their organization's mission. *Id.* at 4.

*Plaintiff Berkshire Resources for Integration of Diverse Groups and Education, ("BRIDGE").* BRIDGE has sought and secured CRS services on several occasions in recent years, adapting its model for delivering services to constituents on its partnership with CRS. Supp. VanSant Decl., Doc. No. 33-23 at 2. At BRIDGE's request and with their assistance, CRS

conducted a School-SPIRIT program in February 2025 at W.E.B. DuBois Middle School in Great Barrington, Massachusetts. *Id.* School-SPIRIT is a proven program used by schools around the country to empower students and divert them from involvement with law enforcement. *Id.* At the request of youth leaders, BRIDGE sought an additional School-SPIRIT program for public schools in Stockbridge, Massachusetts but was denied because of CRS's winddown. Supp. VanSant Decl., Doc. No. 33-23 at 3.

      *Plaintiff NAACP State Conference Colorado-Montana-Wyoming ("Tri-State NAACP").* CRS began assisting Tri-State NAACP in 2024 by facilitating a series of community and law enforcement dialogues to build trust between police and diverse communities, strengthen problem-solving communications, and to increase community member collaboration with law enforcement. Ex. 9 ¶ 4. Two dialogues were held in January and July of 2024, resulting in the creation of an action plan for future engagement, to include an October 25, 2025 community dialogue with Tri-State NAACP. *Id.* CRS terminated planning for that dialogue as a result of its impending dissolution. *Id.* ¶ 5.

      *Plaintiff Pikes Peak Southern Christian Leadership Conference 1 ("Pike's Peak SCLC").* Pikes Peak SCLC, a branch of the organization Martin Luther King, Jr. founded to coordinate civil rights protests through nonviolent action, has partnered with CRS on multiple occasions to address community tensions and conflicts arising from racial profiling incidents and excessive force by law enforcement in Colorado. Nelson Decl. ¶ 3, Doc. No. 33-18 at 1. Recently, this effort included a dialogue that CRS convened between Pikes Peak SCLC and the District Attorney for the Fourth Judicial District in Colorado, an area that includes Colorado Springs. *Id.* at 2. In June 2025, Pikes Peak SCLC requested CRS's assistance in facilitating another dialogue with law enforcement, in response to an incident involving allegations of excessive use of force

against Black youth.  But because of the planned dissolution of the agency, CRS declined the request.  *Id.*

*Plaintiff Peacemakers Lodge.*  In March 2025, Peacemakers Lodge, located on the Wind River Indian Reservation in Wyoming, requested CRS assistance in opening communications with a local school district, after the school district stopped engaging with the Lodge in a dialogue about the schools' disciplinary practices, which the Lodge was concerned were biased against Native American students.  Ex. 11 ¶ 4–5.  CRS convened an initial meeting with the Lodge in March 2025 to hear their concerns, including about perceived lack of sensitivity within the school district to the concerns of Native Americans and the impact that can have on the learning environment for Native American students.  *Id.*  On or about May 2025, CRS convened a meeting between the Lodge and school officials to discuss ways to address these concerns.  But once again, because of the agency's impending dissolution, CRS thereafter ceased providing services to the Lodge.  *Id.* ¶ 6.

*Plaintiff Wellspring Health Access* ("Wellspring").  Wellspring operates a reproductive healthcare clinic located in Casper, Wyoming, that was the victim of an arson attempt in 2022 that delayed the clinic's opening.  Ex. 12 ¶ 4.  Beginning that year, CRS provided facilitation and communications services between Wellspring and Casper law enforcement, following anti-abortion protests at Wellspring.  *Id.* ¶ 5.  The aim of that dialogue was to identify ways to allow the clinic to safely operate and to manage protesters without interruption of the clinic's services.  CRS withdrew its assistance to Wellspring on or about May 2025, despite ongoing safety concerns at the clinic, as a direct result of the agency's planned shutdown.  *Id.* ¶ 6.

