# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ETHICAL SOCIETY OF POLICE, *et al*.,

     *Plaintiffs*,

  **v.**

PAMELA J. BONDI, *et al*.,

     *Defendants*.

**Case No. 25-CV-13115 (IT)**

Hon. Indira Talwani
United States District Judge

**BRIEF OF AMICI CURIAE THE LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS, AND 101 CIVIL RIGHTS AND COMMUNITY ORGANIZATIONS <u>IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE .......................................................................................... 1

INTRODUCTION ............................................................................................................... 2

CONGRESS CREATED AND EMPOWERED CRS TO SERVE AS A FEDERAL CONFLICT MEDIATOR ...... 3

ELIMINATING CRS INFLICTS DIRECT AND ONGOING HARM ON COMMUNITY STAKEHOLDERS........ 6

    A.    Dissolving CRS eliminates a trained, neutral federal mediator serving law enforcement and racially divided communities, depriving those same communities of CRS's valuable educational and other resources. ......................... 7

    B.    Without CRS, religious communities lose critical resources designed to protect places of worship and to promote peaceable resolution of interfaith conflicts..... 12

    C.    Without CRS, persons with disabilities across the nation will lose a powerful ally that responds swiftly and seriously to allegations of harassment and abuse, and provides a channel to voice concerns............................................................. 14

    D.    Dissolving CRS leaves LGBTQ+ communities increasingly vulnerable to bias-motivated attacks and harassment......................................................................... 16

    E.    Educational institutions, schools, and the next generation of students will be greatly harmed now that they are deprived of CRS's vital training resources to address social issues and prompt responses to incidents. ..................................... 17

    F.    CRS's statutory and functional role cannot be replicated by one individual........ 19

CONCLUSION.................................................................................................................. 20

i

# TABLE OF AUTHORITIES

**Page(s)**

## Statutes

Civil Rights Act of 1964,
Pub. L. 88-352, title X, § 1002, 78 Stat. 267 (1964)............................................................ 1, 2, 8

Church Arson Prevention Act of 1996,
Pub. L. No. 104-155, § 6, 110 Stat. 1392 (1996).................................................................. 6, 13

Emmett Till Unsolved Civil Rights Crime Act of 2007,
Pub. L. 110-344, § 6, 122 Stat. 3934 (2008)............................................................................. 6

Emmett Till Unsolved Civil Rights Crimes Reauthorization Act of 2016,
Pub. L. No. 114-325, § 2, 130 Stat. 1965, 1966 (2016)............................................................. 7

Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act,
Pub. L. 111-84, § 4706, 123 Stat. 2835 (2009)............................................................... 7, 9, 17

Title 42, United States Code,
§ 2000a-4 ............................................................................................................................ 21
§ 2000g-1 ..................................................................................................................... 3, 8, 21
§ 2000g-2. ..................................................................................................................... 4, 21
§ 2000g-3 ..................................................................................................................... 7, 21
§ 3608(e)(4) ........................................................................................................................ 5

## Additional Sources

Benjamin F. Holmm, *Community Relations Service*,
Att'y Gen. Ann. Rep. 178 (1970), https://tinyurl.com/49627xbm.............................................. 5

COMMUNITY RELATIONS SERVICE (CRS), Annual Reports to Congress,
1983 Annual Report, https://tinyurl.com/kc8tjhcc ..................................................................... 5
1986 Annual Report, https://tinyurl.com/37zbavzf.................................................................... 6
2012 Annual Report, https://tinyurl.com/3x2carw6............................................................. 13, 14
2013 Annual Report, https://tinyurl.com/3x6mvds4............................................................... 15
2014 Annual Report, https://tinyurl.com/ypsnef25............................................................. 10, 17
2015 Annual Report, https://tinyurl.com/yeyrhwrh .......................................................... 14, 15
2016 Annual Report, https://tinyurl.com/5fwwezvh ................................................. 9, 16, 17, 18
2018 Annual Report, https://tinyurl.com/ycycnvyp............................................................. 9, 10
2019 Annual Report, https://tinyurl.com/46akxjsm ....................................................... 12, 13, 18
2020 Annual Report, https://tinyurl.com/3nmer5fm ...................................................... 9, 10, 11
2022 Annual Report, https://tinyurl.com/49vnbmun .............................................................. 18

**Additional Sources (cont'd)**

CRS, *Bias Incidents and Hate Crimes Forum*,
https://tinyurl.com/24af29r8 .................................................................................................. 9, 13

CRS, *CRS Observes African American History Month*,
https://tinyurl.com/63zwtkrn ...................................................................................................... 8

CRS, *Empowering Students to Collaboratively Identify & Address School Conflicts*,
https://tinyurl.com/mr2detby ............................................................................................... 17, 18

CRS, *Engaging and Building Relationships with Transgender Communities*,
https://tinyurl.com/dy73jnu6 .................................................................................................... 17

CRS, *Marches from Selma to Montgomery*,
https://tinyurl.com/mtcdnp9s ...................................................................................................... 4

CRS, *Programs and Services*,
https://tinyurl.com/4n7x9rcx ....................................................................................................... 3

CRS, *Protecting Places of Worship Forum*,
https://tinyurl.com/29ayyh5v .................................................................................................... 13

CRS, *School-Student Problem Identification and Resolution of Issues Together (School-SPIRIT)*,
https://tinyurl.com/3ftwm6tz .................................................................................................... 18

CRS, *Strengthening Police and Community Partnerships (SPCP)*,
https://tinyurl.com/4mbxmu3t ................................................................................................. 8, 9

CRS, *Training Programs*,
https://tinyurl.com/ckf229rd ....................................................................................................... 3

CRS RESTORATION PROJECT, *Highlights of CRS's Historical Work*,
https://tinyurl.com/36s6dzbw .................................................................................................... 11

