# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

ETHICAL SOCIETY OF POLICE, *et al.*,

                    Plaintiffs,

      v.

PAMELA J. BONDI, in her official
capacity as Attorney General of the United
States, *et al.*,

                    Defendants.

No. 1:25-cv-13115-IT

Leave to file extra pages granted on
December 9, 2025

## <u>DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION MOTION</u>

## TABLE OF CONTENTS

INTRODUCTION.............................................................................................................1

BACKGROUND..............................................................................................................3

I.      CRS's Creation and Functions....................................................................................3

II.     The Transfer of CRS and its Functions to the Department of Justice............................5

III.    Reorganization of the Department of Justice and Transfer of CRS to EOUSA...............6

IV.     This Litigation ........................................................................................................7

LEGAL STANDARD ......................................................................................................8

ARGUMENT ...................................................................................................................9

I.      PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM. .........................9

II.     PLAINTIFFS FAIL TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON
        THE MERITS. ........................................................................................................15

        a.      Plaintiffs lack standing to bring the claims they assert. ....................................15

        b.      This Court lacks jurisdiction to enjoin the RIFs because administrative
                bodies identified in the Civil Service Reform Act of 1978 are the exclusive
                channels for any challenge to federal employee removals.................................17

        c.      Plaintiffs' APA claims fail because they do not seek judicial review of a
                discrete, final agency action..........................................................................22

        d.      Whether to provide particular services and staff an agency at certain levels
                is committed to CRS discretion by law...........................................................26

        e.      Plaintiffs' APA claims fail because they are premised on a false theory
                that Defendants are unilaterally dissolving CRS..............................................30

        f.      Plaintiffs' constitutional claims fail................................................................32

III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST CUT
        AGAINST A PRELIMINARY INJUNCTION...........................................................34

CONCLUSION................................................................................................................35

## TABLE OF AUTHORITIES

**CASES**

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
   929 F.3d 748 (D.C. Cir. 2019) ............................................................................ 18

*Appalachian Energy Grp. v. EPA,*
   33 F.3d 319 (4th Cir. 1994) ................................................................................. 25

*Baker v. Carr,*
   369 U.S. 186 (1962) ............................................................................................. 20

*Bd. of Governors, FRS v. MCorp Fin., Inc.,*
   502 U.S. 32 (1991) ............................................................................................... 33

*Bennett v. Spear,*
   520 U.S. 154 (1997) ....................................................................................... 24, 26

*Biden v. Texas,*
   597 U.S. 785 (2022) ............................................................................................. 23

*Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.,*
   622 F.3d 36 (1st Cir. 2010) ................................................................................. 10

*California v. Texas,*
   593 U.S. 659 (2021) ............................................................................................. 16

*Dep't of Education v. California,*
   604 U.S. 650 (2025) ............................................................................................. 19

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
   370 F.3d 151 (1st Cir. 2004) ................................................................................. 9

*City of New York v. U.S. Dep't of Def.,*
   913 F.3d 423 (4th Cir. 2019) ............................................................................... 26

*Clapper v. Amnesty Int'l,*
   568 U.S. 398 (2013) ............................................................................................. 15

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.,*
   48 F.3d 618 (1st Cir. 1995) ................................................................................... 9

*Cobell v. Kempthorne,*
   455 F.3d 301 (D.C. Cir. 2006) ....................................................................... 22, 23

*Conservation Force v. Salazar,*
  919 F. Supp. 2d 85 (D.D.C. 2013)................................................................28

*Dalton v. Specter,*
  511 U.S. 462 (1994)...............................................................................32, 33

*DeVillier v. Texas,*
  601 U.S. 285 (2024)......................................................................................32

*Drake v. Fed. Aviation Admin.,*
  291 F.3d 59 (D.C. Cir. 2002)........................................................................27

*Egbert v. Boule,*
  596 U.S. 482 (2022)......................................................................................20

*Elgin v. Dep't of the Treasury,*
  567 U.S. 1 (2012)..........................................................................................18

*EPA v. Brown,*
  431 U.S. 99 (1977)........................................................................................25

*Ethical Soc'y of Police v. Bondi,*
  No. 1:25-CV-13115-IT, 2025 WL 3033817 (D. Mass. Oct. 30, 2025)........... *passim*

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021)......................................................................................27

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024), *on remand to*, 117 F.4th 336 (5th Cir. 2024).....................15

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992)................................................................................27, 29

*FTC v. Standard Oil Co. of Cal.,*
  449 U.S. 232 (1980)......................................................................................26

*Gill* v. *Whitford,*
  585 U.S. 48 (2018)........................................................................................17

*Gillan v. Town of Carver,*
  No. 24-CV-12212-AK, 2025 WL 1836609 (D. Mass. July 3, 2025)......................8

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
  527 U.S. 308 (1999)......................................................................................20

*Harkrader v. Wadley*,
    172 U.S. 148 (1898) ........................................................................................ 20

*Hearst Radio, Inc. v. FCC*,
    167 F.2d 225 (D.C. Cir. 1948) ...................................................................... 22

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................................ 27, 29

*In re Sawyer*,
    124 U.S. 200 (1888) ........................................................................................ 20

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) .................................................................. 22, 26

*Lampon-Paz v. OPM*,
    732 F. App'x 158 (3d Cir. 2018) .................................................................. 18

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................... 27, 28, 29, 30

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ........................................................................................... 9

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................... 15

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) .................................................................................. 22, 24

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ........................................................................................ 8

*McMahon v. New York*,
    606 U.S. ---, 145 S. Ct. 2643 (2025) .................................................. 19, 21, 34

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ........................................................................................ 15

*Nat'l Treasury Emps. Union v. Vought*,
    No. 25-5091, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025) ...................... 18, 19

*New Life Evangelistic Ctr., Inc. v. Sebelius*,
    753 F. Supp. 2d 103 (D.D.C. 2010) .............................................................. 28

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................ 8, 34

*Norton v. S. Utah Wilderness All.,("SUWA"),*
    542 U.S. 55 (2004) .......................................................................... 22

*Nuclear Regul. Comm'n v. Texas,*
    605 U.S. 665 (2025) ........................................................................ 33

*Nunez-Soto v. Alvarado,*
    956 F.2d 1 (1st Cir. 1992) ................................................................ 9

*Off. Pers. Mgmt. v. Am. Fed'n of Gov't Emps.,*
    145 S. Ct. 1914 (2025) ............................................................. 17, 19

*Open Tech. Fund v. Pack,*
    470 F. Supp. 3d 8 (D.D.C. 2020),
    *op. vacated, appeal dismissed,*
    No. 20-5195, 2021 WL 11096700 (D.C. Cir. Mar. 16, 2021) ............. 34

*Orkin v. Albert,*
    557 F. Supp. 3d 252 (D. Mass. 2021) ........................................... 1, 9

*Racing Enthusiasts & Suppliers Coal. v. EPA,*
    45 F.4th 353 (D.C. Cir. 2022) ....................................................... 25

*Railway Clerks v. Assoc. for Benefit of Non-contract Employees,*
    380 U.S. 650 (1965) ........................................................................ 33

*Raines v. Byrd,*
    521 U.S. 811 (1997) ........................................................................ 16

*Rhode Island v. Trump,*
    155 F.4th 35 (1st Cir. 2025) ........................................................... 26

*Sampson v. Murray,*
    415 U.S. 61 (1974) ................................................................... 10, 20

*Saul v. United States,*
    928 F.2d 829 ................................................................................... 18

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) ........................................................................ 29

*Spokeo v. Robins,*
    578 U.S. 330 (2016) ........................................................................ 16

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021)................................................................................ 15, 16

*Trump v. Am. Fed'n of Gov't Emps.,*
    606 U.S. ---, 145 S. Ct. 2635 (Mem.) (2025)...................................... 19, 34

*Trump v. Boyle,*
    606 U.S. ---, 145 S. Ct. 2653 (2025)........................................................ 19

*United States v. Fausto,*
    484 U.S. 439 (1988)....................................................................... 17, 18, 21

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982)................................................................................ 16

*Veit v. Heckler,*
    746 F.2d 508 (9th Cir. 1984).................................................................. 18

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978)............................................................................ 29, 30

*Victim Rts. L. Ctr. v. U.S. Dep't of Educ.,*
    154 F. 4th 5 (1st Cir. 2025)................................................................ 19, 34

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.,*
    645 F.3d 26 (1st Cir. 2011)...................................................................... 9

*Walton v. House of Representatives of Oklahoma,*
    265 U.S. 487 (1924)................................................................................ 20

