**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

ETHICAL SOCIETY OF POLICE, *et al.*,

       *Plaintiffs*,

  v.

PAMELA J. BONDI, in her official capacity as
Attorney General of the United States, *et al.*,

       *Defendants*.

Case No. 1:25-cv-13115-IT

Leave to File Granted:
December 9, 2025

**BRIEF OF MEMBERS OF CONGRESS AS *AMICI CURIAE***
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

INTERESTS OF *AMICI CURIAE* .............................................................................1

INTRODUCTION & SUMMARY OF ARGUMENT ....................................................1

ARGUMENT ................................................................................................................3

I.        Congress Created CRS and Has Repeatedly Affirmed Its Statutory Mission. ................3

II.       CRS Has Served a Vital Peacemaking Role Since Its Creation. ....................................7

III.      Defendants' Efforts to Eliminate CRS Violate the Separation of Powers......................11

          A.       Defendants Lack the Authority to Unilaterally Dismantle CRS........................11

          B.       The Record Makes Clear That Defendants Are Dismantling CRS. ..................14

CONCLUSION............................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*American Foreign Service Ass'n v. Trump*,
792 F. Supp. 3d 116 (D.D.C. 2025),
*appeal docketed*, No. 25-5291 (D.C. Cir. Aug. 13, 2025) .......................................17

*Clinton v. City of New York*,
524 U.S. 417 (1998) ...................................................................................................12

*Does 1-26 v. Musk*,
No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) .......................................14

*Free Enterprise Fund v. Public Accounting Co.. Oversight Board*,
561 U.S. 477 (2010) ...................................................................................................12

*Hernandez v. Erlenbusch*,
368 F. Supp. 752 (D. Or. 1973) ...................................................................................4

*Myers v. United States*,
272 U.S. 52 (1926) .....................................................................................................12

*National Treasury Employees Union v. Vought*,
774 F. Supp. 3d 1 (D.D.C.), *vacated and remanded*,
149 F.4th 762 (D.C. Cir. 2025) ..................................................................................17

*National Socialist Party of America v. Village of Skokie*,
432 U.S. 43 (1977) .......................................................................................................8

*New York v. Kennedy*,
789 F. Supp. 3d 174 (D.R.I.), *stay denied*, 155 F.4th 67 (1st Cir. 2025) ................17

*Rhode Island v. Trump*,
781 F. Supp. 3d 25 (D.R.I.), *stay denied*, 155 F.4th 35 (1st Cir. 2025) ..................17

*Somerville Public Schools v. McMahon*,
139 F.4th 63 (1st Cir.), *stay granted pending appeal sub nom.*,
*McMahon v. New York*, 145 S. Ct. 2643 (2025) (mem.) ...........................................17

*Widakuswara v. Lake*,
779 F. Supp. 3d 10 (D.D.C. 2025), *stay granted pending appeal*, No. 25-5144,
2025 WL 1288817 (D.C. Cir. May 3, 2025), *reh'g en banc granted in part*,
2025 WL 1521355 (D.C. Cir. May 28, 2025) (per curiam) ........................................17

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)....................................................................................11, 12, 14

**Constitutional Provisions & Statutes**

U.S. Const. art. I, § 8............................................................................................12

U.S. Const. art. II, § 3...........................................................................................12

5 U.S.C. § 301 .................................................................................................12-13

5 U.S.C. § 905(b)..................................................................................................14

28 U.S.C. § 510 ....................................................................................................13

42 U.S.C. § 2000a-3(d) ..........................................................................................4

42 U.S.C. § 2000a-4................................................................................................5

42 U.S.C. § 2000g...............................................................................................1, 3

42 U.S.C. § 2000g-1...............................................................................................3

42 U.S.C. § 2000g-2(a)...........................................................................................4

42 U.S.C. § 2000g-2(b)...........................................................................................4

42 U.S.C. § 2000g-3................................................................................................4

42 U.S.C. § 3608(e)(4)............................................................................................5

Church Arson Prevention Act of 1996, Pub. L. No. 104-155, 110 Stat. 1392 .........................5, 6

Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241 .....................................3

Continuing Appropriations, Agriculture, Legislative Branch, Military
    Construction and Veterans Affairs, and Extensions Act, 2026,
    Pub. L. No. 119-37, 139 Stat. 495 (Nov. 12, 2025).........................................7

Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25 ..................7

Emmett Till Unsolved Civil Rights Crime Act of 2007,
    Pub. L. No. 110-344, 122 Stat. 3934 ..............................................................6

Emmett Till Unsolved Civil Rights Crimes Reauthorization Act of 2016,
    Pub. L. No. 114-325, 130 Stat. 1965 ..............................................................6

Full-Year Continuing Appropriations and Extensions Act, 2025,
   Pub. L. No. 119-4, 139 Stat. 9 (Mar. 15, 2025) ..........................................................7

Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act,
   Pub. L. No. 111-84, 123 Stat. 2190 (2009) .......................................................... 5-6

Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203 ...................................14

Reorganization Plan No. 1 of 1966, 80 Stat. 1607, 5 U.S.C. app. .......................3, 13, 14

**Other Authorities**

Russell Contreras, *Hate Crimes Hit Second Largest Record in 2024*, Axios (Aug.
   5, 2025), https://www.axios.com/2025/08/05/hate-crimes-2024-black-
   antisemitism-muslim-fbi ........................................................................................10

