UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ETHICAL SOCIETY OF POLICE; NAACP ST. LOUIS COUNTY; MISSIONARY BAPTIST STATE CONVENTION OF MISSOURI; TWO WRASSLIN' CATS ACCORD; OUT ACCOUNTABILITY PROJECT; BERKSHIRE RESOURCES FOR INTEGRATION OF DIVERSE GROUPS AND EDUCATION; NAACP STATE CONFERENCE COLORADO-MONTANA-WYOMING; PEACEMAKERS LODGE; PIKES PEAK SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE 1; WELLSPRING HEALTH ACCESS; and HAITIAN COMMUNITY HELP & SUPPORT CENTER,<br><br>   *Plaintiffs*,<br><br>v.<br><br>PAMELA J. BONDI, in her official capacity as Attorney General of the United States; and U.S. DEPARTMENT OF JUSTICE,<br><br>   *Defendants*. | Case No. 25-CV-13115 (IT)<br><br>**(Leave to file granted on Dec. 15, 2025)** |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs file this reply memorandum in support of their Motion for Preliminary Injunction to address a handful of points in Defendants' Opposition.

I. **Plaintiffs Continue to Suffer Ongoing, Uncontroverted Irreparable Harm**

Defendants do not meaningfully contend with the record evidence that Plaintiffs continue to be harmed every day that CRS services remain unavailable, and that no amount of relief after the fact can cure this harm. Instead, Defendants rehash their earlier claim that the ruling on Plaintiffs' Motion for Temporary Restraining Order ("TRO") precludes relief here. The Court has already rejected this contention:

> The court did not find a lack of irreparable harm due to the alleged closing of the Community Relations Service altogether, and the order contemplated the possibility of "a renewed motion for a preliminary injunction supported by an immediate need for CRS's services after the government shutdown ends[.]"

Minute Order of Nov. 7, 2025, Doc. No. 29 (internal citation omitted).

As laid out in detail in their opening brief, Plaintiffs have offered uncontroverted testimony of their immediate need for CRS services while this litigation is pending, including through the submission of three new declarations. For example, the head of Berkshire Resources for Integration of Diverse Groups and Education ("BRIDGE") has explained that "[e]very day that CRS is closed is another day that BRIDGE cannot offer [a] critical program to students" that has been proven to reduce youth involvement with the juvenile justice system. Supp. VanSant Decl. ¶ 11, Doc. No. 33-23 at 4. And CRS's unavailability to help BRIDGE address threats of violence and hostility coming from within its insular community has "exposed BRIDGE and [its] constituents . . . to increased security risks on an ongoing basis." *Id.* at 5-6 (¶¶ 15-17). Now that the government shutdown has ended, Defendants' unlawful shuttering of CRS—however that action is labeled—is the sole cause of Plaintiffs' ongoing inability to obtain CRS services, and it is precisely the injury that preliminary injunctive relief would redress. *See, e.g., id.* at 2

("BRIDGE would immediately seek services from CRS, if CRS were to become operational again."); Mayes Decl. ¶ 5, Doc. No. 33-18 at 2 ("If not for CRS's cessation of services and ultimate closure, Tri-State NAACP would be working with them on an ongoing basis."); Duvall Decl. ¶ 22, Doc. No. 33-24 at 7 (Missionary Baptist State Convention of Missouri is harmed "[e]ach day, week, and month that CRS is shuttered" but would "immediately" seek CRS services if permitted); Supp. Nam Decl. ¶¶ 8-12, Doc. No. 33-11 at 4-7 (rescission of RIF relief would permit CRS "to resume the services withdrawn from the plaintiffs").

Unable to contest those record facts, Defendants instead resort to a bare assertion that the withdrawal of CRS services was not "connected to the realignment" of CRS. Doc. No. 51 at 14, 15. That *ipse dixit* finds no support anywhere in the record. Plaintiffs have demonstrated that, "[h]ad it not been for CRS's planned dissolution and DOJ leadership's direction to implement the elimination process quickly, CRS would have continued to provide each stakeholder with the requested services." Nam Decl. ¶ 29, Doc. No. 33-10 at 22. The declaration of Denise Nazaire, the sole remaining CRS employee, which Defendants submitted with their Opposition, makes no effort to dispute that causation, let alone to identify any independent reason for the withdrawals sufficient to create a fact issue. The fact that the winddown of services was undertaken *in preparation for* (rather than after) the reduction in force ("RIF") and ultimately shuttering of CRS, see id., is irrelevant.

