**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ETHICAL SOCIETY OF POLICE; NAACP ST. LOUIS COUNTY; MISSIONARY BAPTIST STATE CONVENTION OF MISSOURI; OUT ACCOUNTABILITY PROJECT; BERKSHIRE RESOURCES FOR INTEGRATION OF DIVERSE GROUPS AND EDUCATION; NAACP STATE CONFERENCE COLORADO-MONTANA-WYOMING; PEACEMAKERS LODGE; PIKES PEAK SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE 1; WELLSPRING HEALTH ACCESS; and HAITIAN COMMUNITY HELP & SUPPORT CENTER,<br><br>    ***Plaintiffs,***<br><br> **v.**<br><br>PAMELA J. BONDI, in her official capacity as Attorney General of the United States; and U.S. DEPARTMENT OF JUSTICE,<br><br>    ***Defendants.*** | **Case No. 25-CV-13115 (IT)** |

**<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'</u>**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

    A.    Statutory Background of CRS ............................................................................ 2

    B.    CRS Has Served as "America's Peacemaker" for More Than Sixty Years ................. 5

    C.    CRS's Critical Services to Communities, Local Governments, and Other
        Stakeholders ...................................................................................................... 9

    D.    Defendants Decided to Stealthily Dissolve CRS Due to Hostility to its
        Congressionally Assigned Mission ..................................................................... 12

    E.    Defendants Withdrew or Terminated Crucial Services to Plaintiffs as a Result of
        Their Decision to Dismantle the Agency ........................................................... 15

    F.    Plaintiffs Sue to Challenge CRS's Dissolution ................................................. 19

    G.    Even After Congress Funded CRS for FY2026 and Mandated Rescission of the
        RIF of CRS Employees, DOJ Has Refused to Restore CRS Operations ................. 20

LEGAL STANDARD ............................................................................................................ 21

I.    The Dissolution of CRS Is Not in Accordance with Law and Is in Excess of
    Statutory Authority ................................................................................................ 23

II.    The Dissolution of CRS Violates the Separation of Powers ................................... 25

III.    The Dissolution (or Supposed "Realignment") of CRS Was
    Arbitrary & Capricious ......................................................................................... 27

IV.    Defendants Have Unlawfully Withheld the Provision of Services
    Mandated by Law ................................................................................................... 31

V.    Plaintiffs Readily Meet Threshold Standards for Reviewability ............................. 32

    A.    Plaintiffs Have Standing ................................................................................... 32

    B.    Defendants Actions Constitute "Final Agency Action" ..................................... 32

VI.    Vacatur Is the Appropriate and Presumptive Remedy, and Compulsory Relief Is Also
    Warranted .............................................................................................................. 35

**TABLE OF AUTHORITIES**

**Cases**

*AFGE v. OMB*,
  Case No. 3:25-cv-08302, 2025 WL 3654116 (N.D. Cal. Dec. 17, 2025) ................................. 20

*Aid Ass'n for Lutherans v. USPC*,
  321 F.3d 1166 (D.C. Cir. 2003) .................................................................................. 25

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) ................................................................................. 34

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ................................................................................................ 22

*Ass'n of Am. Universities v. DoD*,
  806 F. Supp. 3d 79 (D. Mass. 2025) ............................................................. 28, 29, 31

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................ 33

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) ................................................................................................ 27

*Bowsher v. Synar*,
  478 U.S. 714 (1986) ................................................................................................ 26

*Camp v. Pitts*,
  411 U.S. 138 (1973) ................................................................................................ 22

*Citizens Awareness Network, Inc. v. NRC*,
  59 F.3d 284 (1st Cir. 1995) ...................................................................................... 21

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ................................................................................................ 26

*Cont'l Air Lines, Inc. v. C. A. B.*,
  522 F.2d 107 (D.C. Cir. 1974) .................................................................................. 33

*Custom Commc'ns, Inc. v. Fed. Trade Comm'n*,
  142 F.4th 1060 (8th Cir. 2025) ................................................................................. 36

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) .................................................................................... 22, 25, 34

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) .......................................................................................... 22, 28

*Does 1-26 v. Musk,*
　No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) ....................................................... 26

*Encino Motorcars, LLC v. Navarro,*
　579 U.S. 211 (2016) ................................................................................................................. 31

*Ex parte Young,*
　209 U.S. 123 (1908) ................................................................................................................. 25

*FCC v. NextWave Personal Commc'ns Inc.,*
　537 U.S. 293 (2003) ................................................................................................................. 35

*Free Enter. Fund v. PCAOB,*
　561 U.S. 477 (2010) ................................................................................................................. 27

*Harrington v. Chao,*
　280 F.3d 50 (1st Cir. 2002) ..................................................................................................... 35

*Home Box Off., Inc. v. FCC,*
　567 F.2d 9 (D.C. Cir. 1977) ..................................................................................................... 22

*In re Aiken County,*
　725 F.3d 255 (D.C. Cir. 2013) ................................................................................................. 24

*Kingdom v. Trump,*
　No. 1:25-CV-691, 2025 WL 1568238 (D.D.C. June 3, 2025) ................................................. 34

*Massachusetts v. NIH,*
　164 F.4th 1 (1st Cir. 2026) ................................................................................................. 25, 36

*Monsanto Co. v. Geertson Seed Farms,*
　561 U.S. 139 (2010) ................................................................................................................. 36

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,*
　463 U.S. 29 (1983) ................................................................................................................... 22

*New York v. Kennedy,*
　155 F.4th 67 (1st Cir. 2025) ................................................................................................ 32, 33

*New York v. Trump,*
　No. 25-1236, 2026 WL 734941, --F.4th-- (1st Cir. Mar. 16, 2026) ......................................... 33

*New York v. Trump,*
　No. 25-cv-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ....................................... 34

*New York v. Trump*
　133 F.4th 51 (1st Cir. 2025) ................................................................................................... 33

*Norton v. S. Utah Wilderness All.,*
　542 U.S. 55 (2004) ................................................................................................................... 31

iii

*Ohio v. EPA,*
603 U.S. 279 (2024)........................................................................................... 21, 27

*Oregon Nat. Desert Ass'n v. Bushue,*
644 F. Supp. 3d 813 (D. Or. 2022)............................................................................ 31

*R.I. Coal. Against Domestic Violence v. Kennedy,*
No. 25-cv-342, 2025 WL 2988705 (D.R.I. Oct. 23, 2025)........................................ 28

*R.I. Dep't of Env't. Mgmt. v. United States,*
304 F.3d 31 (1st Cir. 2002) .............................................................................. 22, 25

*Rhode Island v. Trump,*
155 F.4th 35 (1st Cir. 2025) .................................................................................... 32

*Rhode Island v. Trump,*
781 F. Supp. 3d 25, 52 (D.R.I. 2025), appeal dismissed,
No. 25-1477, 2025 WL 3459538 (1st Cir. Nov. 25, 2025) ....................................... 27

*Seila L. LLC v. CFPB,*
591 U.S. 197 (2020)................................................................................................ 27

*Sierra Club v. Van Antwerp,*
719 F. Supp. 2d 77 (D.D.C. 2010)........................................................................... 35

*South Carolina v. United States,*
907 F.3d 742 (4th Cir. 2018).................................................................................... 35

*Tolan v. Cotton,*
572 U.S. 650 (2014)................................................................................................ 23

*Trump v. CASA,*
606 U.S. 831 (2025)................................................................................................ 36

*TVA v. Hill,*
437 U.S. 153 (1978)................................................................................................ 24

*Vietnam Veterans of Am. v. CIA,*
811 F.3d 1068 (9th Cir. 2016).................................................................................. 32

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952).......................................................................................... 25, 26

**Statutes**

5 U.S.C. § 706(1) .................................................................................................... 31

5 U.S.C. § 706(2)(A)............................................................................................... 21

5 U.S.C. § 706(2)(B)............................................................................................... 21

5 U.S.C. § 706(2)(C)..................................................................................................................21

5 U.S.C. § 706(2)(D)..................................................................................................................21

5 U.S.C. § 706(b)(2)(B) ............................................................................................................. 25

42 U.S.C. § 2000a-3(d) ............................................................................................................... 3

42 U.S.C. § 2000a-4..................................................................................................................... 3

42 U.S.C. § 2000g...................................................................................................................... 23

42 U.S.C. § 2000g-1 ............................................................................................................... 2, 23

42 U.S.C. § 2000g-2 .................................................................................................................... 3

42 U.S.C. § 2000g-3 .................................................................................................................... 3

42 U.S.C. § 3608(e)(4)............................................................................................................4, 27

Pub. L. 104-155, § 6, 110 Stat. 1392 (1996)........................................................................... 4, 27

Pub. L. 110-344, 122 Stat. 3934 (2007)................................................................................... 4, 27

Pub. L. 111-84, § 4706, 123 Stat. 2190 (2009)........................................................................ 4, 27

Pub. L. 111-84, § 4707, 123 Stat. 2190 (2009)........................................................................4, 27

Pub. L. 114-325, § 2, 130 Stat. 1965 (2016)............................................................................ 4, 27

Public Law No. 119-3 § 120(e) (2025) ..................................................................................... 20

Reorganization Act of 1949, 63 Stat. 203, as amended ................................................................ 3

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................................. 23

**Constitutional Provisions**

U.S. Const. Art. I §§ 1, 8............................................................................................................ 26

U.S. Const. Art. II § 2 ............................................................................................................... 26

**Other Authorities**

Message of the President Accompanying Reorganization Plan No. 1 of 1966, Eff. Apr. 22, 1966,
    31 F.R. 6187, 80 Stat. 1607, 5 U.S.C. app. at 164 (Feb. 10, 1966)........................................... 4

**INTRODUCTION**

This case concerns the Executive Branch's efforts in 2025 to dismantle and disable a congressionally-created civil rights agency and then rewrite history to hide the government's nakedly unlawful actions.  In the Civil Rights Act of 1964, Congress established the Community Relations Service ("CRS") and charged it with providing dispute- and conflict-resolution assistance to communities across the Nation.  CRS has long been known as "America's peacemaker."  For decades, CRS has worked—quietly and without publicity—to preserve and restore peace in moments of deep division, from its work in Selma in the aftermath of "Bloody Sunday" to its deployment nearly sixty years later in Milwaukee and Chicago during the Republican and Democratic National Conventions.

