**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

ETHICAL SOCIETY OF POLICE, *et al.*,

               Plaintiffs,

     v.

TODD BLANCHE, in his official capacity
as Acting Attorney General of the United
States, *et al.*,

               Defendants.

No. 1:25-cv-13115-IT

**<u>DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS,  OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

BACKGROUND .................................................................................................................. 3

I.      Statutory Background .............................................................................................. 3

        A.      Congress Crafted a Triple-Discretionary CRS Statute. ........................................ 3

        B.      Congress did not "direct" CRS through other statutes or otherwise limit its
                discretionary functions ........................................................................................... 4

II.     Factual Background .................................................................................................. 5

        A.      The Reorganization and Transfer of CRS to EOUSA ........................................... 5

        B.      CRS Today.............................................................................................................. 9

III.    This Litigation.......................................................................................................... 10

LEGAL STANDARDS ....................................................................................................... 11

ARGUMENT......................................................................................................................... 11

I.      The Case is Not Justiciable..................................................................................... 11

        A.      Plaintiffs Lack Standing to Challenge CRS's Overall Operations........................ 11

        B.      Plaintiffs' Claims Are Moot.................................................................................... 14

        C.      Plaintiffs' Claims Regarding Potential Future Injury Are Not Ripe...................... 16

II.     Plaintiffs Are Not Entitled to Relief under the APA .......................................... 19

        A.      The Challenged Actions Are Committed to Agency Discretion and
                Therefore Unreviewable .......................................................................................... 19

        B.      Plaintiffs Fail to Allege Qualifying "Final Agency Action" Under the APA....... 22

                1.      CRS's reorganization is not discrete agency action subject to APA
                        review...................................................................................................... 23

                2.      Any discrete agency action is not final for APA purposes ...................... 26

                3.      Plaintiffs Fail to Show that Agency Action Must Be Compelled
                        Under the APA........................................................................................ 28

III.    Plaintiffs' Claims Fail............................................................................................. 29

        A.      Plaintiffs' APA Claims Fail on the Merits............................................................. 29

ii

        1.     Defendants' Actions Were Not Arbitrary and Capricious ........................ 30

        2.     Plaintiffs Fail to Show that Defendants' Actions Were 'Not in Accordance with Law' or 'In Excess of Statutory Authority.' ................. 31

   B.    Plaintiffs' Constitutional Claim Fails ...................................................... 32

   C.    Plaintiffs' *Ultra Vires* Claim fails........................................................... 34

IV.   Remedy ................................................................................................................. 35

   A.    Plaintiffs Have Abandoned their Claim for a Permanent Injunction—and they Fail to Show Irreparable Harm in any event. ................................... 35

   B.    Neither Vacatur nor Compulsory Relief Are Appropriate or Warranted ............. 36

CONCLUSION ................................................................................................................. 39

# TABLE OF AUTHORITIES

**Cases**

*Adim v. Bragg*,
  2024 WL 4467193 (S.D.N.Y. Oct. 7, 2024)............................................................................ 13

*African Cmtys. Together v. Noem*,
  2026 WL 948591 (D. Mass. Apr. 8, 2026), *appeal filed*, No. 26-1376 (1st Cir. Apr. 10, 2026)22

*AFSCME  v. U.S. OMB*,
  813 F. Supp. 3d 944 (N.D. Cal. 2025) ..................................................................................... 10

*American Federation of Teachers, AFL-CIO v. Davis*,
  --- F. Supp. 3d. ---, 2025 WL 3763813 (S.D.N.Y. Dec. 30, 2025), *appeal filed sub nom.
  American Federation of Teachers, AFL-CIO v. Goldstein,* No. 26-461 (2d Cir. Mar. 2,
  2026) ................................................................................................................. 20, 21, 31

*Anderson v. SUNY*,
  2024 WL 3656551 (S.D.N.Y. July 29, 2024)........................................................................... 13

*Animal Welfare Inst. v. Martin*,
  668 F. Supp. 2d. 254 (D. Maine 2009).................................................................................... 35

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000)............................................................................................... 26

*Appalachian Voices v. FERC*,
  139 F.4th 903 (D.C. Cir. 2025) ............................................................................................... 30

*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*,
  Nos. 1:25-cv-00999 & 1:25-cv-01266, 2026 WL 523023 (D.D.C. Feb. 25, 2026)................. 25

*Association for Education Finance  & Policy, Inc. v. McMahon*,
  786 F. Supp. 3d 13 (D.D.C. 2025) ............................................................................... 24, 25, 33

*Bennett v. Spear*,
  520 U.S. 154 (1997)................................................................................................................. 26

*Biden v. Texas*,
  597 U.S. 785 (2022)........................................................................................................... 24, 26

*Bloch v. Powell*,
  348 F.3d 1060 (D.C. Cir. 2003)............................................................................................... 30

*Boston Bit Labs, Inc. v. Baker*,
  11 F.4th 3 (1st Cir. 2021) ........................................................................................................ 15

iv

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974)..................................................................................................... 30

*Bowster v. Noem*,
  2026 WL 555624 (D. Mass. Feb. 27, 2026)..................................................................... 22, 23

*City of Erie v. Pap's A.M.*,
  529 U.S. 277 (2000)..................................................................................................... 14

*Corrigan v. Boston Univ.*,
  98 F.4th 346 (1st Cir. 2024) ......................................................................................... 15

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)..................................................................................................... 14

*Dalton v. Specter*,
  511 U.S. 462 (1994)..................................................................................................... 32, 33

*DeVillier v. Texas*,
  601 U.S. 285 (2024)..................................................................................................... 32

*DHS v. New York*,
  589 U.S. 1173 (2020)................................................................................................... 38

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
  45 F.3d 530 (1st Cir.1995) ........................................................................................... 17, 18

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)..................................................................................................... 30, 31

*Fernandez v. Brock*,
  840 F.2d 622 (9th Cir. 1988)......................................................................................... 20

*Gastelum v. Kohl's Inc.*,
  2023 WL 2575825 (E.D. Cal. Mar. 20, 2023)..................................................................11

*Gill v. Whitford*,
  585 U.S. 48 (2018)....................................................................................................... 38

*Global Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025) ......................................................................................... 33, 37

*Gulf Oil Corp. v. Brock*,
  778 F.2d 834 (D.C. Cir. 1985)....................................................................................... 38

*Hayes v. BNY Mellon*,
  621 F. Supp. 3d 162 (D. Mass. 2022) .............................................................................11

v

*Heckler v. Chaney*,
  470 U.S. 821 (1985)................................................................................................. 19, 29

*Himes v. Johnson*,
  772 F. Supp. 678 (D. Me. 1991)....................................................................................... 18

*In re Bluewater Network*,
  234 F.3d 1305 (D.C. Cir. 2000).......................................................................................... 28

*In re Core Commc'ns, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008)............................................................................................ 28

*Kingdom v. Trump*,
  No. 1:25-CV-691, 2025 WL 1568238 (D.D.C. June 3, 2025) ................................................. 26

*Labor Rels. Div. of Constr. Indus. v. Healey*,
  844 F.3d 318 (1st Cir. 2016) .............................................................................................. 16

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)........................................................................................................... 19

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)........................................................................................................... 12

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990).................................................................................................. *passim*

*Lyman v. Baker*,
  954 F.3d 351 (1st Cir. 2020) .............................................................................................. 13

*Make the Rd. N.Y. v. Noem*,
  No. 25-5320, 2025 WL 3563313  (D.C. Cir. Nov. 22, 2025)................................................... 22

*McInnis-Misenor v. Me. Med. Ctr.*,
  319 F.3d 63 (1st Cir. 2003) ..................................................................................... 17, 18, 19

*Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of Milwaukee*,
  708 F.3d 921 (7th Cir. 2013)............................................................................................... 14

*Morales v. Noem*,
  791 F. Supp. 3d 100 (D. Mass. 2025) ...................................................................................11

*Murthy v. Missouri*,
  603 U.S. 43 (2024)............................................................................................................. 12

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003)........................................................................................................... 17

*New York v. Kennedy*,
   155 F.4th 67 (1st Cir. 2025) .................................................................................... 14

*New York v. U.S. DHS*,
   969 F.3d 42 (2d Cir. 2020) ..................................................................................... 35

*Newma v. Santander Bank, N.A.*,
   548 F. Supp. 3d 237 (D. Mass. 2021) ......................................................................11

*Norton v. S. Utah Wilderness Alliance* ("*SUWA*"),
   542 U.S. 55 (2004)........................................................................................... *passim*

*NRC v. Texas*,
   605 U.S. 665 (2025)................................................................................................. 34

*Nulankeyutmonen Nkihtaqmikon v. Impson*,
   503 F3d 18 (1st Cir. 2007) ..................................................................................... 16

*Ortiz-Bonilla v. Federacion de Ajedrez de P.R., Inc.*,
   734 F.3d 28 (1st Cir. 2013) ..................................................................................... 35

*Patel v. Johnson*,
   2 F. Supp. 3d 108 (D. Mass. 2014) ..........................................................................11

*President & Fellows of Harv. Coll. v. HHS*,
   798 F. Supp. 3d 77 (D. Mass. Sept. 3, 2025) .......................................................... 34

*Project Veritas Action Fund v. Rollins*,
   982 F.3d 813 (1st Cir. 2020) ................................................................................... 16

*Puerto Rico v. United States*,
   490 F.3d 50 (1st Cir. 2007) ..................................................................................... 22

*Racing Enthusiasts & Suppliers Coal. v. EPA*,
   45 F.4th 353 (D.C. Cir. 2022) ............................................................................ 27, 28

*Raines v. Byrd*,
   521 U.S. 811 (1997)................................................................................................. 12

*Ramirez v. Sanchez Ramos*,
   438 F.3d 92 (1st Cir. 2006) ................................................................................ 13, 14

*Rhode Island v. Trump*,
   155 F.4th 35 (1st Cir. 2025) .................................................................................... 14

*Rhode Island v. Trump*,
   810 F. Supp. 3d 283 (D.R.I. 2025), *appeal filed*, No. 26-1070 (1st Cir. Jan. 21, 2026) ........... 25

*Risinger v. Concannon*,
117 F. Supp. 2d 61 (D. Me. Oct. 12, 2000) ................................................................................ 19

*Rodriguez v. DeBuono*,
175 F.3d 227 (2d Cir. 1999) ........................................................................................................ 35

*Rural Development Innovations Ltd. v. Marocco*,
2026 WL 710260 (D.D.C. Mar. 13, 2026) .......................................................................... *passim*

*Rusnak v. United States*,
2026 WL 809985 (D.D.C. Mar. 24, 2026) ............................................................................. 19, 21

*Salazar v. King*,
822 F.3d 61 (2d Cir. 2016) ...................................................................................................... 19, 20

*Sampson v. Murray*,
415 U.S. 61 (1974) ....................................................................................................................... 35