*Plaintiff Haitian Community Help & Support Center.*  On or about February 2024, at the request of the U.S. Attorney's Office for the Southern District of Ohio, CRS convened a forum,

dubbed "United Against Hate," to bring together faith-based leaders and members of the Haitian community to discuss issues arising from the conviction and sentencing of an African-American assailant for robberies and hate crime assaults against Haitian immigrants in Springfield, Ohio. Ex. 13 ¶ 6–9. Haitian Support Center participated in this forum. *Id.* CRS continued to engage with Haitian Support Center through the end of 2024 and beginning of 2025, with the goal of supporting the Haitian community's desire to improve communications and relations with civic leaders and address concerns about the policing of the Haitian community. *Id.* This engagement was poised to culminate in a Memorandum of Understanding ("MOU") between the Springfield Police Department and the Center and other community groups regarding policing practices. *Id.* After agreeing to facilitate and consult on this MOU, however, CRS abruptly withdrew the provision of all services to the Center, preventing the MOU from being finalized.

## ARGUMENT

On a motion for preliminary injunction, a district court must consider "the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (cleaned up). The final two factors—the balance of hardships and the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, each of these factors favors Plaintiffs. District courts have provided relief in similar agency-dissolution cases, including in two decisions the First Circuit recently declined to stay on appeal. *See, e.g.*, *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 52 (D.R.I. 2025), *stay denied on appeal by Rhode Island v. Trump*, 155 F.4th 35, 50 (1st Cir. 2025); *New York v.*

*Kennedy*, 789 F. Supp.3d 174, 213 (D.R.I. 2025), *stay denied on appeal by New York v. Kennedy*, 155 F.4th 67, 77 (1st Cir. 2025); *see also Widakuswara v. Lake*, 773 F. Supp. 3d 46, 57 (S.D.N.Y. 2025); *Wiley v. Kennedy*, 789 F. Supp. 3d 447, 466-67 (S.D.W.Va. May 13, 2025).  Many of those cases involved less widespread RIFs than was taken here and did not have the kind of unambiguous statements about agency closure evident here.  A preliminary injunction is all the more appropriate here.

## I.    Plaintiffs Are Likely to Succeed on the Merits

As the Court recognized at the TRO stage, Plaintiffs are likely to succeed on the merits for three independent reasons.  First, Defendants' unilateral dissolution of CRS contravenes statutory law and authority, in violation of the APA.  Second, the dissolution is arbitrary and capricious, also in violation of the APA.  Third, Defendants' action—usurping Congress's authority to legislate—violates the separation of powers and is *ultra vires*.  Finally, it bears emphasis: The unlawfulness of Defendants' unilateral actions to abolish CRS is all the more clear in the wake of Congress's funding CRS *and* ordering the Executive Branch to rescind RIFs (including the CRS RIF) implemented after October 1, 2025.

### A.    The Dissolution of CRS Is Not in Accordance with Law and in Excess of Statutory Authority

The APA requires a reviewing court to set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).  Defendants' dissolution of CRS—up to and including the termination of all but one of its employees—runs afoul of these basic constraints on agency action.

The Civil Rights Act is unambiguous: "*There is hereby established* . . . a Community Relations Service," 42 U.S.C. § 2000g, and it "*shall be the function* of the Service to provide assistance" to communities in resolving disputes related to discriminatory practices, *id.*

§ 2000g-1 (emphasis added).  The Executive Branch has no authority to eliminate CRS, to discontinue its functions, or to refuse to provide any assistance to communities.

And yet DOJ's own contemporaneous statements and actions leave no doubt that is what happened here.  DOJ's Budget and Performance Summary announced that the "Department will eliminate CRS and *its functions*," and that CRS "will formally close all its offices *by the end of FY 2025*."[2]  Ex. 2 to Freeny Decl., Doc. No. 33-2 at 9, 113 (emphasis added).  CRS thereafter stopped providing *all* services.  Nam Decl. ¶¶ 27, 29 Doc. No. 33-10 at 21–22 (explaining that cessation was the result of CRS's planned closure).  The RIF notices that were issued to all but one CRS employee likewise stated that the action was taken because of the "dissolution of the Community Relations Service."  Supp. Nam Decl. ¶ 3 & Ex. C, Doc. No. 33-11 at 11.  This amounts to a categorical shuttering of a congressionally created agency.  And it was undertaken, in Defendants' own words, because "[t]he CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities."  Ex. 2 to Freeny Decl. at p.9, Doc. No. 33-2 at 20.  This is as close to an admission of willful defiance of Congress as one might expect to see, and a textbook example of an APA violation.