U.S. DEPARTMENT OF JUSTICE (DOJ) Press Release,
*Five Former Memphis Police Officers Charged with Federal Civil Rights, Conspiracy, and
Obstruction Violations In Connection with the Death of Tyre Nichols* (Sept. 12, 2023),
https://tinyurl.com/84wp83y5 .................................................................................................... 11

DOJ, *Community Relations Service Strategic Plan 2016–2020* (2016),
https://tinyurl.com/2zsxkxyd ...................................................................................................... 3

DOJ, *Community Relations Service: Organization, Mission and Functions Manual*,
https://tinyurl.com/2amjpcph ...................................................................................................... 4

**Additional Sources (cont'd)**

DOJ, *CRS FY2018 Performance Budget*,
https://tinyurl.com/2447h8rx ..................................................................................................... 20

DOJ, *CRS FY2025 Performance Budget*
https://tinyurl.com/5dcrb3tr ....................................................................................................... 20

DOJ, *Remarks by Attorney General Robert F. Kennedy to the National Citizens' Committee for Community Relations*, https://tinyurl.com/4t8djnjs .................................................................... 2

Grande Lum, *DOJ's Community Relations Service Delivers Mediation and Conciliation Services to AAPI Community*, WHITE HOUSE BLOG (Dec. 12, 2012), https://tinyurl.com/3cs7ju2v ...... 13

Letter from Robert Scott et al., Members of Cong., to Pam Bondi, Att'y Gen. (May 6, 2025),
https://tinyurl.com/y2p8zc45 ..................................................................................................... 12

Message from the President Transmitting Reorganization Plan No. 1 of 1966,
112 CONG. REC. 2822, at 3 (daily ed. Feb. 10, 1966), https://tinyurl.com/4pp5x3rb ................. 5

Rick Rojas, *Video of Memphis Officers Beating Tyre Nichols Elicits Widespread Horror*,
NY TIMES (Jan. 28, 2023), https://tinyurl.com/3988a4s4 ......................................................... 11

Suzanne Monyak, *Local Police Lament Dismantling of DOJ 'Peacemakers' Service (1)*,
BLOOMBERG LAW (July 17, 2025),  https://tinyurl.com/mswmxs3b ......................................... 12

THE SIKH COALITION, *Remembering Oak Creek, 13 Years Later* (Aug. 5, 2025),
https://tinyurl.com/vbfjvbk9 ..................................................................................................... 13

U.S. COMMISSION ON CIVIL RIGHTS, *School Desegregation in Boston* (1975),
https://tinyurl.com/2u84cwfa ...................................................................................................... 8

U.S. CONFERENCE OF MAYORS, *Resolution: Preventing and Responding to Hate Crimes* (2025),
https://tinyurl.com/32keup9p ...................................................................................................... 8

### INTERESTS OF AMICI CURIAE[1]

For over six decades, the Community Relations Service (CRS) has served as "America's Peacemaker," mediating the most volatile conflicts, bridging divides among diverse communities, and safeguarding civil rights for the vulnerable. As part of the Civil Rights Act of 1964, Congress created CRS as a federal racial-justice mediator whose purpose is to help communities in conflict resolve their differences through open dialogue. Since then, Congress has expanded CRS's duties to preserve and promote civil rights for all persons. As of October 31, 2025, the Department of Justice—unlawfully, and against the express wishes of Congress—unilaterally shuttered CRS.

Amicus curiae The Leadership Conference on Civil and Human Rights is the nation's oldest and largest civil-rights coalition, with a diverse membership of more than 240 national organizations working to build an America as good as its ideals. Since its founding in 1950, The Leadership Conference has helped to secure the passage of every major civil-rights law, from the Civil Rights Acts of 1957 and 1964, to the Americans with Disabilities Act, and many more. The remaining 101 amici, listed in **Appendix 1**, are an alliance of community-based organizations, faith networks, civil-rights nonprofits, educational associations, and public-safety leaders that have worked directly with CRS, relied on its services, or value and support CRS's work.

Amici are jointly invested in the continued existence of an impartial, professional federal conciliation service to address civil-rights crises. They submit this brief to highlight CRS's value and impact, and the various harms that communities nationwide face because of DOJ's elimination of CRS. Amici urge this Court to grant Plaintiffs' motion for preliminary injunction.

---

[1] No counsel for a party authored this brief in whole or in part, and no one other than amici curiae, their members, or their counsel made a monetary contribution intended to fund this brief's preparation or submission. Amici have received consent to this filing from Plaintiffs' and Defendants' counsel of record.

**INTRODUCTION**

The Community Relations Service predates several Executive agencies, including the Departments of Homeland Security, Veterans Affairs, Education, Energy, Transportation, and Housing and Urban Development. Created by Congress as part of the Civil Rights Act of 1964, CRS has been seated within the Department of Justice since 1966. But it is a standalone, statutorily created federal agency with a unique Congressional mission and purpose. Just six weeks after the 1964 Act was signed into law, then United States Attorney General Robert F. Kennedy spoke to various community leaders about the newly created CRS:

> The problems with which you will deal are national problems. But that does not mean that these problems will have national solutions or that there is a universal panacea. These problems must be solved, in the same way they arise: in each community. ***
>
> The purpose of the Community Relations Service is to help resolve disputes relating to discriminatory practices which impair constitutional rights. But such impairment is by no means limited to the narrow issue of civil rights. The very phrase "civil rights" has come to identify only the face, not the body of the problem.[2]

For decades, CRS has quietly mediated disputes involving race, national origin, religion, disability, sexual orientation, and gender identity. In the aftermath of violent events such as hate- or bias-motivated crimes and police-involved shootings, CRS has promptly deployed its personnel and services to assist local officials and community leaders as they deescalate tensions and begin the hard work of healing.