*White v. Berry,*
    171 U.S. 366 (1898)................................................................................ 20

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)................................................................................ 8, 9

**STATUTES**

5 U.S.C. § 551.......................................................................................... 22, 23

5 U.S.C. § 701.......................................................................................... 26, 28

5 U.S.C. § 702.............................................................................................. 19

5 U.S.C. § 704.......................................................................................... 22, 25

5 U.S.C. § 706 ............................................................................................... 1, 14, 16, 21

42 U.S.C. § 2000a-3 ................................................................................................ 4

42 U.S.C. § 2000a-4 ................................................................................................ 4

42 U.S.C. § 2000g .................................................................................... 3, 4, 5, 27

42 U.S.C. § 2000g-1 .................................................................................... 3, 27, 28

42 U.S.C. § 2000g-2 .......................................................................................... 3, 5

42 U.S.C. § 2000g-3 .............................................................................................. 3

42 U.S.C. § 3608(e)(4) ......................................................................................... 5

Pub. L. No. 95-454, 92 Stat. 1111 (1978) ......................................................... 17

Pub. L. No. 110-344, § 6(b), 122 Stat. 3934 (2007) .......................................... 4

Pub. L. No. 119-37 § § 120(e), 139 stat. 495 (2025) ......................................... 21

## RULES

Fed. R. Civ. P. 65(c) ............................................................................................. 35

## REGULATIONS

Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025) ............................... 6

Message of the President Accompanying Reorganization Plan No. 1 of 1966, *eff.* Apr. 22, 1966, 31 Fed. Reg. 6187, 80 Stat. 1607, 5 U.S.C. app. at 97 (Feb. 10, 1966) ....................................... 6

**INTRODUCTION**

A month and a half ago, Plaintiffs moved for a temporary restraining order ("TRO"), seeking to enjoin the Community Relations Service ("CRS") reduction in force ("RIF") and reorganization because CRS had ceased providing Plaintiffs certain services in the preceding months. *See* Mot. for TRO ("Pls.' TRO Mot."), ECF No. 2. The Court denied Plaintiffs' motion on irreparable harm grounds. *Ethical Soc'y of Police v. Bondi*, No. 1:25-CV-13115-IT, 2025 WL 3033817, at *4 (D. Mass. Oct. 30, 2025). Now, Plaintiffs move for a preliminary injunction, seeking essentially the same relief and relying on the same alleged harms. *See* Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. ("Pls.' PI Mot.") at 34-38, ECF No. 35.[1] This Court should deny the preliminary injunction motion for the same reasons it denied the TRO.

"The standard for issuing a TRO is the same as for a preliminary injunction." *Orkin v. Albert*, 557 F. Supp. 3d 252, 256 (D. Mass. 2021) (citation omitted). Accordingly, the Court's irreparable harm analysis at the TRO stage applies with the same force here. Like the TRO stage, Plaintiffs again describe the "services provided by CRS in the past" and advocate for the resumption of services. *Ethical Soc'y of Police*, 2025 WL 3033817, at *3; *see* Pls.' PI Mot. at 35. But aside from two supplemental declarations that identify the same alleged harms as the TRO stage, Plaintiffs recycle the declarations already submitted and have done nothing to show that anything has materially changed in the last month and a half. Thus, under this Court's analysis, Plaintiffs fail to meet their burden to show irreparable harm.

Plaintiffs' motion also fails to show a likelihood of success on the merits. The heart of Plaintiffs' purported injuries is lost services. *See, e.g.*, Pls.' PI Mot. at 25. But Plaintiffs do not bring any claims under 5 U.S.C. § 706(1)—the Administrative Procedure Act ("APA") provision

---

[1] Unless otherwise indicated, ECF pin cites refer to the ECF page number.

that permits a plaintiff to compel agency action that has been unlawfully withheld or unreasonably delayed. And Plaintiffs fail to show that they have any legal entitlement to CRS services or any legal authority or claim that would justify the Court ordering the resumption of services. Instead, Plaintiffs impermissibly invoke the APA to challenge personnel actions and the CRS reorganization. But Congress has carefully crafted a complex administrative scheme and judicial review scheme to be the exclusive channel for employment disputes. Plaintiffs—organizations that received services from CRS at one point—cannot circumvent that scheme by challenging personnel actions on behalf of former federal employees. Additionally, Plaintiffs fail to identify final agency action required for APA review to challenge the CRS realignment. Nor could they. Rather than a discrete, concrete, non-abstract policy or rule, the CRS realignment is an agency reorganization that is currently ongoing and being worked out in real time.

Plaintiffs claim that CRS is being dissolved and eliminated. But events that have occurred even during this litigation show otherwise. "Defendants concede that only Congress, and not the executive branch, may eliminate a Congressionally created agency[.]" *Ethical Soc'y of Police*, 2025 WL 3033817, at *3. And since the TRO stage, CRS and its functions were officially realigned from a stand-alone component to a separate unit within EOUSA, with the transferred CRS employee working with EOUSA staff to ensure a smooth transition of functions. Plaintiffs' entire case rests on an incorrect, assumed conclusion: that CRS is being dissolved. The Court should reject Plaintiffs' characterizations, which do not factually align with the CRS reorganization, and permit CRS to continue the realignment process and to administer its functions post-realignment.

# BACKGROUND

## I.    CRS's Creation and Functions

CRS was established by the Civil Rights Act of 1964, originally as a unit within the Department of Commerce. *See* 42 U.S.C. § 2000g. The statute provides that CRS "shall be headed by a Director who shall be appointed by the President with the advice and consent of the Senate for a term of four years"; the Director is "authorized to appoint" other personnel "as may be necessary to enable the Service to carry out its functions and duties[.]" *Id*.

The statute instructs that "[i]t shall be the function of the Service to provide assistance to communities and persons therein in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin which impair the rights of persons in such communities under the Constitution or laws of the United States or which affect or may affect interstate commerce." *Id*. § 2000g-1. CRS has broad discretion in carrying out that function: CRS "may offer its services in cases of such disputes, disagreements, or difficulties *whenever, in its judgment,* peaceful relations among the citizens of the community involved are threatened thereby, and it *may* offer its services either upon its own motion or upon the request of an appropriate State or local official or other interested person." *Id*. (emphases added).

CRS's only true statutory mandate is that its Director "shall, on or before January 31 of each year, submit to the Congress a report of the activities of the Service during the preceding fiscal year." *Id*. at § 2000g-3. The statute also provides some parameters around CRS's conduct when it chooses to engage in resolving disputes, disagreements, or difficulties. For example, "[t]he activities of all officers and employees of [CRS] . . . shall be conducted in confidence and without publicity[.]" *Id*. at § 2000g-2(b). Similarly, "the Service shall hold confidential any information acquired in the regular performance of its duties upon the understanding that it would be so held."

*Id.* The statute also provides that CRS *cannot* do certain things: namely, engage in "investigative or prosecuting functions" for any "department or agency in any litigation arising out of a dispute in which [they] acted on behalf of the Service." *Id.* (imposing misdemeanor liability for a violation of the subsection).

Other provisions of the Civil Rights Act also mentioned CRS, but none imposed additional statutory requirements on CRS, leaving CRS's broad discretion intact. For example, federal district courts *may* refer parties to CRS to conduct settlement proceedings where the "court believes there is a reasonable possibility of obtaining voluntary compliance[.]" *Id.* § 2000a-3(d). If a district court refers a matter to CRS, the agency "is *authorized* to make a full investigation . . . and *may* hold such hearings with respect thereto as may be necessary" as part of "bring[ing] about a voluntary settlement between the parties," but is not *required* to do so. *Id.* § 2000a-4 (emphases added).