Joseph Copeland & Jocelyn Kiley, *Americans Say Politically Motivated Violence
   Is Increasing, and They See Many Reasons Why*, Pew Research Center (Oct.
   23, 2025), https://www. pewresearch.org/short-reads/2025/10/23/americans-
   say-politically-motivated-violence-is-increasing-and-they-see-many-reasons-
   why/.......................................................................................................................10

David Goldberger, *The Skokie Case: How I Came to Represent the Free Speech
   Rights of Nazis*, ACLU (Jan. 3, 2020), https://www.aclu.org/news/free-
   speech/the-skokie-case-how-i-came-to-represent-the-free-speech-rights-of-
   nazis .......................................................................................................................9

H.R. 923 - Emmett Till Unsolved Civil Rights Crime Act of 2007, 110th
   Congress (2007-2008), https://www.congress.gov/bill/110th-congress/house-
   bill/923/all-actions ..................................................................................................6

H.R. 3525 - Church Arson Prevention Act of 1996, 104th Congress (1995-1996),
   https://www.congress.gov/bill/104th-congress/house-bill/3525/all-actions ............5

Henry B. Hogue, Cong. Rsch. Serv., R42852, *Presidential Reorganization
   Authority: History, Recent Initiatives, and Options for Congress* (Dec. 2012),
   https://www.congress. gov/119/meeting/house/118060/documents/HMKP-
   119-GO00-20250325-SD005.pdf .....................................................................13, 14

Nathan James, Cong. Rsch. Serv., R48134, *Overview of FY2025 Appropriations
   for Commerce, Justice, Science, and Related Agencies (CJS)* (updated Aug.
   15, 2025), https://www.congress.gov/crs-product/R48134 .....................................7

Suzanne Monyak, *Embattled DOJ 'Peacemakers' Unit Preserved in Senate
   Proposal*, Bloomberg Law (July 18, 2025),
   https://news.bloomberglaw.com/us-law-week/embattled-doj-peacemakers-
   unit-preserved-in-senate-proposal...........................................................................16

Press Release, *FBI Releases 2024 Reported Crimes in the Nation Statistics*, FBI (Aug. 5, 2025), https:// www.fbi.gov/news/press-releases/fbi-releases-2024-reported-crimes-in-the-nation-statistics ....................................................................10

S. 2854 - Emmett Till Unsolved Civil Rights Crimes Reauthorization Act of 2016, 114th Congress (2015-2016), https://www.congress.gov/bill/114th-congress/senate-bill/2854/all-actions. ..................................................................6

S. Rep. No. 199-44 (2025) ............................................................................3, 6, 10, 16

Richard A. Salem, *Mediating Political and Social Conflicts: The Skokie-Nazi Dispute*, 10 Sociological Practice 151 (1992), https://digitalcommons.wayne.edu/cgi/viewcontent.cgi?article=1088&context=socprac ........................................9

## INTERESTS OF *AMICI CURIAE*

*Amici* are 90 members of Congress who are familiar with the Community Relations Service (CRS) and the important work that it has done for their constituents since the agency was established by Congress in the Civil Rights Act of 1964. *Amici* include members of Congress who serve on committees with legislative and oversight jurisdiction over the Department of Justice and CRS; members who have appropriations authority with regard to the Department of Justice; members who rely on the reports that CRS is mandated by statute to submit to Congress annually; and members whose districts have directly benefited from services provided by CRS. *Amici* accordingly have a strong interest in the continued existence of CRS.

*Amici* also have a strong interest in the separation of powers issues at the heart of this case. As members of Congress, *amici* are responsible for exercising the legislative and appropriations powers that the Constitution assigns to Congress. Those powers include control over the establishment and continued existence of departments, agencies, and offices in the executive branch. Defendants' efforts to eliminate CRS—an agency that Congress created by statute—would contravene Congress's clear intent, as expressed in the statutes it had passed to authorize and fund CRS, and accordingly implicate *amici*'s core institutional and constitutional prerogatives.

A full list of *amici* appears in the Appendix attached hereto.[1]

## INTRODUCTION & SUMMARY OF ARGUMENT

In 1964, at the culmination of the civil rights movement, Congress established a new federal agency called the Community Relations Service. 42 U.S.C. § 2000g. Though modest in name, CRS was assigned a mighty mission—to support communities throughout the country in

---

[1] No counsel for any party authored this brief in whole or in part. No party or their counsel, or any person other than *amici* or their counsel, contributed money that was intended to fund this brief.

resolving conflict and violence stemming from race-based discrimination.  Since then, Congress has repeatedly affirmed and extended CRS's mission with broad bipartisan support, assigning CRS responsibility for mediating conflicts across a wide range of flashpoints, from protecting the free exercise of religion to helping communities grappling with hate crimes.  Throughout its six-decade history, including during moments of national crisis, CRS has maintained the same fundamental focus on preserving peace through dialogue, mediation, training, and consultation—quietly earning its nickname as "America's Peacemaker."

Defendants now seek to eliminate CRS by executive fiat, leaving local communities without the vital peacemaking support and services that the agency has long provided.  But Congress created CRS by statute, and it has time and again reaffirmed the agency's statutory mission, including through annual appropriations.  The President and Attorney General lack any constitutional or statutory authority to dismantle the agency themselves.  Their efforts to do so usurp congressional authority, in violation of the separation of powers.

Defendants' dismantling of CRS is just the latest in a string of similar offenses.  Since January of this year, the administration has taken a wrecking ball to a range of executive departments, agencies, and offices, all established by Congress to serve U.S. citizens and interests.  In its efforts to undermine and eliminate the Department of Education, the U.S. Agency for International Development, and the Consumer Financial Protection Bureau, among other statutorily mandated federal entities, the administration has far exceeded the limits of executive power and demonstrated blatant disregard for Congress's role in our constitutional system.