Defendants also argue that relief is unnecessary because the Court "could" enter final judgment in "just a few months." Doc. No. 51 at 13. But because the record establishes that Plaintiffs face continuing and serious harm "[e]very day that CRS is shuttered," Doc. No 33-23 at 4, there is no equitable basis to require Plaintiffs to suffer for "just a few [more] months." Nor does it help Defendants to note that Plaintiffs have already been deprived of CRS services since

the summer. Equity does not reward unlawful conduct by extending it—especially where Defendants took deliberate steps to shield their unlawful conduct from public scrutiny. Moreover, there is reason to believe this case will take longer than Defendants suggest to reach final judgment, in light of disputed fact issues on the merits (which do not necessarily need to be resolved at the PI stage, given Plaintiffs' likelihood of success). Although the scheduling order in this case contemplates expedited merits briefing, it also recognizes that disputes concerning the administrative record and discovery may delay resolution. Having now received Defendants' initial disclosures and the Administrative Record—which, among other things, cherry-picks one internal memorandum among many for inclusion—Plaintiffs intend to move by December 22, 2025, to challenge the completeness of the record and/or seek limited discovery.[1]

## II. Defendants Fail to Call into Question Plaintiffs' "Strong Showing" on the Merits

Nothing in Defendants' Opposition even remotely calls into question this Court's prior determination that Plaintiffs made a "strong showing" that they are likely to succeed on the merits in this case. Defendants' desperate challenges to justiciability fly in the face of controlling circuit precedent, and their post hoc rationalizations for the merits of Defendants' dismantling of CRS only serve to confirm the unlawfulness of those actions.

### A. Defendants' Justiciability Defenses Are Without Merit

Defendants devote the majority of their brief to arguing that this case is not justiciable. This is perhaps unsurprising, given the patent indefensibility of their actions on the merits. But these gating arguments have already been rejected by the First Circuit on similar facts.

---

[1] Defendants' reliance on post hoc rationalizations also threatens to prolong the path to final judgment by creating factual issues needing resolution. Although Defendants have argued that this case should be decided solely on the administrative record, they have simultaneously identified *eight* potential witnesses in their initial disclosures whose testimony they may rely on. And the Administrative Record contains material from only one or two of those eight witnesses.

***Standing.*** Defendants' challenge to Article III standing rests on the disingenuous claim that Plaintiffs' injuries are "unconnected to" the Department's decision to shutter (or "realign") CRS. As noted above, this is wholly without record support. Defendants are also plainly incorrect when they claim that Plaintiffs have not brought a challenge in this case to compel agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1). *See* Compl., Ct. III, Doc. No. 1 at 28 (alleging just such a claim). In any event, Plaintiffs' pursuit of a § 706(1) claim is immaterial to the standing inquiry. Plaintiffs are challenging Defendants' unlawful actions to shutter CRS—including the withdrawal of services and the RIF—and the "set[ting] aside" of those unlawful actions under § 706(2) would directly redress their injuries.

***Final Agency Action.*** Defendants' actions to dismantle CRS—to decimate its work force and shut down all public services—constitute final agency action subject to APA review, because they "mark the consummation of the agency's decisionmaking process" and represent action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). Plaintiffs are not, as Defendants claim, seeking "wholesale improvement" of CRS, but rather to undo discrete unlawful actions Defendants have taken to hobble CRS in violation of congressional mandate.

This conclusion is compelled by First Circuit precedent. In *New York v. Trump*, the Court of Appeals held that a series of decisions to implement broad, categorical freezes on obligated funds constituted final agency action, rejecting the government's claim that they amounted to an improper "programmatic" challenge to agency day-to-day operations. 133 F.4th 51, 68 (1st Cir. 2025). And in *New York v. Kennedy*, the First Circuit upheld, in the context of a motion to stay PI relief, the district court's conclusion that an agency reorganization—and the "resulting dismantling of sub-agencies"—was final agency action. 155 F.4th 67, 76 (1st Cir. 2025).

Defendants' actions are readily reviewable under that standard, whether they are labeled a "dissolution" (as Defendants stated in the RIF notice) or a reorganization. *See Cont'l Air Lines, Inc. v. C. A. B.*, 522 F.2d 107, 124 (D.C. Cir. 1974) ("The label an agency attaches to its action is not determinative" of its finality). It is also immaterial that Plaintiffs seek relief from multiple interrelated actions that all flow from the same core decision to dismantle CRS. *See New York v. Trump*, 133 F.4th at 68 (rejecting notion that the APA bars challenges to a series of agency actions). Like the funding freezes at issue in *New York v. Trump*, the withdrawal of services to Plaintiffs were "categorical in nature" rather than separate, individuated decisions. *See id.* at 64. They are part and parcel of Defendants' final, consequential decision to hobble CRS out of disdain for its statutory mission.