The current Administration is fundamentally hostile to CRS's existence and has stated as much in writing.  Rather than secure legislation to eliminate the agency, however, Defendants set out to destroy CRS unilaterally, under the guise of agency "realignment."  Defendants did so behind closed doors, without notice or public input, and without consulting the communities that depend on CRS.  Defendants sought to hide the unlawful elimination of CRS as a functioning agency by dressing it up in the language of bureaucratic restructuring, claiming they were only "realigning" the agency under the Executive Office of the U.S. Attorney's Office ("EOUSA").  This excuse is plainly inconsistent with Defendants' own contemporaneous admissions that they would "eliminate CRS and its functions" out of disagreement with its mission, and that CRS employees were being terminated as part of the "dissolution" of CRS.  It is also disproved by the undisputed facts about what Defendants actually did, including to cease *all* services to the public, reducing CRS to a "paper" entity whose primary responsibility is to submit a meaningless annual report with Congress.  This is plainly contrary to CRS's statutory mandate and the constitutional

1

separation of powers.

This Court has already found that Plaintiffs are likely to succeed on the merits of their claims. Doc. No. 22 at 5. The subsequent filing of the administrative record only serves to confirm the strength of Plaintiffs' claims. Not only did Defendants contravene the Civil Rights Act of 1964 by eliminating CRS's ability to function and provide direct services to communities in need, but Defendants failed to provide any explanation—let alone a reasoned one—for the adoption of a single-person CRS within EOUSA. Indeed, they made that change knowing that it would disable CRS from providing core conciliation services that Congress had long funded and that communities and organizations across the country—including Plaintiffs—have long relied on. This leaves, as the only plausible explanation for such a move, Defendants' fundamental hostility toward CRS's statutory mission, which even Defendants appear to understand is not a lawful basis for decision.

## BACKGROUND

### A. Statutory Background of CRS

CRS was established by the Civil Rights Act of 1964, which provides that "[i]t shall be the function of the Service to provide assistance to communities and persons therein in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin which impair the rights of persons in such communities under the Constitution or laws of the United States or which affect or may affect interstate commerce." 42 U.S.C. § 2000g-1. CRS is authorized to offer such assistance "whenever, in its judgment, peaceful relations among the citizens of the community involved are threatened thereby." *Id.*

By law, CRS must conduct "conciliation assistance. . .in confidence and without publicity," "hold confidential any information acquired in the regular performance of its duties,"

2

and may not "engage in the performance of investigative or prosecuting functions of any department or agency in any litigation arising out of a dispute" handled by CRS. 42 U.S.C. § 2000g-2.

CRS has a specific statutory mandate to assist in federal judicial proceedings. In public accommodation cases, District Courts may refer parties to CRS so the agency can conduct settlement proceedings where the "court believes there is a reasonable possibility of obtaining voluntary compliance." 42 U.S.C. § 2000a-3(d). Once a District Court refers a matter to CRS, the agency "is authorized to make a full investigation. . .and may hold such hearings with respect thereto as may be necessary" as part of "bring[ing] about a voluntary settlement between the parties." 42 U.S.C. § 2000a-4.

CRS is required to submit "a report of the activities of the Service during the preceding fiscal year" "on or before January 31 of each year." 42 U.S.C. § 2000g-3.

The Civil Rights Act originally placed CRS within the Department of Commerce and established the CRS Director as a Presidentially-appointed and Senate-confirmed position for a term of four years. 42 U.S.C. § 2000g. As part of the Reorganization Plans of 1966 and pursuant to congressional authorization set forth in the Reorganization Act of 1949, 63 Stat. 203, as amended, President Lyndon B. Johnson transferred CRS to the Justice Department. In his explanatory message to Congress regarding this transfer, President Johnson stated: "The Attorney General will provide for the organization of the Community Relations Service as a separate unit within the Department of Justice," "with full regard for" the Civil Rights Act's provisions requiring "(1) cooperation with appropriate State or local, public, or private agencies; (2) the confidentiality of information acquired with the understanding that it would be so held; and (3) the limitation on the performance of investigative or prosecutive functions by personnel

3

of the Service." Message of the President Accompanying Reorganization Plan No. 1 of 1966, Eff. Apr. 22, 1966, 31 F.R. 6187, 80 Stat. 1607, 5 U.S.C. app. at 164 (Feb. 10, 1966).

Four subsequent statutes expanded the role of CRS in violence prevention, hate crimes prevention, and civil rights conflict resolution. *First*, in 1968, the Fair Housing Act recognized CRS's role in preventing and eliminating discriminatory housing practices, and directed the Secretary of Housing and Urban Development to assist CRS with that work. 42 U.S.C. § 3608(e)(4). *Second*, in 1996, the Church Arson Prevention Act directed CRS to "prevent, and respond to potential violations" of 18 U.S.C. §§ 247 and 844, involving damage to religious property and interference with the free exercise of religion, and destructive conduct using fire, bombs, or other explosives. Pub. L. 104-155, § 6, 110 Stat. 1392, 1394 (1996). *Third*, in 2007 and 2016, respectively, the Emmett Till Unsolved Civil Rights Crime Act and the Emmett Till Unsolved Civil Rights Crimes Reauthorization Act simultaneously directed DOJ's Civil Rights Division to investigate unsolved civil rights–era homicides and directed CRS to "provide technical assistance by bringing together law enforcement agencies and communities to address tensions raised by" those same crimes. Pub. L. 114-325, § 2, 130 Stat. 1965, 1967; *see also* Pub. L. 110-344, 122 Stat. 3934 (2007). *Fourth*, in 2009, the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act directed CRS to "prevent and respond to alleged violations" of 18 U.S.C. § 249, a newly established federal hate crime for causing or threatening bodily injury based on race, color, national origin, gender, gender identity, sexual orientation, religion, or disability. Pub. L. No. 111-84, §§ 4706, 4707, 123 Stat. 2190, 2838 (2009). Until Defendants' recent actions to disable CRS, Congress and DOJ consistently understood these statutes to expand the jurisdiction of CRS. *See* Supp. Nam Decl. ¶ 16, Doc. No. 96-4 at 8.

4

### B.  CRS Has Served as "America's Peacemaker" for More Than Sixty Years

CRS has quietly and without fanfare played an important public-safety role in some of the most significant moments in this country's history over the last sixty years.  Consider just a few highlights.

In March 1965, CRS conciliators were dispatched to Selma, Alabama, following the "Bloody Sunday" attack on peaceful marchers seeking to cross the Edmund Pettus Bridge.  CRS conciliators coordinated with civil rights leaders, the Justice Department, and state officials by shuttle diplomacy to negotiate a safe path for the subsequent marches to Montgomery.  These efforts prevented the outbreak of further violence, bloodshed, and injuries; enabled the resumption of a peaceful march to Montgomery, Alabama; and helped establish CRS's credibility as an impartial peacemaker.  Nam Decl., Doc. No. 96-3 at 9.

In the 1970s, CRS became significantly involved in mediating school desegregation conflicts.  CRS conciliators played a critical role when Boston faced a challenging period of desegregation and a busing crisis.  A CRS team facilitated engagement between and among school district officials, the mayor's office, the police department, and various community groups, including the NAACP, which brought the lawsuit that resulted in the District Court's desegregation order.  *Id.*

CRS also de-escalated violent situations in individual schools during that crisis.  For example, a CRS conciliator singlehandedly calmed a fight that had broken out between Black and White students at South Boston High School.  Recognizing CRS's important role, this Court brought CRS into the desegregation process and required all parties to cooperate with CRS's efforts.  *Id.* Over the following years, CRS actively worked in Boston to prevent violence, organize interracial parent councils, and sustain dialogue among governmental and community

5

stakeholders.  On December 6, 1978, this Court wrote to President Jimmy Carter regarding CRS's work in Boston, saying: "At the outset of school desegregation here, and on several occasions thereafter, local officials simply didn't know which way to turn. CRS was able to . . . provide counsel and leadership not only to school officials but to the police and other municipal departments as well, and to avoid widespread violence." *Id.*

In 1973, CRS served as a neutral intermediary and communication channel between the 200 members of the American Indian Movement and Oglala Lakota activists that had occupied Wounded Knee, South Dakota.  CRS's work to mediate and maintain lines of communication contributed to prevention of bloodshed and, ultimately, to the end of the standoff.  *Id.* at 10-11.