*Schlesinger v. Reservists Comm. to Stop the War*,
418 U.S. 208 (1974) ..................................................................................................................... 13

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ..................................................................................................................... 12

*Stern v. U.S. Dist. Court*,
214 F.3d 4 (1st Cir. 2000) ....................................................................................................... 17, 21

*Texas v. Cardona*,
743 F. Supp. 3d 824 (N.D. Tex. 2024) .................................................................................... 22, 26

*Town of Chester v. Laroe Ests., Inc.*,
581 U.S. 433 (2017) ..................................................................................................................... 13

*Town of Portsmouth v. Lewis*,
813 F.3d 54 (1st Cir. 2016) ..................................................................................................... 15, 16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ..................................................................................................................... 12

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ..................................................................................................................... 38

*Trump v. Hawaii*,
585 U.S. 667 (2018) ..................................................................................................................... 39

*Trump v. New York*,
592 U.S. 125 (2020) ..................................................................................................................... 17

viii

*Union 219, Retail Clerks Int'l Ass'n. v. NLRB,*
   265 F.2d 814 (D.C. Cir. 1959)................................................................................. 3

*Webster v. Doe,*
   486 U.S. 592 (1988)............................................................................................... 21

*Weichel v. Town of Braintree,*
   2022 WL 17852109 (D. Mass. Dec. 22, 2022) ...................................................... 17

*XY Planning Network, LLC v. U.S. SEC,*
   963 F.3d 244 (2d Cir. 2020) .................................................................................. 20

**<u>Statutes</u>**

5 U.S.C. § 551........................................................................................................ 23, 24

5 U.S.C. § 701(a)(2).................................................................................................... 19

5 U.S.C. § 704.......................................................................................................... 22, 23

5 U.S.C. § 706(1) ................................................................................................ 2, 28, 29

18 U.S.C. § 247.............................................................................................................. 5

18 U.S.C. § 249.............................................................................................................. 5

29 U.S.C. § 158(d) ............................................................................................ 20, 31, 32

29 U.S.C. § 173(b) .......................................................................................... 3, 4, 20, 21

42 U.S.C. Ch. 21 ............................................................................................................ 4

42 U.S.C. § 2000a-3(d) .................................................................................................. 5

42 U.S.C. § 2000g................................................................................................. 3, 6, 29

42 U.S.C. § 2000g-1 ............................................................................................. 3, 4, 21

42 U.S.C. § 2000g-2 .................................................................................................... 3, 5

42 U.S.C. § 3608(e)(4).................................................................................................... 5

Church Arson Prevention Act (CAPA),
   Pub. L. No. 104-155, 110 Stat. 1392 (1996).............................................................. 5

Civil Rights Act of 1964,
   Pub. L. No. 88-352...................................................................................................... 3

Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026,
2026, Pub. L. No. 119-74, 140 Stat. 5 ................................................................................... 9, 34

Emmett Till Unsolved Civil Rights Crimes Reauthorization Act of 2016,
Pub. L. No. 114-325, 130 Stat. 1965 ....................................................................................... 5

Labor Management Relations Act,
Pub. L. No. 80-101, 61 Stat. 136, 153-54 (1947) ........................................................................ 3

Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act  (HCPA),
Pub. L. No. 111-84, 123 Stat. 2190 (2009).................................................................................. 5

Message of the President, Accompanying Reorganization Plan No. 1 of 1966,
eff. Apr. 22, 1966, 31 Fed. Reg. 6187, 80 Stat. 1607, 5 U.S.C. app. at 97 (Feb. 10, 1966)........ 6

## Rules

Fed. R. Civ. P. Rule 12(c)................................................................................................................. 39

## Administrative and Executive Materials

28 C.F.R. § 0.30 ............................................................................................................................... 4

28 C.F.R. § 0.31 ............................................................................................................................... 4

28 C.F.R. § 0.32 ............................................................................................................................... 4

Exec. Order No. 14,210,
90 Fed. Reg. 9669 (Feb. 11, 2025) ............................................................................................ 6

## Other Authorities

Just. Mgmt. Div., U.S. Dep't of Just., *Fiscal Year 2026 Budget and Performance Summary* (June 13, 2025),
*available at*  https://perma.cc/4F2P-XCE2 ................................................................................... 7

OMB, *Technical Supplement to the 2026 Budget Appendix* at 607 (2025,
*available at*  https://perma.cc/8TPJ-WUHY .................................................................................. 7

Plaintiffs—ten community organizations that have received or sought services from the Community Relations Service (CRS) over the years—sued the Department of Justice in late 2025, alleging that through a CRS reduction-in-force and other measures undertaken to comply with an Executive Order, the Department was unlawfully "abolishing, "dismantling," or "dissolving" CRS, eliminating services to Plaintiffs and more broadly, to the public. On that premise, Plaintiffs sought broad relief under the Administrative Procedure Act and other theories, including an order halting the alleged "wholesale dissolution of the agency and its functions," rescinding the CRS RIF, and reinstating CRS personnel.  But this premise for Plaintiffs' claims was unfounded from the outset or has been resolved unilaterally by the Department in the interim.

The factual record in May 2026 tells a far different story than the stale version of events advanced by Plaintiffs based on allegations from late 2025, when CRS temporarily halted operations. The Department has rescinded the CRS RIF and restored CRS operations, now carried out in more concentrated fashion under the Executive Office for United States Attorneys (EOUSA). And the Department has resumed the provision of many CRS services, albeit at lower volume. In fact, CRS has been providing services to multiple non-party organizations in response to their requests from February 2026. Meanwhile, most of the Plaintiffs so far have declined to resubmit requests for the CRS services they allege they have been deprived of. While the President has proposed elimination of CRS altogether based on misalignment with Administration priorities, CRS will continue to operate unless and until Congress legislatively eliminates it. Thus, far from the narrative advanced by Plaintiffs at the outset, the core dispute is now whether CRS is providing the volume and type of services Plaintiffs believe it should be.  But that is not a legally cognizable dispute.

At the threshold, there is no case-or-controversy that would provide jurisdiction over Plaintiffs' claims for at least three reasons.  First, Plaintiffs cannot show standing to challenge how

1

CRS is structured, staffed, and operated—and they have standing only as to their own claimed injuries. Second, the case is moot. Contrary to Plaintiffs' assertions, CRS is operational, has not been "dissolved," and will continue to operate unless and until Congress legislatively eliminates it.  Finally, even if Plaintiffs could show standing and evade mootness, they cannot show that their claims are ripe.  At any time, they can re-submit their requests to CRS to resume any lost or interrupted services, yet most have not done so.  (By contrast to multiple non-party organizations, several of which have requested and are receiving services from CRS.)  Beyond that, Plaintiffs cannot show jurisdiction over their APA claims for additional reasons: they cannot overcome the "committed to agency discretion by law" and the "final agency action" bars to judicial review, and they cannot meet the exacting standards required to show agency action unlawfully withheld under 5 U.S.C. § 706(1).  Across the board, Plaintiffs fail to carry their burden of establishing jurisdiction over each of their claims.

Plaintiffs' claims likewise fail on the merits. They cannot show any violation of the APA, they lack a cause of action for their 'freestanding' constitutional claim, and they cannot satisfy the stringent requirements for their *ultra vires* claim.

Finally, while the Complaint includes a request for permanent injunctive relief, Plaintiffs' opening summary judgment brief abandons that request, making no mention of any permanent injunction demand. More broadly, the harms Plaintiffs allege and the relief they do seek in their opening brief are starkly mismatched. Plaintiffs simply fail to show how the Court could craft any workable remedy here, where CRS's underlying statute makes clear that all the functions relevant here are discretionary rather than mandatory.

Thus, the Court should grant Defendants' Rule 12(c) motion for judgment on the pleadings or, alternatively, grant it summary judgment and deny Plaintiffs' motion for summary judgment.

## BACKGROUND

I.      **Statutory Background**

A.      **Congress Crafted a Triple-Discretionary CRS Statute.**

Congress created CRS through Title X of the Civil Rights Act of 1964, Public Law 88-352

(July 2), 42 U.S.C. § 2000g, *et seq.* (the Civil Rights Act), to "provid[e] conciliation assistance"

(42 U.S.C. § 2000g-2), and it gave the agency a discretionary, rather than mandatory, function in

"resolving disputes, disagreements, or difficulties":

> It **shall be the function of the Service to provide assistance to** communities and persons therein in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin which impair the rights of persons in such communities under the Constitution or laws of the United States or which affect or may affect interstate commerce.  The Service **may offer its services** in cases of such disputes, disagreements, or difficulties whenever, **in its judgment**, peaceful relations among the citizens of the community involved are threatened thereby, and **it may offer its services** either upon its own motion or upon the request of an appropriate State or local official or other interested person.

42 U.S.C. § 2000g-1 (Functions of Service) (emphasis added).

Congress did not draft this from scratch, but used the discretionary language in the statute

for the Federal Mediation and Conciliation Service (FMCS), which also provides conciliation

services—but giving CRS even further discretion. In relevant part:

> It shall be the **duty** of the Service, in order to prevent or minimize interruptions of the free flow of commerce growing out of labor disputes, to assist parties to labor disputes in industries affecting commerce to settle such disputes through conciliation and mediation.
>
> * * * *
>
> The Service **may** proffer its services in any labor dispute in any industry affecting commerce, either upon its own motion or upon the request of one or more of the parties to the dispute, whenever **in its judgment** such dispute threatens to cause a substantial interruption of commerce.

Labor Management Relations Act, Pub. L. No. 80-101, 61 Stat. 136, 153-54 (1947), 29 U.S.C. §

173(b) (emphasis added).  Thus, "under … § 173(b), the [FMCS] is given a discretionary and not

a mandatory function in proffering its services in a labor dispute[.]"*Local Union 219, Retail Clerks*

3

*Int'l Ass'n. v. NLRB*, 265 F.2d 814, 817-18 (D.C. Cir. 1959).

In crafting the CRS statute, Congress declined to impose any express "duty" similar to FMCS, providing instead CRS's "function." *Compare* 42 U.S.C. § 2000g-1 (Functions of Service), with 29 U.S.C. § 173(b) (Functions of Service). That is, Congress designated CRS's *purpose*, not any mandatory "duty." Congress also made the CRS statute triple-discretionary—deferring to the agency's "judgment," but also twice using the word "may" in the same sentence. *Id*.

Congress imposed no mandatory functions across the remainder of the scheme, apart from requiring that CRS submit an annual report to Congress. The CRS subchapter in the Civil Rights Act, 42 U.S.C. Ch. 21, Subchapter VIII, comprises only four short parts:

- *§ 2000g* establishes CRS, which "shall be headed by a Director who shall be appointed by the President with the advice and consent of the Senate for a term of four years"; and who is "authorized to appoint" other personnel "as may be necessary to enable the Service to carry out its functions and duties[.]" *Id*.

- *§ 2000g-1* designates CRS's purpose and authorizes it to offer services at its discretion.