As then-Judge Kavanagh explained in *In re Aiken County*, an agency may not "decline to follow a statutory mandate or prohibition simply because of policy objections."  725 F.3d 255, 259, 267 (D.C. Cir. 2013) (holding that the Nuclear Regulatory Commission acted unlawfully in declining to continue a statutorily mandated licensing process).  "Once Congress . . . has decided

---

[2] Defendants' claim in this litigation that the closure of CRS was only a "proposal" put to Congress in the Administration's FY2026 budget is flatly inconsistent with this pre-litigation admission.  *See also* Doc. No. 33-1 at 19 ("The Justice Department's reorganization will eliminate the Community Relations Service (CRS) and its functions *in FY 2025*.").

the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought." *TVA v. Hill*, 437 U.S. 153, 194 (1978).

In their opposition to Plaintiffs' Motion for TRO, Defendants conceded that "only Congress, through legislation, can dissolve or eliminate CRS." Opp. to TRO, Doc. No. 15 at 23. Their only substantive defense was an astonishing bit of revisionist history: a claim that what they had called a "dissolution" as recently as September 29, 2025, is actually a mere "realignment." Defendants' litigating position cannot be squared with their contemporaneous statements, nor with their actions. "Accepting [the] contrived reasons" offered here "would defeat the purpose of" requiring that agencies engage in reasoned decision-making. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). The Court should not accept the government's entreaty "to exhibit a naiveté from which ordinary citizens are free." *Id.*

### B.     The Dissolution of CRS Is Arbitrary & Capricious

Defendants' actions are also arbitrary and capricious for much the same reason. An agency action is arbitrary or capricious "if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (cleaned up). "A court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015). Here, the only available contemporaneous explanation for the shuttering CRS is that this Administration disagrees with its statutory mission. That explanation is in invalid basis for precisely the reasons set forth above.

And even if Defendants' post-hoc justification of "realignment" were considered, Defendants have failed to demonstrate "a rational connection between the facts found and the choice made." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (cleaned up). The available record provides no hint that Defendants engaged in any analysis at

all to reach their alleged conclusion that a single CRS employee could carry out CRS's statutory mission—let alone, that they considered CRS's statutory mandates, the communities it serves, or the reliance interests of those CRS was in the midst of assisting.[3] *See R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-cv-342, 2025 WL 2988705, at *7 (D.R.I. Oct. 23, 2025) (rejecting action where defendants "failed to achieve even [the] basic requirement" of a satisfactory explanation); *see also R.I. v. Trump*, No. 25-cv-128, 2025 WL 3251113, at *13.

Defendants' decision to terminate 14 out of 15 CRS employees, and their continued refusal to rescind the unlawful RIF, is now also flatly contrary to the recent Continuing Resolution ("CR") that funded CRS and other agencies at the existing level through January 31, 2025. That CR provided that "any reduction in force proposed, noticed, initiated, *executed, implemented, or otherwise taken* by an Executive Agency between October 1, 2025, and the date of enactment [Nov. 12, 2025], *shall have no force or effect*." *See* Public Law No. 119-3 § 120(e) (2025) (emphasis added). It further directed agencies, within five days, to provide notice to affected employees of the withdrawal of relevant RIFs notice and of the affected employee's reinstatement. *Id.* The RIF of CRS employees falls squarely within the plain language of the CR's rescission provision. Although the RIF *notices* were issued to employees on September 29, 2025, they stated that the RIF would be "conducted effective October 31, 2025," and that employees would be "separated from the Federal service by reduction in force on October 31, 2025." Doc. No. 33-11 at 11. Defendants' refusal to rescind these RIF notices is yet another example of their willful defiance of Congress—a hint at the lengths they will go to destroy an

---

[3] Defendants also evidently failed to consider CRS's confidentiality and neutrality obligations when purportedly deciding that CRS's functions could be carried out within EOUSA and/or U.S. Attorney's Offices. *See* Supp. Nam Decl. ¶¶ 13–14, Doc. No. 33-11 at 7-8 (explaining why these obligations historically led CRS to maintain separation from prosecuting offices).

agency whose civil rights mission they are hostile to. Accordingly, even if the government

claims that CRS is currently or will soon be operating with a single employee, there is every

reason to believe this is a fig leaf to cover their efforts to undermine and destroy CRS.