Amici have worked with, benefited from, and support CRS's purpose and mission. Here, amici review the history of CRS's creation and expanded authority through several acts of Congress between 1964 and 2009. Amici then highlight CRS's work with different vulnerable populations, both proactively and in response to emergent incidents, as recounted in CRS's annual

---

[2] *Remarks by Attorney General Robert F. Kennedy to the National Citizens' Committee for Community Relations,* DOJ (Aug. 18, 1964), https://tinyurl.com/4t8djnjs.

reports to Congress.[3] Now that DOJ has shuttered CRS as of October 31, 2025, the adverse impacts of CRS's absence will be felt in communities across the United States. With CRS eliminated, communities nationwide are suffering—and will continue to suffer—unnecessary and avoidable harm. The Court should enjoin DOJ's unlawful elimination of CRS, a short-sighted decision that is not only contrary to law, but fundamentally wrong and against the nation's interests.

### CONGRESS CREATED AND EMPOWERED CRS TO SERVE AS A FEDERAL CONFLICT MEDIATOR

Heralded as "America's Peacemaker," CRS's longstanding mission is "to resolve conflict by engaging American communities in difficult conversations through peaceful dialogue."[4] Congress first created CRS—as part of the Civil Rights Act of 1964—to assist communities "in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin which impair the rights of persons in such communities under the Constitution or laws of the United States[.]"[5] CRS thus began as the nation's federal racial-justice mediator. Through later enactments, Congress expanded CRS's duties to address housing discrimination, protect religious liberty, and respond to discrimination against vulnerable groups.

Since its inception, CRS has sought to foster peace during fraught periods for communities across the nation, providing a wide variety of services both in the aftermath of crises, and preemptively before such crises emerge.[6] CRS's training programs engage community members and government actors to promote sustainable conflict-resolution practices.[7]

---

[3] Enclosed as **Appendix 2** is a comprehensive overview of CRS's work over the decades, which includes the examples cited in this brief, among many others.

[4] *Community Relations Service Strategic Plan 2016–2020*, at 5, DOJ (2016), https://tinyurl.com/2zsxkxyd.

[5] 42 U.S.C. § 2000g-1.

[6] These services include conciliation, consultation, facilitated dialogue, training, and mediation services (to name a few) with the goal of addressing and preventing discrimination, prejudice, and identity-based violence. *Programs and Services*, CRS, https://tinyurl.com/4n7x9rcx.

[7] *Training Programs*, CRS, https://tinyurl.com/ckf229rd.

Unlike other federal law enforcement and regulatory agencies, CRS has no investigative or enforcement role.[8] Indeed, Congress expressly barred CRS from "engag[ing] in the performance of investigative or prosecuting functions of any department or agency in any litigation arising out of" CRS's dispute-resolution work.[9] What's more, Congress required CRS to "hold confidential any information acquired in the regular performance of its duties,"[10] which enables CRS to serve its statutory role as a neutral mediator while building trust with community groups that would otherwise be reluctant to engage with government representatives. Throughout consequential periods in the nation's history—whether Bloody Sunday in Selma, or the 2020 murder of George Floyd in Minneapolis—CRS's core mission has remained unchanged: providing communities in the throes of pain, violence, and conflict access to unique federal resources that facilitate communication, resilience, and a peaceful path forward.

CRS faced an early test of its abilities in March 1965 during the aftermath of Bloody Sunday, a turning point in our nation's civil-rights history. After peaceful protestors seeking to secure voting rights for Black Americans and others were beaten and attacked by law enforcement as they attempted to march across the Edmund Pettus Bridge, President Lyndon B. Johnson called on CRS to assist with keeping the subsequent marches peaceful.[11] And CRS delivered, working with civil-rights leaders, the Department of Justice, and government officials to negotiate a safe path for Dr. Martin Luther King's historic marches across the bridge, and later to Montgomery.[12]

---

[8] *Community Relations Service: Organization, Mission and Functions Manual*, DOJ, https://tinyurl.com/2amjpcph.

[9] 42 U.S.C. § 2000g-2.

[10] *Id.*

[11] *Marches from Selma to Montgomery*, CRS, https://tinyurl.com/mtcdnp9s.

[12] *Id.*

Given its early successes, President Johnson sought to improve CRS's effectiveness by transferring it to the Department of Justice as part of the Reorganization Plans of 1966, noting that in doing so:

> The Community Relations Service will have direct access to the extensive information, experience, staff, and facilities within the Department [of Justice] and in other Federal agencies. *** Together the Service and the Department will have a larger capacity for accomplishment than they do apart.[13]

Later, as part of the 1968 Fair Housing Act, Congress mandated that the Secretary of Housing and Urban Development cooperate with and provide technical and other assistance to CRS as needed to eliminate discriminatory housing practices.[14] In the ensuing years, CRS affirmed its crucial role as a conflict mediator and bulwark for civil rights with a broad mandate. For instance, through the early 1970s, CRS was called upon to mediate conflicts involving education, economic development, housing and planning, communications, as well as police-community relations.[15] And CRS responded, in any given year, to several hundred conciliation requests.[16]

In 1983, President Ronald Reagan made CRS responsible for the Cuban/Haitian Reception Processing Program, which helped hundreds of thousands of Cuban and Haitian refugees who entered the United States successfully resettle within the country.[17] Throughout this period, CRS continued to discharge its mandate of brokering peace during community conflicts. In 1986, when the Ku Klux Klan announced a rally to boost membership in Fayette County, Pennsylvania, the

---

[13] Message from the President Transmitting Reorganization Plan No. 1 of 1966, 112 CONG. REC. 2822, at 3 (daily ed. Feb. 10, 1966), https://tinyurl.com/4pp5x3rb.

[14] 42 U.S.C. § 3608(e)(4).

[15] Benjamin F. Holmm, *Community Relations Service*, Att'y Gen. Ann. Rep. 178, 179 (1970), https://tinyurl.com/49627xbm.