Plaintiffs cite four statutes that they claim expanded CRS's role. *See* Pls.' PI Mot. at 9-10. For the most part, however, these statutes, while expressing Congress's intent for CRS to focus on particular areas, did not expand CRS's mandate beyond the Civil Rights Act. Rather, the Emmett Till Act, Church Arson Prevention Act ("CAPA"), and Hate Crimes Prevention Act ("HCPA") authorized appropriations for activities already within CRS's mandate under the Civil Rights Act. For example, the Emmett Till Act authorizes appropriations for CRS *"in carrying out the functions described in Title X of . . . 42 U.S.C. 200g et seq."* Pub. L. No. 110-344, § 6(b), 122 Stat. 3934 (2007) (emphasis added). While the CAPA and HCPA do not refer to CRS's functions under the Civil Rights Act ("CRA"), responding to community tensions related to church arson and hate crimes falls squarely withing CRS's existing authority under the CRA. To the extent the CAPA and HCPA refer to investigating and prosecuting church arson and hate crimes, there is no indication that Congress intended for CRS to perform those roles, as opposed to other parts of the

Departments of Justice and (in the case of church arson) Treasury that would normally perform those functions. In fact, the CRA explicitly prohibits CRS from engaging in investigative and prosecutorial functions. 42 U.S.C. § 2000g-2(b). Moreover, CAPA and HCPA have not authorized appropriations since 1997 and 2012, respectively.[2] As for the Fair Housing Act, it imposes statutory obligations on the Secretary of Housing, not on CRS, nor does it even authorize appropriations for CRS. *See Id.* § 3608(e)(4) (instructing the Secretary of Housing and Urban Development to "cooperate with and render such technical and other assistance to the Community Relations Service as may be appropriate to further its activities in preventing or eliminating discriminatory housing practices").

## II.    The Transfer of CRS and its Functions to the Department of Justice

Although the Civil Rights Act originally placed CRS within the Department of Commerce, 42 U.S.C. § 2000g, CRS was moved elsewhere in the Executive Branch in 1966. As part of the Reorganization Plan of 1966, pursuant to congressional authorization set forth in the Reorganization Act of 1949, 63 Stat. 203, as amended, President Lyndon B. Johnson transferred CRS to the Department of Justice ("DOJ"). The Reorganization Plan made clear that "[a]ll functions of the Community Relations Service, and all functions of the Director of the Community Relations Service, together with all functions of the Secretary of Commerce and the Department of Commerce with respect thereto, are hereby transferred to the Attorney General." 42 U.S.C. § 2000g(2).

In his explanatory message to Congress regarding the transfer, President Johnson stated

---

[2] The HCPA did provide a limited expansion of CRS's authority, as it allows CRS to address tensions related to hate crimes committed on the basis of race, color, national origin, gender, gender identity, sexual orientation, religion, or disability, whereas the Civil Rights Act only refers to race, color, and national origin.

that "[a]fter careful review of the activities of the Federal agencies involved in the field of civil rights, it became clear that the elimination of duplication and undesirable overlap required the consolidation of certain functions." Message of the President Accompanying Reorganization Plan No. 1 of 1966, Eff. Apr. 22, 1966, 31 Fed. Reg. 6187, 80 Stat. 1607, 5 U.S.C. app. at 97 (Feb. 10, 1966). He explained that the "accompanying reorganization plan would transfer the functions of the Community Relations Service and of its Director to the Attorney General" and "vest[] all the transferred powers in the head of the department." *Id.* "[T]he reorganization will permit the most efficient and effective utilization of resources in this field[,]" President Johnson explained. *Id.*

## III.    Reorganization of the Department of Justice and Transfer of CRS to EOUSA

Since the 1966 Reorganization Plan, CRS has functioned as a standalone component within DOJ. Upon taking office in 2025, President Trump issued an Executive Order instructing agency heads to identify, among other things, whether any agency subcomponents should be eliminated or consolidated. Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025).

Pursuant to that instruction, DOJ ultimately decided to transfer CRS to EOUSA, where it will remain as a unit headed by a Director, but with different reporting lines. "As part of a government-wide effort since January 2025 to streamline federal agencies, DOJ is realigning CRS and its functions to [EOUSA], a component of DOJ. CRS will remain a 'unit' of the Department as specified by the Reorganization Plan of 1966." Decl. of Jolene Ann Lauria ("Lauria Decl.") ¶ 6, ECF No. 15-1. "It will report to the Deputy Attorney General—and ultimately the Attorney General—through EOUSA rather than through the Associate Attorney General, as it currently does." *Id.* "DOJ has determined that realigning CRS, along with other reorganization actions undertaken by DOJ, will make DOJ more efficient by reducing bureaucracy, lowering costs, and reducing the number of DOJ components and employees, while ensuring that DOJ's organizational

6

structure and continued functions align with Departmental and Administration priorities and comport with federal law." *Id.* at ¶ 7.

The position of Director of CRS (which is filled through presidential appointment with the advice and consent of the Senate) and the position of first assistant to the Director—which will be filled by one employee—transferred to EOUSA as a part of the realignment. *See id.* at ¶ 6; *see* Decl. of Denise Nazaire ("Nazaire Decl.") ¶ 9. The other CRS employees were subject to a reduction in force ("RIF") that was effective October 31. *See* Lauria Decl. ¶ 6. On November 2, 2025, CRS and its functions were realigned from a stand-alone component to a separate unit within EOUSA. Nazaire Decl. at ¶ 9. And since November 2025, the transferred CRS employee has "worked with EOUSA staff to ensure a smooth transition of CRS functions[.]" *Id.* at ¶ 10. The transition includes "a) transferring and housing CRS operational data and relevant organizational files; and b) identifying steps and establishing milestones to complete the Department's statutory requirements, to hold any court referred mediation hearings, offer conciliation services, and submit an annual report of CRS activities to Congress." *Id.*

## IV. This Litigation

On October 24, 2025, Plaintiffs—a set of organizations that had received or sought CRS services in the past—sued DOJ and Attorney General Bondi in her official capacity. Pls' Compl. for Injunctive & Declaratory Relief, ECF No. 1. Plaintiffs allege six claims under the APA and the Constitution, but each rests on the premise that Defendants are eliminating CRS without congressional authority.

On the same day, Plaintiffs moved for a TRO, arguing that Defendants are unilaterally and unlawfully dismantling CRS. Pls.' TRO Mot., ECF No. 2. Plaintiffs sought to enjoin Defendants from implementing "the decision to 'eliminate the Community Relations Service (CRS) and its functions,'" and "the Reduction in Force ('RIF') of CRS employees scheduled to go into effect on

October 31, 2025[.]" Pls.' [Proposed] Temporary Restraining Order at 2, ECF No. 2-2.

On October 30, 2025, this Court denied Plaintiffs' TRO motion on irreparable harm grounds. *Ethical Soc'y of Police*, 2025 WL 3033817, at *4 (explaining because Plaintiffs did not meet their burden on irreparable harm grounds, the Court "need not consider the remaining factors for a TRO"). Almost a month later, Plaintiffs moved for a preliminary injunction, Pls.' PI Mot., again seeking to enjoin Defendants from "taking any further actions to eliminate, dissolve, close, or otherwise dismantle CRS or its functions" and to order rescission of the "RIF of CRS employees that went into effect on October 31, 2025, and [restoration of] affected employees to their status before the above-referenced RIF." Pls.' [Proposed] Prelim. Inj. Order at 2, ECF No. 32-1. Unlike their TRO motion, Plaintiffs' preliminary injunction motion asks this Court to order Defendants to "resum[e] services to Plaintiffs." *Id.*

## LEGAL STANDARD

Preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Gillan v. Town of Carver*, No. 24-CV-12212-AK, 2025 WL 1836609, at *1 (D. Mass. July 3, 2025) (explaining that "[c]ourts apply the same standard in assessing motions for a temporary restraining order and motions for a preliminary injunction"). The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And "[t]he

burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon" Plaintiffs as the movant. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

## ARGUMENT

### I.    PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM.

The Court denied Plaintiffs' TRO motion because "Plaintiffs [had] not met their burden of showing that they would face irreparable harm absent a TRO halting the RIFs." *Ethical Soc'y of Police*, 2025 WL 3033817, at *4. "The standard for issuing a TRO is the same as for a preliminary injunction." *Orkin*, 557 F. Supp. 3d at 256 (citation omitted). Thus, as at the TRO stage, Plaintiffs must show they are "likely to suffer irreparable harm in the absence of preliminary relief." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Winter*, 555 U.S. at 20). "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Charlesbank Equity Fund II*, 370 F.3d at 162 (citation omitted). To meet this burden, Plaintiffs must demonstrate a "likelihood of substantial and immediate irreparable injury, as opposed to speculative claims of future injury." *Nunez-Soto v. Alvarado*, 956 F.2d 1, 3 (1st Cir. 1992) (citing *Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983)). And the irreparable harms pleaded must be harms *to the Plaintiffs*; Plaintiffs may not rely on alleged harms to third parties. *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) ("the issuance of a preliminary injunction requires a showing of irreparable harm *to the movant* rather than to one or more third parties" (emphasis in original)).