Defendants' unlawful conduct makes a mockery of the separation of powers.  Congress has created CRS and assigned it a vital role—one that Defendants lack authority to eliminate, absent further action by Congress.  *Amici* respectfully urge this Court to grant Plaintiffs' motion for a

preliminary injunction.

## ARGUMENT

## I.    Congress Created CRS and Has Repeatedly Affirmed Its Statutory Mission.

Congress created CRS in the Civil Rights Act of 1964.  *See* Pub. L. No. 88-352, §§ 1001-
1004, 78 Stat. 241, 267 (codified at 42 U.S.C. § 2000g–g-3).  In so doing, it established a statutory
mission for the agency consistent with the Act's civil rights objectives—stating that "[i]t shall be
the function of the Service to provide assistance to communities and persons therein in resolving
disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or
national origin." 42 U.S.C. § 2000g-1.  CRS accordingly "provides assistance to communities and
persons in the prevention and resolution of disagreements arising from discriminatory practices"—
"partner[ing] with … community-based organizations when possible in order to better support
community-based peacebuilding and violence prevention efforts."  S. Rep. No. 199-44, at 93
(2025).

Though CRS was originally housed within the Department of Commerce, Congress
required that it be led by its own Director, appointed by the President and confirmed by the Senate.
42 U.S.C. § 2000g.  And President Lyndon B. Johnson maintained that basic organizational
structure when he proposed transferring CRS (including the office of Director) to the Department
of Justice in 1966—a proposal that Congress accepted pursuant to a since-expired statutory
mechanism that delegated the President limited reorganization authority.  *See* Reorganization Plan
No. 1 of 1966, 80 Stat. 1607, 5 U.S.C. app. at 188-89 (stating that "[t]he Attorney General will
provide for the organization of [CRS] as a separate unit within the Department of Justice."); *see
also infra* pp. 13-14.

In establishing CRS, Congress mandated that CRS cooperate with state and local
governments, including law enforcement agencies, in performing its statutorily assigned functions.

42 U.S.C. § 2000g-2(a) ("The Service shall, whenever possible, in performing its functions, seek and utilize the cooperation of appropriate State or local, public, or private agencies.").  And it imposed statutory requirements on CRS that would help ensure the agency's primary goal is gaining the trust of law enforcement and the communities it works with in resolving what are often sensitive disputes.  For instance, Congress required CRS to maintain confidentiality when working with state and local agencies.  *Id.* § 2000g-2(b) (stating that CRS's "conciliation assistance shall be conducted in confidence" and that CRS "shall hold confidential any information acquired in the regular performance of its duties upon the understanding that it would be so held").  That requirement helps ensure that CRS operates separately from the Department's prosecutorial arms, bolstering community stakeholders' trust in the agency.  Suppl. Nam Decl. ¶ 13, Doc. No. 33-11.

Congress also assigned CRS certain mandatory functions in support of the legislative and judicial branches.  CRS is required to submit an annual report to Congress documenting the agency's activities during the preceding fiscal year.  42 U.S.C. § 2000g-3 (stating that the Director "shall" submit an annual report to Congress); *see also, e.g.*, Freeny Decl., Ex. 8 (2022 report), Ex. 7 (2021 report), Ex. 6 (2020 report), Ex. 5 (2019 report), Doc. Nos. 33-5–33-8.  Congress required such reports for a reason:  Members of Congress rely on CRS's annual reports to understand conditions on the ground in communities across the country, to evaluate the effectiveness of federal civil rights laws, and to assess the performance of CRS and the services the agency provides.

In addition, Congress authorized federal district courts to refer public accommodation cases to CRS where the court "believes there is a reasonable possibility of obtaining voluntary compliance."  42 U.S.C. §2000a-3(d); *cf., e.g.*, *Hernandez v. Erlenbusch*, 368 F. Supp. 752, 756 (D. Or. 1973) (referring a case involving a tavern that prohibited the use of foreign languages at the bar for CRS "to determine whether it could helpfully intervene").  Upon referral of a complaint

by a district court, CRS is authorized to investigate the complaint and hold hearings "as may be necessary." 42 U.S.C. § 2000a-4 (CRS "shall conduct any hearings with respect to any such complaint in executive session."). And CRS "shall endeavor to bring about a voluntary settlement between the parties," with the title of the provision expressly referencing a "duty to bring about voluntary settlements." *Id*.

Over the past sixty years, in no less than five statutes enacted on a bipartisan basis, Congress has recognized and extended CRS's statutory functions, all consistent with CRS's core mission:

- **Preventing Discriminatory Housing Practices.** In the Fair Housing Act of 1968, Congress recognized CRS's role in "preventing or eliminating discriminatory housing practices," directing the Secretary of Housing and Urban Development to support those CRS activities. 42 U.S.C. § 3608(e)(4).

- **Protecting Houses of Worship.** In the Church Arson Prevention Act of 1996, Congress authorized appropriations to CRS, among other entities, as required "to increase the number of personnel, investigators, and technical support personnel to investigate, prevent, and respond to potential violations" of statutes criminalizing damage to religious property and interference with the free exercise of religion. Pub. L. No. 104-155, § 6, 110 Stat. 1392, 1394. The statute was passed unanimously by both chambers of Congress. *See* H.R. 3525 - Church Arson Prevention Act of 1996, 104th Congress (1995-1996), https://www.congress.gov/bill/104th-congress/house-bill/3525/all-actions.