Contrary to Defendants' claim, the finality of their actions is not undone simply because (they say) the details of the "realignment" are "being actively worked out." Doc. No. 51 at 25. DOJ adopted and executed a *definitive* plan to dismantle the agency, gambling that Congress would later ratify that decision and knowing that if Congress did not, DOJ could not comply with congressional directives as the agency is currently constituted post-RIF. *See* Lauria Decl ¶ 13, Doc. No. 15-1 at 3-4 (conceding that if Congress funded CRS, DOJ would need to "reassess and consider how to comply"). DOJ's present claim that its realignment is "ongoing" reflects not a lack of finality but the collapse of the government's gamble—and confirmation that Defendants' actions were unlawful from the outset.

**Committed to Agency Discretion.** Even while conceding that "only Congress . . . can dissolve or eliminate CRS," Doc. No. 51 at 34, Defendants contend that their actions are insulated from judicial review, merely because Congress afforded CRS some discretion in deciding whether and how to provide services in particular cases. This misstates the "narrow[]"

and "rare" exception to review set forth in 5 U.S.C. § 701(a)(2): "A court could never determine that an agency abused its discretion"—something the APA undoubtedly contemplates—"if all matters committed to agency discretion were unreviewable." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018). That Congress used mandatory language to compel the provision of CRS services, and that Defendants stopped providing those services, decisively forecloses application § 701(a)(2).

It is also notable DOJ does not claim to have exercised their "judgment" to determine that "peaceful relations among the citizens of the community" are not sufficiently "threatened" to warrant CRS involvement. 42 U.S.C. § 2000g-1. Nor do they claim to have decided to prioritize certain services over others as part of an allocation of limited appropriations.[2] The record is clear—Defendants withdrew *all* services to the public, because they disagreed with CRS's mission. Nam Decl. ¶ 29, Doc. No. 33-10 at 22. Discretion to assess community conditions and focus resources where they are most needed is not discretion to extinguish the agency or deny services categorically. *See Weyerhaeuser*, 586 U.S. at 23-24.

**CSRA.** As explained in Plaintiffs' opening brief, the CSRA does not bar the recipients of government services from challenging efforts by the Executive "to shut down a statutorily created agency by summarily firing its employees en masse." *Somerville Public Schools v. McMahon*, 139 F.4th 63, 71 (1st Cir. 2025), *holding reaffirmed by R.I.*, 155 F.4th at 47. Defendants' claim that the First Circuit has "reiterated the exclusivity of the CSRA scheme" flies in the face of this recent precedent. Defendants also point to Justice Roberts' recent stay of the

---

[2] To be sure, in her memorandum to DOJ leadership, Ms. Nazaire explained that certain services *could* be deprioritized, and that this de-prioritization would be necessary to work within the pre-selected constraint of a single CRS employee. But, as explained further below, nowhere does she or anyone else at DOJ indicate that a reasoned decision was made about which services to offer and which to deprioritize. Nor does she indicate that CRS is currently offering *any* services.

Fourth Circuit's decision in *Margolin v. Nat'l Ass'n of Immigr. Judges*, 25A662 (Dec. 5, 2025), as support for the contrary position, but *Margolin* involved a challenge on behalf of terminated personnel, not agency constituents. If accepted, Defendants' position would allow the Executive to evade review of *any* decision to eliminate an agency—something Defendants concede is beyond their Article II power—simply by effectuating it through a RIF. There is no indication Congress intended the CSRA to act as such a sweeping kill-switch to judicial review.

**B. Defendants' Factual Submissions Confirm the Unlawfulness of their Actions**

DOJ pursued a calculated, bad-faith gambit—dismantling CRS without congressional authorization while hoping that subsequent congressional ratification would render that unlawful action moot. That gambit failed. In the Continuing Resolution ("CR"), Congress funded CRS at prior levels and rescinded the RIFs of CRS (and other) employees that were executed during the government shutdown. *See* Public Law No. 119-3 (2025). Against this backdrop, Plaintiffs are overwhelmingly likely to succeed on their APA and constitutional challenges.