In 1977, CRS successfully led a negotiation between a neo-Nazi group seeking to march in Skokie, Illinois (a Chicago suburb with a large Jewish population), the Jewish community (including many Holocaust survivors), city officials, and civil rights advocates that resulted in the prevention of violence and a successful resolution of the impasse, while ensuring First Amendment rights and community safety.  *Id.*

Throughout the 1980s, CRS was central in improving and reforming relationships between law enforcement and minority communities.  CRS helped found the National Association of Police-Community Relations Officers, convened symposiums on reductions in the use of force, and supported minority recruitment in policing.  *Id.* at 11.

Between 1991 and 1994, following the widely televised beating of Rodney King, the acquittal of the Los Angeles Police Department ("LAPD") officers who participated in the beating, and the rioting and civil unrest that followed, CRS deployed conciliation teams to Los Angeles within hours of the verdict to help defuse violence and restore communication between and among racial and community groups.  CRS served as a neutral liaison between city officials,

6

police, civil-rights organizations, business leaders, and residents; worked with the mayor's office, LAPD, local clergy, and community coalitions to coordinate peaceful responses and reduce retaliation; and helped establish community-based recovery and dialogue programs aimed at healing relationships among Black, Latino, Korean, and other ethnic communities.  *Id.*

CRS was instrumental in the federal government's response to a string of church burnings throughout the United States, many of which targeted Black congregations in the South.  In June 1996, Attorney General Janet Reno and Treasury Secretary Robert Rubin jointly established the National Church Arson Task Force, which included federal law enforcement agencies and CRS. In that role, CRS focused on stabilizing the community and preventing further violence.  *Id.*

After the terrorist attacks of September 11, 2001, CRS worked under the direction of Attorney General John Ashcroft to prevent hate-based retaliation against Arab, Muslim, Sikh, and South Asian communities.  In April 2003, Ashcroft announced that CRS had held more than 250 town and community meetings and forums on backlash issues and developed best practices for law enforcement to prevent and respond to hate incidents against Arab-Americans, Muslim-Americans, South Asian-Americans, and Sikh-Americans.  Throughout this time, CRS trained law enforcement, organized dialogues, and established working groups nationwide to protect targeted populations and maintain community trust.  *Id.* at 12.

CRS performed a conflict-resolution and liaison role in the aftermath of Hurricane Katrina, focusing on reducing racial and ethnic tensions, facilitating communication between disaster victims and authorities, and, in the context of post-disaster disputes and inequalities that emerged in the storm's chaotic aftermath, ensuring equitable access to relief and recovery resources.  *Id.*

CRS played a pivotal role in helping communities recover and rebuild trust following the

7

August 5, 2012, mass shooting at the Sikh Gurdwara in Oak Creek, Wisconsin, in which six Sikh worshippers were killed and several others injured. CRS conciliators were deployed to Oak Creek immediately after the shooting to assist local, state, and federal officials in engaging with grieving community members and restoring calm. CRS provided on-site crisis mediation and facilitation between Sikh community leaders, law enforcement, and local government to promote trust and open communication. *Id.* at 12-13.

After the 2012 killing of Trayvon Martin and the not-guilty jury verdict of George Zimmerman, CRS mediators worked day and night to maintain calm between protesters, local officials, and law enforcement. CRS also convened an interdenominational group of local clergy to decrease misinformation and maintain peace. *Id.* at 13.

After the killing of Michael Brown, a young, unarmed Black man, by a White police officer, sparking months of protests and civil unrest, CRS worked with officials from various law enforcement agencies, as well as local community leaders, to develop viable working relationships and establish a coalition of civic and community leaders to address the underlying issues of the conflict and begin to develop long-term solutions to the community tension. *Id.*

After an armed attacker perpetrated a mass shooting at the Pulse Nightclub in Orlando, Florida, resulting in the massacre of 49 people and the wounding of many more (with most victims reportedly identifying as LGBTQ+), CRS convened a coalition of civic and community leaders to provide immediate support for victims and prevent retaliation or escalation of bias-related tensions. *Id.* ¶ 18(f). To maintain peace amid heightened emotions, CRS worked with the Orlando Emergency Operations Center and local law enforcement to prepare for counter-protests from anti-LGBTQ+ and anti-Muslim groups during vigils and funerals. *Id.* at 14.

Following the murder of George Floyd, CRS deployed field teams to coordinate

8

communication between law enforcement, activists, clergy, and neighborhood leaders. *Id.*
¶ 18(l).  By combating misinformation and encouraging cooperation, CRS reduced the likelihood
of additional violence.  Local leaders credited the mediators' neutrality with preventing wider
destruction. *Id.* at 16-17.

CRS deployed to Milwaukee and Chicago for the Republican National Convention and
the Democratic National Convention, as CRS had done every four years. *Id.* ¶ 18(o).  Working
with law enforcement, protest organizers, and municipal leaders, CRS helped both cities manage
demonstrations and prevent major violence while ensuring that constitutional rights were
protected.  Throughout both conventions, CRS conciliators were on the streets of the two cities
engaging in de-escalation efforts between pro-Palestinian protesters and pro-Israeli protesters
and between the protesters and police officers to prevent riots and help maintain peace and order,
in coordination with federal, state, and city law enforcement. *Id.* at 17-18.

### C.  CRS's Critical Services to Communities, Local Governments, and Other Stakeholders

At the time of its dismantling, CRS provided direct services to communities and
community members across the country in service of an important public safety function.  AR at
344; Doc. No. 92-2 at 3.  CRS had a headquarters office in Washington, D.C. and 25 field offices
across five different regions of the United States. *Id.*  Pursuant to its statutory mandate, CRS
provided four categories of services to state and local governments and partner organizations like
Plaintiffs in advancement of its mission: facilitation of dialogue, mediation, training, and
consultation. AR 427, Doc. No. 91-2 at 86 (describing these as "core activities").  These services
were provided both in-person and virtually, at no cost, and tailored to each community's needs.

*Facilitation of Dialogue.*  CRS-facilitated dialogues helped stakeholders—including local
agencies, institutions, and community members—to develop action plans to improve

communication and promote partnerships on topics such as racial tensions, police-community relations, perceived hate crimes, tribal conflicts, and protests and demonstrations.  Nam Decl. ¶ 10, Doc. No. 96-3 at 4-5.

*Mediation.*  CRS conciliators served as impartial third-party mediators, helping stakeholders resolve community-based conflicts, such as tensions between law enforcement and communities.  The goal of mediation was not to determine fault but to identify ways to improve collaboration and strengthen partnerships among parties.  By law, these sessions were confidential.  The results of mediation were commonly memorialized in written documents, such as memorandums of understanding or mediation agreements.  *Id.* at 5.

*Training.*  CRS conducted training sessions that provided representatives from government, faith organizations, law enforcement, civil rights groups, and other community organizations with the knowledge and skills needed to increase understanding and improve collaboration among diverse stakeholders.  *Id.*

*Consultation.*  CRS conciliators offered consultation services to provide stakeholders with insights into best practices and resources designed to alleviate tensions and prevent future conflict.  *Id.*

The aim of all CRS programs was to help parties in conflict understand different perspectives, share information about resources and best practices, and support communities as they identify and implement solutions.  Consider just a sample of CRS's facilitated dialogue and training programs.

*Bias Incidents and Hate Crimes Forums.*  CRS organized forums to educate community members and law enforcement about the Shepard-Byrd Hate Crimes Prevention Act, as well as state and local hate crimes laws.  These forums gathered local and federal law enforcement,

10

district attorneys, civil rights organizations, and community organizations to develop strategies to effectively respond to bias incidents and hate crimes. *Id.* at 6.

*Protecting Places of Worship Forums.* CRS organized programs to help communities safeguard places of worship against potential threats. Experts from federal, state, and local law enforcement agencies, along with faith-based organizations, provide information and resources related to hate crime laws, the handling of active shooter situations, and physical security at religious buildings. *Id.*

*Strengthening Police and Community Partnerships ("SPCP").* These programs convened law enforcement and diverse community leaders in problem-solving discussions aimed at improving public safety by fostering trust, building partnerships, and boosting local capacity. *Id.*

*Contingency Planning.* CRS hosted workshops to strengthen participants' knowledge around the planning of safe public events, such as demonstrations or rallies, focusing on ways to reduce the risk of violence. These programs included sessions for developing safety plans and addressing potential safety concerns. *Id.* at 6-7.