- *§ 2000g-2* establishes parameters around CRS's conduct when it offers its services: it "shall, whenever possible, in performing its functions, seek and utilize the cooperation of appropriate State or local, public, or private agencies;" *Id*. § 2000g-2(a); it is subject to confidentiality obligations, *id*. § 2000g-2(b), and it is prohibited from performing "investigative or prosecuting functions." *Id.*

- § 2000g-3 requires CRS to submit to Congress an annual report of its activities during the preceding fiscal year.

CRS's three (short) regulations likewise do not impose any further mandatory functions. *See* 28 CFR §§ 0.30, 0.31, and 0.32.

**B.    Congress did not "direct" CRS through other statutes or otherwise limit its discretionary functions**

Plaintiffs assert that other statutes "directed" CRS to undertake other roles—and that "[o]ver, over, and over again, Congress . . . *expanded* CRS's . . . duties." See Pls.' Mem of Law in Supp. of Mot. for Summ. J. ("Br.") 4, 27 (ECF No. 108). This is incorrect. To start:

- *Church Arson Prevention Act* (CAPA) "authorized" funding to Treasury and DOJ, including

CRS, for FY 1996 and 1997, as "necessary to increase the number of personnel, investigators, and technical support personnel to investigate, prevent, and respond to potential violations of [18 USC § 247 (damage to religious property) and [18 USC § 247 (arson and explosive related crimes)." *See* Pub. L. No. 104-155, § 6, 110 Stat. 1392, 1394 (1996).

- *Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act* (HCPA) "authorized" funding to DOJ, including CRS, for FY 2010-2012, as "necessary to increase the number of personnel to respond to alleged violations" of 18 U.S.C. § 249—the hate crime covering race, color, national origin, gender, gender identity, sexual orientation, religion, or disability. Pub. L. No. 111-84, §§ 4706, 4707, 123 Stat. 2190, 2838 (2009).

CAPA and HCPA provide no indication that Congress intended for CRS to perform any role in investigating or responding to church arson and hate crimes, respectively, as opposed to other parts of DOJ and Treasury that would normally do so. As noted, the Civil Rights Act prohibits CRS from engaging in investigative and prosecutorial functions. 42 U.S.C. § 2000g-2(b).

The Emmett Till Unsolved Civil Rights Crimes Reauthorization Act of 2016 (Br. 4) does provide that CRS "shall provide technical assistance by bringing together law enforcement agencies and communities to address tensions raised by Civil Rights era crimes;" Pub. L. No. 114-325 (2016), § 2, 130 Stat. 1965, 1967. The Fair Housing Act (*see* Br. 4) imposes statutory obligations on the Secretary of Housing and Urban Development (HUD), not on CRS, and does not even authorize appropriations for CRS. *See* 42 U.S.C. § 3608(e)(4). And the Civil Rights Act itself simply provides that district courts *may* refer cases of public accommodation discrimination to CRS to conduct settlement proceedings; 42 U.S.C. § 2000a-3(d); if they do so, CRS "is *authorized* to make a full investigation . . . and *may* hold such hearings with respect thereto as may be necessary" as part of "bring[ing] about a voluntary settlement between the parties," but is not *required* to do so. *Id.* § 2000a-4 (emphasis added).

## II.    Factual Background

### A.    The Reorganization and Transfer of CRS to EOUSA

Upon taking office, the President issued an Executive Order, *Establishing and*

*Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, instructing agency heads to identify, among other things, whether any agency subcomponents "should be eliminated or consolidated." Exec. Order No. 14,210, § 3(e), 90 Fed. Reg. 9669, 9670 (Feb. 11, 2025).[1] On March 25, 2025, in response to the Executive Order, the Deputy Attorney General issued a proposal addressing various DOJ components, including CRS: "Eliminating CRS: eliminating the Community Relations Service and moving some or all impacted employees to U.S. Attorneys' Offices." *See* Administrative R., ECF Nos, 92, 92-1, & 92-3 ("AR") AR0001-02 (*Soliciting Feedback for Agency Reorganization Plan and RIF*). In the following weeks, much of the CRS workforce voluntarily departed. *See* AR0443 ("33 employees have either resigned, retired, or been placed on administrative leave under the Deferred Resignation Program," while "22 employees remain in CRS"). CRS also began withdrawing from services, and categorically denying new requests between May and October 2025. *See* Second Decl. of Denise W. Nazaire Decl. ("2nd Nazaire Decl.") ¶ 3, ECF No. 116. Around this time, CRS produced deliberative memoranda proposing different approaches to its future work. AR0443 (April 25 memorandum titled *Community Relations Service: Planned Elimination and Fulfillment of Its Statutory Functions*); *see also* AR0559.

On May 30, DOJ's Justice Management Division (JMD) Budget Staff issued DOJ's 2025 Spend Plan, explaining that "the Department's [Agency RIF and Reorganization Plan (ARRP)] includes the disestablishment of . . . CRS [as well as Office for Access to Justice (ATJ) and

---

[1] CRS was originally housed in the Commerce Department, as specified in the Civil Rights Act of 1964, 42 USC § 2000g, but transferred to the DOJ under the Reorganization Plan of 1966. In his explanatory message to Congress regarding the transfer, President Johnson stated that "[T]he Attorney General will provide for the organization of the Community Relations Service as a separate unit within the Department of Justice." Message of the President, Accompanying Reorganization Plan No. 1 of 1966, eff. Apr. 22, 1966, 31 Fed. Reg. 6187, 80 Stat. 1607, 5 U.S.C. app. at 97 (Feb. 10, 1966).

Organized Crime Drug Enforcement Task Force (OCDETF)] as standalone components in FY 2026." AR0004, at AR0022; *see also*, AR00147-149. That same day, the White House, through OMB, issued a "Technical Supplement to the 2026 Budget: Appendix," explaining that "reorganization will eliminate [CRS] and its functions in FY 2025, so no funding is requested in FY 2026 for CRS[,]" and proposing the statutory elimination of CRS.[2]

About two weeks later, on June 13, DOJ published a Budget and Performance Summary for FY 2026, which, consistent with the President's budget request, requested no funding for CRS for FY 2026 and outlined proposed ARRP actions, including for CRS: "The Department will eliminate CRS and its functions, a total of 56 positions. The CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities."[3]

Meanwhile, a July 3 CRS memorandum explained DOJ's "proposed reorganization plan for CRS consist[ing] of the elimination of the component as a stand-alone entity, transfer of CRS's statutory functions to EOUSA, and designation of a single employee in EOUSA to fulfill CRS's day-to-day functions." AR0269 (*Implementation Considerations for the Department's Proposed [ARRP] for the [CRS]*). "Under the Department's proposed transfer of function plan for CRS, EOUSA would assume two core functions of CRS: (1) conciliation and (2) annual report to Congress." AR0270. This memorandum elaborated:

> *Conciliation*
> While housed in EOUSA, [CRS's National Program Manager (NPM)] could reasonably provide some, though not all, of the conciliation services traditionally offered by CRS . . . . Specifically, the NPM could continue to deliver core services such as conciliation in select community conflict cases (particularly in situations where the need for federal involvement is clear and manageable), training and program development, and stakeholder engagement. . . .

---

[2] *See* OMB, *Technical Supplement to the 2026 Budget Appendix* at 607 (2025), *available at* https://perma.cc/8TPJ-WUHY (at pdf 613/1224); id. at 636 (at pdf 642/1224).
[3] Just. Mgmt. Div., U.S. Dep't of Just., *Fiscal Year 2026 Budget and Performance Summary* (June 13, 2025), at 8-9, 113, *available at* https://perma.cc/4F2P-XCE2 (at pdf 18-19/258 and 125/258, respectively).

> However, given the proposed reduction to a single employee, CRS would no longer be positioned to offer facilitated dialogues and mediation services. Facilitated dialogues and mediations typically require sustained engagement, intensive case management, and the flexibility to respond to evolving dynamics between parties.

*Id*.  Thus, the memorandum contemplated transitioning CRS "from a reactive to a proactive model," "while ensuring that CRS's core mandates continue to be advanced through strategic partnerships and local ownership of community conflict resolution."  AR0271.

On September 16, the Attorney General signed the final ARRP, which included the transfer of CRS to EOUSA.  AR0304 (*Implementation of the Fiscal Year (FY) 2025 [ARRP]*).  This followed DOJ's July 2025 notification to Congress that DOJ "intends to eliminate" CRS (along with ATJ and OCDETF) after September 30, 2025.[4]  AR0290.  The final ARRP memorandum "authorize[s] the transfer of functions and RIFs that were part of [DOJ's FY 2025 operating plans]."  AR0304.  The memorandum explained that "CRS will reduce its functions to the statutory minimum":

> Although statutory change will be necessary to eliminate CRS as a component and eliminate the position of CRS Director as a Presidential appointment requiring Senate confirmation (PAS) position, this realignment is a first step that furthers the Administration's plans with respect to CRS. . . .  Only one employee is expected to transfer with this function, which is the minimum required to perform the statutory functions. . . .

AR0307.

On September 29, DOJ set forth its legal rationale on the CRS reorganization, explaining the EOUSA realignment proposal and concluding that it "is occurring consistently with legal requirements."  AR0332.  The memorandum explained that DOJ will "ensure that within EOUSA, CRS continues all necessary statutory functions and maintains its status as a separate unit, albeit

---

[4]  The notice stated:  "The Department's plans include that no employees are onboard in CRS by September 30, 2025. Reassignment of current CRS personnel to other vacant, funded positions is planned, but the current hiring freeze and other factors may impact who moves to other positions. The Department will conduct a RIF of CRS employees if necessary. . . ." AR0290.

8

one that reports to the EOUSA Director." *Id.* It also echoed the ARRP memo: "We recognize that a statutory change will be necessary to eliminate CRS . . . Therefore, the realignment is merely a first step that furthers the Administration's plans with respect to CRS." *Id.* Given Congress's budgetary impasse at that time, the memorandum added, "[W]e recognize that we may need to reassess the situation once our appropriations are enacted. If funding is provided for CRS during a Continuing Resolution or a full-year appropriation, we will consider how to legally expend such funds consistent with the enactment" AR0333.

On the same day, September 29, DOJ sent RIF notices to fourteen of the remaining fifteen active CRS employees to be effective on October 31. *See* Decl. of Jonathan Pelletier ("Pelletier Decl.") ¶ 4, ECF No. 85-1; Decl. of Jolene Ann Lauria ¶¶ 3-4, ECF No. 75-1. Although these employees separated effective October 31, they later were reinstated, as detailed below.

On November 2, in execution of the Department's plan, CRS and its functions were transferred to EOUSA. There, Ms. Nazaire undertook administrative and operational duties in connection with the reorganization. *See* 2d Nazaire Decl. ¶ 2. In December, CRS launched a new phone number and email address, resumed review of service requests dating back to November 2, and continued reviewing new requests, subject to realignment-related delays. *Id.* ¶¶ 2-3.