### C. The Dissolution of CRS Violates the Separation of Powers

Plaintiffs are similarly likely to succeed in demonstrating that Defendants' actions violate

the separation of powers and are *ultra vires.* This claim encompasses three distinct causes of

action: First, Plaintiffs may assert their constitutional separation of powers claim through the

APA, *see* 5 U.S.C. § 706(2)(B), and, second, by seeking injunctive relief under *Ex parte Young*,

209 U.S. 123 (1908). Third, when the "executive acts *ultra vires*," as it has here, Plaintiffs may

bring a free-standing claim to "reestablish the limits" on the executive's authority. *Aid Ass'n for*

*Lutherans v. USPC*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (quotation marks omitted); *R.I. Dep't*

*of Env'tl. Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002) ("The basic premise behind

nonstatutory review is that, even after the passage of the APA, some residuum of power remains

with the district court to review agency action that is *ultra vires.*").

Our constitutional order is premised on the proposition that the "diffus[ion]" of "power"

"secure[s] liberty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson,

J., concurring). "Even a cursory examination of the Constitution reveals . . . that checks and

balances were the foundation of a structure of government that would protect liberty." *Bowsher*

*v. Synar*, 478 U.S. 714, 722 (1986). The Framers understood this system "produces conflicts,

confusion, and discordance at times," but its structure "assure[s] full, vigorous, and open debate

on the great issues affecting the people" and "provide[s] avenues for the operation of checks on

the exercise of governmental power." *See id*.

The "Constitution is neither silent nor equivocal" about which branch of government has the power to establish or dissolve agencies. *See Youngstown*, 343 U.S. at 587. The "legislative Powers" are vested in Congress, which is empowered to "make all Laws" "necessary and proper" for the execution of the other two branches of government. U.S. Const. art. I §§ 1, 8; *see id*. art. II § 2 (confirming that executive branch offices "shall be established by Law"). "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). The President thus oversees the departments and executes the laws; he does not make, repeal, or abolish them. In short, under the separation of powers, "the Executive branch may not eliminate a *congressionally* created and funded agency without *congressional* authorization." *Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *7 (4th Cir. Mar. 28, 2025) (Gregory, J., concurring in judgment).

But, again, that is precisely what the Executive Branch is attempting to do. Without any congressional authorization whatsoever—indeed, in direct defiance of the Civil Rights Act of 1964 and a half-dozen other statutes—the Executive Branch is unilaterally shuttering a landmark institution which valiantly stood witness to civil rights history for more than half-a-century. Nor can the Executive Branch claim to be acting in response to "congressional inertia, indifference or quiescence." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Over, over, and over again—at times on a unanimous or overwhelmingly bipartisan basis—Congress *expanded* CRS's functions and duties. *See, e.g.*, 42 U.S.C. § 3608(e)(4); Pub. L. No. 104-155, § 6; Pub. L. No. 110-344; Pub. L. No. 111-84, §§ 4706, 4707; Pub. L. No. 114-325, § 2. In other words, the People's representatives in Congress have repeatedly reaffirmed that CRS should exist. In concluding otherwise, the executive branch is usurping *Congress's* authority—in violation of the separation of powers—and is acting *ultra vires*.

When one branch seeks to trample on the separation of powers, federal courts provide a remedy. *See, e.g.*, *Seila L. LLC v. CFPB*, 591 U.S. 197, 211 (2020); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 492 (2010). In particular, courts do not hesitate to intervene when the executive branch seeks to unlawfully destroy an agency—which is precisely what the Executive is attempting here. *See, e.g.*, *Rhode Island*, 781 F. Supp. 3d at 52 (issuing preliminary injunction because the "[e]xecutive is usurping Congress's" "vested legislative authority to create and abolish federal agencies"); *Widakuswara*, 773 F. Supp. 3d at 57 (issuing temporary restraining order based, among other things, on separation of powers claim); *Does 4, 7, 22, 27, 28, & 29 v. Musk*, No. CV 25-0462-TDC, 2025 WL 2346258, at *20 (D. Md. Aug. 13, 2025) (denying motion to dismiss).

### D. Defendants' Challenges to the Justiciability of this Case Are Without Merit

In their TRO opposition and in subsequent scheduling filings, Defendants mounted (or promised to mount) several challenges to the justiciability of Plaintiffs' claims. None of these has merit or affects Plaintiffs' overwhelming likelihood of success on their claims.