[16] For example, in 1972 CRS responded to 836 "racial conflicts" in 335 cities in 27 states. *Id.*

[17] CRS 1983 Annual Report to Congress, at 8–9 (1984), https://tinyurl.com/kc8tjhcc.

NAACP, American Jewish Committee, and others planned a counterdemonstration.[18] CRS worked with these groups, the police, and other local officials to ensure the events would remain peaceful.[19]

Over time, Congress expanded CRS's scope through legislation addressing emerging civil-rights challenges. In 1996, the Church Arson Prevention Act provided funding to CRS to respond to communities affected by violent attacks on places of worship.[20] Through the Emmett Till Unsolved Civil Rights Crime Act in 2007, Congress authorized funding for CRS to mitigate tensions arising from unsolved Civil Rights-era crimes that jeopardized constructive relations between law enforcement and impacted communities.[21] Congress later passed the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act in 2009, expanding federal hate-crime protections to LGBTQ+ and other communities; in that statute, Congress expressly granted CRS additional funding to prevent and respond to alleged hate- and bias-motivated crimes.[22]

### ELIMINATING CRS INFLICTS DIRECT AND ONGOING HARM ON COMMUNITY STAKEHOLDERS

According to the Department of Justice, "CRS's only *true* statutory mandate" is to provide a report on its activities to Congress each year.[23] That assertion is impossible to square with the

---

[18] CRS 1986 Annual Report to Congress, at 10 (1986), https://tinyurl.com/37zbavzf.

[19] *Id.*

[20] Church Arson Prevention Act of 1996, Pub. L. No. 104-155, § 6, 110 Stat. 1392, 1394 (1996). Notably, in the following decade CRS would respond to church arsons in Boligee, Alabama; Columbia, Tennessee; Tigrett, Tennessee; Rocky Mount, North Carolina; Sacramento, California; Savannah, Georgia; Syracuse, New York; Dallas, Texas; and Elizabeth, New Jersey, among many others. *See* CRS Annual Reports to Congress 1996–2006, https://tinyurl.com/2zdwcdmv.

[21] *See* Emmett Till Unsolved Civil Rights Crime Act of 2007, Pub. L. 110-344, § 6, 122 Stat. 3934 (2008). In 2016, Congress reauthorized the act, requiring DOJ to convene CRS and other agencies on its implementation, and renewed funding for CRS to continue its mission of bridging divides and reducing race-related tensions. Emmett Till Unsolved Civil Rights Crimes Reauthorization Act of 2016, Pub. L. No. 114-325, § 2, 130 Stat. 1965, 1966 (2016).

[22] 18 U.S.C. § 249; Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, Pub. L. 111-84, § 4706, 123 Stat. 2835, 2838 (2009).

[23] *See* Gov't Opp. to TRO Application, ECF No. 15, at 5 (citing 42 U.S.C. § 2000g-3) (emphasis added).

6

above forty-plus years of enactments, through which Congress has repeatedly empowered CRS as a comprehensive resource for addressing discrimination, strengthening communities, and bridging divides between law enforcement and historically marginalized groups. From its creation through the current day, Congress established CRS as an autonomous and separate agency, with a unique conciliatory mission. By shuttering CRS and eliminating its various statutory functions, DOJ acts plainly in defiance of Congress and the law.

As a trusted, neutral resource that community members and government officials alike rely upon during crises to protect vulnerable populations, CRS stands apart in the scope of services it provides to those most in need, including communities of color and other historically marginalized communities, religious groups, persons with disabilities, members of the LGBTQ+ community, and students. Shuttering CRS, as DOJ illegally did as of October 31, 2025, stands to harm the very populations that Congress sought to protect through CRS's establishment and steady expansion in several legislative acts between 1964 and 2009. The Court should grant the preliminary injunction that Plaintiffs seek, not only to preserve CRS's mandated functions but to protect the communities that benefit from CRS's efforts.

A.      **Dissolving CRS eliminates a trained, neutral federal mediator serving law enforcement and racially divided communities, depriving those same communities of CRS's valuable educational and other resources.**

Under Title X of the Civil Rights Act of 1964, CRS was originally created as a federal racial-justice mediator, to foster dispute resolution in matters involving "race, color, or national origin." [24] Since its inception, CRS has discharged that mandate, serving as a neutral mediator in racially divided communities, especially those bearing fraught relationships with local law

---

[24] *See* 42 U.S.C. § 2000g-1.

enforcement. From Selma in 1965 to Boston's school desegregation battles of the 1970s,[25] through the numerous contemporary examples discussed below, CRS mediators have provided safe forums where citizens can speak across racial lines and city leaders can hear grievances openly and honestly. In times of civil unrest, CRS has been an essential resource for mayors and city managers.

The U.S. Conference of Mayors has passed resolutions urging full funding of CRS, lauding the agency's "essential work strengthening communities and building local resilience against hate and extremism" through "its expertise in promoting dialogue, mediation, and conciliation to help Mayors and their communities successfully address conflict."[26] CRS's work speaks for itself, both in its proactive efforts to educate local officials about how to bridge divides in their communities, and its effective responses to emergent, politically charged incidents—including police-involved shootings—that can quickly escalate to further violence without CRS's timely intervention.