Like at the TRO stage, it is not necessary for the Court to reach the merits. Plaintiffs have not shown that their harms have changed since the Court denied the TRO on irreparable harm grounds almost a month and a half ago. Accordingly, Plaintiffs cannot show that they will suffer

irreparable harm absent injunctive relief. *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (describing irreparable harm as an "essential prerequisite for equitable relief" (citation omitted)); *see also Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm." (citation omitted)).

In its TRO order, this Court recognized that the thrust of Plaintiffs' argument was "that the impact of the RIF notices going into effect, where fourteen of the fifteen remaining CRS employees are being terminated, is to effectively shutter CRS's operations permanently." *Ethical Soc'y of Police*, 2025 WL 3033817, at *3. If the RIF is to take effect, Plaintiffs argued, they may not "receive effective relief from this Court, even if they ultimately prevail in this litigation." *Id.* (citation omitted). This Court rejected that argument. Although the Court acknowledged certain difficulties "may occur" if Plaintiffs ultimately prevail, the Court reasoned that it in fact "could order Defendants to rescind its shuttering of CRS, including as necessary to restaff the agency by rehiring employees terminated by the RIFs, or by transferring employees from other divisions of DOJ and the United States Attorney's Offices to CRS." *Id*.

Setting aside Defendants' partial disagreement with the Court's reasoning,[3] under the Court's analysis, Plaintiffs fail to establish irreparable harm at this stage as well. Like at the TRO stage, Plaintiffs again describe their injury as the cessation of CRS services "they had been receiving" and the potential loss of future CRS services. *See, e.g.*, Pls.' PI Mot. at 35, (emphasis omitted). Plaintiffs' supplemental declarations again describe "abandoned mediations, unresolved conflicts, increased security risks, and lost access to services" as their alleged ongoing harm. *Id.* (footnotes and quotation omitted). These are the same harms and types of harms that the Court

---

[3] Namely, Defendants maintain that this Court lacks jurisdiction to rescind the RIF and reinstate employees, as explained *infra*.

already found insufficient to warrant a TRO. The below chart, which compares the allegations in the declarations at the TRO stage and preliminary injunction stage confirms that Plaintiffs assert the same alleged harm: loss of past services and the potential loss of future services. *Compare* Pls.' TRO Mot. at 27 (describing Plaintiffs' harm as including "withdrawal" from mediations); *id.* at 16–20 (describing Plaintiffs' harm as the withdrawal of services) *with* Pls.' PI Mot. at 35.

| Plaintiff Organization | TRO Allegations | Preliminary Injunction Allegations |
|---|---|---|
| Ethical Society of Police, Missouri Baptist Convention, and NAACP St. Louis County | CRS withdrew its services before a memorandum of agreement ("MOA") could be reached. Despite CRS's withdrawal, the final MOA was still finalized and signed. Declaration of Donnell Walters, ECF 2-5 at ¶ 11; Declaration of John Bowman, Sr., ECF 2-6 at ¶ 11; Declaration of Linden Bowie, ECF 2-7 at ¶ 13. | CRS withdrew its services before a MOA could be reached. Despite CRS's withdrawal, the final MOA was still finalized and signed. Declaration of Donnell Walters, ECF 33-12 at ¶ 11; Declaration of John Bowman, Sr., ECF 33-13 at ¶ 11; Declaration of Linden Bowie, ECF 33-14 at ¶ 13. *See* Supplemental Declaration of Philip Duvall, ECF 33-24 at ¶¶ 14-15 (explaining that CRS withdrew its services before a MOA could be finalized but that the agreement was still signed). |
| Two Wrasslin' Cats Accord | CRS's failure to provide services like community listening and dialogue sessions. Declaration of Mark Thiede, ECF 2-8 at ¶¶ 4-7. | CRS's failure to provide services like community listening and dialogue sessions. Declaration of Mark Thiede, ECF 33-15 at ¶¶ 4-7. |
| Out Accountability Project | CRS's lack of engagement after early 2025. *Id.* Out Accountability Project had reached out to CRS to discuss different services that CRS could provide. Declaration of Melissa Combs, ECF 2-9 at ¶¶ 6-9. | CRS's lack of engagement after early 2025. *Id.* Out Accountability Project had reached out to CRS to discuss different services that CRS could provide. Declaration of Melissa Combs, ECF 33-16 at ¶¶ 6-9. |

11

| Plaintiff Organization | TRO Allegations | Preliminary Injunction Allegations |
|---|---|---|
| Berkshire Resources for Integration of Diverse Groups and Education ("BRIDGE") | CRS's declining to provide an additional School-SPIRIT program. Declaration of Gwendolyn Vansant, ECF 2-10 at ¶ 4. | CRS's declining to provide an additional School-SPIRIT program. Declaration of Gwendolyn Vansant, ECF 33-17 at ¶ 4; *See also* Supplemental Declaration of Declaration of Gwendolyn Vansant, ECF 33-23 at ¶¶ 5, 8-10 (describing the denial of the School-SPIRIT program and stating BRIDGE would "immediately seek services from CRS" again). |
| NAACP State Conference Colorado-Montana-Wyoming's ("Tri-State NAACP") | CRS terminated planning for an action plan for future engagement. Declaration of Thomas Mayes, ECF 2-11 at ¶¶ 4-5. | CRS terminated planning for an action plan for future engagement. Declaration of Thomas Mayes, ECF 33-18 at ¶¶ 4-5. |
| Southern Christian Leadership Conference 1 ("Pike's Peak SCLC") | CRS declined a request to facilitate a dialogue in June 2025. Declaration of Paul P. Nelson, ECF No. 2-12 at ¶ 5. | CRS declined a request to facilitate a dialogue in June 2025. Declaration of Paul P. Nelson, ECF No. 33-19 at ¶ 5. |
| Peacemakers Lodge | CRS ceased providing services after May 2025. Declaration of L'Dawn Olsen, ECF No. 2-13 at ¶ 6. | CRS ceased providing services after May 2025. Declaration of L'Dawn Olsen, ECF No. 33-20 at ¶ 6. |
| Wellspring Health Access | CRS "withdrew its assistance to Wellspring on or about May 2025." Declaration of Julie Burkhart, ECF No. 2-14 at ¶ 6. | CRS "withdrew its assistance to Wellspring on or about May 2025." Declaration of Julie Burkhart, ECF No. 33-21 at ¶ 6. |
| Haitian Community Help & Support Center | CRS withdrew the provision of its services, "preventing the [Memorandum of Understanding ("MOU")] process from being completed and the anticipated consultation from being | CRS withdrew the provision of its services, "preventing the [Memorandum of Understanding ("MOU")] process from being completed and the anticipated consultation from being |

| Plaintiff Organization | TRO Allegations | Preliminary Injunction Allegations |
|---|---|---|
|  | received." Declaration of Viles Dorsainvil, ECF 2-15 at ¶ 10. | received." Declaration of Viles Dorsainvil, ECF 33-22 at ¶ 10. |

Plaintiffs' harms fail under the rubric laid out in this Court's order denying the TRO where Plaintiffs merely resubmitted the same declarations from the TRO stage. The two new supplemental declarations that Plaintiffs submit reiterate the same basic harms and allegations as the first. *See* Supplemental Declaration of Declaration of Gwendolyn Vansant, ECF 33-23 at ¶¶ 5, 8-10; Supplemental Declaration of Philip Duvall, ECF 33-24 at ¶¶ 14-15. Identifying the same harms cannot supply the "immediate need for CRS's services" that the Court contemplated in its order. *Ethical Soc'y of Police*, 2025 WL 3033817, at *3.

Under the Court's reasoning, Plaintiffs can receive the relief they seek at final judgment. And, as a practical matter, final judgment is not some uncertain date in the distant future. The Court has already set expedited briefing this case. Scheduling Order, ECF No. 37. Although the scheduling order contemplates the potential for discovery, which could delay briefing, summary judgment could be briefed by early March—just a few months from now. *See id.*

In any event, none of the harms that Plaintiffs allege are either imminent or irreparable, as required for injunctive relief. And the "ongoing" nature of these alleged harms—by Plaintiffs' own telling—further undermines any suggestion of irreparability. Indeed, the material difference between TRO and the preliminary injunction proceedings is the passage of time. The harms that Plaintiffs assert are harms that they claim have been ongoing for months. *See, e.g.*, Pls.' PI Mot. at 36 ("[c]onsider, for example, the loss that BRIDGE *continues* to suffer from the closure of CRS"

(emphasis added)); *id.* ("consider CRS's abrupt withdrawal from a mediation process that three plaintiffs, including Missionary Baptist State Convention of Missouri, had requested").