- **Addressing Hate Crimes.** In the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act (HCPA), enacted in 2009, Congress similarly authorized appropriations for the Department of Justice and CRS to address potential violations of the new federal hate

crimes law.  Pub. L. No. 111-84, § 4706, 123 Stat. 2190, 2838.  The Senate Appropriations Committee recognized earlier this year that "[t]he HCPA expanded CRS's mandate, requiring that CRS help communities prevent and respond to violent hate crimes committed on the basis of gender, gender identity, sexual orientation, religion, and disability, in addition to race, color, and national origin."  S. Rep. No. 199-44, at 93.

- **Supporting Communities Confronting Civil Rights–Era Cold Cases.**  Congress directly reaffirmed CRS's core mission in recent statutes directing the Department of Justice to investigate unsolved civil rights–era homicides.

    o  In the Emmett Till Unsolved Civil Rights Crime Act of 2007, Congress appropriated funds for CRS for the specific purpose of "bringing together law enforcement agencies and communities," in support of the Department's investigative efforts.  Pub. L. No. 110-344, § 6, 122 Stat. 3934, 3935.  The bill was approved unanimously in the Senate and by a 422-2 vote in the House.  *See* H.R. 923 - Emmett Till Unsolved Civil Rights Crime Act of 2007, 110th Congress (2007-2008), https://www.congress.gov/bill/110th-congress/house-bill/923/all-actions.

    o  And Congress affirmed CRS's responsibilities when it reauthorized the Emmett Till Act in 2016 by voice vote, expressly stating that CRS "shall provide" the same type of expert assistance and consultation services to help "address tensions raised by Civil Rights era crimes."  Pub. L. No. 114-325, § 2, 130 Stat. 1965, 1967; *see* S. 2854 - Emmett Till Unsolved Civil Rights Crimes Reauthorization Act of 2016, 114th Congress (2015-2016), https://www.congress.gov/bill/114th-congress/senate-bill/2854/all-actions.

Congress has also demonstrated consistent support for CRS through its appropriations statutes.  Most recently, Congress appropriated $24 million for CRS for fiscal year 2024, authorizing the Attorney General to increase that amount in the event he determined "that emergent circumstances require[d] additional funding for [CRS's] conflict resolution and violence prevention activities."  Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 136.  And Congress has continued funding for CRS at the same level in continuing resolutions enacted this year.  *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101, 139 Stat. 9, 10-11 (Mar. 15, 2025); Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, § 101, 139 Stat. 495, 496 (Nov. 12, 2025).[2]

## II.    CRS Has Served a Vital Peacemaking Role Since Its Creation.

CRS is the only federal agency devoted exclusively to preventing and resolving conflict through confidential conciliation.  Were it eliminated, CRS's work could not easily be replicated by any other federal entity.

Since 1964, CRS has provided conciliation, training, and related services to help mediate and resolve conflict and prevent violence in communities across the country.  Some of the episodes in which CRS has played a role are familiar to most Americans; others are less well known.  In all of them, CRS has performed vital peacekeeping functions, working with law enforcement and communities to dissolve tensions, bring stakeholders together, and rebuild trust.

Through its work, CRS helps preserve and advance fundamental American values and constitutional rights.  By facilitating peaceful protest, CRS supports the exercise of core First

---

[2] *See also* Nathan James, Cong. Rsch. Serv., R48134, *Overview of FY2025 Appropriations for Commerce, Justice, Science, and Related Agencies (CJS)*, tbl. 1 (updated Aug. 15, 2025), https://www.congress.gov/crs-product/R48134.

Amendment rights to freedom of speech and peaceful assembly.  In helping safeguard places of worship, CRS furthers the free exercise of religion.  And in working to reduce tensions around political and electoral events, CRS helps ensure that our democratic system operates free of violence.  Across all this work, CRS protects both Americans' civil liberties and the safety of law enforcement personnel by working to de-escalate and prevent violent conflicts.

The following are just a few examples of the many important services that CRS has provided:

- **Civil Rights Protests in Selma, Alabama.**  Following the "Bloody Sunday" attack on protesters in 1965, CRS conciliators were dispatched to Selma, Alabama, to help avert further violence.  Through shuttle diplomacy with civil rights leaders, state officials, and the Department of Justice, CRS helped negotiate a safe path for subsequent marches.  Nam Decl. ¶ 15, Doc. No. 2-3.

- **Neo-Nazi Demonstrations in Skokie, Illinois.**  In 1978, CRS played a significant role in de-escalating tensions around a planned march by a group of neo-Nazis in Skokie, Illinois—a Chicago suburb with a large Jewish population.  After various efforts by the Village of Skokie to block the planned march were invalidated on First Amendment grounds, *see, e.g.*, *National Socialist Party of America v. Village of Skokie*, 432 U.S. 43 (1977), a CRS mediation team deployed to Illinois with the goal of preventing violence in any related demonstrations or counterdemonstrations.  The CRS team led negotiations with civil rights advocates, Jewish community leaders, and law enforcement; it also engaged directly with the leader of the neo-Nazi group to explore alternatives to a march in Skokie given heightened tensions and the possibility of violence.  CRS helped reach a resolution that successfully balanced First Amendment rights and community safety, with the neo-

Nazis moving their march to downtown Chicago, where law enforcement was able to manage the march and counterprotests without violence.[3]

- **Aftermath of Violence at Places of Worship.** CRS has organized programs to help communities safeguard places of worship against potential threats. *See, e.g.*, Freeny Decl., Ex. 8 at 18-21, Doc. No. 33-8 (2022 CRS report on "helping communities keep places of worship safe"). CRS has also helped local communities recover and rebuild trust following acts of violence that have targeted religious institutions, including the shootings at a Sikh temple in Oak Creek, Wisconsin in 2012 and at the Tree of Life synagogue in Pittsburgh, Pennsylvania in 2018. *See, e.g.*, *id.* at 18-20 (2022 CRS report on services related to commemorating the anniversary of the Oak Creek shooting); Freeny Decl., Ex. 5 at 7, Doc. No. 33-5 (2019 CRS report on services provided "in 19 incidents related to anti-Semitism," including the Tree of Life shooting).