The Nazaire Declaration and accompanying memorandum only serve to underscore, rather than refute, the unlawfulness of Defendants' actions. Ms. Nazaire does not dispute that CRS stopped offering all services to the public because of DOJ's hostility to CRS's mission. This alone is fatal to Defendants' position. Moreover, Ms. Nazaire does not claim that DOJ engaged in a considered analysis of the minimum number of personnel necessary to satisfy CRS's statutory mandate, nor an assessment of whether the "reorganization" of CRS beneath EOUSA, with a single employee, would preserve the independence, confidentiality, and institutional capacity that Congress mandated.[3] Ms. Nazaire also fails to explain how CRS is

---

[3] It is apparent that in preparing her memorandum for DOJ leadership, Ms. Nazaire was asked to *start* with the premise that CRS should have only one employee—a premise DOJ has never explained or justified, aside from their dislike of CRS's mission—and work backwards to what

currently complying with its statutory mandates—or even to aver that it *is* complying. *See* Nazaire Decl. ¶ 10, Doc. No. 51-1 at 3 (noting, evasively, that she is "identifying steps and establishing milestones to complete the Department's statutory requirements"). Again, the silence is deafening.

It is also telling that the government chose to rely on a declarant who is only "familiar with *limited aspects*" of the decisions under review here. *Id.* at 2 (emphasis added). In their initial disclosures, Defendants identified *eight* witnesses with knowledge of the decisions under review. That Defendants refused to proffer the testimony of knowledgeable witnesses confirms what was already apparent from their shifting post-hoc rationalizations—that DOJ has no defense to their unlawful actions, other than a disingenuous rebranding and the hope that the Court will not look beyond their linguistic legerdemain.

### III. The Balance of Equities Strongly Favors the Relief Sought

Defendants argue that preliminary relief would "impair the public interest by having agency decisions be made via judicial decree rather than the politically elected and accountable branches of government." Doc. No. 51 at 34; *see also id.* at 20 (claiming that the creation of remedies is a "legislative endeavor"). That is a brazen inversion of constitutional accountability, and more than a little ironic. The relief Plaintiffs seek would not *displace* the will of the political branches but would *enforce* it. Congress has already spoken by creating and continuing to fund CRS and by directing the Executive Branch to provide one aspect of the preliminary relief sought here—rescission of the RIF implemented on October 31, 2025. In a sad reflection of the

---

services might be offered within that significant constraint. Indeed, her memorandum confirms that, with the "constrained staffing" imposed by DOJ leadership, CRS cannot participate in any "sustained engagement" with the public (including any and all mediation) and will be reduced to little more than a webinar platform and referral clearinghouse.

apparent disdain that the Executive has for the separation of powers, Defendants do not even *try* to defend their refusal to rescind the RIF as a valid execution of the laws. As previously noted, Section 120(e) of the CR plainly applies to RIFs "executed, implemented, or otherwise taken" during the shutdown, even if they were initiated or noticed before.[4]

Finally, the Court should dispense with a bond in this case (or, at most, impose a bond of nominal amount), as is well within its discretion. *See Crowley v. Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, and Packers*, 679 F.2d 978, 1000 (1st Cir. 1982); *see also New York v. Kennedy*, 789 F. Supp.3d 174, 214 (D.R.I. 2025) (imposing "nominal" bond of $100). Generally, "[a] bond is not necessary where requiring one would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat'l Council of Nonprofits v. OMB*, 775 F.Supp.3d 100, 130 (D.D.C. Feb. 25, 2025) (cleaned up); *see also Rhode Island v. Trump*, 781 F. Supp. 3d 25, 52 (D.R.I. 2025), *stay denied on appeal by* 155 F.4th 35, 50 (1st Cir. 2025). Such is the case here, where Defendants' request for a bond seems calculated to deny Plaintiff non-profit organizations their right to seek redress for the irreparable harm the Defendants' unlawful actions have caused them.

Dated: December 15, 2025          Respectfully Submitted,

/s/ *Kyle R. Freeny*
Kyle R. Freeny
(DC Bar No. 1684764 – admitted *pro hac vice*)
WASHINGTON LITIGATION GROUP
1717 K Street NW
Washington, DC 20006
Telephone: (202) 521-8750
KFreeny@WashingtonLitigationGroup.org

---

[4] The Administrative Record in this case shows that, on September 18, 2025, DOJ gave 30-days' notice to Congress that it "intend[ed] to execute" a RIF of CRS employees. *See* Admin. Record, Doc. No. 47-1 at 301. This stands as a clear admission by Defendants that the RIF was "executed" on October 31, 2025, *not* on September 29, 2025 (when notices were issued), and therefore is covered by the rescission mandate.

Ana Muñoz
(Mass. Bar No. 569233)
Z<small>ALKIND</small> D<small>UNCAN</small> & B<small>ERNSTEIN</small> LLP
2 Oliver Street, Suite 200
Boston, MA 02110
Telephone: (617) 742-6020
AMunoz@ZalkindLaw.com

*Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above Reply Memorandum in Support of Motion for Preliminary Injunction was served upon all attorneys of record by electronic filing on December 15, 2025.

<u>/s/ *Kyle R. Freeny*</u>
Kyle R. Freeny