*Event Marshals: Maintaining Safety During Public Events.* This CRS training program taught community members to act as event marshals, ensuring the safety and success of public events. Participants learn about the roles and responsibilities of marshals, discuss how to handle real-life scenarios, and receive a reference guide with essential information. *Id.* at 7.

*"Understanding" and "Engaging and Building Partnerships" with Communities Series – Arab American, Hindu American, Jewish, Muslim American, and Sikh American Communities.* These CRS programs familiarized participants with customs and cultural aspects of each community, including their beliefs, identity, practices, and civil rights-related issues that impact

11

the community.  The programs provided best practices for collaboration with these communities for peaceful co-existence and public safety.  *Id.*

*School-Student Problem Identification and Resolution of Issues Together ("School-SPIRIT").*  School-SPIRIT programs engaged student leaders, school administrators, and other school community members in identifying and resolving issues affecting their schools.  *Id.* at 8.

### D.  Defendants Decided to Stealthily Dissolve CRS Due to Hostility to its Congressionally Assigned Mission

Defendants are fundamentally hostile to CRS and its mission.  Behind closed doors, they decided to abolish CRS, resulting in a gradual cessation of services to Plaintiffs and other stakeholders and leading to the decimation of CRS's workforce effective October 31, 2025.  This decision was not a mere reorganization, but, in Defendants' own words, represents a functional "dissolution" of the agency and its capacity to carry out its statutory mission.

On January 20, 2025, President Trump issued an Executive Order titled *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* that directed agency heads to "undertake preparations to initiate large-scale reductions in force (RIFs)."  *See* E.O. 14158 § 3(c), 90 Fed. Reg. 8441 (Jan. 20, 2025).  That direction did not apply, among other things, to "functions related to public safety."  *Id.*  In a memorandum in response to this Executive Order, then-head of CRS Julius Nam noted that CRS was exempt from the E.O. as a public safety agency and, in any event, was already at a "near-minimum level of personnel."  AR at 345, ECF No. 92-2 at 4.

On March 25, 2025, Deputy Attorney General Todd Blanche issued a memorandum entitled "Soliciting Feedback for Agency Reorganization Plan [ARRP] and RIF" to all DOJ department and component heads, soliciting feedback on proposed staffing reductions and agency reorganizations.  AR at 1, Doc. No. 92-1 at 1.  Among the proposals in that memorandum

was "eliminating the Community Relations Service and moving some or all impacted employees to U.S. Attorneys' Offices." *Id.* at 2.

The President's FY 2026 budget request for DOJ included zero funding for CRS and sought elimination of the statutory provision creating CRS. AR at 332, Doc. No. 91-1 at 332. But Defendants' plan to eliminate CRS was not contingent on congressional approval of that proposal. Buried within OMB's Technical Supplement to that budget request, it states, without providing a rationale, that "[t]he Justice Department's reorganization **will eliminate the Community Relations Service (CRS) and its functions** in FY 2025, so no funding is requested in FY 2026 for CRS." Ex. 1 to Freeny Decl. at p.607, Doc. No. 96-1 at 19 (emphasis added).

The justification behind Defendants' plan to eliminate CRS (whether characterized as a formal or functional dissolution) is set forth in another obscure document, a FY 2026 Budget and Performance Summary that DOJ published on June 13, 2025, in connection with the President's FY 2026 budget. That document stated that "**[t]he Department will eliminate CRS and its functions**, a total of 56 positions," going on to state that "**[t]he CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities**." Ex. 2 to Freeny Decl. at p.20, Doc. No. 96-2 at 9.[1]

In response to a request from DOJ leadership in connection with the ARRP process, CRS employee Denise Nazaire was asked to provide "implementation considerations" with respect to a proposal to reduce CRS to a single-employee entity with EOUSA. AR at 269, Doc. No. 92-1 at 269. That memo outlined what functions CRS could and could not undertake with a single

---

[1] Defendants' resistance to including these documents in the Administrative Record only serves to the emphasize the deficiencies with that record. It beggars believe that officials at DOJ would not consider, *directly or indirectly*, written plans produced by DOJ and OMB to explain the President's budget requests, when deciding what steps to take with respect to CRS.

13

person.  *Id.*  The memorandum did not recommend reduction to a single person.  *Id.*  Nor did it address the prior input from Mr. Nam that CRS was already at near-minimum staffing levels.  *Id.*  It did, however, caution that a single-person CRS could not perform the same conciliation functions that CRS had been performing for years.  *Id.*  Among other things, a single-person CRS would not be able to offer mediation or other services that require "sustained engagement" with the public.  *Id.* at 270.  In essence, CRS would be relegated to a referral service.  *See id.*

Between March and September 2025, CRS declined to accept new requests for—and actively withdrew from—mediation and other conflict resolution and de-escalation services that fell within CRS's jurisdictions.  Nam Decl. ¶ 27, Doc. No. 96-3 at 21. This wholesale cessation of the services mandated by the Civil Rights Act was done at the direction of DOJ leadership in connection with Defendants' unlawful elimination of the CRS in its entirety.  *Id.*

On September 18, 2025, the Attorney General approved a memorandum entitled *Implementation of Fiscal Year (FY) 2025 Agency Reduction in Force (RIFs) and Reorganization Plan (ARRP)* ("Final ARRP Memo"), which stated that CRS's functions would be "realigned to the Executive Office for the U.S. Attorneys," and all CRS employees would be RIF-ed except one.  AR 307, Doc. No. 91-1 at 307.  That memo did not disavow DOJ's prior statement that CRS's mission was inconsistent with the agenda of the Department and Trump Administration. In fact, it reiterated the Administration's plan to ultimately eliminate CRS, while acknowledging that an Act of Congress would be required.  *Id.*  The memo stated that CRS "will reduce its functions to the statutory minimum," but did not explain what that minimum was determined to be.  And in this litigation, Defendants have taken the position that CRS's "only true statutory mandate" is to file an annual report with Congress.  Doc. No. 15 at 3.

On September 29, 2025, the Justice Department sent RIF notices to fourteen of the

14

remaining 15 active employees of CRS, including the head of CRS, with an effective date of October 31, 2025.  Ex. C to Supp. Nam Decl., Doc. No. 96-4 at 10.  The notice advised that RIFs were being taken "as a result of the **dissolution of the Community Relations Service** (CRS) in accordance with the reorganization and reconsolidation of [DOJ]." *Id.*

### E.  Defendants Withdrew or Terminated Crucial Services to Plaintiffs as a Result of Their Decision to Dismantle the Agency

Each of the Plaintiff organizations had been receiving CRS's services until CRS ceased providing assistance to the public; and they would like to resume these services and their ability to request new services once CRS resumes operations.

*Plaintiff Ethical Society of Police ("ESOP")*, *Missionary Baptist State Convention of Missouri ("MBSC")*, and *NAACP St. Louis County*.  ESOP, MBSC, and NAACP St. Louis County participated in a CRS-led engagement with St. Louis County law enforcement in the wake of a September 2024 incident where a Black off-duty officer with the St. Louis County Police Department was beaten by three White construction workers in Clayton, Missouri.  *See generally* Decl. of Walters, Bowman, and Bowie, Doc. Nos. 96-5, 96-6, 96-7.  When the responding officers, who worked in the same Department as the victim, arrived on the scene, they handcuffed the off-duty officer despite clear indications that he was the victim, and they failed to provide or ensure timely medical assistance to the injured officer.  The incident raised serious concerns within the community and among civil rights organizations about racial bias, officer treatment, and procedural failures within the police department.  Decl. of Rev. Duvall ¶ 10, Doc. No. 97 at 3.  ESOP, MBSC, and NAACP St. Louis County participated in CRS-led discussions with the St. Louis County Police Department about addressing these concerns, but CRS withdrew from the engagement before its completion.  *Id.* at 4.  CRS's withdrawal meaningfully hampered the ability of the Plaintiffs to have their concerns addressed by the police

15

department, resulting in the department's failure to carry through on its commitments.  *Id.* at 5-7.

*Plaintiff Out Accountability Project ("OAP")*.  OAP reached out to CRS in the fall of 2024 and early 2025 to discuss harassment and bullying concerns of LGBTQ+ students in Connecticut.  Combs Decl. ¶ 7, Doc. No. 96-8 at 3.  OAP and CRS discussed the different services CRS could provide, but as a result of CRS's dismantlement, CRS discontinued that engagement in early 2025.  *Id.*  OAP continues to regard CRS's service as important to their organization's mission.  *Id.* at 4.