And on January 23, 2026, Congress funded CRS, enacted the final FY 2026 appropriations for DOJ, which provided for $20 million to CRS. *See* Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, 140 Stat. 5.

### B.   CRS Today

Today, CRS is actively reviewing and undertaking service requests. *See* 2nd Nazaire Decl., ¶¶ 3, 5, 6-8. So far in 2026, CRS has received 22 requests for services, and three of these requests, each from February 2026, progressed to a "case stage":

9

- A now-completed U.S. Attorney's Office request for assistance in planning a forum addressing religious discrimination and hate crimes against faith communities.

- A now-completed local government organization request for help supporting community dialogue and meetings to strengthen conflict prevention, community engagement, and de-escalation strategies amid protests and community tensions.

- An ongoing request from a U.S. armed forces entity seeking assistance in addressing reports of harassment and discrimination based on race, national origin, and religion experienced by service members and their families.

*Id*. ¶ 7-9, ¶ 9(a)-(c) (explaining Ms. Nazaire's specific role and actions in each of these).

Ms. Nazaire, who moved with CRS, is the sole CRS employee discharging these responsibilities. *Id*. ¶¶ 1, 9, 11, 12(c). But including her, at the time of the February 11, 2026 Pelletier Declaration, CRS had 32 employees, including 31 whose removals were rescinded on January 9, 2026. *See* Pelletier Decl. ¶ 4.[5] That number included nine previously removed CRS employees who were reinstated retroactive to November 1, 2025, and returned to duty status on February 9, 2026. *See* Pelletier Decl. ¶ 4. It also included six and sixteen employees reassigned from ATJ and OCDETF, respectively. *Id*. (Some of these employees have since departed DOJ, and those employees from ATJ and OCDETF are not expected to assume CRS duties or be paid out of CRS funding).  The remainder (of those 31 employees) are on detail elsewhere within EOUSA for approximately 90 days, undergoing developmental training for integration into EOUSA, given their lack of EOUSA experience. *Id*. ¶ 5.

## III.   This Litigation

In anticipation of the October 31 effective date of the RIFs, Plaintiffs sued on October 24, 2025.  *See* Doc. 1.  As noted, Plaintiffs are ten community organizations which allege they had

---

[5] Contrary to Plaintiffs' argument, the RIF recissions were not "congressionally-mandated." *See* Br. 33. The Continuing Resolution, which ended the lapse in appropriations, did not explicitly require recission of RIF notices like these, which were noticed on September 29, 2025 prior to the October 1 lapse in appropriations.  Nevertheless, CRS voluntarily rescinded the recissions following the ruling about the Continuing Resolution in separate litigation.  *See AFSCME v. U.S. OMB*, 813 F. Supp. 3d 944 (N.D. Cal. 2025).

received or sought services from CRS, or were in discussions with CRS, and then lost those services in 2025 as CRS was winding down prior to the reorganization.  *See* Compl. ¶¶ 65-75. Plaintiffs assert three APA claims, and a constitutional and an ultra vires claim (as well as a declaratory judgment claim), resting each on the premise that Defendants are "eliminating" (or abolishing or dissolving) CRS without congressional authority. *See* Compl. ¶¶ 6, 56, 80.  For the APA claims, the Complaint asserts that "Defendants' dissolution of CRS constitutes final agency action that is reviewable by this Court." Compl. ¶  78.

## LEGAL STANDARDS

A Rule 12(c) motion is treated similarly to a Rule 12(b)(6) motion to dismiss, *Hayes v. BNY Mellon*, 621 F. Supp. 3d 162, 166 (D. Mass. 2022), differing "primarily because it is filed after the close of pleadings and implicates the pleadings as a whole." *Newma v. Santander Bank, N.A.*, 548 F. Supp. 3d 237, 241 (D. Mass. 2021) (citation modified). "[A]lthough a challenge to subject matter is normally made under Rule 12(b)(1), it may also be raised on a motion pursuant to Rule 12(c)." *Gastelum v. Kohl's Inc.*, 2023 WL 2575825, at *4 (E.D. Cal. Mar. 20, 2023) (citation omitted).

In an APA case, Rule 56(a)'s summary judgment standard, requiring the court to determine if there is a genuine issue of material fact, does not apply "due to the limited role of a court in reviewing the administrative record."  *See Morales v. Noem*, 791 F. Supp. 3d 100, 104 (D. Mass. 2025).  Rather, "summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Id*. (quotation omitted). "[T]he district judge sits as an appellate tribunal." *See Patel v. Johnson,* 2 F. Supp. 3d 108, 117 (D. Mass. 2014) (quotation omitted).

## ARGUMENT

I.      **The Case is Not Justiciable**

    A.      **Plaintiffs Lack Standing to Challenge CRS's Overall Operations**

Plaintiffs seek wholesale changes to the operations of CRS, including an order "compelling Defendants to resume services" (evidently to the prior level of operations). *See* Br. 35. But Plaintiffs lack the "irreducible constitutional minimum of standing" required to pursue such relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Even if they could show standing to challenge individualized injuries stemming from their loss of CRS services, they lack standing to assert this programmatic challenge. Federal courts do not sit to "exercise general legal oversight of the Legislative  and Executive Branches," but to redress concrete injuries to specific interests. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021).  Plaintiffs must show they "[have] suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a  favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted). "[S]tanding is not dispensed in gross." *Id.* at 61 (citation omitted). Thus, "plaintiffs must demonstrate standing for each claim that they press"—"and for each form of relief that they seek." *Id.* (quoting *TransUnion LLC*, 594 U.S. at 431).

Plaintiffs' central challenge is the alleged "dismantling" and "abolish[ment]" of CRS. Compl. ¶¶ 30, 56, 57.  CRS has not been dismantled. *See* 2nd Nazaire Decl. ¶¶ 6-8. But in any event, Plaintiffs' asserted interest in vindicating CRS's "proper" operation is an abstract and generalized grievance that is improper under Article III for at least four reasons.

First,  a generalized dispute over an agency's performance of allegedly required "duties" or its allocation of sufficient resources to do so involves no "legally and judicially cognizable" harm. *Raines v. Byrd*, 521 U.S. 811, 819 (1997). Such suits have no "ground[ing] in historical practice" or "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).

Second, the relief Plaintiffs seek goes beyond remedying specific grievances arising from

their alleged loss of CRS services, far exceeding their alleged injuries.  Plaintiffs must show standing "for each form of relief that is sought." *Town of Chesterv. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (citation omitted);  *compare* Compl. at 30-31 ("Prayer for Relief") (seeking order "vacating and setting aside Defendants' decision to dismantle CRS and permanently enjoining Defendants from taking any actions to effectuate or enforce that decision"), *with, e.g.,* Duvall Decl.  ¶ 22 (Doc. 107-16) (alleging harm from "CRS's absence from the process" of finalizing Memorandum of Agreement"). As the First Circuit has explained, "Prudential concerns require a plaintiff to show that she is seeking to protect her own legal rights (rather than those of a third party), that her complaint does not merely represent a generalized grievance, and that the complaint falls within the zone of interests protected by the law invoked." *Ramirez v. Sanchez Ramos*, 438 F.3d 92, 98 (1st Cir. 2006). Plaintiffs fail to make that showing.

Third, Plaintiffs lack a  particularized interest in safeguarding the separation of powers, as they claim, because "[a]ll citizens" share "an interest in the independence of each branch of Government." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220, 226 (1974). This "generalized interest … is too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Id.* at 226-27; *see Lyman v. Baker*, 954 F.3d 351 (1st Cir. 2020) ("Injuries that are too widely shared or are comparable to the common concern for obedience to law may fall into the category of generalized grievances about the conduct of government.") (citation modified); *see also Adim v. Bragg*, 2024 WL 4467193, at *4 (S.D.N.Y. Oct. 7, 2024) (plaintiff lacked standing for abstract interest); *Anderson v. SUNY*, 2024 WL 3656551, at *3 (S.D.N.Y. July 29, 2024) (no standing as to  "generalized grievances" that plaintiff "suffer[ed] in some indefinite way in common with people generally" (citation modified)).

And fourth, such a programmatic injury is not redressable, as it would require "interpos[ing]

13

the federal courts as virtually continuing monitors of the wisdom and soundness of . . . administration, contrary to the more modest role Article III envisions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006) (citation modified).

Plaintiffs' brief says nothing of this. *See* Br. 32. Plaintiffs misrely on *Rhode Island v. Trump*, 155 F.4th 35, 45 (1st Cir. 2025), which, in deny a stay of a preliminary injunction pending appeal, observed the district court's determination that the agency actions "directly caused *and will continue to cause the loss of services* of which the plaintiffs complain." (emphasis added). That is not the case here, where CRS has resumed providing services. And Plaintiffs simply can re-initiate their requests. Plaintiffs also misrely on *New York v. Kennedy*, 155 F.4th 67, 74 (1st Cir. 2025): that case generally involves "informational harms" not present here, and in any event, Defendants are not predicating their standing arguments on the contention that "plaintiffs' injuries arise from the loss of services to which they are not statutorily entitled." In short, Plaintiffs fail to even address their standing, much less establish it.

### B.    Plaintiffs' Claims Are Moot

Plaintiffs' claims also should be dismissed because they are moot. A "case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (plurality opinion) (citation modified). "[M]ootness is the doctrine of standing set in a time frame; that is, the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of Milwaukee*, 708 F.3d 921, 929 (7th Cir. 2013) (cleaned up). "When . . . a plaintiff has initial standing to bring a particular claim, a federal court is duty bound to dismiss the claim as moot if subsequent events unfold in a manner that undermines any one of the three pillars on which constitutional standing rests: injury in fact, causation, and redressability." *Ramirez*, 438 F.3d at 100. "In this regard, the

14

key question is whether the relief sought would, if granted, make a difference to the legal interests of the parties (as distinct from their psyches, which might remain deeply engaged with the merits of the litigation)." *Corrigan v. Boston Univ.*, 98 F.4th 346, 352 (1st Cir. 2024) (citation modified).

There is no longer a live controversy. Plaintiffs contend that CRS has been dismantled in contravention of its statute. But the facts show otherwise. 2nd Nazaire Decl. ¶¶ 6-8. CRS is receiving and evaluating requests from entities seeking services. *Id*. ¶¶ 3, 6. The employee is primarily responsible for carrying out CRS's mission reviews requests, determines if CRS has jurisdiction, and offers services or makes referrals as needed. *Id*. ¶¶ 3-5. True, CRS is providing a lower volume of services than it did before. *Id*. ¶ 10. But nothing in the statute requires any type or level of services. *See* Background, *supra*. Whether, how often, and to what extent CRS chooses to provide a service is within its discretion. Although the President has proposed its elimination, CRS remains operational absent an act of Congress.[6] Plaintiffs' claims are moot.