### i. Plaintiffs Have Standing

As a result of Defendants' decision to close CRS, Plaintiffs each lost government services they had previously enjoyed. This is a classic Article III injury.

In their TRO opposition, Defendants challenged this commonsense conclusion because, they say, Plaintiffs are not statutorily entitled to any particular CRS service. The First Circuit rejected a materially identical argument in *New York v. Kennedy*, holding that the government's claim that plaintiffs were "not statutorily entitled" to the services did not undermine plaintiffs' standing. 155 F.4th at 74; *see also R.I.*, 155 F.4th at 44 (affirming standing where plaintiffs

"have been and will continue to be injured by the defendants' failure to provide services on which the plaintiffs rely").

Defendants also proclaim, with no support, that "Plaintiffs' injuries are not caused by the [purported] realignment or RIF." Doc. No. 15 at 13. But, as the head of CRS at the relevant time explains, CRS did not selectively withdraw services on a case-by-case basis; instead, they ceased *all* assistance to communities, and they did so as a direct result of the planned shuttering of CRS. Nam Decl. ¶¶ 26, 29, Doc. No. 33-10 at 21-22. Moreover, "[h]ad it not been for CRS's planned dissolution and DOJ leadership's direction to implement the elimination process quickly, CRS would have continued to provide each stakeholder with the requested services, including continuing consultation on the services provided during the following year." *Id.*

### ii. The CSRA Does Not Preclude Jurisdiction

Defendants have signaled that they intend to argue that this case is "channeled away from district court review" by the Civil Service Reform Act ("CSRA"). Doc. No. 31 at 4. The First Circuit has already rejected this argument: the CSRA does not bar the recipients of government services from challenging efforts by the Executive "to shut down a statutorily created agency by summarily firing its employees en masse." *Somerville Public Schools v. McMahon*, 139 F.4th 63, 71 (1st Cir. 2025). The First Circuit reaffirmed this conclusion in the wake of the Supreme Court's order staying the preliminary injunction in *McMahon v. New York*, 606 U.S. __, 145 S. Ct. 2643 (2025). *R.I.*, 155 F.4th at 47 (quoting *Somerville* and finding that "nothing in *McMahon* indicates that we must now conclude otherwise").

By its terms, the CSRA's channeling provisions apply to personnel disputes brought by individual federal workers and organizations representing them, 5 U.S.C. § 7103(a)(1)-(2), not to claims that the Executive Branch is unlawfully depriving *the public* of congressionally mandated

services. *See R.I.*, 781 F. Supp. 3d 25. *Accord Axon Enter., Inc. v. FTC*, 598 U.S. 175, 189 (2023) (distinguishing between challenges to "specific substantive decisions" and challenges related to "the structure or very existence of an agency").

And even if the CSRA applied to non-employee claims, application of the tripartite test for determining whether Congress intended to channel *this* specific type of claim to agency review, *see Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994), compels the same result. *First*, because Plaintiffs have no access to any of the exclusive administrative means for challenge under the CSRA, preclusion of district court review would "foreclose all meaningful judicial review." *See Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212-13. *Second*, Plaintiffs' structural APA and separation of powers claims are "wholly collateral" to personnel matters and procedures. *See id. Third*, those claims are outside "outside the agency's expertise," while being squarely within this Court's. *See id.*

### iii. The "Narrow" Exception to APA Review in § 701(a)(2) Does Not Apply

Defendants argued in their TRO opposition that the shuttering of CRS is unreviewable under 5 U.S.C. § 701(a)(2), a provision that exempts from APA review "agency action [that] is committed to agency discretion by law." Because the APA "embodies a basic presumption of judicial review," courts read this exemption "quite narrowly." *Dep't of Com.*, 588 U.S. at 771-72. Its application is restricted to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 586 U. S. 9, 23 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). Even where a statute "leaves a great deal of discretion to the agency," that does not "make actions taken pursuant to it unreviewable." *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 19 (1st Cir. 2020). If agency action "is found

-28-

not to be reasonably consistent with [statutory objectives], then the courts must invalidate it." *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985).