As one example of its proactive initiatives, CRS has created the Strengthening Police and Community Partnerships (SPCP) program, "which engages local law enforcement and community leaders in a dialogue to identify issues and collaboratively develop solutions that improve police-community partnerships."[27] Through SPCP, CRS connects key city and law enforcement officials with community members to facilitate dialogue and devise action plans that address the concerns of all stakeholders.[28] The participants discuss which resources are missing, where dialogue and accountability are lacking, root causes of community mistrust of law enforcement or local

---

[25] *CRS Observes African American History Month*, CRS, https://tinyurl.com/63zwtkrn; *School Desegregation in Boston*, COMM'N ON CIV. RTS. 103, 113–15 (1975), https://tinyurl.com/2u84cwfa.
[26] *Resolution: Preventing and Responding to Hate Crimes* (2025), U.S. CONF. OF MAYORS, https://tinyurl.com/32keup9p.
[27] *Strengthening Police and Community Partnerships (SPCP)*, CRS, https://tinyurl.com/4mbxmu3t.
[28] *Id.*

government, and where training is needed.[29] Chief Bill Cochran, who participated in SPCP in Topeka, Kansas, aptly described the program as "an opportunity for everyone involved to come to the table on equal footing and to have their voices and perspectives heard."[30]

Further, since the enactment of the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act in 2009, CRS has regularly hosted Bias Incidents and Hate Crimes Forums in communities nationwide. These programs "engage[ ] local and federal law enforcement, district attorneys, civil rights organizations, and community organizations in discussions and information sharing on methods to combat and respond to bias incidents and hate crimes."[31] And CRS has facilitated these forums at different venues, including: (1) in Sheridan, Wyoming, after several "Native American female students at a local college" were victimized in three separate bias-motivated incidents[32]; (2) in Eugene, Oregon, "[a]t the request of local city officials" who "asked CRS to help address the sharp rise in alleged hate incidents in Eugene, particularly crimes targeting the Muslim, Arab, Sikh, South Asian, and Hindu *** communities on the basis of their race, religion, and national origin"[33]; and (3) in Milwaukee, Wisconsin, "to help address community tensions in the aftermath of an alleged hate crime *** involving a white male suspect who reportedly threw battery acid in the face of a Latino male allegedly due to his race and national origin"[34] These forums allow "law enforcement and community members to network and strengthen relationships"—connections made because of CRS's mediating presence.[35]

---

[29] *Id.*

[30] CRS 2018 Annual Report to Congress, at 33 (2019), https://tinyurl.com/ycycnvyp.

[31] *Bias Incidents and Hate Crimes Forum*, CRS, https://tinyurl.com/24af29r8; *see also* CRS 2016 Annual Report to Congress, at 14 (2017), https://tinyurl.com/5fwwezvh.

[32] CRS 2018 Annual Report, *supra* note 30, at 69.

[33] *Id.* at 75.

[34] CRS 2020 Annual Report to Congress, at 55 (2021), https://tinyurl.com/3nmer5fm.

[35] CRS 2018 Annual Report, *supra* note 30, at 18.

Besides such forward-looking initiatives, CRS regularly responds to emergent matters, particularly police-involved shootings or killings, which often lead to widespread unrest. As CRS has learned responding to such events, "the first 48 hours are critical to setting the tone for how the city, police department, and community will respond."[36] "Positive interactions during this time can lead to constructive outcomes, while negative interactions can foster deep mistrust and continued conflict."[37] When such incidents have occurred—particularly in minority communities that have fractured relationships with their local law enforcement—CRS has promptly deployed mediators to promote peace and head off the potential for further violence.

For instance, in March 2014, during demonstrations protesting dozens of police shootings in Albuquerque, New Mexico between 2010 and 2014, local officials deployed riot-control measures and used tear gas against the protestors.[38] This exacerbated the strained relationship between law enforcement and community members, necessitating a neutral party's intervention. CRS swiftly responded, attending a "City Council meeting where community members expressed their concerns," and separately met with the mayor and police chief to "discuss best practices for reducing tension between law enforcement and communities[.]"[39] The impacted stakeholders agreed to have CRS provide trainings for police officers and other city personnel, which CRS conducted in April 2014. Similarly, in 2020, after "witnesses recorded and livestreamed the death of George Floyd, a Black man who was killed in police custody" in Minneapolis, "protests erupt[ed] across the city," and "local officials requested CRS assistance to address the ongoing conflict and high levels of racial tension."[40] Again, CRS promptly "responded with consultation

---

[36] *Id.* at 29.

[37] *Id.*

[38] CRS 2014 Annual Report to Congress, at 54 (2015), https://tinyurl.com/ypsnef25.

[39] *Id.*

[40] CRS 2020 Annual Report, *supra* note 34, at 26–27.

services to local law enforcement, and separately with community leaders, including providing rumor control strategies and best practices to defuse conflict."[41]

Yet another example of CRS's crucial role in mediating police-community conflicts is its response to the January 2023 death of Tyre Nichols, a 29-year-old Black man in Memphis. Nichols was subjected to physical assault, including being "kicked, punched, tased, and pepper sprayed" by police officers after he fled on foot during a traffic stop, and later died of his injuries.[42] Following the tragedy, CRS worked with faith leaders, city officials, and others, to discuss the community's perspectives, particularly regarding the release of body-camera footage from Nichols's assault.[43] CRS provided guidance on best practices for contingency planning in anticipation of the footage's release to mitigate potential unrest.[44] The city's subsequent release of body-camera footage from the incident prompted further nationwide protests.[45] CRS, in response, coordinated with local officials to facilitate peaceful demonstrations, deploying CRS mediators to mitigate potential conflicts.[46] Aided by CRS's efforts, the protests remained largely peaceful.[47]

These few (among many) examples illustrate the critical gap that CRS bridges between law enforcement and community members in CRS's capacity as a neutral mediator. Particularly for amici—who serve Black and other historically marginalized communities often mistrustful of law enforcement—CRS is a crucial voice, building trust with public officials and community members,

---

[41] *Id.*

[42] DOJ Press Release, Five Former Memphis Police Officers Charged with Federal Civil Rights, Conspiracy, and Obstruction Violations In Connection with the Death of Tyre Nichols (Sept. 12, 2023), https://tinyurl.com/84wp83y5.

[43] *Highlights of CRS's Historical Work*, CRS RESTORATION PROJECT, https://tinyurl.com/36s6dzbw.