In any event, much of the relief that Plaintiffs seek in their preliminary injunction motion would not actually redress their alleged harms. When Plaintiffs filed their TRO motion, the realignment (which Plaintiffs characterize as "dissolution") had not been implemented and the RIF had not yet become effective. Now, Plaintiffs file a preliminary injunction motion as the realignment is underway and the RIF has been effective for over forty days. Despite these developments, Plaintiffs' status quo has not changed. According to Plaintiffs, their alleged harms are still ongoing and are the same pre- and post-RIF and pre- and post-realignment. Thus, an order rescinding the RIF or halting CRS's realignment would not remedy those harms. It would simply restore them to their status when they filed their TRO motion—which was the status they had been in for months.[4]

## II. PLAINTIFFS FAIL TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS.

### a. Plaintiffs lack standing to bring the claims they assert.

As a threshold matter, Plaintiffs lack the "irreducible constitutional minimum of standing" required to maintain a suit for the sweeping relief that they seek. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To meet that constitutional requirement, Plaintiffs must establish that they "[have] suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v.*

---

[4] In their proposed order, Plaintiffs also ask this Court to order Defendants to resume services to Plaintiffs. Pls.' Proposed Order at 2, ECF No. 32-1. But Plaintiffs do not bring a claim under 5 U.S.C. § 706(1)—the portion of the APA that authorizes suits for the "unlawful withholding of services"—and have no legal entitlement to any particular services in any event. CRS is not obliged to continue providing mediation assistance or prepare training programs to these particular Plaintiffs simply because it has done so in the past.

*Missouri*, 603 U.S. 43, 57 (2024) (citation omitted). The Supreme Court has emphasized that "standing is not dispensed in gross." *Id.* at 61 (citation omitted) (holding that the circuit court in that case had erred by treating the plaintiffs and defendants, respectively, "as a unified whole"). Thus, "plaintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek." *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

Only "actual or imminent" injuries count for Article III purposes. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024), *on remand to*, 117 F.4th 336 (5th Cir. 2024). Allegations that are "too speculative" or merely assert "possible future injury" do not suffice. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (emphasis and citations omitted). Generalized, speculative disputes over whether agencies will perform their statutory duties or will have sufficient resources to do so are insufficient to confer standing on Plaintiffs.

This is the case as to the CRS realignment and the RIF. Plaintiffs challenge CRS's general restructuring but specify no harm connected to the realignment. Indeed, the cessation of services that Plaintiffs complain about occurred early this year; the latest identified harm occurred in June 2025. *See* Pls.' TRO Mot. at 16–20; Pls.' PI Mot. at 35. This is months before the actual realignment was effective. Nazaire Decl. at ¶ 9 (explaining the transition to EOUSA in November 2025). In short, Plaintiffs' alleged harm preceded the very thing that they allege caused the harm. Because Plaintiffs fail to show that the CRS realignment caused their harm, they do not have standing to challenge the CRS realignment.[5]

---

[5] Plaintiffs' broad claim regarding the purported "dissolution" of CRS fails for the same reason. That claim does not acknowledge the reality of the CRS realignment—which involved the downsizing and streamlining of CRS but not its elimination—and involves no "legally and judicially cognizable" harm that is "traditionally thought to be capable of resolution through the judicial process" in any event. *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (citation omitted). Such

The same goes for Plaintiffs' challenge to the RIF. Although CRS's personnel have been reduced, Plaintiffs fail to show how their alleged injuries flow from staffing decisions. Like the realignment, Plaintiffs' alleged harms occurred before the RIF.  The RIF became effective on October 31—after Plaintiffs filed their TRO motion—meaning that Plaintiffs' alleged injuries occurred pre-RIF and before CRS's staffing was reduced. Accordingly, Plaintiffs cannot establish that specific staffing levels would redress any concrete injury stemming from the loss of discrete CRS programs or services. *See TransUnion LLC*, 594 U.S. at 423 (identifying causation and redressability as essential for standing).

 The thrust of Plaintiffs' alleged harms is aimed at the cessation of particular CRS services. The appropriate and lawful method to challenge an actual (not hypothetical) failure to provide a service that a plaintiff believes an agency is legally obligated to provide is through a claim under 5 U.S.C. § 706(1), if and when the program or service is no longer available and any injury to that plaintiff has actually occurred. *See California v. Texas*, 593 U.S. 659, 678 (2021) (rejecting a "highly attenuated chain of possibilities" (citation omitted)); *Off. Pers. Mgmt. v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 1914, 1914 (2025). Plaintiffs have failed to bring such a claim here and should not be permitted to circumvent Article III in an attempt to receive relief that will not actually remedy their alleged injuries.

For the reasons explained further herein, the Court should deny relief in full. To the extent the Court is inclined to grant any relief, however, Article III—and the related requirement that the remedy sought "be limited to the inadequacy that produced the injury in fact that the plaintiff has

---

suits have no "ground[ing] in historical practice" or "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo v. Robins*, 578 U.S. 330, 341 (2016). This generalized interest is too abstract to constitute a case or controversy appropriate for judicial resolution. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482-83 (1982).

established," *Gill* v. *Whitford*, 585 U.S. 48, 68 (2018) (citation omitted)—necessitates that any relief be drawn narrowly to address only what caused the alleged injuries to Plaintiffs in this case.

> **b. This Court lacks jurisdiction to enjoin the RIFs because administrative bodies identified in the Civil Service Reform Act of 1978 are the exclusive channels for any challenge to federal employee removals.**

In their proposed order, Plaintiffs ask this Court to "rescind[] the . . . RIF of CRS employees that went into effect on October 31, 2025" and "restor[e] affected employees to their status before the . . . RIF." Pls' PI Mot. ECF No. 32-1 at 2. But federal law does not permit Plaintiffs to use the APA to challenge the removal of federal employees—much less when those employees are not parties—and this Court lacks jurisdiction to order such a remedy. In the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (1978), Congress established a comprehensive framework for evaluating employment actions against federal employees. The CSRA provides an integrated scheme of both administrative and judicial review of challenged personnel practices. When passing the statute, Congress carefully balanced "the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988) (citation omitted).

Under the CSRA, the Office of Special Counsel ("OSC"), the Merit Systems Protection Board ("MSPB"), and the Federal Labor Relations Authority ("FLRA") are the exclusive means for federal employees, applicants, labor unions and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions, *see id.* at 455, even when those disputes involve constitutional claims, *see Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10-15 (2012); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*").

The Supreme Court has long recognized the CSRA as the exclusive and comprehensive

scheme covering all matters involving federal employment. *See Fausto*, 484 U.S. at 455. Indeed, the Supreme Court has held that, even for constitutional claims, the CSRA imposes an "implied preclusion of district court jurisdiction[.]" *Elgin*, 567 U.S. at 12. The CSRA thus "precludes courts from providing supplemental remedies." *Lampon-Paz v. OPM*, 732 F. App'x 158, 161 (3d Cir. 2018); *Saul v. United States*, 928 F.2d 829, 840(9th Cir. 1991) ("Congress is better equipped than we to strike an appropriate balance between employees' interests in remedying constitutional violations and the interests of the government and the public in maintaining the efficiency, morale and discipline of the federal workforce."); *see Veit v. Heckler*, 746 F.2d 508, 510-11 (9th Cir. 1984). A request for "reinstatement [of] members already terminated and to prevent [an agency] from terminating other members in the future . . . is precisely the relief afforded through the CSRA." *Nat'l Treasury Emps. Union v. Vought*, No. 25-5091, 2025 WL 2371608, at *5 D.C. Cir. Aug. 15, 2025).

Just four days ago, in fact, the Supreme Court reiterated the exclusivity of the CSRA scheme when it stayed the Fourth Circuit's mandate in a case where the Fourth Circuit questioned whether, in light of presidential control of the MSPB and the OSC, Congress's intent to preclude district-court jurisdiction is fairly discernible in the statutory scheme. *Margolin v. Nat'l Ass'n of Immigr. Judges*, 25A662 (Dec. 5, 2025). *See also McMahon v. New York*, 606 U.S. ---, 145 S. Ct. 2643 (2025) (staying a district court order enjoining a Department of Education RIF); *Off. of Pers. Mgmt.*, 145 S. Ct. at 1914; *Trump v. Am. Fed'n of Gov't Emps.*, 606 U.S. ---, 145 S. Ct. 2635 (Mem.) (2025). Although an interim decision, the Supreme Court's interim orders "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 606 U.S. ---, 145 S. Ct. 2653, 2654 (2025). Other appellate courts around the country, including the First Circuit, have reiterated the exclusivity of the CSRA scheme. *See, e.g.*, *Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*,

154 F. 4th 5, 11 (1st Cir. 2025) (staying a district court order enjoining a RIF of the Department

of Education's Office for Civil Rights); *Nat'l Treasury Emps. Union*, 2025 WL 2371608, at *5-6

(holding that even as to challenges to personnel actions that occur as part of "broad disputes about

agency shutdowns[,]" *i.e.*, not formulated as specific challenges to individual terminations by those

individuals, such challenges cannot be heard by a district court in light of congressional channeling

of such claims to a specialized review scheme).