- **Major Party Political Conventions.** Every four years, in the lead-up to presidential elections, CRS personnel work with law enforcement, municipal leaders, and community organizations to reduce tensions and prevent violence at the Republican and Democratic National Conventions. Nam Decl. ¶ 18(o), Doc. No. 2-3. Most recently, CRS personnel deployed to the streets of Milwaukee and Chicago during the 2024 conventions to help manage demonstrations without the use of force and engage in de-escalation efforts, coordinating with federal, state, and local law enforcement. *Id.*

---

[3] *See* Richard A. Salem, *Mediating Political and Social Conflicts: The Skokie-Nazi Dispute*, 10 Sociological Practice 151 (1992) (recounting CRS's involvement), https://digitalcommons.wayne. edu/cgi/viewcontent.cgi?article=1088&context=socprac; David Goldberger, *The Skokie Case: How I Came to Represent the Free Speech Rights of Nazis*, ACLU (Jan. 3, 2020), https://www.aclu. org/news/free-speech/the-skokie-case-how-i-came-to-represent-the-free-speech-rights-of-nazis (crediting the role played by CRS).

While the country has made significant progress on the discrimination-related issues within CRS's ambit since the agency was established in 1964, the services that it provides remain vital today. In fiscal year 2022, for instance, CRS provided support in nearly 200 matters involving a range of sensitive issues—from vandalism of places of worship, to hate incidents in schools, to violent crimes targeting Asian Americans, among others. *See* Freeny Decl., Ex. 8 at 14, Doc. No. 33-8 (2022 CRS report). Even a brief glance at the news confirms why those services are necessary: Just four months ago, the FBI published data showing that 2024 saw the highest number of reported hate crimes since the Bureau started collecting relevant data, behind only 2023.[4] And a majority of Americans across the political spectrum recognize that politically motivated violence in this country is on the rise.[5] The mission of "America's Peacemaker" is thus as relevant now as ever—precisely the reason that Congress continues to support CRS.

Indeed, in recently recommending continued funding for CRS, the Senate Appropriations Committee expressed specific concern about "the rise in reported incidents of bias-motivated and hate crimes in the United States in the last several years," said that it "appreciates the work of [CRS]" in the area, and accordingly recommended continued funding for the agency that would "maximize the CRS crisis response nationwide and enable CRS to fulfill both its original mandate and expanded mandate under the HCPA." *See, e.g.*, S. Rep. No. 199-44, at 78, 93.

---

[4] *See* Press Release, *FBI Releases 2024 Reported Crimes in the Nation Statistics*, FBI (Aug. 5, 2025), https://www.fbi.gov/news/press-releases/fbi-releases-2024-reported-crimes-in-the-nation-statistics; Nam Decl. ¶ 35, Doc. No. 2-3; Russell Contreras, *Hate Crimes Hit Second Largest Record in 2024: FBI*, Axios (Aug. 5, 2025), https://www.axios.com/2025/08/05/hate-crimes-2024-black-antisemitism-muslim-fbi.

[5] Joseph Copeland & Jocelyn Kiley, *Americans Say Politically Motivated Violence Is Increasing, and They See Many Reasons Why*, Pew Research Center (Oct. 23, 2025), https://www.pewresearch.org/short-reads/2025/10/23/americans-say-politically-motivated-violence-is-increasing-and-they-see-many-reasons-why/.

III.    **Defendants' Efforts to Eliminate CRS Violate the Separation of Powers.**

Because Congress created CRS, only Congress can eliminate it. The President and Attorney General lack any statutory or constitutional authority to do so themselves. That has not stopped Defendants, who in recent months have begun to unilaterally dismantle CRS by firing all but one of its employees as part of the agency's purported "dissolution," Suppl. Nam Decl. ¶ 3, Doc. No. 33-11—conduct that will make it impossible for CRS to perform the functions that Congress has assigned it by statute. These actions are brazen violations of the separation of powers, usurping authority that belongs to Congress alone under Article I of the Constitution. The actions are also part of a broader trend of disregard for Congress's role in the constitutional system—one whereby the executive branch flouts statutory mandates, asserting unconstrained authority to undermine and destroy executive departments, agencies, and offices as it sees fit.

A. **Defendants Lack the Authority to Unilaterally Dismantle CRS.**

The power of the President and his subordinates "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). And when, as here, "the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Id.* at 637 (Jackson, J., concurring). Defendants lack any inherent constitutional authority to dismantle CRS. The Constitution instead assigns *Congress* the power to regulate the executive branch's structure. Defendants also lack any relevant statutory authority. Congress has at earlier points authorized the President to submit plans for the restructuring of executive branch agencies to Congress, but the President's limited power under those delegations has long since expired.