*Plaintiff Berkshire Resources for Integration of Diverse Groups and Education, ("BRIDGE")*.  BRIDGE partnered with CRS repeatedly over the course of fifteen years, to the point where BRIDGE adapted its model for delivering services to its constituents in reliance on its ongoing partnership with CRS.  Supp. VanSant Decl. ¶ 5, Doc. No. 96-15 at 2.  At BRIDGE's request and with their assistance, CRS conducted a School-SPIRIT program in February 2025 at W.E.B. DuBois Middle School in Great Barrington, Massachusetts.  *Id.*  School-SPIRIT is a proven program used by schools around the country to empower students and divert them from involvement with law enforcement.  *Id.*  At the request of youth leaders, BRIDGE sought an additional School-SPIRIT program for public schools in Stockbridge, Massachusetts but was denied because of CRS's winddown.  *Id.* at 3.  Until the challenge agency dissolution, BRIDGE relied on CRS for its safety plan.  *Id.*

*Plaintiff NAACP State Conference Colorado-Montana-Wyoming ("Tri-State NAACP")*.  CRS began assisting Tri-State NAACP in 2024 by facilitating a series of community and law enforcement dialogues to build trust between police and diverse communities, strengthen problem-solving communications, and to increase community member collaboration with law enforcement.  Mayes Decl. ¶ 4 Doc. No. 96-10 at 2.  Two dialogues were held in January and

16

July of 2024, resulting in the creation of an action plan for future engagement, to include an October 25, 2025 community dialogue with Tri-State NAACP.  *Id.*  CRS terminated planning for that dialogue as a result of its impending dissolution.  *Id.* ¶ 5.

*Plaintiff Pikes Peak Southern Christian Leadership Conference 1 ("Pike's Peak SCLC").* Pikes Peak SCLC, a branch of the organization Martin Luther King, Jr. founded to coordinate civil rights protests through nonviolent action, has partnered with CRS on multiple occasions to address community tensions and conflicts arising from racial profiling incidents and excessive force by law enforcement in Colorado.  Nelson Decl. ¶ 3, Doc. No. 96-11 at 1.  Recently, this effort included a dialogue that CRS convened between Pikes Peak SCLC and the District Attorney for the Fourth Judicial District in Colorado, an area that includes Colorado Springs.  *Id.* at 2.  In June 2025, Pikes Peak SCLC requested CRS's assistance in facilitating another dialogue with law enforcement, in response to an incident involving allegations of excessive use of force against Black youth.  But because of the planned dissolution of the agency, CRS declined the request.  *Id.*

*Plaintiff Peacemakers Lodge.*  In March 2025, Peacemakers Lodge, located on the Wind River Indian Reservation in Wyoming, requested CRS assistance in opening communications with a local school district, after the school district stopped engaging with the Lodge in a dialogue about the schools' disciplinary practices, which the Lodge was concerned were biased against Native American students.  Olsen Decl. ¶ 4-5, Doc. No. 96-12 at 1.  CRS convened an initial meeting with the Lodge in March 2025 to hear their concerns, including about perceived lack of sensitivity within the school district to the concerns of Native Americans and the impact that can have on the learning environment for Native American students.  *Id.*  In or about May 2025, CRS convened a meeting between the Lodge and school officials to discuss ways to

17

address these concerns.  But once again, because of the agency's impending dissolution, CRS thereafter ceased providing services to the Lodge.  *Id.* ¶ 6.

*Plaintiff Wellspring Health Access* ("Wellspring").  Wellspring operates a reproductive healthcare clinic located in Casper, Wyoming, that was the victim of an arson attempt in 2022 that delayed the clinic's opening.  Burkhart Decl. ¶ 4, Doc. No. 96-13 at 1-2.  Beginning that year, CRS provided facilitation and communications services between Wellspring and Casper law enforcement, following anti-abortion protests at Wellspring.  *Id.* ¶ 5.  The aim of that dialogue was to identify ways to allow the clinic to safely operate and to manage protesters without interruption of the clinic's services.  CRS withdrew its assistance to Wellspring on or about May 2025, despite ongoing safety concerns at the clinic, as a direct result of the agency's planned shutdown.  *Id.* ¶ 6.

*Plaintiff Haitian Community Help & Support Center.*  On or about February 2024, at the request of the U.S. Attorney's Office for the Southern District of Ohio, CRS convened a forum, dubbed "United Against Hate," to bring together faith-based leaders and members of the Haitian community to discuss issues arising from the conviction and sentencing of an African-American assailant for robberies and hate crime assaults against Haitian immigrants in Springfield, Ohio. Dorsainvil Decl. ¶¶ 6–9, Doc. No. 96-14 at 2-3.  Haitian Support Center participated in this forum.  *Id.*  CRS continued to engage with Haitian Support Center through the end of 2024 and beginning of 2025, with the goal of supporting the Haitian community's desire to improve communications and relations with civic leaders and address concerns about the policing of the Haitian community.  *Id.*  This engagement was poised to culminate in a Memorandum of Understanding ("MOU") between the Springfield Police Department and the Center and other community groups regarding policing practices.  *Id.*  After agreeing to facilitate and consult on

18

this MOU, however, CRS abruptly withdrew the provision of all services to the Center, preventing the MOU from being finalized.

### F. Plaintiffs Sue to Challenge CRS's Dissolution

Plaintiffs filed this lawsuit on October 24, 2025, one week before the RIF of CRS employees was to take effect, and they simultaneously moved for a temporary restraining order ("TRO") to prevent that RIF from occurring.  In their opposition, Defendants cast the dissolution of CRS as a mere "realignment" or "reorganization."  But in a declaration submitted with that opposition, a DOJ administrator confirmed that DOJ lacked any plan for operating CRS if Congress decided to fund it at—or even close to—prior appropriations levels for FY 2026 (which started October 1, 2025).  Lauria Decl., Doc. No. 15-1 ¶ 13.  Instead, "[i]f funding is provided for CRS for fiscal year 2026," DOJ would need to "reassess and consider how to comply with any funding enactment and legally expend such funds consistent with the enactment." *Id.*

The Court denied Plaintiffs' TRO motion, finding insufficient irreparable harm on the basis that, if Plaintiffs prevailed on final judgment, the Court could "order Defendants to rescind its shuttering of CRS" and thereby redress Plaintiffs injuries.  Doc. No. 22 at 7.  The Court nevertheless found that Plaintiffs had "made a strong showing that they are likely to succeed on the merits, where Defendants concede that only Congress, and not the executive branch, may eliminate a Congressionally created agency; the RIF notice reportedly stated that the reason for the RIF was "the dissolution of the Community Relations Service"; the RIF would result in only one remaining CRS employee (and two empty positions); and the only Declaration offered by Defendants is silent as to any functions that the sole remaining CRS employee would fulfill and

concedes that if Congress continues funding CRS, DOJ would need to "reassess and consider how to comply with any funding enactment." *Id.* at 5 (internal punctuation altered).

### G. Even After Congress Funded CRS for FY2026 and Mandated Rescission of the RIF of CRS Employees, DOJ Has Refused to Restore CRS Operations

On November 12, 2025, not long after the RIF of CRS employees took effect, Congress enacted a Continuing Resolution that funded CRS and other federal agencies at FY2025 levels through January 31, 2026. That Continuing Resolution also provided that "any reduction in force proposed, noticed, initiated, *executed, implemented, or otherwise taken* by an Executive Agency between October 1, 2025, and the date of enactment [Nov. 12, 2025], *shall have no force or effect*." *See* Public Law No. 119-3 § 120(e) (2025) (emphasis added). It directed agencies to provide notice, within five days, to affected employees of their reinstatement. *Id.* This provision squarely covered the RIF of CRS employees: although *RIF notices* were issued to employees on September 29, 2025, those notices stated that the RIF would be "conducted effective October 31, 2025," and that employees would be "separated from the Federal service by reduction in force on October 31, 2025." Ex. C to Supp. Nam Decl., Doc. No. 96-4 at 11.

Despite this, DOJ did not issue RIF rescission notices to terminated CRS employees until January 9, 2026, *see* Doc. No. 75 at 1, after a district court in California rejected the government's argument that it was not required to reinstate employees who received RIF notices before October 1, 2025, *AFGE v. OMB*, Case No. 3:25-cv-08302, 2025 WL 3654116, at *10-11, 14 (N.D. Cal. Dec. 17, 2025).

In the aftermath of the rescissions of the CRS RIF, DOJ initially claimed that CRS was back up and operational, because "CRS website has been updated with a new telephone number and email address, both of which are now operational." Doc. No. 75 at 3. That claim was soon proved false, when DOJ submitted its second status update to the Court, acknowledging that

20

(1) reinstated CRS personnel were not performing CRS functions; (2) no operational plan exists for resuming those functions; and (3) congressional funds appropriated for CRS are not being used to deliver CRS services.  Doc. No. 85 at 3.

On January 23, 2026, Congress passed a full appropriations bill for DOJ for FY 2026. *See* Public Law No. 119-74 (Jan. 23, 2026).  Congress expressly appropriated $20 million for CRS for FY 2026.  Notwithstanding that, as of February 23, 2026, DOJ indicated that "specific plans for resumption of operations of CRS . . . are not yet set."  Doc. No. 89 at 2 (cleaned up).  Open-source information about the plans for those appropriations confirms that Defendants' "realignment" was actually a decision to functionally shutter CRS.  In particular, the data shows that, out of the $20 million appropriated by Congress, OMB approved expenditure of only up to $972,561 for Q1 of FY 2026; just over $2 million for Q2; only $70,000 for Q3; and the remainder (ostensibly) for Q4.  *See* 3rd Freeny Decl. ¶ 18, ECF No. 96 at 3-4.  This data also confirms that Defendants have no intention to depart from that decision now, despite the rescission of the CRS RIF and the availability of dozens of employees to perform CRS functions using funds specifically appropriated for CRS.