Voluntary cessation is not a valid counter-argument here. The voluntary-cessation doctrine "can apply when a defendant voluntar[ily] ceases the challenged practice in order to moot the plaintiff's case and there exists a reasonable expectation that the challenged conduct will be repeated after the suit's dismissal. *Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3, 9 (1st Cir. 2021) (citation modified). But the doctrine "does not apply" if the change in conduct is "unrelated to the litigation." *See Town of Portsmouth v. Lewis*, 813 F.3d 54, 59 (1st Cir. 2016). But the record shows that even prior to this litigation, when the Administration had proposed that Congress legislatively abolish CRS (as inconsistent with the Administration's priorities), the Department

---

[6] CRS has rescinded the RIFs, and nine of twelve affected employees have returned to CRS and are being integrated into EOUSA. *See* Pelletier Decl. ¶ 4. If Plaintiffs argue that their challenge to the RIF is not moot, it falls outside of district court jurisdiction under the Civil Service Reform Act of 1978 in any event. *See* ECF No. 51 (Defs. Opp. to Pls. Prelim. Injunction Mtn.), pp. 17-21.

15

planned to retain a minimum number of positions—two—and that is what they have done. Pursuant to this, the working level employee, Ms. Nazaire, has been responding to and evaluating requests for services and delivering services as appropriate. This change therefore is "unrelated to the litigation," see *id*., so the voluntary cessation doctrine is inapplicable.

### C.      Plaintiffs' Claims Regarding Potential Future Injury Are Not Ripe

Even if Plaintiffs' claims are not moot, they are unripe.  Plaintiffs rely on declarations recycled from their October 2025 complaint and TRO motion that testify that the declarants would use CRS services if CRS were operational, and that they are harmed every day that CRS is not operational.  *See, e.g.,* Mayes Decl., Doc. 107-10, ¶5 ("*If* not for CRS's cessation of services and ultimate closure, Tri-State NAACP *would* be working with [CRS] . . . .") (emphasis added); Nelson Decl. (107-11), ¶ 5 ("Pikes Peak SCLC1 *would* continue to use CRS's invaluable services *if* it could.") (emphasis added); Bowie Decl. (107-7), ¶ 14.  But CRS is operational now, and Plaintiffs have largely failed to recontact CRS to re-request the services previously lost or denied.  Plaintiffs seek an order restoring CRS services lost in 2025 during the wind-down, but there is no reason for the Court to adjudicate that claim now, on the present record, where a Plaintiff's re-submitted request may result in CRS providing or resuming the previously lost or denied services.

"Whereas standing asks 'who' may bring a claim, ripeness concerns 'when' a claim may be brought." *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F3d 18, 32 (1st Cir. 2007) (citation omitted). "The burden to prove ripeness is on the party seeking jurisdiction." *Labor Rels. Div. of Constr. Indus. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016); *see also Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 826 (1st Cir. 2020).  As this Court explained, "Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . . The facts alleged, under all the circumstances, must show that there is a substantial controversy, between parties having adverse

legal interests, of sufficient immediacy and reality to warrant the issuance of the judicial relief sought." *Weichel v. Town of Braintree,* No. 2022 WL 17852109, at \*4 (D. Mass. Dec. 22, 2022) (Talwani, J.) (citation modified).   Thus, a claim is not ripe if it is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 592 U.S. 125, 131 (2020) (citation omitted).   "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted).

The first prong, the fitness inquiry, "typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends on facts that may not yet be sufficiently developed."   *Stern v. U.S. Dist. Court*, 214 F.3d 4, 10 (1st Cir. 2000) (*quoting Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir.1995)). "The critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *McInnis-Misenor v. Me. Med. Ctr.*,  319 F.3d 63, 70 (1st Cir. 2003) (citation omitted).   Plaintiffs cannot carry their burden of showing fitness for decision because their case has a gaping factual contingency: whether they would receive the CRS services allegedly lost in 2025 if they simply reinitiate contact with CRS now and present a legitimate request for service.   As shown at Appendix A, most never re-initiated contact with CRS in 2026. For the three or four Plaintiffs that did re-request services, there was no "categorical refusal to execute the statutory mission" by CRS, *see* Compl.¶ 74; rather, CRS declined services because of certain obstacles or failures specific to those requests.

The ripeness defect is also manifest in the speculative nature of Plaintiffs' declarations, based on the incorrect (or at minimum, outdated) view that CRS is not offering services.  *See* Duval. Decl.

17

(107-16) ¶ 21 ("I am confident that, *had* CRS remained involved in the mediation process, the results today *would* be very different.) (emphasis added); VanSant Decl. 107-15, ¶ 13 (expecting that "that CRS *would have* provided assistance to us in navigating this and other recent issues, *had* it still been operating.") (emphasis added); Mayes Decl., 107-10, ¶ 5. Plaintiffs' speculation about the future renders this case unripe under the fitness prong.

Plaintiffs also fail to carry their burden under the second prong, hardship, which "is entirely prudential." *McInnis-Misenor,* 319 F.3d at 70). "The hardship prong evaluates the extent to which withholding judgment will impose hardship—an inquiry that typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." *Id*. (citation modified). Notably, a "plaintiff's weak showing on the fitness prong means that they must compensate on the hardship prong." *Id*. at 73. Here, were there true "hardship," Plaintiffs should have sought to regain CRS services. Yet most never reached out in 2026. By instead relying on six-month old declarations, Plaintiffs do not even attempt to show hardship.

As the First Circuit has explained, "[t]he ripeness inquiry is often *sui generis*. Most litigation has idiosyncratic features, and the various integers that enter into the ripeness equation play out quite differently from case to case, thus influencing the bottom line." *Ernst & Young,* 45 F.3d at 535. *See generally, Rainbow Trout Farms, Inc. v. Brownback*, No. 11-1290, 2012 WL 387989, at \*20 (D. Kan. Sept. 6, 2012) (case unripe where no plaintiff "has filed a tax appeal . . . under the new fee requirements.") *Himes v. Johnson*, 772 F. Supp. 678, 679-80 (D. Me. 1991) (case unripe where business owner had not applied for license under challenged ordinance).

Plaintiffs therefore fail to carry their burden on either ripeness prong. The Court should dismiss the case for lack of jurisdiction, because as the record exists now, Plaintiffs are "pressing solely abstract concerns founded on ill-defined facts, creating a danger that a judicial pronouncement

18

would constitute a prohibited 'advisory opinion.'" *McInnis-Misenor*, 319 F.3d at 71; *see also Risinger v. Concannon*, 117 F. Supp. 2d 61, 65 (D. Me. Oct. 12, 2000).

## II.    Plaintiffs Are Not Entitled to Relief under the APA

### A.    The Challenged Actions Are Committed to Agency Discretion and Therefore Unreviewable

Plaintiffs' claims are not reviewable under the APA because the challenged actions are discretionary. Critically, "agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'" *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (quoting 5 U.S.C. § 701(a)(2)). "Whether their claim is construed as arising under Section 706(1) or 706(2), Plaintiffs 'must first clear the hurdle of § 701(a).'" *Rusnak v. United States*, 2026 WL 809985, at *19 (D.D.C. Mar. 24, 2026) (quoting *Heckler v. Chaney,* 470 U.S. 821, 828 (1985)). To determine whether the challenged actions are discretionary, courts look to the statutory text, the agency's regulations, and informal agency guidance governing the challenged action. *Salazar v. King,* 822 F.3d 61, 76–77 (2d Cir. 2016).

Here, Plaintiffs essentially claim that CRS stopped working on their matters despite a "statutory mandate." Compl. ¶ 50, *also*, ¶ 60 (alleging "wholesale cessation of the services mandated by the Civil Rights Act"). But nowhere do the provisions of the Civil Rights Act, or any of the other statutes Plaintiffs cite—or the CRS regulations—contain any command for CRS to perform services—or even specify any duty. The CRS statute initially states that "[i]t shall be the *function* of the Service"—as opposed to "duty"— "to provide assistance to communities . . . in resolving disputes, disagreements, or difficulties relating to discriminatory practices based on race, color, or national origin . . . ." 42 U.S.C. § 2000g-1 (emphasis added). This general command sets forth CRS's *purpose* and functions writ large. But the second sentence in the section spells out how CRS should accomplish this objective, and provides triple discretion to decide whether to

19

offer services in specific "disputes, disagreements, or difficulties":

> The Service *may offer* its services in cases of such disputes, disagreements, or difficulties *whenever, in its judgment*, peaceful relations among the citizens of the community involved are threatened thereby, and it *may offer its services* either upon its own motion or upon the request of an appropriate State or local official or other interested person.

*Id.* (emphasis added). *See XY Planning Network, LLC v. U.S. SEC*, 963 F.3d 244, 249 (2d Cir. 2020) ("may" is "permissive" and "reflects Congress's grant of discretionary rulemaking authority"); *Fernandez v. Brock*, 840 F.2d 622, 632 (9th Cir. 1988) ("'May' is a permissive word, and [courts] will construe it to vest discretionary power absent a clear indication from the context that Congress used the word in a mandatory sense.").

A recent instructive decision on the "committed to agency discretion" bar is *American Federation of Teachers, AFL-CIO v. Davis*, --- F. Supp. 3d. ---, 2025 WL 3763813, at *6 (S.D.N.Y. Dec. 30, 2025) (citation omitted), *appeal filed sub nom. American Federation of Teachers, AFL-CIO v. Goldstein,* No. 26-461 (2d Cir. Mar. 2, 2026), which addresses 29 U.S.C. §173(b), the FMCS statute that served as the starting point for the crafting of the CRS statute. Plaintiff labor unions asserted an APA challenge to policies limiting FMCS mediation to cases meeting explicit numerical thresholds as to bargaining unit size (as well as a challenge a RIF that reduced the number of FMCS mediators from 123 to six), undertaken in response to an Executive Order that called for, among other things, the elimination of the non-statutory components and functions of FMCS. *Id*. at *1. In considering whether the "committed to agency discretion by law" bar applied to the numerical thresholds, the Court considered two statutes, one applicable to healthcare plaintiffs (29 U.S.C. § 158(d)(4)(C)), and the other to the remaining plaintiffs (29 U.S.C. §173(b)). The court concluded that the former, Section 158(d)(4)(C) ("After notice is given to [FMCS] . . . , the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement"), created a mandatory duty on behalf of FMCS to

20

mediate, when called upon, in the healthcare industry.  The court next considered Section 173(b), providing (symmetrical in part with the CRS statute) that FMCS "*may* proffer its services in any labor dispute in any industry affecting commerce . . . whenever in its *judgment* such dispute threatens to cause a substantial interruption of commerce." 29 U.S.C. § 173(b) (emphasis added). The court concluded, that "[w]hile this statute [§ 173(b)] affords FMCS more discretion, it does not foreclose judicial review. . . . the existence of some discretion does not mean that judicial review is unavailable[.]" *See Am. Fed'n of Teachers,* 2025 WL 3763813 at \*6-7.