Here, CRS's statutory mandate is explicit: it "*shall be the function*" of CRS to provide assistance to communities. 42 U.S.C. § 2000g-1. Defendants' categorical refusal to carry out that mandate—and their assertion that CRS's mission conflicts with their priorities—provides ample law for a reviewing court.[4] Plaintiffs are not, as in *Lincoln v. Vigil*, 508 U.S. 182 (1993), challenging the discretionary allocation of a lump sum appropriation.[5] *Rhode Island v. Trump*, No. 25-CV-128, 2025 WL 3251113, at *11 (D.R.I. Nov. 21, 2025) (distinguishing *Lincoln* from challenge to dismantling of agency specifically authorized and funded by Congress). They are challenging the complete abandonment of a statutory function and the attempted elimination of an agency Congress required to exist. Courts routinely review such claims, including when the government acted on impermissible factors. *See id.* at *12 (collecting cases).

## II.     Plaintiffs Face Serious Irreparable Harm

Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages,

---

[4] Even where the statute speaks in permissive terms—that the Service "may offer its services"— it still provides guidelines for CRS's decisionmaking, namely, the decision should be guided by whether "in [CRS's] judgment, peaceful relations among the citizens of the community involved are threatened." 42 U.S.C. § 2000g-1. While the phrase "in [CRS's] judgment" may afford discretion to the agency in deciding whether assistance is warranted, it certainly does not authorize CRS to refuse services based improper factors, such as a disagreement with CRS's peacekeeping mission.

[5] Congress has specifically appropriated funds for CRS. *See* Pub. L. No. 118-42 (2024); Pub. Law No. 119-37 (2025) (maintaining prior levels). And Plaintiffs have conceded that, by eliminating CRS's workforce, they are not currently in a position to expend funds appropriated for CRS's operation. *See* Lauria Decl., Doc. No. 15-1 ¶ 13 (noting that DOJ would need to "reassess and consider how to comply with any funding enactment")

irreparable harm is a natural sequel." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). A movant need not "demonstrate definitive harm." *Animal Welfare Inst. v. Martin*, 588 F. Supp. 2d 70, 101 (D. Me. 2008). Rather, a showing that "irreparable injury is *likely*" will suffice. *Winter*, 555 U.S. at 22. Moreover, the measure of irreparable harm is not a rigid one; "[t]he strength of the showing necessary . . . depends in part on the degree of likelihood of success shown." *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 43 (1st Cir. 2010); *see also EEOC v. Astra USA, Inc.*, 94 F.3d 738, 743 (1st Cir.1996) ("[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief.").

The harm Plaintiffs now face is ongoing and irreparable. CRS has ceased all public operations, in defiance of Congress. As a direct result, Plaintiffs have lost access not only to services they *had* been receiving, but also to services they had every reason to expect would continue into the future. *See* Nam Decl. ¶ 29, Doc. No. 33-10 at 22 ("Had it not been for CRS's planned dissolution . . ., CRS would have continued to provide each stakeholder with the requested services."). Plaintiffs' declarations describe immediate, ongoing consequences: abandoned mediations,[6] unresolved conflicts, "increased security risks,"[7] and lost access to services. The services Plaintiffs lost—and continue to be without access to while CRS is inoperable—are irreplaceable. *See, e.g.*, Duvall Decl. ¶ 23, Doc. No. 33-24 at 7 ("[T]here are no other alternative resources that could substitute for CRS's" assistance); Supp. VanSant Decl.

---

[6] *See, e.g.*, Dorsainvil Decl. ¶ 11, Doc. No. 33-22 at 4 ("Without CRS's facilitation, the city, law enforcement, and community organizations have not been able to engage further in the MOU process, and HSC's ability to advocate for improved local policing practice in the Haitian community . . . has been, and continued to be, harmed.")

[7] Supp. VanSant Decl. ¶¶ 15–18, Doc. No. 33-23 at 5-6 ("I and my staff re less safe while CRS's assistance is unavailable."); *see also* Burkhart Decl. ¶ 6, Doc. No. 33-21 at 2 (describing "ongoing security concerns" the women's health clinic).

¶ 12, Doc. No. 33-24 at 4 ("There are also no alternative resources available in Western Massachusetts that would substitute for CRS's experience and capacity."); Combs Decl. ¶ 8, Doc. No. 33-16 at 4.