[44] *Id.*

[45] Rick Rojas, *Video of Memphis Officers Beating Tyre Nichols Elicits Widespread Horror*, NY TIMES (Jan. 28, 2023), https://tinyurl.com/3988a4s4.

[46] *Highlights of CRS's Historical Work*, *supra* note 43.

[47] *Id.*

and leveraging that trust toward open, productive dialogue. By coordinating with local officials and the communities they serve in the wake of tragedies such as police-involved shootings, CRS balances citizens' robust exercise of their First Amendment rights with preserving community safety amidst large protests or demonstrations. Since DOJ unlawfully shuttered CRS, stakeholders have been, and will continue to be, deprived of a critical neutral third party, constituting what former police chiefs and sheriffs themselves describe as "vicarious defunding of the police."[48]

### B.    Without CRS, religious communities lose critical resources designed to protect places of worship and to promote peaceable resolution of interfaith conflicts.

As part of the 1996 Church Arson Prevention Act, Congress provided targeted funding for CRS, to ensure that it had sufficient resources to address acts of violence against places of worship.[49] With CRS dissolved, religious communities nationwide have lost a critical resource when facing hate- or bias-motivated threats or crimes.

After receiving reports about DOJ's plans to shutter CRS earlier this year, several members of Congress explained: "CRS's work has kept places of worship safe after a series of high-profile attacks by bringing together best practices against these threats."[50] As an example, in October 2018, "a masked gunman entered the Tree of Life synagogue in Pittsburgh, Pennsylvania, shouting, 'All Jews must die,'" before killing "11 worshippers and wound[ing] four law enforcement officers."[51] Shortly after the horrific shooting, CRS coordinated with "federal and local government agencies" and "facilitated dialogues with state and city officials, state and local advisory group members, local civil rights organizations, and community organizations to assess the communities' needs."[52]

---

[48] Suzanne Monyak, *Local Police Lament Dismantling of DOJ 'Peacemakers' Service (1)*, BLOOMBERG LAW (July 17, 2025), https://tinyurl.com/mswmxs3b.

[49] Church Arson Prevention Act of 1996, *supra* note 20.

[50] Letter from Robert Scott et al., Members of Cong., to Pam Bondi, Att'y Gen. (May 6, 2025), https://tinyurl.com/y2p8zc45.

[51] CRS 2019 Annual Report to Congress, at 27 (2020), https://tinyurl.com/46akxjsm.

[52] *Id.*

Following the attack, "more than a dozen faith communities contacted CRS for assistance," and between October 2018 and April 2019,  CRS "facilitated dialogues and conducted programs for faith-based communities" in Kansas, Washington, Illinois, Pennsylvania, Iowa, Michigan, and Indiana. [53] In August 2012, a white supremacist shot and killed seven worshippers and wounded others at a Sikh gurdwara in Oak Creek, Wisconsin.[54] CRS responded within hours, contacting national and local Sikh officials, state and federal law enforcement, and the White House Counsel on Faith-Based and Neighborhood Partnerships.[55] Following the incident, CRS provided "cultural training for law enforcement and communities seeking to better understand Sikhism and Islam."[56]

But here, too, CRS's role is not limited to reacting to crises—its programming is designed to prevent future conflicts. CRS not only resolves interfaith disputes but actively works to unify diverse communities by fostering familiarity, understanding, and respect for different beliefs. For example, CRS's Protecting Places of Worship and Hate Crimes Forums are proactive programs that help religious communities implement preventive security measures.[57] Without CRS, faith-based groups across the country will be deprived of these necessary educational and community-building resources to prevent hate crimes and protect places of worship from attack.

Amici include several faith-based organizations who have directly benefited from, relied on, or highly value CRS's efforts to broker peaceful dialogue among diverse religious communities, and CRS's timely and expert intervention in the aftermath of horrific acts of violence targeting

---

[53] *Id.* at 28.

[54] CRS 2012 Annual Report to Congress, at 27–28 (2013), https://tinyurl.com/3x2carw6; Grande Lum, *DOJ's Community Relations Service Delivers Mediation and Conciliation Services to AAPI Community*, WHITE HOUSE BLOG (Dec. 12, 2012), https://tinyurl.com/3cs7ju2v; *Remembering Oak Creek, 13 Years Later*, SIKH COALITION (Aug. 5, 2025), https://tinyurl.com/vbfjvbk9.

[55] *See* sources cited *supra* note 54.

[56] *Id.*

[57] *Protecting Places of Worship Forum,* CRS, https://tinyurl.com/29ayyh5v; *Bias Incidents and Hate Crimes Forum*, CRS, https://tinyurl.com/24af29r8.

places of worship. CRS is a critical, neutral federal agency that has proven—repeatedly—that it can help faith-based communities heal from their worst moments of tragedy, while promoting peaceful dialogue and mutual respect among diverse religious, atheist, and humanist groups. By dissolving CRS, DOJ now signals to communities that it is no longer concerned with their right to freely—and safely—exercise their faith and personal convictions. Shuttering CRS jeopardizes peaceful religious plurality by removing a reliable and neutral means to resolve conflict between and among religious groups, to the detriment of faith-based communities nationwide.

### C. Without CRS, persons with disabilities across the nation will lose a powerful ally that responds swiftly and seriously to allegations of harassment and abuse, and provides a channel to voice concerns.

CRS has intervened to redress incidents of harassment and abuse targeting persons with disabilities. For instance, in August 2012, after learning of two cases in Ohio involving troubling allegations of abuse and harassment against children with disabilities, CRS convened a Hate Crimes Forum at Ohio State University, which drew participants from federal and state law enforcement, civil rights, and disability organizations.[58] Those participants "formed a Disability Hate Crimes Task Force" that meets quarterly.[59] In June 2015, CRS learned that individuals with disabilities were "experiencing bullying and harassment while accessing services located at a day treatment facility and a residential facility" in Hamilton, Ohio.[60] In response, "CRS convened the community residents and business representatives with the service providers and advocacy groups," for ongoing dialogue and training regarding disabilities awareness.[61] CRS also hosted a Hate Crimes Forum "with Ohio area disability service providers."[62] Here again, participants "formed a

---

[58] CRS 2012 Annual Report, *supra* note 54, at 16.