      This case is no different. Because federal law requires channeling of all claims related to

federal employment via the administrative bodies that Congress created in the CSRA, this Court

lacks jurisdiction to consider Plaintiffs' claims to the extent they challenge federal personnel

decisions. Indeed, such a holding is consistent with the Supreme Court's emphasis in *California*

that the APA does not allow litigants to forestall properly applicable channeling regimes that

Congress established. *See Dep't of Education v. California*, 604 U.S. 650 at 650-52 (2025).

      Even if jurisdiction over such employment-related actions generally was not precluded,

reinstatement is not an available remedy under the APA because it exceeds court's historical

authority in equity. The APA authorizes a court to grant injunctive relief subject to traditional

equitable limitations. *See* 5 U.S.C. § 702(1). Absent express statutory authority, a federal court

may grant only those equitable remedies that were "traditionally accorded by courts of equity."

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).

Reinstatement was not a traditionally available remedy at equity. *See Sampson v. Murray*, 415

U.S. 61, 83 (1974). To the contrary, courts of equity lacked "the power . . . to restrain by injunction

the removal of a [public] officer." *In re Sawyer*, 124 U.S. 200, 212 (1888); *see, e.g., Baker v. Carr*,

369 U.S. 186, 231 (1962) (decisions that "held that federal equity power could not be exercised to

enjoin a state proceeding to remove a public officer" or that "withheld federal equity from staying

removal of a federal officer" reflect "a traditional limit upon equity jurisdiction" (citations omitted)); *Walton v. House of Representatives of Oklahoma*, 265 U.S. 487, 490 (1924) ("A court of equity has no jurisdiction over the appointment and removal of public officers[.]" (citation omitted)); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898) ("[T]o sustain a bill in equity to restrain . . . the removal of public officers, is to invade the domain of the courts of common law, or of the executive and administrative department of the government." (citation omitted)); *White v. Berry*, 171 U.S. 366, 377 (1898) ("[A] court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee, nor restrain the appointment of another." (citation omitted)).

The creation of new remedies is "a legislative endeavor," *Egbert v. Boule*, 596 U.S. 482, 491 (2022), and courts of equity lack "the power to create remedies previously unknown to equity jurisprudence[,]" *Grupo Mexicano*, 527 U.S. at 332. Plaintiffs are not entitled to bring claims under the CSRA, nor did they follow CSRA-required procedures. More broadly, no statute authorizes courts to reinstate public employees in order to improve government services to third parties. This Court thus lacks the power to grant the reinstatement remedy here.

Plaintiffs acknowledge that the CSRA applies only to "personnel disputes brought by individual federal workers and organizations representing them" and that "[they] have no access to any of the exclusive administrative means for challenge under the CSRA[.]" Pls.' PI Mot. at 32-33. And Plaintiffs admit that their claim centers around the deprivation of services. *Id.* That is exactly the point. Plaintiffs may not evade the CSRA's limits by seeking mass reinstatement of employees who may provide such services. *See McMahon*, 145 S. Ct. at 2643. The CSRA would be turned "upside down" if organizations whose members are not federal employees could challenge the personnel decisions about federal employees in district court. *Fausto*, 484 U.S. at

449. The "exclusion" of plaintiffs who are not individual government employees "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [them] from seeking review" under other provisions. *Id.* at 455. Ultimately, any claim that Defendants have failed to take a discrete, mandatory agency action (such as the provision of concrete services) to which Plaintiffs believe they are legally entitled must be brought under the APA's provision authorizing suits to "compel agency action unlawfully withheld or unreasonably delayed"—not under the guise of challenging a RIF. 5 U.S.C. § 706(1). Plaintiffs simply have not brought such a claim here.

Separately, Plaintiffs briefly mention the Continuing Resolution ("CR") passed by Congress in November that funded CRS and other agencies through January 31, 2025. Pls.' PI Mot. at 28. In particular, Plaintiffs highlight the CR's language that "any reduction in force proposed, noticed, initiated, executed, implemented, or otherwise taken by an Executive Agency between October 1, 2025, and the date of enactment [Nov. 12, 2025], shall have no force or effect." *See* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37 § 120(e), 139 stat. 495 (2025), and argue that Defendants violated the CR by failing to rescind the RIF of CRS employees. As an initial matter, this argument is untethered to any particular claim that Plaintiffs' bring in this lawsuit—much less a claim on which Plaintiffs seek injunctive relief. *See* Compl.; Pls.' PI Mot.. And Plaintiffs cite no cause of action under which they could have standing to invoke or enforce the CR. Even so, Plaintiffs' argument is just another angle to challenge the RIF—at bottom, a personnel action that must be challenged through the administrative schemes provided by Congress.

c. **Plaintiffs' APA claims fail because they do not seek judicial review of a discrete, final agency action.**

Plaintiffs' APA claims independently fail because Plaintiffs are not challenging a discrete agency action. The APA authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "Agency action" is defined to include the "whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The APA allows for judicial review only of "circumscribed, discrete agency actions," *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004), not "everything done by an administrative agency," *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). Under the APA, plaintiffs "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

Consistent with these principles, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Id*. "Because an on-going program or policy is not, in itself, a final agency action under the APA, [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citations omitted). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Id*. (citation omitted).

Plaintiffs' assertions and arguments commit at least two errors. *First*, they incorrectly characterize CRS's realignment as a "dissolution," asserting that Defendants improperly sought to "eliminate" CRS. *See, e.g.*, Pls.' PI Mot. at 25-26. But Plaintiffs cannot identify anything tangible

or concrete—*e.g.*, an agency rule, order, license, sanction, or relief, 5 U.S.C. § 551(13)—that would qualify as an "agency action." This failure is detrimental to Plaintiffs' claim. The Supreme Court has been clear that the APA does not authorize review of "abstract decision[s] apart from specific agency action, as defined in the APA." *Biden v. Texas*, 597 U.S. 785, 809 (2022). Indeed, in *Biden v. Texas*, the Supreme Court held that an appellate court erred "by postulating the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability . . . designed to implement' that decision." *Id.* at 809 (quoting 5 U.S.C. § 551(4)). Here, like in *Biden v. Texas*, Plaintiffs identify no "action" as defined in the APA—*i.e.*, no such "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[,]" 5 U.S.C. § 551(13). Indeed, Plaintiffs fail to point to any statement, formal or informal, written or oral, that could be considered an agency action. Nor do Plaintiffs suggest that the putative dissolution is anything like a "rule, order, license, sanction, [or] relief." *Id.* These too are defined terms, *see id.* § 551(6), (8), (10), (11), and a decision to shut down an agency would not satisfy any of the definitions. *See Nat'l Treasury Emps. Union*, 149 F.4th at 783. Accordingly, the alleged dissolution posited here is an abstract decision "wholly apart from" any "specific agency action, as defined in the APA." *Biden*, 597 U.S. at 809.

*Second*, rather than challenge a specific agency action or the cessation of particular services, Plaintiffs appear to challenge CRS's entire course of conduct moving forward. *See* Pls' Proposed Order ECF No. 32-1 at 2 (seeking to enjoin Defendants from "taking any further actions to eliminate, dissolve, close, or otherwise dismantle CRS or its functions" and to order Defendants to rescind the RIF and resume services to Plaintiffs). The APA does not permit such wholesale judicial review. In *Lujan*, the Supreme Court dispelled any notion that such a programmatic challenge can proceed under the APA:

> [I]t is at least entirely certain that the flaws in the entire "program"—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them . . . is ripe for review and adversely affects [a plaintiff].