Defendants' actions do not stem from, and are not authorized by, the Constitution. The Constitution assigns Congress the power to enact "all Laws which shall be necessary and proper for carrying into Execution" not only its own powers, but "all other Powers vested by this

11

Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8.  Congress accordingly has "plenary control over the … existence of executive offices." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010); *see also Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction[.]"). Although the President oversees the executive branch, he lacks any inherent constitutional authority to eliminate executive agencies created by Congress.  *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("[N]o provision in the Constitution [] authorizes the President to enact, to amend, or to repeal statutes.").  Instead, the Constitution requires that the President "take Care that the Laws [enacted by Congress] be faithfully executed."  U.S. Const. art. II, § 3.  That provision "refutes the idea that [the President] is to be a lawmaker." *Youngstown*, 343 U.S. at 587.

Nor is there any statutory basis for Defendants' actions.  There "is no statute that expressly authorizes the President" or the Attorney General to dismantle CRS, "[n]or is there any act of Congress … from which such a power can fairly be implied."  *Id*. at 585.  To the contrary, by creating CRS, assigning it specific statutory responsibilities, and approving appropriations for CRS, *see supra* pp. 3-7, Congress has mandated the agency's existence and the continued performance of its conflict resolution functions.  The power of the President and his delegates is accordingly "at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

Defendants cite 5 U.S.C. § 301 and 28 U.S.C. § 510.  Am. TRO Opp'n at 16, Doc. No. 18. But neither statute comes close to authorizing the dismantling of an agency created by Congress. The former statute merely authorizes a department head to "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property."  5 U.S.C.

§ 301. And the latter merely authorizes the Attorney General to delegate her functions to other Department of Justice employees. 28 U.S.C. § 510.

When Congress wants to give the President authority to reorganize the executive branch, it can and has done so clearly, through legislation. Most notably, between 1932 and 1984, in a series of laws known as the Reorganization Acts, Congress authorized the President to develop plans for reorganizing portions of the federal government. *See* Henry B. Hogue, Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* 1-3, 34 (Dec. 2012) [hereinafter Hogue, *Reorganization*], https://www.congress. gov/119/meeting/house/118060/documents/HMKP-119-GO00-20250325-SD005.pdf. Even those delegations, however, carefully circumscribed the President's authority to avoid executive overreach, specifying the permissible scope of a reorganization plan. *Id.* Congress also established an oversight role for itself in the Reorganization Acts, requiring plans to be submitted by the President for congressional review, and allowing one or both legislative chambers to reject that plan—a "legislative veto" option that Congress used to reject more than thirty plans proposed by the President while the statutes were in effect. *Id.* at 1-3 & tbl. 1.

The transfer of CRS to the Department of Justice was itself an exercise of this limited delegated authority. President Johnson did not claim inherent constitutional authority to transfer CRS, let alone eliminate the agency. Instead, he transmitted a reorganization plan to Congress pursuant to the Reorganization Act of 1949. Reorganization Plan No. 1 of 1966, 80 Stat. 1607, 5 U.S.C. app. at 188 ("Prepared by the President and transmitted to the Senate and the House of Representatives … pursuant to the provisions of the Reorganization Act of 1949"). In a message to Congress accompanying the Plan, the President was careful to note that the proposed transfer of CRS to the Department of Justice "would be carried out with full regard for" CRS mandates set

13

out by Congress in the Civil Rights Act, and that the transfer would "benefit … the Community Relations Service in the fulfillment of [its] existing functions."  *Id.* at 189.  And the President's plan did not become law until Congress allowed it to take effect, by letting sixty days elapse without either the House or the Senate exercising its legislative veto option.  *See* Reorganization Act of 1949, Pub. L. No. 81-109, §§ 3, 6, 63 Stat. 203, 204-05; Hogue, *Reorganization* 20 (explaining that in the 1949 statute, "Congress elected to provide for disapproval by a vote of either house—a so-called one-house legislative veto—easing rejection of a plan that would reorganize a specific agency").

But the President's reorganization authority expired in 1984, when Congress let the last Reorganization Act lapse.  5 U.S.C. § 905(b); Hogue, *Reorganization* 31.  Since then, Presidents have asked Congress to enact new delegations of reorganization authority.  Hogue, *Reorganization* 31-35.  But Congress has not done so.  As a result, the President currently lacks any general authority to restructure or eliminate agencies or offices created by Congress.

If the President and Attorney General disagree with the mission of CRS, they may seek to advance those policy preferences through the political process by, for instance, recommending the dissolution of CRS or vetoing efforts by Congress to further extend CRS's responsibilities.  *See Youngstown*, 343 U.S. at 587.  But absent any constitutional or congressionally delegated authority, the President and his delegates cannot unilaterally dismantle CRS.  *See, e.g.*, *Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *7 (4th Cir. Mar. 28, 2025) (Gregory, J., concurring in the judgment) ("The Executive branch may not eliminate a *congressionally* created and funded agency without *congressional* authorization.").

### B.  The Record Makes Clear That Defendants Are Dismantling CRS.

Despite lacking constitutional or statutory authority to do so, Defendants are dismantling CRS.  Their own words make this clear:  Earlier this year, in a budget document published by the

Department of Justice, Defendants announced plans to "eliminate CRS *and its functions*" as part of a reorganization of the Department.  Freeny Decl., Ex. 2 at 9, Doc. No. 33-2 (emphasis added). Their stated basis for eliminating the agency was that "[t]he CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities."  *Id.*  On October 31, Defendants followed through on those plans by firing fourteen of the remaining fifteen CRS employees.  Nam Decl. ¶ 32, Doc. No. 2-3; Suppl. Nam Decl. ¶ 3, Doc. No. 33-11.