## LEGAL STANDARD

Under the APA, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).  This standard "is not a rubber stamp."  *Citizens Awareness Network, Inc. v. NRC*, 59 F.3d 284, 290 (1st Cir. 1995).  It requires that agency action be "reasonable and reasonably explained."  *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted).  An agency's

21

decisionmaking is not reasonable if it "relied on factors Congress has not intended," if it "failed to consider an important aspect of the problem," or if it "runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

APA review is limited to "the grounds that the agency invoked when it took the action." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020). In the typical APA case, the focal point for judicial review is "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). But an agency may not "justif[y] its actions by reference only to" cherrypicked information in the public certified record, "while failing to disclose the substance of other relevant information that has been presented to it" during the decisionmaking process. *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 54 (D.C. Cir. 1977)` (referring to an incomplete record as a "fictional account of the actual decisionmaking process"). Where there is a "strong showing of bad faith or improper behavior" by an agency or a "disconnect between the decision made and the explanation given," consideration of extra-record evidence is appropriate, including to allow a court to determine whether the agency's stated rationale is genuine or pretextual. *Dep't of Commerce v. New York*, 588 U.S. 752, 781, 785 (2019) (citation omitted). This Court has already found that the presumption of regularity ordinarily accorded to an administrative record has been overcome in this case. Doc. No. 90 at 11.

Even where the APA does not apply, this Court has the "equitable power[]" to "enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015); *see also R.I. Dep't of Env't. Mgmt. v. United States*, 304 F.3d 31, 42-43 (1st Cir. 2002). In those circumstances, summary judgment is appropriate when "the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (quoting Fed. R. Civ. P. 56(a)).

## I.    The Dissolution of CRS Is Not in Accordance with Law and Is in Excess of Statutory Authority

The Civil Rights Act is unambiguous: "*There is hereby established . . .* a Community Relations Service," 42 U.S.C. § 2000g, and it "*shall be the function* of the Service to provide assistance" to communities in resolving disputes related to discriminatory practices, *id.* § 2000g-1 (emphasis added). The Executive Branch has no authority to eliminate CRS, to discontinue its functions, or to refuse to provide any assistance to communities.

And yet DOJ's own contemporaneous statements and actions leave no doubt that is what happened here. DOJ's Budget and Performance Summary announced that the "Department will eliminate CRS and *its functions*," and that CRS "will formally close all its offices *by the end of FY 2025*."[2] Ex. 2 to Freeny Decl., Doc. No. 96-2 at 9, 113 (emphasis added). CRS thereafter stopped providing *all* services. Nam Decl. ¶¶ 27, 29 Doc. No. 96-3 at 21–22 (explaining that cessation was the result of CRS's planned closure). The RIF notices that were issued to all but one CRS employee likewise stated that the action was taken "a result of the dissolution of the Community Relations Service." Supp. Nam Decl. ¶ 3 & Ex. C, Doc. No. 96-4 at 11. Regardless of the label applied to this action, it amounted to a categorical shuttering of a congressionally-created agency. And it was undertaken, in Defendants' own words, because "[t]he CRS mission

---

[2] Defendants' claim in this litigation that the closure of CRS was only a "proposal" put to Congress in the Administration's FY2026 budget is flatly inconsistent with this pre-litigation admission that the closure would take place in FY2025. *See also* Doc. No. 33-1 at 19 ("The Justice Department's reorganization will eliminate the Community Relations Service (CRS) and its functions *in FY 2025*.").

does not comport with Attorney General and Administration law enforcement and litigating priorities." Ex. 2 to Freeny Decl. at p.9, Doc. No. 96-2 at 20. This is as close to an admission of willful defiance of Congress as one might expect to see, and a textbook example of an APA violation.

As then-Judge Kavanagh explained in *In re Aiken County*, an agency may not "decline to follow a statutory mandate or prohibition simply because of policy objections." 725 F.3d 255, 259, 267 (D.C. Cir. 2013) (holding that the Nuclear Regulatory Commission acted unlawfully in declining to continue a statutorily mandated licensing process). "Once Congress . . . has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought." *TVA v. Hill*, 437 U.S. 153, 194 (1978).

Defendants concede that "only Congress, through legislation, can dissolve or eliminate CRS." Opp. to TRO, Doc. No. 15 at 23. But they defend their actions on the specious ground that what they called a "dissolution" as recently as the September 29, 2025 RIF notices, was really just an administrative "realignment." Notably, even though that word is found in the Final ARRP memo (which predates the RIF notices), the administrative record does not support a conclusion that Defendants' actions amounted to only an administrative reorganization. Notably, Defendants never disavowed their original explanation for dissolving CRS (*i.e.*, disagreement with its mission). *See generally* AR. And Defendants' denial that they "dissolved" CRS, despite having promised to do so, cannot be squared with their actions that functionally hobbled the agency and prevented it from offering *any* public services for months on end (and permanently disabled it from being able to provide mediation and other services).

The only rational conclusion to be drawn from this set of facts is that Defendants intentionally reduced CRS to a single-person "paper" agency, incapable of providing meaningful

direct services to the public, as a means of functionally disabling the agency before they secured congressional approval to do so.  Accepting Defendants' "contrived" explanation that they were merely realigning CRS, with no intent to disable it, would require the Court to "to exhibit a naiveté from which ordinary citizens are free," which it need not and should not do.  *See Dep't of Commerce*, 588 U.S. at 785; *see also Massachusetts v. NIH*, 164 F.4th 1, 16 (1st Cir. 2026).

As this Court discerned during the hearing on Plaintiffs' motion for TRO at the very start of this case, Defendants made a calculated gambit—dismantling CRS without congressional authorization while hoping that subsequent congressional ratification for FY 2026 would render that unlawful action moot.  That gambit failed, and Defendants must be held to account for their willful violation of the law.

## II.    The Dissolution of CRS Violates the Separation of Powers

Defendants' actions violate the separation of powers and are *ultra vires* for similar reasons.  This claim encompasses three distinct causes of action: First, Plaintiffs may assert their constitutional separation of powers claim through the APA, *see* 5 U.S.C. § 706(2)(B), and, second, by seeking injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908).  Third, when the "executive acts *ultra vires*," as it has here, Plaintiffs may bring a free-standing claim to "reestablish the limits" on the executive's authority.  *Aid Ass'n for Lutherans v. USPC*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (quotation marks omitted); *R.I. Dep't of Env'tl. Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002) ("The basic premise behind nonstatutory review is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is *ultra vires*.").

Our constitutional order is premised on the proposition that the "diffus[ion]" of "power" "secure[s] liberty."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson,

J., concurring). "Even a cursory examination of the Constitution reveals . . . that checks and balances were the foundation of a structure of government that would protect liberty." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986). The Framers understood this system "produces conflicts, confusion, and discordance at times," but its structure "assure[s] full, vigorous, and open debate on the great issues affecting the people" and "provide[s] avenues for the operation of checks on the exercise of governmental power." *See id.*

The "Constitution is neither silent nor equivocal" about which branch of government has the power to establish or dissolve agencies. *See Youngstown*, 343 U.S. at 587. The "legislative Powers" are vested in Congress, which is empowered to "make all Laws" "necessary and proper" for the execution of the other two branches of government. U.S. Const. art. I §§ 1, 8; *see id.* art. II § 2 (confirming that executive branch offices "shall be established by Law"). "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). The President thus oversees the departments and executes the laws; he does not make, repeal, or abolish them. In short, under the separation of powers, "the Executive branch may not eliminate a *congressionally* created and funded agency without *congressional* authorization." *Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *7 (4th Cir. Mar. 28, 2025) (Gregory, J., concurring in judgment).

But, again, that is precisely what the Executive Branch is attempting to do. Without any congressional authorization whatsoever—indeed, in direct defiance of the Civil Rights Act of 1964, a half-dozen other statutes, and recent appropriations—the Executive Branch is unilaterally shuttering a landmark institution which valiantly stood witness to civil rights history for more than half-a-century. Nor can the Executive Branch claim to be acting in response to "congressional inertia, indifference or quiescence." *Youngstown*, 343 U.S. at 637 (Jackson, J.,

26

concurring). Over, over, and over again—at times on a unanimous or overwhelmingly bipartisan basis—Congress *expanded* CRS's functions and duties. *See, e.g.*, 42 U.S.C. § 3608(e)(4); Pub. L. No. 104-155, § 6; Pub. L. No. 110-344; Pub. L. No. 111-84, §§ 4706, 4707; Pub. L. No. 114-325, § 2. In other words, the People's representatives in Congress have repeatedly reaffirmed that CRS should exist. In concluding otherwise, the executive branch is usurping *Congress's* authority—in violation of the separation of powers—and is acting *ultra vires*.