That logic compels the opposite conclusion here.  The CRS statute is symmetrical to FMCS in its discretionary aspects, except that Section 2000g-1 is *even more discretionary*. *Compare* 42 U.S.C. § 2000g-1, with 29 U.S.C. § 173(b).  Section 2000g-1, in contrast to Section 173(b), imposes no "duty," but simply identifies the purpose or "function" of CRS. And the CRS statute has a double-"may" that is absent from the FMCS statute.  *Id*. And the different context also compels this conclusion.  In *American Federation of Teachers*, the Court concluded that plaintiffs' challenge to "an explicit numerical threshold established by defendants to determine when they will provide mediation and conciliation services," was "an action that provides a focus for judicial review.'"  *Id*. at 7 (*quotation omitted).*  Here, by contrast, Plaintiffs challenge no "threshold" governing when CRS will provide its services; they want services restored to them, plus a return to prior operations and staffing levels.  Unlike the policy challenged in *American Federal of Teachers*, those are matters well within the discretionary bounds of the CRS statute.

At bottom, this is one of those "rare instance where statutes are drawn in such broad terms that in a given case there is no law to apply."  *See Webster v. Doe*, 486 U.S. 592, 599 (1988) (citation modified); *Rusnak v. United States,* 2026 WL 809985, at \*20 (statute in question "provides the court no meaningful standard against which to judge" because it confers "complete

21

discretion"). In fact, Plaintiffs concede that "the statute gives DOJ discretion to determine the specific instances in which it will provide services," and argue only that "it does not have discretion to provide *no* services at all." Br. 31 (emphasis in original). But this argument is unavailing, because it is predicated upon incorrect facts. CRS *is* providing services, using its statutory discretion to determine the type and volume. Plaintiffs identify no statutory provision that entitles them to more than that.

That relative silence is striking, because circuits have held that the "committed to agency discretion" requirement is jurisdictional. *Make the Rd. N.Y. v. Noem,* No. 25-5320, 2025 WL 3563313, at *19 n.5 (D.C. Cir. Nov. 22, 2025) (citation omitted) (explaining "[t]here is a circuit split on whether Section 701(a)(2)'s 'committed to agency discretion" bar is jurisdictional,'" and continuing that "[t]he Second, Fifth, Ninth, and Tenth Circuits consider Section 701(a)(2) to be jurisdictional."). The First Circuit apparently has not ruled on this issue.[7]

**B.    Plaintiffs Fail to Allege Qualifying "Final Agency Action" Under the APA**

Even if APA review is not precluded, the statute limits it to (a) discrete "agency action" that is (b) "final." 5 U.S.C. § 704. Here, the Complaint claims that "Defendants' dissolution of CRS constitutes final agency action that is reviewable by this Court." Compl. ¶ 78. As explained below, this meets neither requirement. As a result, the Court lacks jurisdiction over the APA claims. *See Bowster v. Noem*, 2026 WL 555624, at *4 (D. Mass. Feb. 27, 2026) (under the APA, "[t]he issue of whether there was final agency action implicates the jurisdiction of the federal courts" (quoting *Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007)); *see also, e.g., Texas v. Cardona*, 743 F. Supp. 3d 824, 842 (N.D. Tex. 2024) ("If there is no final agency, a federal

---

[7] In one recent unpublished decision, another judge of this District suggested in *dicta* that the "committed to agency discretion-bar" "goes to the merits of the claim" rather than jurisdiction. *African Cmtys. Together v. Noem*, 2026 WL 948591, at *4 n.14 (D. Mass. Apr. 8, 2026) (citation omitted), *appeal filed*, No. 26-1376 (1st Cir. Apr. 10, 2026).

court lacks subject matter jurisdiction." (cleaned up)).

### 1. CRS's reorganization is not discrete agency action subject to APA review.

APA Section 704 authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "Agency action" is defined to include the "whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The APA allows for judicial review only of "circumscribed, discrete agency actions," *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 62 (2004),. Under the APA, plaintiffs "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). Consistent with these principles, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Id*. Two recent decisions addressing APA challenges to the "dismantling" of an agency are instructive.

First, in *Rural Development Innovations Ltd. v. Marocco*, 2026 WL 710260, at *3-4 (D.D.C. Mar. 13, 2026), the court granted summary judgment to the government, holding that plaintiffs' APA claims challenging the "dismantling" of the U.S. African Development Foundation (USADF) "fail[] for lack of discrete final agency action." The agency had "terminated the employment of numerous USADF employees, placed other employees on administrative leave, cancelled contracts, and terminated almost all partner grants," following a February 2025 Executive Order directing that the USADF be "eliminated to the maximum extent consist with applicable law." *Id*. at *1, 4. Nevertheless, Plaintiffs could not clear the "final agency action" bar:

> Plaintiffs claim that defendants cannot unilaterally eliminate a congressionally created agency, but plaintiffs do not identify a single decision or rule shutting down USADF. Instead, plaintiffs argue that eliminating USADF's staff and terminating the agency's contracts and grants amount to shutting down the agency. This Court,

23

however, may not review an "abstract decision apart from specific agency action, as defined in the APA."

*Id*. at \*4 (quoting *Biden v. Texas*, 597 U.S. 785, 809 (2022) (cleaned up).

The same is true here. Plaintiffs' characterization of the "dissolution" of CRS as the sole final agency action is an impermissible 'abstraction' at best. CRS has not been dissolved, and its curtailment and refocusing of activities is not "dissolution." At most, Plaintiffs' "dissolution" narrative is really a comparison versus how the agency operated prior to 2025. But that cannot support an APA claim. Plaintiffs fail to identify anything tangible or concrete—an agency rule, order, license, sanction, or relief, 5 U.S.C. § 551(13)—that would qualify as an "agency action." The Supreme Court made clear that the APA does not authorize review of "abstract decision[s] apart from specific agency action, as defined in the APA." *Biden v. Texas*, 597 U.S. 785, 809 (2022). Here, like in *Rural Development and Biden v. Texas*, Plaintiffs identify no "action" as defined in the APA, and pointing to planning documents' use of the term "dissolution" does not suggest otherwise. While CRS is not aligned with the Administration's purpose, The Department will not eliminate it unless Congress does so. Nor do Plaintiffs suggest that the putative dissolution is anything like a "rule, order, license, sanction, [or] relief." *Id*. These too are defined terms, *see id.* § 551(6), (8), (10), (11), and a decision to shut down a component would not satisfy them.

Second, in *Association for Education Finance & Policy, Inc. v. McMahon*, 786 F. Supp. 3d 13, 21, 24 (D.D.C. 2025), the court concluded that "[t]he programmatic nature of [plaintiffs'] challenge dooms its motion [for preliminary injunction]" where plaintiffs brought an APA claim "to stop the wholesale 'dismantling'" of the Institute of Education Sciences (part of the Department of Education, conducting education-related research). The court explained that plaintiffs have not "shown the APA is a viable cause of action for their claims": "To the extent that unilateral dismantlement (or large-scale reorganization) is underway, it is not challengeable as a final agency

24

action any more than the land classification process in *Lujan* was challengeable": "The APA was not built to vindicate programmatic challenges to day-to-day agency operations, which is precisely what Plaintiffs assert." *Id*. "The APA is a remedial scalpel, used to excise circumscribed [and] discrete improper actions." *Id*. at 22, 24 (cleaned up). [8]

This is also the case here. Plaintiffs are challenging CRS's *entire course of conduct* moving forward—a programmatic challenge. *See* Compl. p.31 (seeking order "setting aside Defendants' decision to dismantle CRS and permanently enjoining Defendants from taking any actions to effectuate or enforce that decision.") The APA does not permit such wholesale judicial review. Here, as *Association for Education Finance*, Plaintiffs' "true focus is wholesale correction, not remediation for a narrow band of erroneous decisions": "The overall goal is not incremental correction by fixing specific erroneous decisions, but a grand decree blocking all actions that risk rendering an executive agency incapable of carrying out [its] statutory functions." *Id*. at 25-26 (cleaned up). Here, as in *Association for Education Finance,* Plaintiffs' attempt to use the APA to halt the "dismantling" is misdirected: "[Plaintiff's] plea for the Court to step in and stop the 'dismantling' of the Institute is a request for the sort of programmatic relief reserved for 'the offices of the Department or the halls of Congress.'" *Id*. at 29 (quoting *Lujan,* 497 U.S. at 891).[9]

At base, Plaintiffs' APA claims here are fundamentally a challenge to CRS's operations,

---

[8] In a subsequent decision, the court observed that the plaintiffs had amended and "narrowed their Complaint" to specific cancellations and terminations. *See Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, Nos. 1:25-cv-00999 & 1:25-cv-01266, 2026 WL 523023, at *11 (D.D.C. Feb. 25, 2026).

[9] Plaintiffs' reliance on *Rhode Island v. Trump*, 810 F. Supp. 3d 283, 301 (D.R.I. 2025), *appeal filed*, No. 26-1070 (1st Cir. Jan. 21, 2026), (Br. 28) is unavailing. There, the district court concluded that plaintiffs' APA claim was proper under *Lujan* because it challenged "Defendants' adoption of a "discrete, categorical policy" that applies an Executive Order's mission "of eliminating all functions and components not mandated by statute, and of dramatically reducing their remaining functions" across the board." (cleaned up). That is not the case here, where CRS remains an operating Department of Justice component.

including staffing decisions and determinations of criteria in evaluating what services to provide and how to provide them.  That is the opposite of the discrete, circumscribed agency action that is required for review under the APA. *See Lujan*, 497 U.S. at 890-91.

### 2.      Any discrete agency action is not final for APA purposes

Second, even if there was any discrete agency action, it was not *final*. To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up). Plaintiffs argue that CRS's "decision" to dissolve CRS, Compl.¶ 78, surmised from various actions taken to prepare for the reorganization, like the cessation of certain services—was final. But the provisional course of action at issue cannot possibly qualify as final.

As an initial matter, while Plaintiffs claim that "the existence of final agency action is determined at the time at lawsuit is filed," *see* Br. 33 and *id*. at n.4., their cited authorities do not support that.[10] Rather, as one court explained, "the Supreme Court emphasized that the relevant time period for evaluating the finality of agency action is *when* the action is taken." *Texas v. Cardona*, 743 F. Supp. 3d at  843 (citing *Biden v. Texas*, 597 U.S. at  808 (illustrating that a matter is considered "final agency action" when it "'mark[s] the "consummation" of the agency's decision-making [sic] process' and result[s] in 'rights and obligations [being] determined'") (quoting *Bennett*, 520 U.S. at 178)).