Consider, for example, the loss that BRIDGE continues to suffer from the closure of CRS, which served as a key partner in BRIDGE's delivery of civil rights programming to its constituents for the last fifteen years. Supp. VanSant Decl. ¶ 5, Doc. No. 33-23 at 2. BRIDGE was in the midst of partnering with CRS to provide well-received dispute-resolution programming in Massachusetts public schools when CRS withdrew its assistance, preventing the program from occurring. *Id.* at 2-4. As the supplemental declaration submitted herewith details, "Every day that CRS is closed is another day that BRIDGE cannot offer this critical program to students," thereby "directly undermin[ing] BRIDGE's mission to reduce tension and promote constructive dialogue among youth." *Id.* at 4. Meanwhile, BRIDGE will immediately resume partnering with CRS—and receiving its services—if the agency reopens. *Id.*

Or consider CRS's abrupt withdrawal from a mediation process that three plaintiffs, including Missionary Baptist State Convention of Missouri, had requested to address concerns of racial bias in policing in St. Louis. Although the parties ultimately signed an agreement without CRS, CRS's absence from the process "weaken[ed] [the] prospects for effectuating real change" through the agreement. Duvall Decl. ¶ 16, 17, Doc. No. 33-24 at 4-7. Without CRS's oversight and credibility as a witness to the agreement and as a monitor for ongoing implementation, the police department's compliance with its commitments in the agreement has been incomplete. *Id.*; *see also* Supp. Nam Decl. ¶ 9, Doc. No. 33-11 at 5 ("Had CRS not ceased operations, it would have played a significant role in implementation of that agreement."). Plaintiffs desperately want CRS's services and are harmed because they cannot receive them. And as with

BRIDGE, Missionary Baptist State Convention of Missouri will immediately seek to resume services from CRS if the agency is resuscitated.  Doc. No. 33-24 at 7.

These are precisely the types of irreparable harms recognized in *Rhode Island* and *Kennedy* as a basis for preliminary injunctive relief.  "[L]ost services flowing from an agency-wide RIF are sufficient to demonstrate" irreparable harm.  *Rhode Island*, 155 F.4th at 48; *see also Rhode Island*, 781 F. Supp. 3d at 53; *Kennedy*, 789 F. Supp. 3d at 211–12.  Here, as in those cases, Defendants "do not dispute that the agency has completely stopped their public sector services," nor that those services "are not easily replicable."  *Rhode Island*, 781 F. Supp. 3d at 53.  Nor are these losses, including the ongoing injuries to Plaintiffs' pursuit of their missions, "compensable by money damages."  *Ross-Simons*, 102 F.3d at 18-19.

To reiterate: this harm is not just in the past.  As the supplemental declarations underscore, these Plaintiffs were denied services *because* of Defendants' unlawful shutdown of the agency, and if that shutdown is reversed and Plaintiffs returned to the status quo, they would immediately resume their use of CRS's services to advance the important civil rights work they each perform in their communities.  *See* Supp. VanSant Decl. ¶ 5, Doc. No. 33-23 at 2 ("BRIDGE would immediately seek services from CRS, if CRS were to become operational again."); Duvall Decl. ¶¶ 22-23, Doc. No. 33-24 at 7 ("If CRS were to resume assistance to the public, MBSC would immediately seek to reengage CRS in the implementation process" CRS abandoned).[8]  Indeed, because several of the conciliation specialists who were terminated as part

---

[8] *See also, e.g.*, Mayes Decl. ¶ 5, Doc. No. 33-18 at 2 ("If not for CRS's cessation of services of ultimate closure, Tri-State NAACP would be working with them on an ongoing basis to build trust and resolve conflict between law enforcement and the communities we serve."); Nelson Decl. ¶ 5, Doc. No. 33-19 at 2 ("Pikes Peak SCLC1 would continue to use CRS's invaluable services if it could."); Dorsainvil Decl. ¶ 11, Doc. No. 33-22 at 4 ("If CRS had not ceased its operations in the community, HSC would continue using its valuable services."); Thiede Decl. ¶ 6–7, Doc. No. 33-15 at 2 (describing desire for "continued CRS support").

of the RIF were responsible for facilitating assistance to these very Plaintiffs, *see* Supp. Nam Decl. ¶¶ 9-12, Doc. No. 33-11 at 5-7, the rescission of the (now-doubly) unlawful RIF would directly address Plaintiffs' injuries. In contrast, even if Plaintiffs win a favorable judgment at the conclusion of this litigation—which this Court has already found they are likely to do—they will never get back the services lost during the pendency of this case, nor will there be any redress for the irretrievable loss of violence-prevention programming that has historically reduced racial tension, prevented community unrest, and kept communities safe.