[59] *Id.*

[60] CRS 2015 Annual Report to Congress, at 25 (2016), https://tinyurl.com/yeyrhwrh.

[61] *Id.*

[62] *Id.*

task force to prevent and resolve conflicts based on biases against community members with disabilities by becoming better informed" and "improving communication with the local police."[63]

CRS has also been a vocal, and persistent, advocate for persons with disabilities who struggle to access required services. For example, CRS intervened in Detroit, Michigan, after the only school for deaf children in the city closed in 2012, "spark[ing] tensions and protests among various community stakeholders[.]"[64] "CRS facilitated discussions between parents, disability and special needs advocacy organizations, school district officials, and a representative from the State of Michigan Disability Council, which resulted in a mediated agreement between the represented parties to formalize a Task Force" designed to streamline integrating "students with special needs in the general school population[.]"[65] In each instance, CRS timely intervened to address the needs of people with disabilities in different communities, while enabling those communities to come together and create proactive solutions—proof that CRS's intervention has enduring impacts.

Amici include disability-rights organizations that are fundamentally committed to ensuring that all people are treated with dignity and have access to services required to fully participate in their communities. For such amici, CRS has been a powerful ally in the federal government, with the unique ability to bring community stakeholders together to hear and address the needs of persons with disabilities. Without CRS, persons with disabilities who experience harassment, abuse, violence, denials of needed services, or a range of other harmful conduct will be deprived of that crucial mediator in seeking redress.

---

[63] *Id.*

[64] CRS 2013 Annual Report to Congress, at 46 (2014), https://tinyurl.com/3x6mvds4.

[65] *Id.*

### D. Dissolving CRS leaves LGBTQ+ communities increasingly vulnerable to bias-motivated attacks and harassment.

In 2009, the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act expanded federal hate-crime protections to include sexual orientation and gender identity, and empowered CRS—through additional funding—to serve those targeted for violence or harassment based on their membership in these protected classes.[66] Discharging its statutory mandate, CRS has consistently advocated for the health and safety of all persons, including LGBTQ+ individuals.

After the Pulse Nightclub shooting in Orlando in June 2016—at the time "the deadliest mass shooting incident by a lone gunman in U.S. history and the deadliest attack on U.S. soil since the events of September 11, 2001"—CRS promptly responded.[67] Within hours of the attack, CRS coordinated with federal prosecutors in the Middle District of Florida and the DHS Office of Civil Rights and Civil Liberties, among others.[68] At community members' request, CRS provided "consulting services" that "led to the creation of Orlando United and Somos Orlando," alliances comprised of "city and state officials, LGBT community members, merchants, and service providers, designed to assist victims and their families and work toward a more unified and inclusive Orlando in the long term."[69] CRS later hosted a Hate Crimes Forum to "address a stated community need: openly discussing the Pulse shooting as a hate crime."[70] Validating that its efforts were neither transient nor temporary, CRS wrote to Congress—in its 2016 annual report—that it "will continue to provide services to communities impacted by the Pulse shooting until they are no longer needed or requested."[71]

---

[66] 18 U.S.C. § 249; Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, *supra* note 22.

[67] CRS 2016 Annual Report, *supra* note 31, at 23.

[68] *Id.*

[69] *Id.* at 23–24.

[70] *Id.* at 24.

[71] *Id.* at 25.

Recognizing that certain LGBTQ+ communities have experienced negative interactions with law enforcement, CRS has proactively responded with ongoing trainings and opportunities for dialogue.[72] CRS offers, for instance, a law-enforcement training program called "Engaging and Building Relationships Transgender Communities," which "help[s] officers develop relationships and improve their interactions with transgender communities[.]"[73] In 2016, at the request of the Utah Women in Law Enforcement Association, CRS provided this program to local law enforcement in West Valley City, Utah.[74]

Shuttering CRS deeply concerns amici, which include organizations that advocate for LGBTQ+ persons and work to protect such persons from violence and discrimination. For such amici, CRS has been an indispensable ally, and in its absence, LGBTQ+ communities will not have this trusted, neutral federal mediator to call upon during times of crises, or the benefit of CRS's proactive educational efforts that help community leaders and law enforcement officials understand and respect the needs of LGBTQ+ community members.

**E.    Educational institutions, schools, and the next generation of students will be greatly harmed now that they are deprived of CRS's vital training resources to address social issues and prompt responses to incidents.**

Students and faculty at educational institutions nationwide have benefited, for years, from CRS's mediation and training services. The School-Student Problem Identification and Resolution of Issues Together ("School-SPIRIT") program compellingly illustrates why.[75] CRS implemented this program in schools across the country in response to increased suicide attempts,[76] racially

---

[72] *Engaging and Building Relationships with Transgender Communities*, CRS (2023), https://tinyurl.com/dy73jnu6.
[73] *Id.*
[74] CRS 2016 Annual Report, *supra* note 31, at 40.
[75] *Empowering Students to Collaboratively Identify & Address School Conflicts*, CRS, https://tinyurl.com/mr2detby.
[76] CRS 2014 Annual Report, *supra* note 38, at 53.

motivated cyberbullying,[77] gang activity,[78] and hate-motivated incidents targeting minority students,[79] among several other instances. In the School-SPIRIT program, CRS "brings together diverse groups of students to identify and address issues."[80] The "student-driven" initiative aims to "build mutual respect," while allowing for improved collaboration between students and members of the school community.[81] The results of this program are overwhelmingly positive, as students "take a leadership role in addressing conflicts in their schools and build the skills and capacity to dissuade future conflicts."[82]

Without CRS, schools will be left to handle such disputes and conflicts without the aid of this trained and neutral federal ally, which may—in particularly volatile environments—lead to harmful outcomes. And DOJ's elimination of CRS as "inconsistent" with the administration's priorities telegraphs to students and educators alike that the federal government itself devalues peaceful dialogue as a means for resolving disputes. Amici include educational advocates and organizations that are deeply invested in ensuring that schools remain safe environments for learning and growth. CRS's programming is a critical tool for creating such environments, and student-driven programs such as School-SPIRIT teach the next generation how to responsibly and peacefully mediate disputes, while taking ownership of solutions that better their own communities. Without CRS, future students will be deprived of these critical resources, to their detriment.