497 U.S. at 892-93 (footnote omitted).

Just as in *Lujan*, Plaintiffs' APA counts seek to bring a collective, programmatic, challenge to CRS's reorganization efforts on the theory that it may be unable to comply with unidentified statutory obligations. These are grab-bag challenges to general agency operations, not discrete challenges to concrete agency actions. *See Nat'l Treasury Emps. Union*, 149 F.4th at 782-84 (explaining that plaintiffs' challenge did not present a "viable" action under the APA where plaintiffs inferred a "putative shutdown decision" from various actions taken by the agency to downsize, "including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease for its headquarters" (citation omitted)). At bottom, Plaintiffs' fundamental complaint does not stem from the programmatic efforts of the agency writ large, but from specific activities and the cessation of certain services. But they do not bring those specific challenges, and Plaintiffs cannot subsume concrete final agency action within the banner of a programmatic challenge more generally.

CRS's realignment efforts are not *final* agency action either. To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). Plaintiffs' argument that CRS's "decision" to dissolve CRS, Pls.' PI Mot. at 18—surmised from various actions taken to prepare for the realignment, like the cessation of certain services—is final agency actions under *Bennett* fails. Indeed, Plaintiffs do not address *Bennett* in their preliminary injunction motion. *See generally id.*

Under *Bennett*'s first prong, CRS's realignment, taken in response to the Department's decision to move CRS as a stand-alone component into a separate unit in EOUSA, is an ongoing process—not the consummation of the agency's decision-making process. Defendants' efforts are

part of a government-wide effort to streamline federal agencies. *See* Lauria Decl. ECF 15-1 at ¶ 6. As with any change in structure, organization, and policy initiatives, agencies need time to work out the kinks and settle into their streamlined operations. For CRS, although the transition was made last month, efforts to ensure a smooth transition; transfer and house CRS operational data and relevant organizational files; and identify and establish milestones to complete the Department's statutory requirements, to hold any court referred mediation hearings, offer conciliation services, and submit an annual report of CRS activities to Congress are ongoing—and far from final or consummated. *See* Nazaire Decl. at ¶ 10. To enjoin the realigned CRS in the middle of these efforts would be premature. Setting aside the "agency action" hurdle, any purported decisions would be "preliminary" in nature and "not directly reviewable[.]" 5 U.S.C. § 704; *see also EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel." (citation omitted)); *Appalachian Energy Grp. v. EPA*, 33 F.3d 319, 322 (4th Cir. 1994) (no final agency action where agency "has not taken any action at this point triggering [the court's] power to review its position").

   Nor does CRS's realignment satisfy the second *Bennett* prong. Prong two, which requires "a 'pragmatic' inquiry that requires courts to examine the 'concrete consequences' of an agency action." *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (citation omitted). The court must consider the "concrete impact the [agency action] had on [the Plaintiffs]." *Indep. Equip. Dealers Ass'n v*, 372 F.3d at 427; *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate . . . effect on the day-to-day business' of the complaining parties" (citation omitted)); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties"). Where the details of CRS's operations post-realignment are being actively worked out, *see* Nazaire Decl. at ¶ 10, it can hardly be said that

CRS has made any decisions from which obligations, rights, or legal consequences flow. *Bennett*, 520 U.S. at 177-78. And Plaintiffs cannot identify any. Simply put, Plaintiffs' sweeping claims here are not workable as APA challenges.[6]

#### d. Whether to provide particular services and staff an agency at certain levels is committed to CRS discretion by law.

To remedy the APA violations they allege, Plaintiffs ask this Court to order Defendants to resume services to Plaintiffs and rescind the RIF that became effective over forty days ago. Pls.' Proposed Order at 2, ECF No. 32-1. But Plaintiffs have no legal entitlement to CRS services and no legal authority or claim that would justify the Court ordering such relief. Moreover, both CRS's provision of services and CRS's staffing decisions are committed to agency discretion by law and therefore unreviewable under the APA. 5 U.S.C. § 701(a)(2).

*CRS Services:* "In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. Fed. Aviation Admin.*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, both factors show that CRS's provision of services are committed to agency discretion.

First, decisions about whether and how to engage in particular "disputes, disagreements, or difficulties," 42 U.S.C. § 2000g-1, fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" *Lincoln v. Vigil*, 508 U.S. 182, 191–92 (1993) (quoting *Franklin v. Massachusetts,* 505 U.S. 788, 817 (1992) (Stevens, J., concurring in part and concurring in judgment)). In *Lincoln*, the Supreme

---

[6] Plaintiffs make much of *Rhode Island v. Trump*, 155 F.4th 35, 40, 50 (1st Cir. 2025), and state that the First Circuit's decision is "binding" on this Court. Pls.' PI Mot. at 39. It is not. In any event, the *Rhode Island* appeal was mooted out, and the First Circuit dismissed the appeal on November 25, 2025. *See Rhode Island*, No. 25-1477, Doc. Entries 6768069 & 6768256.

Court concluded that "allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion." *Id.* at 192. "After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* So too here. The statute governing CRS, *see* 42 U.S.C. § 2000g-1, gives CRS unfettered discretion on how and when to employ its services, vesting in CRS the decision-making authority to determine whether ongoing agency actions "best fit[] the agency's overall policies" and "whether agency resources are best spent on" particular projects. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-32.

As a result, Plaintiffs cannot succeed on the merits of their arbitrary and capricious claim regarding the provision of CRS services, which involve actions committed to agency discretion by law. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness[.]" *Id.* The standard of review is "highly deferential" in determining whether an action is arbitrary and capricious, *Conservation Force v. Salazar*, 919 F. Supp. 2d 85, 89 (D.D.C. 2013), and agency action regarding reallocation of resources and reorganizing of enforcement priorities after a change in presidential administrations, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln*, 508 U.S. at 193 (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."). Plaintiffs bear the burden of making such a showing and have not done so here. *See generally New*

*Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 113 (D.D.C. 2010) ("[T]he burden of establishing that the agency action is arbitrary or capricious rests with the party challenging agency action.").

Second, the statute's language and structure give complete discretion to CRS. CRS's governing statute states that CRS "may" provide services if certain conditions are satisfied "in its judgment." 42 U.S.C. § 2000g-1 (explaining that CRS "*may* offer its services in cases of such disputes, disagreements, or difficulties whenever, *in its judgment*, peaceful relations among the citizens of the community involved are threatened thereby, and it *may* offer its services either upon its own motion or upon the request of an appropriate State or local official or other interested person" (emphasis added)). That is the classic language of discretion. If CRS's judgment is that certain services should not be provided, a court is not permitted to second-guess that.[7]

To override these principles and enjoin CRS from exercising its own judgment as to which services to provide and how to provide them would be an extraordinary violation of not only the APA, which immunizes such activities as "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), but also the separation of powers.

*CRS Personnel Levels:* Relatedly, courts lack the power to "dictat[e] to the agency the methods [and] procedures" the agency must use to complete its statutory obligations. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544-45 (1978) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Indeed, internal staffing decisions are traditionally left to an agency's discretion. *See id.* at 524 (explaining that the Supreme "Court has for more than four decades emphasized that" even outward facing "procedures [are] basically to

---

[7] Plaintiffs admit as much in their preliminary injunction motion. Pls' PI Mot. at 34 n.4 (acknowledging the statute speaks in "permissive terms" and "afford[s] discretion to the agency in deciding whether assistance is warranted").

be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments"). To override these principles and enjoin the government from exercising procedural control over its own staff would be an extraordinary violation of the separation of powers. Such activities are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Here, as above, each factor shows that Defendants' managerial decisions are committed to agency discretion. *Drake*, 291 F.3d at 70 ("In determining whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administration action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action.").

First, these decisions fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191-92 (quoting *Franklin,* 505 U.S. at 817). Individual staffing decisions reflect efforts to determine whether ongoing agency actions "best fit the agency's overall policies" and "whether agency resources are best spent on" current projects or whether they would be better spent differently. *Heckler*, 470 U.S. at 831. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id*. at 831-32.

Second, Plaintiffs can point to no particular statute limiting the agency's inherent discretion to make independent staffing decisions. Again, agencies generally have broad discretion to fashion internal procedures for formulating policies and implementing a statute. *See Vt. Yankee*, 435 U.S. at 543. Here, the CRS statute expressly grants such discretion. *See* 42 U.S.C. § 2000g (explaining that the CRS Director is "authorized to appoint" other personnel "as may be necessary to enable to the Service to carry out its functions and duties").

Ultimately, if Plaintiffs are dissatisfied with a specific final agency action, they may

challenge that action in an appropriate venue under the appropriate cause of action. But they cannot preemptively challenge staffing determinations antecedent to those actions because they have a different vision of how the agency should operate. Put differently, a person may be able to challenge a final agency action that injures them; they cannot challenge the staffing determinations that decided which employee made that determination.