Defendants admit that the President seeks to eliminate CRS.  Am. TRO Opp'n at 1.  And they acknowledge that, "under the DOJ reorganization plan, CRS will no longer be a standalone, independent component."  *Id.* at 15.  Yet Defendants also argue that CRS will not in fact be "eliminate[d]" "unless and until Congress takes that step."  *Id.* at 1.  And they maintain that, in the meantime, the agency is merely "being internally *transferred* to the Executive Office for United States Attorneys (EOUSA)."  *Id.*

Not so.  Defendants themselves describe their actions as dissolving CRS, not simply transferring its functions:  The Department's budget document said that "CRS will formally close all its offices by the end of [fiscal year] 2025."  Freeny Decl., Ex. 2 at 113, Doc. No. 33-2.  And the "Reduction in Force" notice sent to the fourteen fired CRS employees expressly said that the firings were "a result of the dissolution of [CRS] in accordance with the reorganization and reconsolidation of the Department of Justice."  Suppl. Nam Decl. ¶ 3, Doc. No. 33-11 (citation omitted).

Even viewing Defendants' actions as an attempt to transfer CRS, their claim that that transfer as executed is consistent with statutory requirements does not bear serious scrutiny.  Am. TRO Opp'n at 15-17.  By eliminating CRS as a standalone unit and firing all but one of its employees, Defendants have functionally eliminated the agency, contrary to statutes expressly

requiring the agency's existence.  *See supra* pp. 3-7.  At the very least, Defendants have made it impossible for what they purport now constitutes CRS to perform its statutorily mandated functions—an outcome entirely consistent with Defendants' stated intent to eliminate not only the agency itself but also the agency's "functions."  Freeny Decl., Ex. 2 at 9, Doc. No. 33-2; *see also* Nam Decl. ¶ 33, Doc. No. 2-3 (CRS's former associate director attesting that "CRS's statutory mandates cannot be fulfilled by a single person").  Indeed, this Court has already found that "the only Declaration offered by Defendants is silent as to any functions that the sole remaining CRS employee would fulfill."  TRO Memorandum & Order at 5, Doc. No. 22.

The lone declaration submitted by Defendants also "concedes that if Congress continues funding CRS, [the Department of Justice] would need to 'reassess and consider how to comply with any funding enactment.'"  *Id.* (quoting Jolene Ann Lauria Decl. ¶ 13, Doc. No. 15-1).  In other words, Defendants effectively admit that the existence of a single CRS-designated employee within EUOSA would be inadequate to comply with continued appropriations for CRS.  *Cf.* Lauria Decl. ¶ 13, Doc. No. 15-1 ("For example, the Department may consider entering into reimbursable agreements with United States Attorney's Offices to continue the CRS work with the enacted funding.").  But Congress *has* continued to fund CRS through continuing resolutions enacted this year.  *See supra* p. 7.  And Defendants must continue to comply with those funding enactments, no matter how badly the administration wants to eliminate the agency.[6]

* * *

---

[6] Before Congress enacted its second continuing resolution this year, *see supra* p. 7, the Senate Committee on Appropriations declined to follow the President's recommendation that CRS be eliminated, instead proposing $22 million for CRS in fiscal year 2026.  *See* S. Rep. No. 199-44, at 93; Suzanne Monyak, *Embattled DOJ 'Peacemakers' Unit Preserved in Senate Proposal*, Bloomberg Law (July 18, 2025), https://news.bloomberglaw.com/us-law-week/embattled-doj-peacemakers-unit-preserved-in-senate-proposal.

CRS is far from the first victim of this particular brand of executive branch lawlessness. Since January, the President and his delegates have taken a wrecking ball to a range of departments, agencies, institutes, and offices created by statute, contrary to the express will of Congress. The specifics of the relevant executive actions differ, and the targeted federal entities and programs vary widely in size and function—from entire executive departments, *see, e.g.*, *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 67, 72-73 (1st Cir.), *stay granted pending appeal sub nom.*, *McMahon v. New York*, 145 S. Ct. 2643 (2025) (mem.) (Department of Education); to executive and independent agencies, both relatively new and long established, *see Nat'l Treasury Emps. Union v. Vought*, 774 F. Supp. 3d 1, 11-12 (D.D.C.), *vacated and remanded*, 149 F.4th 762 (D.C. Cir. 2025) (Consumer Financial Protection Bureau); *Am. Foreign Serv. Ass'n v. Trump*, 792 F. Supp. 3d 116, 123 (D.D.C. 2025), *appeal docketed*, No. 25-5291 (D.C. Cir. Aug. 13, 2025) (U.S. Agency for International Development); to numerous smaller but no less important federal entities and programs, *see, e.g.*, *Rhode Island v. Trump,* 781 F. Supp. 3d 25, 33-34 (D.R.I.), *stay denied*, 155 F.4th 35 (1st Cir. 2025) (the Institute of Museum and Library Services; the Minority Business Development Agency; the Federal Mediation and Conciliation Service); *New York v. Kennedy*, 789 F. Supp. 3d 174, 187-88, 208 (D.R.I.), *stay denied*, 155 F.4th 67 (1st Cir. 2025) (Department of Health and Human Services sub-agencies and programs); *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 21-22, 36 (D.D.C. 2025), *stay granted pending appeal*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025), *reh'g en banc granted in part*, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (per curiam) (the U.S. Agency for Global Media).

Despite their factual differences, the administration's efforts to dismantle federal entities created by Congress share at least one key feature: They all involve unsupported assertions of executive power that reflect blatant disregard for Congress's role in our constitutional system.