When one branch seeks to trample on the separation of powers, federal courts provide a remedy. *See, e.g.*, *Seila L. LLC v. CFPB*, 591 U.S. 197, 211 (2020); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 492 (2010). In particular, courts do not hesitate to intervene when the executive branch seeks to unlawfully destroy an agency—which is precisely what the Executive is attempting here. *See, e.g.*, *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 52 (D.R.I. 2025), appeal dismissed, No. 25-1477, 2025 WL 3459538 (1st Cir. Nov. 25, 2025) (issuing preliminary injunction because the "[e]xecutive is usurping Congress's" "vested legislative authority to create and abolish federal agencies").

### III.    The Dissolution (or Supposed "Realignment") of CRS Was Arbitrary & Capricious

Defendants' wholesale disabling of CRS as a functioning agency is also arbitrary and capricious, because it was neither "reasonable" nor "reasonably explained." *See Ohio*, 603 U.S. at 292.

Even taking at face value Defendants' characterization of their actions as a "realignment" rather than a "dissolution"—which this Court need not do for the reasons previously stated—Defendants have failed to demonstrate "a rational connection between the facts found and the choice made" in adopting that so-called "realignment." *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (cleaned up). The available record provides no hint

27

that Defendants engaged in a reasoned analysis (or any analysis whatsoever) to reach their supposed conclusion that a single CRS employee could carry out CRS's statutory mission.

Nor did Defendants provide any explanation for why—even if they *could* legally operate CRS as a single-person referral service—it was reasonable to do so in light of CRS's mission, the dedicated funding that Congress provided, the communities CRS serves, and the reliance interests of those CRS had been assisting. *See R.I. Coal. Against Domestic Violence v. Kennedy*, No. 25-cv-342, 2025 WL 2988705, at *7 (D.R.I. Oct. 23, 2025) (rejecting elimination of agency programs where defendants "failed to achieve even [the] basic requirement" of a satisfactory explanation); *see also Rhode Island v. Trump*, 810 F. Supp. 3d 283, 306 (D.R.I. 2025) (rejecting decision to issue systematic RIFs where defendants "failed to provide even that minimal level of analysis"). As to the latter factor, Defendants were obligated, at a minimum, to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33. They entirely failed to do so.

Moreover, the Final ARRP Memo addresses the DOJ-wide reorganization only at the highest level of generality, stating that the numerous RIFs and reorganizations within the Department were aimed at "improv[ing] efficiency and achiev[ing] cost savings." AR at 305; Doc. No. 91-1 at 305. This generic and conclusory explanation—which is not tailored at all to CRS, its statutory mandate, or it long history of providing critical direct services to communities in crisis—falls well short of reasoned decisionmaking. It is the sort of "conclusion without premises" that other courts in this district have already found to be arbitrary and capricious. *See Ass'n of Am. Universities v. DoD*, 806 F. Supp. 3d 79, 111 (D. Mass. 2025). Moreover, because CRS has its own express appropriations, "cost savings" is an unsound basis to reduce CRS to a

28

single-person entity unable to offer core conciliation services to the public. *Cf. id.* at 114 (noting that an agency's desire for "cost savings" "cannot mean keeping money in DOD's pocket, since Congress decides appropriations, not Defendants").

In prior briefing, Defendants pointed to a memorandum by CRS employee Denise Nazaire, prepared in July 2025 for DOJ leadership, that offered "implementation considerations" for a proposed one-person CRS. AR at 269, Doc. No. 91-1 at 269. It is apparent from that memorandum that Ms. Nazaire was asked by DOJ leadership to *start* with the premise that CRS should have only one employee—a premise DOJ has never explained or justified, aside from their dislike of CRS's mission—and work backwards to what services might be offered within that significant constraint. Indeed, her memorandum confirms that, with the "constrained staffing" imposed by DOJ leadership, CRS cannot participate in any "sustained engagement" with the public (including any and all mediation) and will be reduced to little more than a webinar platform and referral clearinghouse. *Id.* at 270. The record is devoid of any reasoned explanation for these core direct services should be terminated, particularly when Congress provided funding to CRS to allow those services to continue.

Defendants also failed to grapple with numerous considerations and concerns raised by the then-head of CRS, Julius Nam, about the proposed "realignment." Among other things, Mr. Nam cautioned DOJ leadership that "CRS is already at a near-minimum level of personnel," AR at 345, ECF No. 92-2 at 4, going on to explain that "[t]he 36 employees in field offices represent a near-minimum level necessary to provide rapid responses to emergency situations arising in different parts of the Nation, in fulfillment of CRS's statutory mandates." *Id.* at 6. Mr. Nam also pointed to public statements by a prior CRS Director that warned that "the nation will be at greater risk of unrest, boycotts, and lawsuits without the Community Relations Service deployed

29

regionally across nation." AR at 556, Doc. No. 92-2 at 215. But Defendants not only failed to heed that warning but failed even to address the known risk of harm they were creating by disabling CRS's ability to work throughout the country. Nor did Defendants engage with Mr. Nam's explanation for why CRS—as an agency previously deemed to carry out "public safety" functions (including during the first Trump Administration)—was not exempt from Trump's Executive Order on that basis. AR at 343.

Mr. Nam also raised concerns that moving CRS within a litigating/prosecuting component (such as EOUSA) could conflict with CRS's confidentiality and non-enforcement obligations. AR at 389, 396, 418-421; Doc. No. 91-2 at 48, 55, 77-80; *see also* Supp. Nam Decl. ¶¶ 13–14, Doc. No. 33-11 at 7-8 (explaining why these obligations historically led CRS to maintain separation from prosecuting offices).[3] The record contains no evidence these concerns were considered, let alone how they were resolved.

Nor is there any explanation in the record for Defendants' abrupt reversal of course on the scope of CRS's statutory jurisdiction. Mr. Nam repeatedly outlined the series of statutes, following the Civil Rights Act of 1964, that expanded CRS's mandate. *See, e.g.*, AR at 344-45, 426, Doc. No. 92-2 at 3-4, 85. This interpretation was not unique to Mr. Nam but reflected the understanding of CRS and Congress for years, including during the first Trump Administration. *See* Supp. Nam Decl. ¶ 16, Doc. No. 96-4 at 8-9 &. Ex. D. Defendants were required not only to

---

[3] Defendants redacted significant portions of the administrative record, in particular, within communications involving Mr. Nam, purportedly based on the deliberative process privilege. Unredacted copies of some of those documents have been released by Congress, however, and they demonstrate that Defendants selectively invoked privilege. *See* Press Release, House Judiciary Committee, New Whistleblower Disclosure Suggests DOJ May Have Covered Up Public Safety Harms Caused by Dismantling of Hate Crime Prevention Office, https://democrats-judiciary.house.gov/media-center/press-releases/new-whistleblower-disclosure-suggests-doj-may-have-covered-up-public-safety-harms-caused-by-dismantling-of-hate-crime-prevention-office.

"provide a reasoned explanation for the change" in their position about the scope of these statutes, but also to "display awareness that [they were] changing position." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  They failed to do so.

In sum, other than the explanation set forth in the DOJ Performance Summary that Defendants now disclaim, Defendants failed at the basic task of "explain[ing] 'why it chose to do what it did,'" *Ass'n of Am. Universities*, 806 F. Supp. 3d at 114 (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001).  Accordingly, their disabling of CRS—regardless of what it is called—was arbitrary and capricious in violation of the APA.

## IV.    Defendants Have Unlawfully Withheld the Provision of Services Mandated by Law

Defendants' refusal to operate CRS or provide *any* direct services to the public also represents agency action unlawfully withheld, entitling Plaintiffs to an order compelling resumption of services.  Under 5 U.S.C. § 706(1), a court must "compel agency action unlawfully withheld" where the plaintiffs have identified one or more "discrete agency action[s]" that the agency is "required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted).  Defendants' refusal to provide any CRS services—despite the ostensible availability of more than 30 "CRS employees" to perform the work in the wake of the RIF rescission—fall squarely within that ambit.  As noted above, although the statute gives DOJ discretion to determine the specific instances in which it will provide services, it does not have discretion to provide *no* services at all. *Cf. Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 833 (D. Or. 2022) ("Agency action can involve the exercise of judgment and discretion and remain 'discrete' enough for a court to compel the action.") (cleaned up).  Moreover, as explained above, Congress has expressly allocated funding for these services in both FY2025 and FY2026.  The basic provision of services is both mandatory and sufficiently discrete to

31

require an order compelling its resumption. *Cf. Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1082 (9th Cir. 2016) (concluding that requirement to provide medical care to former test subjects was a "discrete" agency action the court could compel, even though the language of the regulation did not specify when, how, or for how long test subjects would receive care).