Under *Bennett*'s first prong, clearly there was no definitive decision to "dissolve" CRS (at least in the sense of "dissolution" of CRS in its entirety, as Plaintiffs would have it).  While the President has proposed to Congress that it eliminate CRS altogether, and the President has made

---

[10] *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) and *Kingdom v. Trump*, No. 1:25-CV-691, 2025 WL 1568238, at *9 (D.D.C. June 3, 2025).

clear that CRS does not align with his administrative priorities, that does not equal a "final" decision to dissolve CRS. Rather, the documents reflect the acknowledgement that "only an act of Congress" can eliminate CRS, and unless and until that happens, CRS continues to exist and to perform its statutory functions. Put differently, the "consummation of the agency's decision making process" ended in a decision *not* to eliminate CRS. The facts on the ground, as reflected in the Nazaire Declaration, make this clear. And even if it might have *appeared* at one point that the agency intended to shutter operations—*i.e.,* per the withdrawal of CRS services beginning in spring 2025, the issuance of RIF notices (ultimately rescinded), and the categorical denial of new services from May to October 2005—that did not happen.

Under the second prong, Plaintiffs identify no way in which the alleged "dissolution" had any concrete effect on their "rights or obligations." Prong two is "a 'pragmatic' inquiry that requires courts to examine the 'concrete consequences' of an agency action." *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (citation omitted). As explained above, while CRS withdrew from services and involvement with Plaintiffs in 2025, CRS has been operating in 2026—receiving and reviewing requests, and providing services. Plaintiffs remained free to reach back out to CRS to resume services. Most of them never did so.

Last, Plaintiffs' own finality theory—the "government's gamble," as they call it—is speculative and does not clear the finality bar in any event. Br. 34. According to Plaintiffs, "DOJ adopted and executed a *definitive* plan to dismantle the agency, gambling that Congress would later ratify that decision" —and this "gamble" failed when Congress in fact appropriated funds to CRS." *Id.* (emphasis in original). As an initial matter, this is just Plaintiffs' conjecture; they point to nothing concrete in the record supporting this. Moreover, by its own terms, there is no mark of 'finality' in this theory, because the alleged plan is contingent upon Congress's "later

27

ratif[ication]." *See id*. Indeed, as noted earlier, the legal rationale memorandum stated, "we recognize that *we may need to reassess* the situation once our appropriations are enacted." *See* AR0333 (emphasis added). This does not reflect finality. Rather, the record overall shows an unfolding, developing process in 2025, not a "definitive plan."

### 3. Plaintiffs Fail to Show that Agency Action Must Be Compelled Under the APA

Even if the APA permitted review of Plaintiffs' claims, they cannot meet the high standard required to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), for Count III. This mandamus-like standard applies since the crux of Plaintiffs' claim (insofar as it alleges injury to them) is that CRS failed to provide them services. "[T]he only agency action that can be compelled under the APA is action legally required." *SUWA*, 542 U.S. at 63. In 5 U.S.C. § 706(1), "the APA carried forward the traditional practice prior to its passage, when judicial review was achieved through" writs like mandamus, a remedy "normally limited to enforcement of a *specific, unequivocal command*, the ordering of a precise, definite act . . . about which [an official] had no discretion whatever[.]" *Id*. (emphasis added) (cleaned modified).

Analysis under Section 706(1) "starts from the premise that issuance of the writ [of mandamus] is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act." *In re Core Commc'ns, Inc.,* 531 F.3d 849, 855 (D.C. Cir. 2008) (citation modified). Reflecting the traditional limitations on mandatory injunctions issued to co-equal branches, "[i]n the case of agency inaction" the Court "not only must satisfy [itself] that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000) (quoting 5 U.S.C. § 706(1)). And then the court must evaluate "whether the agency's delay is so egregious as to warrant mandamus." *In re Core Commc'ns, Inc.*, 531 F.3d at 855 (citation omitted).

As a threshold matter, Plaintiffs have identified no "specific, unequivocal command" such that the Court could "order[] … a precise, definite act." *SUWA*, 542 U.S. at 63 (citation modified). Plaintiffs simply allege that "[b]y withdrawing CRS services to Plaintiffs and denying [their] requests for new CRS services . . . , Defendants have unlawfully withheld and unreasonably delayed agency action, in violation of the APA." Compl. ¶ 87.  But the CRS statute does not require CRS to provide services; it imposes no express duty at all. *See* 42 U.S.C. § 2000g.  The discretionary language in this statute could not be further from a specific, unequivocal requirement necessary to establish a mandamus-type remedy.  Thus, CRS is not obliged to continue providing services to Plaintiffs simply because it has done so in the past.

Even if Plaintiffs had a viable claim under 5 USC § 706(1), it is moot now.  Plaintiffs' fundamental premise—CRS's alleged "refusal to operate CRS or provide *any* direct services"—is incorrect."[11] *See* Br. 31 CRS *is* operating and providing services—and has serviced three  requests so far this year.  See 2nd Nazaire Decl., ¶ 9(a)-(c).  Yet, as shown in Appendix A, most Plaintiffs have never sought to reengage CRS after losing any services, and for the three or four that did, CRS had reasonable basis to decline.  *See supra*.  This is not a situation where "the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Heckler v. Chaney*, 470 U.S. at 833 n.4 (citation modified). Plaintiffs therefore are not entitled to a mandamus-style remedy under the APA in Count III.

## III.    Plaintiffs' Claims Fail

### A.    Plaintiffs' APA Claims Fail on the Merits

Threshold failures aside, Plaintiffs' APA claims fail on the merits.

---

[11] While Plaintiffs' Complaint predicates the Section 706(1) claim on an alleged failure to provide services to *Plaintiffs*, their brief predicates that claim on "Defendants' refusal to operate CRS or provide any direct services *to the public*."  Br. 31 (emphasis added).  Plaintiffs provide no authority for this (a Section 706(1) claim directed to the public at large, rather than plaintiffs themselves).

### 1.    Defendants' Actions Were Not Arbitrary and Capricious

"[A]rbitrary and capricious review entails a very deferential scope of review that forbids a court from substituting its judgment for that of the agency." *Appalachian Voices v. FERC*, 139 F.4th 903, 927 (D.C. Cir. 2025) (Henderson, J., concurring) (citation modified). "[R]eview under the arbitrary-and-capricious standard is narrow; [courts] will uphold an agency decision 'of less than ideal clarity if the agency's path may reasonably be discerned.'" *Bloch v. Powell*, 348 F.3d 1060 (D.C. Cir. 2003) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation modified)). Put differently, the agency need only articulate "a 'rational connection between the facts found and the choice made,'" *Bowman*, 419 U.S. at 285 (citation omitted), acting within a wide "zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Defendants satisfy this standard—as explained below, at base, Plaintiffs' arbitrary and capricious argument largely rests on factual inaccuracies.

First, Plaintiffs claim that "Defendants failed to provide any explanation—let alone a reasoned one—for the adoption of a single-person CRS within EOUSA." Br. 2. This is incorrect. The Legal Rationale memorandum issued in September 2025 explained that "one current employee" "is the minimum number of employees required to perform CRS' statutory functions." AR00332.  This is in the context of explaining that "the realignment is merely a first step that furthers the Administration's plans with respect to CRS"—where ultimately, "a statutory change will be necessary to eliminate CRS . . . ." AR0332. The July 3, 2025 Implementation memoranda (AR0269) also explains how this would work.  As noted earlier, the memorandum considered what services a proposed single-person CRS could continue performing, while identifying difficulty in the performance of others.  AR0270.  It explained, for example, that mediation "may need to be deprioritized or transitioned to external partners when appropriate," because that service "typically required sustained engagement [and] intensive case management." *Id*.  On the other hand, by

30

"prioritizing incidents based on severity, scope, and potential for broader harm, rather than attempting to monitor and engage every case within CRS's jurisdiction," CRS "could continue to respond directly to the most critical incidents." *Id*. "Rather than just working with regional and local chapters of civil rights organizations as CRS has done historically, whenever possible, [the National Program Manager] could coordinate more closely with national chapters." AR0274.

And contrary to Plaintiffs' characterization, the July 3 Proposed Implementation memorandum *did* consider reliance interest, including "stakeholders, such as law enforcement and community leaders." AR0270-71. It did *not* reduce CRS to "little more than a webinar platform and referral clearinghouse," Br. 29, and the reality of CRS's operations today also refutes that characterization. *See* 2nd Nazaire Decl. And there was no "abrupt reversal of course on the scope of CRS's statutory jurisdiction." *See* Br. 30. Plaintiffs overlook the discretionary nature of the CRS statute to argue, incorrectly, that it must operate at its prior level.

### 2. Plaintiffs Fail to Show that Defendants' Actions Were 'Not in Accordance with Law' or 'In Excess of Statutory Authority.'

Count I alleges that Defendants' actions violated the APA because they were "not in accordance with law," and "in excess of statutory authority." But Plaintiffs minimize the discretionary features of the CRS statute and fail to show how it would support these claims. *American Federation of Teachers* again is instructive. There, the court considered the same "not in accordance with law" claims challenging the FCMS policy setting fixed numerical floors for healthcare industry mediations, where the relevant statute, 29 U.S.C. § 158(d)(4)(C) provided, as noted *supra*, that "[a]fter notice is given to [FMCS] . . . , the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement." *See* 2025 WL 3763813, at *8. The court held, "[g]iven that FMCS *is required* under 29 U.S.C. § 158(d)(C) [*sic*] to provide mediation and conciliation services to all bargaining parties in the

31

healthcare industry, defendants' policy limiting services to only a subset of healthcare bargaining units runs contrary to the plain text of the statute." *Id*.  Here, by contrast, the CRS statute plainly does not *require* CRS to provide such services—and Plaintiffs fail to identify any action contrary to the statute.

Indeed, Plaintiffs' briefing at page 23 minimizes the critical discretionary language in the statute.  *See* Br. 23.  From this, Plaintiffs misleadingly suggest that CRS simply "has no authority to refuse to provide assistance to communities."  Br. 23.  But the statute is crystal clear that CRS has discretion and exercises its "judgment" in deciding to provide assistance.  As explained earlier, the other statutes cited by Plaintiffs generally do not "direct" CRS to undertake additional duties.

Plaintiffs also try to predicate these claims on the notion that the agency action "amounted to a categorical shuttering of a congressional-created agency." Br. 23. But again, Defendants are not shuttering CRS, which remains operational—just not at previous levels. *See* 2nd Nazaire Decl. ¶¶ 7-9. And for the record, Plaintiffs' claim that Defendants "permanently disabled [CRS] from being able to provide mediation and other services" is unsupported. Br. 24. While CRS is not presently providing mediation services (while providing other services)—whether it provides mediation services in the future remains to be seen. *See* 2nd Nazaire Decl. ¶ 10.

### B.    Plaintiffs' Constitutional Claim Fails

"Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts. Instead, constitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose[.]" *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) (citation modified).  Plaintiffs "freestanding" separation-of-powers claim (Count V) fails because under *Dalton v. Specter*, 511 U.S. 462, 473-74 (1994), "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."

32

In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation of powers doctrine." *Id*. at 471. Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id*. at 472. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. (collecting cases). The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute. *Id*. at 473 & n.5.