### III. The Remaining Factors Overwhelmingly Favor a PI

The balance of harms—to the public and Defendants—also strongly favor relief. Because "the Government is the opposing party," these two remaining factors merge. *Nken*, 556 U.S. at 435. As the First Circuit recently reiterated in another agency-shutdown case, "there is generally no public interest in the perpetuation of unlawful agency action." *New York*, 155 F.4th at 177. The government can hardly claim an interest in willfully violating any statute, let alone the Civil Rights Act of 1964—one of the most prominent statutes in modern history. Meanwhile, Congress recently funded CRS at pre-existing levels through January 31, 2026, and has rescinded the RIF of CRS employees that took place during the government shutdown. The public has an interest in the Executive Branch following Congress's direction.

The public is also harmed *every day* that CRS is shuttered and cannot perform its mission to reduce violence and promote understanding in our communities—functions which Congress deemed critical. As the Trump Administration acknowledged during its first Term, "CRS provides critical assistance in resolving and preventing racial, ethnic and national origin

community conflicts, violence, and civil disorder, and it helps communities struggling to recover in the aftermath of alleged violent hate crimes." Ex. A to Nam Decl., Doc. No. 33-10 at 36 The harm to the public in the absence of a PI is all the more worrisome in the face of the persistence of hate crimes across the United States, as reported annually by the FBI. *Id.* ¶¶ 24-25. Over its decades of storied history, CRS developed targeted and readily deployable tools and resources to combat and prevent race-based, religion-based, and sexual orientation-based hate crimes, but they depend on the skills, energies, and relationships of employees who were unlawfully terminated at the end of October. *Id.*

CRS has already lost more than 500 years of collective conflict resolution experience since the start of the year. *Id.* ¶ 37. The continued unlawful dissolution of "America's peacemaker" will mean heightened conflict in our communities, more interference with religious liberty, and less safe schools. It will mean fewer paths to peace, more to violence, and worse outcomes across the Nation. Where, as here, a brief pause of the status quo will prevent those grave public harms, equity demands that it be granted.

The Court can and should stop this injustice. Plaintiffs respectfully request the Court order the resumption of services to Plaintiffs, which were (as the record shows) terminated in connection with the unlawful shuttering of CRS. The Court should also order the rescission of the unlawful RIF of CRS employees. At the hearing on Plaintiffs' motion for TRO, the government noted its position that courts lack authority to unwind unlawful RIFs; but the government freely conceded that the weight of authority was against it on this point. Indeed, in a published and binding decision, the First Circuit recently affirmed that courts may order reinstatement of staff and restoration of agency functions in cases involving unlawful agency shutdowns. *Rhode Island*, 155 F.4th at 40, 50 (denying government's application for stay of

preliminary injunction requiring the government to "restore all IMLS, MBDA, and FMCS employees and personal service contractors, who were involuntarily placed on leave or involuntarily terminated due to the implementation of [the EO], to their status before March 14, 2025").  The Court should do so here.

## CONCLUSION

For all these reasons, the Court should grant a Preliminary Injunction.

Dated: November 25, 2025                         Respectfully Submitted,

*/s/ Kyle R. Freeny*
Kyle R. Freeny
(DC Bar No. 1684764 – *admitted pro hac vice*)
WASHINGTON LITIGATION GROUP
1717 K Street NW
Washington, DC 20006
Telephone: (202) 521-8750
KFreeny@WashingtonLitigationGroup.org

Ana Muñoz
(Mass. Bar No. 569233)
ZALKIND DUNCAN & BERNSTEIN LLP
2 Oliver Street, Suite 200
Boston, MA 02110
Telephone: (617) 742-6020
AMunoz@ZalkindLaw.com

*Counsel for Plaintiffs*

November 25, 2025

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon all attorneys of record by electronic filing on the above date.

*/s/ Kyle R. Freeny*
Kyle R. Freeny