---

[77] CRS 2016 Annual Report, *supra* note 31, at 26.

[78] CRS 2019 Annual Report, *supra* note 51, at 49.

[79] CRS 2022 Annual Report to Congress, at 23 (2023), https://tinyurl.com/49vnbmun; *School-Student Problem Identification and Resolution of Issues Together (School-SPIRIT)*, CRS, https://tinyurl.com/3ftwm6tz.

[80] *Empowering Students to Collaboratively Identify & Address School Conflicts*, *supra* note 75.

[81] *Id.*

[82] *Id.*

18

### F.    CRS's statutory and functional role cannot be replicated by one individual.

DOJ contends that CRS's only "true statutory mandate" is to deliver an annual report to Congress, and that its "engag[ing] in resolving disputes, disagreements, or difficulties" is purely discretionary.[83] Further, in DOJ's view, the "minimum number of employees required to perform CRS's statutory functions" include: (1) the "position of Director of CRS (which is filled through presidential appointment with the advice and consent of the Senate)"; (2) "the position of first assistant to the Director"; and (3) "one current employee."[84] The President has, of course, made no effort to nominate a Director for an agency that his administration is actively seeking to shutter. And there is no current first assistant to that non-existent Director. Accordingly, DOJ appears to contend that CRS's entire statutory mandate can be fulfilled by a single employee placed in a prosecutorial agency (namely, the Executive Office for United States Attorneys).

DOJ's perverse formalism argues in a circle. If, in DOJ's view, CRS's only obligation is to provide reports to Congress, then a single employee can accomplish that task, simply providing Congress annual notice that he or she did nothing because CRS, in its "discretion," chose not to provide services to anyone. Yet DOJ's starting premise runs headlong into statutory history, CRS's long-established roles and responsibilities detailed above, and common sense.

Since its creation in the 1964 Civil Rights Act, CRS has been Congressionally mandated "to provide assistance" in "resolving disputes, disagreements, or difficulties" from "discriminatory practices" that impair persons' rights "under the Constitution or laws of the United States[.]"[85]The many crises to which CRS responds each year require coordination among state, local, federal, and community actors. For this reason, before DOJ dismantled it, CRS had over two-dozen offices

---

[83] *See* Gov't Opp. to TRO Application, ECF No. 15, at 5–6.

[84] *Id.*

[85] 42 U.S.C. § 2000g-1.

spread across the country; further, CRS's functions have been funded by Congress each year since its creation.[86] Subject to its statutory obligations to maintain confidentiality,[87] CRS is *also* required to submit annual reports to Congress about its activities—but that reporting obligation hardly constitutes the entirety of CRS's duties, as DOJ contends.[88]

Simply put, a single employee—or even three total employees as DOJ proposes (including a currently non-existent Director and first assistant to the Director)—cannot perform CRS's Congressionally mandated functions, which are expansive and national in scope. Amici respectfully join Plaintiffs in urging this Court to enjoin DOJ's elimination of CRS through its atextual and ahistorical statutory interpretation, particularly given the myriad communities across the country that are, and will continue to be, harmed by CRS's unlawful shuttering.

CONCLUSION

"America's Peacemaker" has worked quietly behind the scenes for over sixty years, responding to emergent crises, meditating disputes, and educating public officials and community leaders alike on how to resolve conflict peacefully. Since 1964, Congress has repeatedly funded and further empowered CRS to discharge its statutory mandate as the nation's only federal civil-rights conflict mediator. And only Congress may decide whether CRS's duties should now come to an end. With CRS shuttered, community stakeholders nationwide are, and will continue to be, unnecessarily harmed. For the above reasons, amici curiae respectfully request that this Court grant Plaintiffs' request to enjoin DOJ's unlawful elimination of CRS.

---

[86] *CRS FY2018 Performance Budget,* DOJ, https://tinyurl.com/2447h8rx; *CRS FY2025 Performance Budget,* DOJ, https://tinyurl.com/5dcrb3tr.
[87] 42 U.S.C. §§ 2000a-4, 2000g-2(b)
[88] 42 U.S.C. § 2000g-3.

Dated: December 5, 2025                    Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Steven M. Stimell*
Steven M. Stimell (BBO No. 551447)
1290 Avenue of the Americas
New York, NY 10104
(212) 541-2042
steven.stimell@bclplaw.com

Saurish Appleby-Bhattacharjee*
(Cal. Bar No. 286284; Ill. Bar No. 6348610)
Arti Sahajpal (Ill. Bar No. 6353697)
161 N. Clark Street, Suite 4300
Chicago, IL 60601
(312) 602-5004
saurish@bclplaw.com

Kevin Jenco (Mo. Bar No. 74056)
Hannah Wissler Demand (Mo. Bar No. 74911)
Emily Seidl (Mo. Bar No. 78200)
211 N. Broadway #3600
St. Louis, MO 63102
(314) 259-2000

*Counsel for Amici Curiae The Leadership Conference on Civil and Human Rights, and 101 Civil Rights and Community Organizations*

*\*Application for admission pro hac vice forthcoming*

21