CRS has the ability to consider the optimal distribution of funding to achieve statutory goals "in what [each agency] sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. The APA does not allow for judicial review of those discretionary judgments that implicate agency expertise about allocating limited resources and advancing policy priorities. *See id*. at 193 (noting that funding decisions involve "a complicated balancing of a number of factors" (quotation omitted)). Accordingly, the Court should decline to enter injunctive relief on Plaintiffs' APA claims.

### e. Plaintiffs' APA claims fail because they are premised on a false theory that Defendants are unilaterally dissolving CRS.

Plaintiffs argue that "the dissolution of CRS is not in accordance with law[,] [is] in excess of statutory authority[,] . . . [and] is arbitrary and capricious." Pls.' PI Mot. at 25-27 (capitalization altered). But, as explained, Defendants are not dissolving CRS, and there has been no "decision" to eliminate CRS. At most, CRS is being eliminated from its current position in DOJ's organizational chart. There is therefore no "dissolution" decision that amounts to final agency action subject to APA review in the first place.

Although Plaintiffs cite to various documents in an attempt to show that Defendants are dissolving CRS, Plaintiffs misconstrue the language and ignore the actual unfolding events. For example, Plaintiffs point to the President's FY 2026 Budget, which includes no funding for CRS and states that DOJ "will eliminate the Community Relations Service." *Id*. at 18. But the

President's FY 2026 Budget is a *proposal to Congress* about upcoming fiscal year appropriations. Although the President is entitled to make such a proposal, Congress is under no obligation to pass it. Congress has not yet enacted it, and it therefore does not represent present day reality. The Lauria Declaration makes clear that Defendants acknowledge that the President's FY 2026 Budget or other legislation would need to be enacted to eliminate CRS. Lauria Decl. at ¶ 12. Until that occurs, if it ever does, CRS will continue to exist. *Id*.[8]

Contrary to Plaintiffs' arguments, Defendants are not dissolving CRS. Instead, leadership at the Department of Justice has been working through implementation considerations and discussing the realignment and move to EOUSA, and the reassigned employee is working with EOUSA staff to ensure a smooth transition of CRS functions to EOUSA. *See* Nazaire Decl. at ¶¶ 6-10. Rather than point to a statutory infirmity with CRS's realignment actions, Plaintiffs repeatedly claim that Defendants are unilaterally eliminating CRS. But repetition does not make the claim true. Defendants *are* "downsizing and reorganizing" CRS, consistent with the realignment plan and consistent with the evidence in this case, *see, e.g.*, Lauria Decl. at ¶¶ 6, 10; Nazaire Decl. at ¶¶ 6-10. And although CRS may provide services using different approaches or methods than it has in the past, *see, e.g.*, Nazaire Decl. Exhibit A, Defendants are permitted to make such changes and Plaintiffs identify no statutory barrier to doing so.

---

[8] Plaintiffs also call out a phrase "[b]uried within [the Office of Management and Budget ("OMB")] Technical Supplement to that budget request," which states "[t]he Justice Department's reorganization will eliminate the Community Relations Service (CRS) and its functions in FY 2025." Pls.' PI Mot. at 18 (emphasis omitted). But that is an OMB document—not a Department of Justice or CRS document for which Defendants could more fairly be held to account. Setting that aside, Plaintiffs interpret that line "[b]uried" in the supplement to accord with their own narrative. It could just as easily be read to account for the CRS realignment and reorganization— namely, the elimination of CRS and its functions as a stand-alone component and realignment into EOUSA. Indeed, that reading would comport with the undisputed facts on the ground—that CRS is now housed within EOUSA. *See* Nazaire Decl. at ¶ 9.

Unless and until Congress decides to eliminate CRS through legislation, CRS will continue to operate as a unit within EOUSA. *See* Lauria Decl. at. ¶ 12. Because Plaintiffs' APA arguments rest on a false premise, and Plaintiffs cannot show that Defendants' actions are inconsistent with the law or in excess of their statutory authority, their claims fail.

### f.  Plaintiffs' constitutional claims fail.

As a threshold matter, Plaintiffs' constitutional claims are merely Plaintiffs' APA claims repackaged because they argue that Defendants' actions do not comport with the applicable statutes. *See, e.g.*, Pls.' PI Mot at 30.

"Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts. Instead, constitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose[.]" *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). As the Supreme Court has confirmed, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473-74 (1994). In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation of powers doctrine." *Id.* at 471. Not "every action by the President, or by another executive official, in excess of his statutory authority is ipso facto in violation of the Constitution." *Id.* at 472. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute. *Id.* at 473 & n.5.

Here, too, Plaintiffs' claims focus entirely on their contention that CRS is being purportedly

dissolved in violation of its authorizing statute and the APA. Pls.' PI Mot. at 29-31. The ultra vires claim thus amounts to little more than an attempt to restate their statutory claim in constitutional parlance. Such efforts should be rejected.

The Supreme Court has "strictly limited" the scope of ultra vires review, reasoning that "ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes[.]" *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). Thus, the Supreme Court has held that *ultra vires* claims must fit within "painstakingly delineated procedural boundaries"; such review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*'" in a statute. *Id.* (quoting *Railway Clerks v. Assoc. for Benefit of Non-contract Employees*, 380 U.S. 650, 660 (1965)) (emphasis in original).

Plaintiffs' claim in this case falls beyond these boundaries. Indeed, ultra vires review is unavailable if, "a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Id*. at 681 (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Here, as discussed, the CSRA and the APA (if Plaintiffs could bring a cognizable claim) provide mechanisms for review of Plaintiffs' claims. And, even if the Court were to disagree and hold that Plaintiff's APA claims could proceed, this, too, would supply an adequate opportunity for the review of Plaintiffs' claims. Given these "alternative path[s] to judicial review," *id.*, an ultra vires claim is not available.

## III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST CUT AGAINST A PRELIMINARY INJUNCTION.

A preliminary injunction is not warranted because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). Here, granting the preliminary injunction that

Plaintiffs seek would disrupt Defendants' realignment efforts and impermissibly impose on the Executive Branch's ability to manage its internal operations—including its ability to decide where on the organizational chart a particular unit should go and the appropriate size and scope of that unit. "[T]hwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest." *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31, (D.D.C. 2020), *op. vacated, appeal dismissed on other grounds*, No. 20-5195, 2021 WL 11096700 (D.C. Cir. Mar. 16, 2021). *See also See McMahon*, 145 S. Ct. at 2643; *Victim Rts. L. Ctr.*, 2025 WL 2753708, at *5; *Am. Fed'n of Gov't Emps.*, 145 S. Ct. at 2635.

Plaintiffs' argument about the equities rests solely on the claim that CRS is being dissolved and that "the government can hardly claim an interest in willfully violating any statute." Pls' PI Mot. ECF 35 at 38. As an initial matter, Plaintiffs' argument rests on a false premise—that CRS is being dissolved. It is not. Once more, Defendants agree that only Congress, through legislation, can dissolve or eliminate CRS. Lauria Decl. at ¶ 12. CRS is merely being transferred to EOUSA and being downsized in the process. *Id.* at ¶ 6. Plaintiffs' principle that there is no "interest in willfully violating [a] statute" or "there is generally no public interest in the perpetuation of unlawful agency action," Pls.' PI Mot. at 38, flows from Plaintiffs' false premise and also assumes the merits.

A preliminary injunction would impair the public interest by having agency decisions be made via judicial decree rather than the politically elected and accountable branches of government. Forcing Defendants to provide certain services or maintain certain staffing levels due to an injunction when Defendants have made a different policy choice or calculus about CRS services and staffing levels imposes on the Executive Branch's prerogative to manage its affairs.

## CONCLUSION

For all the reasons discussed herein, the Court should deny the Plaintiffs' preliminary injunction motion. If the Court does grant any injunctive relief, it should also order Plaintiffs to post security to account for the added cost of keeping the 14 employees (*i.e.*, the number of employees affected by the RIF) on the government payroll during the pendency of the litigation. *See* Fed. R. Civ. P. 65(c).

Dated: December 9, 2025          Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director
Federal Programs Branch

/s/ *Abigail Stout*
ABIGAIL STOUT
(DC Bar No. 90009415)
*Counsel*
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: Abigail.Stout@usdoj.gov

*Attorney for Defendants*

35

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon all attorneys of record by electronic filing on December 9, 2025.

/s/ *Abigail Stout*