Where, as here, Congress has created an agency by statute and mandated its continued existence, the executive branch lacks the authority to unilaterally dismantle it, absent further action by Congress.  To conclude otherwise would contravene the separation of powers, undermining the central element of our Constitution's structural design.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: December 5, 2025

Respectfully submitted,

*/s/ Shoba Pillay*

JENNER & BLOCK LLP

Shoba Pillay, BBO No. 659739
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Matthew B. Klapper (*pro hac vice pending*)
Elizabeth Henthorne (*pro hac vice pending*)
Gavan W. Duffy Gideon (*pro hac vice pending*)
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
MKlapper@jenner.com
BHenthorne@jenner.com
GGideon@jenner.com

*Counsel for Amici Curiae*

## APPENDIX: LIST OF *AMICI CURIAE*

**Jamie Raskin**
    Representative of Maryland

**Pete Aguilar**
    Representative of California

**Gabe Amo**
    Representative of Rhode Island

**Becca Balint**
    Representative of Vermont

**Wesley Bell**
    Representative of Missouri

**Shontel Brown**
    Representative of Ohio

**Julia Brownley**
    Representative of California

**Ed Case**
    Representative of Hawaii

**Sean Casten**
    Representative of Illinois

**Kathy Castor**
    Representative of Florida

**Joaquin Castro**
    Representative of Texas

**Judy Chu**
    Representative of California

**Gilbert R. Cisneros, Jr.**
    Representative of California

**Katherine Clark**
    Representative of Massachusetts

**Emanuel Cleaver, II**
    Representative of Missouri

**Steve Cohen**
    Representative of Tennessee

**J. Luis Correa**
    Representative of California

**Joe Courtney**
    Representative of Connecticut

**Angie Craig**
    Representative of Minnesota

**Jasmine Crockett**
    Representative of Texas

**Danny K. Davis**
    Representative of Illinois

**Madeleine Dean**
    Representative of Pennsylvania

**Diana DeGette**
    Representative of Colorado

**Rosa L. DeLauro**
    Representative of Connecticut

**Suzan K. DelBene**
    Representative of Washington

**Mark DeSaulnier**
    Representative of California

**Maxine Dexter**
    Representative of Oregon

**Lloyd Doggett**
    Representative of Texas

**Sarah Elfreth**
  Representative of Maryland

**Adriano Espaillat**
  Representative of New York

**Lizzie Fletcher**
  Representative of Texas

**Laura Friedman**
  Representative of California

**Maxwell Alejandro Frost**
  Representative of Florida

**John Garamendi**
  Representative of California

**Jesús G. "Chuy" García**
  Representative of Illinois

**Robert Garcia**
  Representative of California

**Sylvia Garcia**
  Representative of Texas

**Dan Goldman**
  Representative of New York

**Al Green**
  Representative of Texas

**Steven Horsford**
  Representative of Nevada

**Jared Huffman**
  Representative of California

**Glenn F. Ivey**
  Representative of Maryland

**Pramila Jayapal**
  Representative of Washington

**Henry C. "Hank" Johnson, Jr.**
  Representative of Georgia

**Julie Johnson**
  Representative of Texas

**Sydney Kamlager-Dove**
  Representative of California

**Robin L. Kelly**
  Representative of Illinois

**Timothy M. Kennedy**
  Representative of New York

**Raja Krishnamoorthi**
  Representative of Illinois

**John B. Larson**
  Representative of Connecticut

**George Latimer**
  Representative of New York

**Summer L. Lee**
  Representative of Pennsylvania

**Ted W. Lieu**
  Representative of California

**Zoe Lofgren**
  Representative of California

**Stephen F. Lynch**
  Representative of Massachusetts

**Seth Magaziner**
  Representative of Rhode Island

**Lucy McBath**
  Representative of Georgia

**Sarah McBride**
  Representative of Delaware

**Dave Min**
Representative of California

**Jared Moskowitz**
Representative of Florida

**Seth Moulton**
Representative of Massachusetts

**Jerrold Nadler**
Representative of New York

**Joe Neguse**
Representative of Colorado

**Eleanor Holmes Norton**
Representative of the District of
Columbia

**Frank Pallone, Jr.**
Representative of New Jersey

**Nancy Pelosi**
Representative of California

**Brittany Pettersen**
Representative of Colorado

**Mark Pocan**
Representative of Wisconsin

**Mike Quigley**
Representative of Illinois

**Delia C. Ramirez**
Representative of Illinois

**Emily Randall**
Representative of Washington

**Deborah K. Ross**
Representative of North Carolina

**Mary Gay Scanlon**
Representative of Pennsylvania

**Robert C. "Bobby" Scott**
Representative of Virginia

**Lateefah Simon**
Representative of California

**Adam Smith**
Representative of Washington

**Melanie A. Stansbury**
Representative of New Mexico

**Greg Stanton**
Representative of Arizona

**Suhas Subramanyam**
Representative of Virginia

**Eric Swalwell**
Representative of California

**Mark Takano**
Representative of California

**Shri Thanedar**
Representative of Michigan

**Bennie G. Thompson**
Representative of Mississippi

**Rashida Tlaib**
Representative of Michigan

**Ritchie Torres**
Representative of New York

**Lori Trahan**
Representative of Massachusetts

**Juan Vargas**
Representative of California

**James Walkinshaw**
Representative of Virginia

A3

**Debbie Wasserman Schultz**
    Representative of Florida

**Frederica S. Wilson**
    Representative of Florida

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of December, 2025, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

*/s/ Shoba Pillay*
Shoba Pillay, BBO No. 659739
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
SPillay@jenner.com

Dated: December 10, 2025