## V.   Plaintiffs Readily Meet Threshold Standards for Reviewability

### A.  Plaintiffs Have Standing

As a result of Defendants' decision to close CRS, Plaintiffs each lost government services they had previously enjoyed as a direct result of Defendants' dissolution of CRS and the winddown of services that directly resulted from that decision. *See* Nam Decl. ¶¶ 26, 29, Doc. No. 96-3 at 21-22 ("Had it not been for CRS's planned dissolution and DOJ leadership's direction to implement the elimination process quickly, CRS would have continued to provide each stakeholder with the requested services, including continuing consultation on the services provided during the following year.). This is a classic Article III injury.  As in *Rhode Island v. Trump*, Plaintiffs here "have been and will continue to be injured by the defendants' failure to provide services on which the plaintiffs rely." 155 F.4th 35, 44 (1st Cir. 2025).  Accordingly, they have standing irrespective of whether they are legally entitled to any particular CRS service in any particular instance. *See New York v. Kennedy*, 155 F.4th 67, 74 (1st Cir. 2025). (rejecting government's argument that plaintiffs lacked standing because they were "not statutorily entitled" to the services at issue).

### B.  Defendants Actions Constitute "Final Agency Action"

Defendants' dismantling of CRS constitutes "final agency action" subject to APA review, because it "mark[s] the consummation of the agency's decisionmaking process"—evidenced by, among other things, the Final ARRP Memo signed by the Attorney General—and represents

actions "by which rights or obligations have been determined, or from which legal consequences will flow." *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). These consequences include termination of employees, withdrawal of public services to Plaintiffs and others, and an acknowledged inability of CRS to resume certain services, such as mediation or other sustained public engagements, in light of the staffing constraints imposed by the RIF (and subsequent refusal to allow reinstated CRS employees to perform any CRS duties). It matters not whether these actions are labeled a "dissolution" (as Defendants stated in the RIF notice) or a "realignment." *See Cont'l Air Lines, Inc. v. C. A. B.*, 522 F.2d 107, 124 (D.C. Cir. 1974) ("The label an agency attaches to its action is not determinative" of its finality).

Any contention to the contrary is foreclosed by First Circuit precedent, including cases finding "final agency action" under closely analogous facts. In *New York v. Trump*, the Court of Appeals held that a series of decisions to implement broad, categorical freezes on obligated funds constituted final agency action, rejecting the government's claim that they amounted to an improper "programmatic" challenge to agency day-to-day operations. *New York v. Trump*, No. 25-1236, 2026 WL 734941, at *9, --F.4th-- (1st Cir. Mar. 16, 2026) (upholding preliminary injunction except to the extent it directed disbursement of funds); *see also* 133 F.4th 51, 68 (1st Cir. 2025) (denying stay of preliminary injunction). And in *New York v. Kennedy*, the First Circuit upheld, in the context of a motion to stay preliminary injunctive relief, the district court's conclusion that an agency reorganization—and the "resulting dismantling of sub-agencies"—was final agency action. 155 F.4th 67, 76 (1st Cir. 2025).

The finality of Defendants' actions is not undone because (they say) the details of the "realignment" are still "being actively worked out," Doc. No. 51 at 25, including following the congressionally-mandated rescission of the CRS RIF, *see* Doc. No. 85 at 3 (representing that

33

"specific plans for resumption of operations of CRS . . . are not yet set") (cleaned up). The existence of a final agency action is determined at the time a lawsuit is filed, and is not altered by subsequent actions by the government, including feints at reconsidering its position.[4] *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (rejecting argument that because agency decision "is subject to change, it is not binding and therefore not final action").

What matters is that DOJ adopted and executed a *definitive* plan to dismantle the agency, gambling that Congress would later ratify that decision and knowing that if Congress did not, DOJ could not comply with congressional directives as the agency is currently constituted (with a single employee performing CRS functions). *See* Lauria Decl. ¶ 13, Doc. No. 15-1 at 3-4 (conceding that if Congress funded CRS, DOJ would need to "reassess and consider how to comply"). DOJ's claim that its realignment is now "ongoing" reflects not a lack of finality but the collapse of the government's gamble—and confirmation that Defendants' actions were unlawful from the outset. Moreover, even if the only thing at stake were a *suspension* of CRS services (and it is not), there is ample authority that "an agency-imposed suspension of . . . activities constitutes final agency action," even where that moratorium "may eventually be lifted." *See New York v. Trump*, No. 25-cv-11221-PBS, 2025 WL 3514301, at *8 (D. Mass. Dec. 8, 2025) (collecting cases).

---

[4] To the extent Defendants contend that they have actually reversed their decision to disable CRS and have resumed CRS operations, including public services, that decision goes to whether the claims are moot, not whether they are final. *See Kingdom v. Trump*, No. 1:25-CV-691, 2025 WL 1568238, at *9 (D.D.C. June 3, 2025). Defendants have not made that argument to date. And in any event, Defendants would bear the burden of establishing mootness, and discovery would be necessary and appropriate to allow Plaintiffs to probe such a defense. *See Dep't of Commerce*, 588 U.S. at 781.

34

### VI.    Vacatur Is the Appropriate and Presumptive Remedy, and Compulsory Relief Is Also Warranted

Under the APA, a reviewing court "shall… set aside" unlawful agency action. 5 U.S.C. § 706(2).  Vacatur is the "presumptively appropriate" remedy where, as here, agency action is arbitrary, capricious, or contrary to law.  *See Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) (citing *FCC v. NextWave Personal Commc'ns Inc.*, 537 U.S. 293, 300 (2003); *see also Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002) ("vacation is a proper remedy when an agency fails to explain its reasoning adequately").  That remedy is warranted here.  Defendants' actions—whether characterized as a "dissolution," "realignment," or otherwise—effectively eliminated CRS's ability to perform the conciliation services Congress mandated and consistently funded.  Vacatur would appropriately nullify those actions.

Vacatur alone, however, is insufficient on this record.  Courts often remand to agencies without further equitable relief.  But that presumes an agency will comply with the law once its action is set aside.  Here, Defendants' conduct demonstrates the opposite.  Even after rescinding the RIF and restoring CRS personnel on paper, Defendants have continued to withhold CRS services, to decline to adopt any operational plan for resuming services, and to maintain the absurd position that CRS's only statutory duty is to provide an annual report to Congress.  In these circumstances, additional equitable relief is warranted to prevent ongoing violations of law and to ensure that vacatur is not rendered ineffectual.

As discussed above, Plaintiffs have shown that Defendants are unlawfully withholding the very services Congress directed CRS to provide—not on a case-by-case basis or in any valid exercise of judgment, but categorically.  An order compelling Defendants to resume services is not just appropriate, but is required under the APA.  *See South Carolina v. United States*, 907 F.3d 742, 756 (4th Cir. 2018) ("I]f a party has successfully demonstrated an unlawfully withheld

35

agency action under § 706(1), the court must enter an appropriate order and secure the agency's compliance with the law. . . regardless of equitable or policy considerations").

Injunctive relief is separately appropriate. Although the Supreme Court has cautioned against issuance of an injunction unless doing so would "have [a] meaningful practical effect independent of its vacatur," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), that standard is readily satisfied here. Defendants have not merely adopted an unlawful policy but have eliminated CRS's ability to carry out its congressionally mandated functions, a harm that vacatur alone will not fully remedy without affirmative relief restoring those functions. *Cf. Massachusetts v. NIH*, 164 F.4th 1, 9 (1st Cir. 2026) (upholding district court's entry of a permanent injunction where agency violated a congressionally enacted appropriations provision). It is therefore appropriate to order Defendants to restore CRS to functioning operation, consistent with its statutory mandate. *Cf. Custom Commc'ns, Inc. v. Fed. Trade Comm'n*, 142 F.4th 1060, 1074 (8th Cir. 2025) (rejecting party-specific vacatur of rule where necessary to address injury to plaintiffs).[5]

Dated: March 30, 2026

Respectfully Submitted,

*/s/ Kyle R. Freeny*
Kyle R. Freeny
(DC Bar No. 1684764 – *admitted pro hac vice*)
WASHINGTON LITIGATION GROUP
1717 K Street NW
Washington, DC 20006
Telephone: (202) 521-8750
KFreeny@WashingtonLitigationGroup.org

Ana Muñoz
(Mass. Bar No. 569233)

---

[5] To be clear, Plaintiffs are not seeking a "universal injunction" in the sense disapproved by the Supreme Court in *Trump v. CASA*, 606 U.S. 831, 856 (2025). Plaintiffs' injuries arise from the disabling of CRS and resulting wholesale cessation of services. Because CRS operates (or operated, until 2025) as a centralized, nationwide service provider, those injuries cannot be redressed through plaintiff-specific relief alone.

ZALKIND DUNCAN & BERNSTEIN LLP
2 Oliver Street, Suite 200
Boston, MA 02110
Telephone: (617) 742-6020
AMunoz@ZalkindLaw.com

*Counsel for Plaintiffs*

March 30, 2026

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon all attorneys of record by electronic filing on the above date.

<u>*/s/ Kyle R. Freeny*</u>
Kyle R. Freeny