For example, in *Rural Development,* 2026 WL 710260, at \*4, the court applied *Dalton* to reject plaintiffs' argument "that defendants have violated the separation of powers . . . by effectively shutting down USADF and failing to spend money appropriated by Congress," explaining: "these are but statutory claims because they are really allegations that defendants have violated the USADF statute and the appropriations acts by canceling grants and refusing to spend appropriated funds.  Plaintiffs' claims are thus predicated on statutory violations, and cannot be repackaged as constitutional claims."  *Id*. (citation modified).  Likewise, in *Association for Education Finance & Policy, Inc.,* 786 F. Supp. 3d at 29, where plaintiffs claimed a separation of powers violation insofar as the agency was "allegedly not performing functions that statutes require it to perform," the court concluded that this "*so-called constitutional claim* . . . fails to state a claim for relief altogether."  *Id.* (emphasis added).  "The attempt at a constitutional claim is just a repackaging of the APA challenge."  *Id*.

The same is true here.  Plaintiffs are not alleging that the CRS statute is unconstitutional; they simply are arguing that CRS violated the CRS statute by allegedly "dismantling" CRS.  *See also, generally, Global Health Council v. Trump,* 153 F.4th 1 (D.C. Cir. 2025).  Count V therefore

33

fails.

And relatedly, while Plaintiffs never develop their 'contrary-to-constitutional power' claim under the APA (Count II), *see* Br. 25, the claim clearly fails. As explained, the CRS statute creates discretionary, rather than mandatory, functions. To the extent Plaintiffs are relying on the relevant appropriations statute for FY 2026, 119 Pub. L. No. 74, 140 Stat. 5, that statute just provides in relevant part, "For necessary expenses of the Community Relations Service, $20,000,000." Neither provides a basis for a separation-of-powers claim under the APA.[12]

### C.      Plaintiffs' *Ultra Vires* Claim fails.

Plaintiffs also cannot meet the stringent requirements for their *ultra vires* claim. The Supreme Court has "strictly limited" the scope of *ultra vires* review, reasoning that "*ultra vires* review could become an easy end-run around the limitations of . . . judicial-review statutes[.]" *NRC v. Texas*, 605 U.S. 665, 681 (2025). Thus, the Supreme Court has held that *ultra vires* claims must fit within "painstakingly delineated procedural boundaries"; *id.,* such review "applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition" in a statute. *Id.* (quotation omitted). *See generally, President & Fellows of Harv. Coll. v. U.S. HHS*, 798 F. Supp. 3d 77, 133-34 (D. Mass. Sept. 3, 2025) (explaining same). Indeed, *ultra vires* claims are "essentially a Hail Mary pass," and are unavailable where plaintiffs have "an alternative path to judicial review," *NRC*, 605 U.S. at 681-82 (citation omitted). Plaintiffs make no particularized argument to support their *ultra vires* claim. Unsurprisingly, Plaintiffs identify no "specific provision" in a statute that Defendants have violated. *See, e.g., Rural Dev.,* 2026 WL 710260*,* at *4 (explaining that "the statutes invoked by plaintiffs are not well-suited to *ultra vires* review"). And in any event, *if* Plaintiffs asserted a cognizable APA claim, APA claims

---

[12] And as noted, the legal rationale memorandum explains that if Congress provides CRS funding, "we will consider how to legally expend such funds consistent with the enactment." AR0333.

would be "alternative path[s] to judicial review," *id.*, further foreclosing *ultra vires* review.

## IV.    Remedy

### A.    Plaintiffs Have Abandoned their Claim for a Permanent Injunction—and they Fail to Show Irreparable Harm in any event.

Plaintiffs appear to have abandoned the claim in their Complaint for a permanent injunction.  Nowhere in their brief do they even reference this relief, let alone claim it. And Plaintiffs declined to include a proposed order.  They therefore have waived this remedy.

In any event, "[t]he issuance of a permanent injunction would be appropriate only if the district court made four findings: (1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief (i.e., an injury for which there is no adequate remedy at law); (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction."  *Ortiz-Bonilla v. Federacion de Ajedrez de P.R., Inc.*, 734 F.3d 28 (1st Cir. 2013) (citation modified).  "The party seeking relief bears the burden of demonstrating that these factors weigh in its favor."  *Animal Welfare Inst. v. Martin*, 668 F. Supp. 2d. 254, 259 (D. Maine 2009).

Critically, Plaintiffs fail to show irreparable harm.  "[T]he basis of injunctive relief in the federal courts has always been irreparable harm."  *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (citation omitted). "Irreparable harm is injury that is neither remote nor speculative," *New York v. U.S. DHS*, 969 F.3d 42, 86 (2d Cir. 2020) (citation omitted), but rather is "actual and imminent," *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (citation modified).  Appendix A shows that the Plaintiffs' allegations of harm stemming from the alleged disruption of services *are* speculative and conclusory—not actual and imminent. And as explained above, if Plaintiffs genuinely are suffering irreparable harm, they would have reinitiated contact with CRS, to re-

35

request services.  Most of them still have not.

A permanent injunction would also be inappropriate because the balance of the equities and the public interest (which merge where the government is defendant) tip in Defendants' favor. The relief sought by Plaintiffs is far more substantial in scope than the alleged harms stemming from the alleged disruption to the limited-scope services Plaintiffs allegedly lost, as reflected in Appendix A. Again, most of the Plaintiffs never even sought to re-request services.  Accordingly, the balance of equities and public interest tip in favor of the Government. To the extent the relief has not been waived, the Court should decline to enter any permanent injunction.

### B.    Neither Vacatur nor Compulsory Relief Are Appropriate or Warranted

Plaintiffs' multiple theories and requests for relief demonstrate the stark mismatch between the alleged harms they claim and what court intervention can do to redress those harms. Neither vacatur nor compulsory relief can reconstitute CRS at the level it operated prior to 2025. As argued *supra*, there is no final agency action to vacate, as CRS continues to operate and has not been "dismantled" or "dissolved." The RIF actions have been reversed and thus no relief is needed there. And as explained *infra*, injunctive relief purporting to "restore CRS to functioning operation" or to "resume services"—notwithstanding that CRS *is* functioning and providing services—would require this Court to get into the minutiae of day-to-day agency operations in a way that is unsustainable and likely still would not satisfy Plaintiffs.

Plaintiffs' requested relief would impermissibly require this Court to monitor an agency's statutory compliance. As explained, programmatic decisions regarding how CRS handles its statutorily required duties or responsibilities are committed to agency discretion. *Lujan,* 497 U.S. at 891; *SUWA*, 542 U.S. at 62. Yet Plaintiffs ask this Court to insert itself into this process, and, in the name of equity, issue an order compelling Defendants to "resume services" and "to restore CRS to functioning operation, consistent with its statutory mandate." Br. 36. No meaningful

36

standard is provided by which the Court could judge whether CRS is operating consistent with its statutory mandate because, apart from a mandate to issue an annual report, the statutory language declaring it is CRS's function to "provide assistance" does not dictate precisely how, how often, and to what extent, CRS should provide that assistance. Plaintiffs insist CRS must do more than what it has been doing since it began withdrawing services in March 2025, but they do not offer criteria for determining when or how this Court will know when CRS has resumed functioning. Without such criteria, the declaratory and injunctive relief Plaintiffs seek is effectively meaningless and should be denied.

Addressing this type of claim would require the Court to supervise all the agency's activities and determine how the agency would accomplish each statutorily mandated function— an even more extreme kind of supervisory claim than was at issue and rejected in *Lujan*. *See* 497 U.S. at 892-93. Such a claim would completely circumvent the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *SUWA,* 542 U.S. at 66-67.

Plaintiffs cannot get "wholesale" improvement to agency operations under the APA by presenting a collection of discrete actions as facets of a single event and then challenging that event instead of the individual actions. *See Lujan*, 497 U.S. at 893. The proper course is to challenge only those "circumscribed [and] discrete" actions within a program. *SUWA*, 542 U.S. at 62. As the district court in *Association for Education Finance  & Policy, Inc. .* stated:

> It is not this Court's place to breathe life back into wide swathes of the [agency's] cancelled programs and then monitor the agency's day-to-day statutory compliance; essentially what Plaintiffs seek. Such widespread modification to agency operations must come instead from 'the offices of the Department or the halls of Congress, where programmatic improvements are normally made.'

*Id*. at 18 (citing *Lujan,* 497 U.S. at 891). But this is precisely what Plaintiffs are requesting here.

And Plaintiffs' requested relief is impermissibly broad because it violates the tenet that relief can only be accorded to parties. In *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), the Supreme Court explained that "neither declaratory nor injunctive relief . . . can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Id.* at 833 (citation modified).  The Court has "consistently rebuffed requests for relief that extended beyond the parties." *Id.*  There is no historical precedent in equity for the broad relief sought by Plaintiffs here.  *See id*. at 832 (historically, "suits in equity were brought by and against individual parties[.]"). If Plaintiffs show entitlement to any relief, it would be to address the alleged harms to them, and not a broader restructuring of CRS and the level of its operations and staffing. While "a court of equity may fashion a remedy that awards complete relief," *id.* at 834, here, that would mean being given access to the CRS services improperly denied to them, *id.* at 853.

If the Court nonetheless concludes it is necessary to grant summary judgment in part to Plaintiffs and to issue a remedy, any "injunction must be narrowly tailored to remedy the harm shown," *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985), and is properly limited only to the Plaintiffs before the Court. *See also Gill* v. *Whitford*, 585 U.S. 48, 50 (2018) (any remedy "be limited to the inadequacy that produced the injury in fact that the plaintiff has established"). Extending relief to individuals not properly before the Court would violate this.  *See i.d* at 73 (citation omitted). A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Id*. at 66 (citation omitted). Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice." *DHS v. New York*, 589 U.S. 1173, 1175 (2020) (Gorsuch, J., concurring). Indeed, nationwide injunctions "take a toll on the federal court system," and "prevent[] legal questions from percolating through

38

the federal courts." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring).

Under these principles, the only potential relief available to Plaintiffs is to restore the services that were terminated if those services are even still needed nearly a year after they were originally terminated. But as explained, most Plaintiffs never even sought restoration of services. And for those that did, CRS denied the request for legitimate reasons.

And should the Court decide to issue any relief, the Government respectfully requests that the Court stay its order for a short time to permit the Government to consider whether to appeal.

## CONCLUSION

For these reasons, the Court should grant Defendants' motion for judgment on the pleadings, under Fed. R. Civ. P. Rule 12(c), or alternatively, grant their motion for summary judgment, and deny Plaintiffs' motion for summary judgment.

Dated: May 8, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

CHRISTOPHER HALL
Assistant Branch Director
Federal Programs Branch

*s/ Steven M. Chasin*

Steven M. Chasin (D.C. Bar# 95853)
Jessica A. Lundberg
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-0747
Email: steven.m.chasin2@usdoj.gov

*Counsel for Defendants*

39

- 1 -

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon all attorneys of record by electronic filing on May 8, 2026.


<u>/s/ Steven M. Chasin</u>