UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ETHICAL SOCIETY OF POLICE; NAACP ST. LOUIS COUNTY; MISSIONARY BAPTIST STATE CONVENTION OF MISSOURI; OUT ACCOUNTABILITY PROJECT; BERKSHIRE RESOURCES FOR INTEGRATION OF DIVERSE GROUPS AND EDUCATION; NAACP STATE CONFERENCE COLORADO-MONTANA-WYOMING; PEACEMAKERS LODGE; PIKES PEAK SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE 1; WELLSPRING HEALTH ACCESS; and HAITIAN COMMUNITY HELP & SUPPORT CENTER,<br><br>     ***Plaintiffs***,<br><br>     v.<br><br>TODD BLANCHE,<br>Acting Attorney General;[1] and U.S. DEPARTMENT OF JUSTICE,<br><br>     ***Defendants***. | No. 25-cv-13115 (IT) |

**PLAINTIFFS' MEMORANDUM IN REPLY RE: MOTION FOR SUMMARY JUDGMENT, AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS OR SUMMARY JUDGMENT**

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Todd Blanche is automatically substituted as defendant for Pamela J. Bondi.

**TABLE OF CONTENTS**

Table of Contents ............................................................................................................. i

Table of Authorities ........................................................................................................ ii

I.     PLAINTIFFS' CASE IS JUSTICIABLE .................................................. 2

    A.   Standing ........................................................................................... 2

    B.   Ripeness ........................................................................................... 4

    C.   Mootness .......................................................................................... 5

II.    PLAINTIFFS ARE ENTITLED TO REVIEW UNDER THE APA .......................... 8

    A.   The Narrow Exception for Action "Committed to Agency Discretion" Does Not Apply ................................................................................................ 8

    B.   Plaintiffs Challenge Final Action ..................................................... 11

III.   MERITS.................................................................................................. 12

    A.   Defendants Violated the APA in Multiple Ways ............................... 12

       i.   Arbitrary & Capricious .................................................... 13

       ii.  Not in Accordance with Law or In Excess of Statutory Authority .................... 14

       iii. Services Unlawfully Withheld .......................................... 16

    B.   Plaintiffs Should Also Prevail on Their Constitutional and Ultra Vires Claims . 17

IV.    VACATUR AND A PERMANENT INJUNCTION ARE APPROPRIATE REMEDIES ............................................................................................... 18

V.     IN THE ALTERNATIVE, IF THE COURT DOES NOT GRANT SUMMARY JUDGMENT TO PLAINTIFFS, RELIEF SHOULD BE GRANTED UNDER RULE 56(D) ..................................................................................................... 20

CONCLUSION..................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Adim v. Bragg,*
2024 WL 4467193 (S.D.N.Y. Oct. 7, 2024)................................................................ 3

*Am. C.L. Union of Mass. v. U.S. Conf. of Cath. Bishops,*
705 F.3d 44 (1st Cir. 2013) .......................................................................................... 7

*Am. Fed. of Gov. Employees ("AFGE"), AFL-CIO v. Trump,*
782 F. Supp. 3d 793 (N.D. Cal. 2025) ................................................................... 9, 17

*Am. Fed. of Teachers, AFL-CIO v. Davis,*
818 F. Supp. 3d 538 (S.D.N.Y. Dec. 30, 2025), *appeal filed sub nom.*
*Am. Federation of Teachers, AFLCIO v. Goldstein,*
No. 26-461 (2d Cir. Mar. 2, 2026) ................................................................. 4, 10, 13

*Am. Forest Res. Council v. United States,*
77 F.4th 787 (D.C. Cir. 2023), *cert. denied,*
--- U.S. ---, 144 S. Ct. 1110 (2024)........................................................................... 17

*Anderson v. SUNY,*
2024 WL 3656551 (S.D.N.Y. July 29, 2024)............................................................. 3

*Ass'n of Am. Univs. v. Dep't of Defense,*
806 F. Supp. 3d 79 (D. Mass 2025) .......................................................................... 13

*Becker v. FEC,*
230 F.3d 381 (1st Cir. 2000) ....................................................................................... 3

*Biden v. Nebraska,*
600 U.S. 477 (2023)..................................................................................................... 4

*Burlington Truck Lines v. United States,*
371 U.S. 156 (1962).................................................................................................. 14

*Citizens Awareness Network, Inc. v. NRC,*
59 F.3d 284 (1st Cir. 1995)....................................................................................... 12

*Collins v. Yellen,*
594 U.S. 220 (2021).................................................................................................. 17

*Dalton v. Specter,*
511 U.S. 462 (1994)............................................................................................ 20, 21

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019)..................................................................................8, 9, 15, 21

*Doe v. Noem,*
    152 F.4th 272 (1st Cir. 2025) ................................................................................ 18

*Doe v. Trump,*
    157 F.4th 36 (1st Cir. 2025) .................................................................................. 22

*Emigrant Residential LLC v. Pinti,*
    37 F.4th 717 (2022).......................................................................................... 22, 23

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016).............................................................................................. 14

*Heckler v. Chaney,*
    470 U.S. 821 (1985).............................................................................................. 16

*Knox v. Serv. Emps. Int'l Union,*
    132 S.Ct. 2277 (2012)............................................................................................ 7

*League of United Latin American Citizens v. Executive Office of the President,*
    818 F. Supp. 3d 34 (D.C. Cir. 2026)............................................................... 17, 18

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................. 19, 20

*Lincoln v. Vigil,*
    508 U.S. 182 (1993)............................................................................................ 8, 9

*Los Angeles Cnty. v. Davis,*
    440 U.S. 625 (1979)................................................................................................ 5

*Lowe v. Gangné-Holmes,*
    126 F.4th 747 (1st Cir. 2025) .................................................................................. 5

*Lyman v. Baker,*
    954 F.3d 351 (1st Cir. 2020) ................................................................................... 3

*Mangual v. Rotger-Sabat,*
    317 F.3d 45 (1st Cir. 2003) ..................................................................................... 5

*Massachusetts v. NIH,*
    770 F. Supp. 3d 277 (D. Mass. 2025) ................................................................... 18

*Michigan v. EPA*,
  576 U.S. 743 (2015).................................................................................................... 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)...................................................................................................... 13

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025) .......................................................................................11

*New York v. Trump*,
  171 F.4th 1 (1st Cir. 2026) .......................................................................................6, 11

*New York v. Trump,*
  811 F. Supp. 3d 215 (D. Mass. 2025) .....................................................................11, 12

*Nulankeyutmonen Nkihtaqmikon v. Impson*,
  503 F.3d 18 (1st Cir. 2007) .......................................................................................... 5

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998)...................................................................................................... 5

*Ohio v. EPA*,
  603 U.S. 279 (2024)..................................................................................................... 12

*Resolution Trust Corp. v. North Bridge Assoc., Inc.*,
  22 F.3d 1198 (1st Cir. 1994) ...................................................................................... 25

*Rhode Island v. Trump*,
  155 F.4th 35 (1st Cir. 2025) ...................................................................... 2, 3, 19, 20

*Rhode Island v. Trump*,
  810 F. Supp. 3d 283 (D.R.I. 2025), *appeal filed*,
  No. 26-1070 (1st Cir. Apr. 4, 2026) ........................................................................9, 11

*Rios v. Centerra Group LLC*,
  106 F.4th 101 (1st Cir. 2024) ..................................................................................... 22

*Robbins v. Reagan*,
  780 F.2d 37 (D.C. Cir. 1985)....................................................................................... 14

*Rural Development Innovations Limited v. Morocco*,
  2026 WL 710260 (D.D.C. Mar. 13, 2026)................................................................11

iv

*Sierra Club v. Dep't of Energy*,
   26 F. Supp. 2d 1268 (D. Colo. 1998), *aff'd*,
   1998 WL 895927 (D. Colo. Oct. 22, 1998) ................................................................. 17

*Somerville Pub. Schools v. McMahon*,
   139 F.4th 53 (1st Cir. 2025) ..................................................................................... 20

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ............................................................................................. 2, 19

*Union of Concerned Scientists v. Wheeler*,
   954 F.3d 11 (1st Cir. 2020) ..................................................................................... 10

*Webster v. Doe*,
   486 U.S. 592 (1988) .................................................................................................. 9

*Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*,
   586 U.S. 9 (2018) ................................................................................................. 8, 10

*Wyo-Ben Inc. v. Haaland*,
   63 F.4th 857 (10th Cir. 2023) ................................................................................. 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................................................ 17

**Statutes**
42 U.S.C. § 2000g-1 ................................................................................................. 9, 15

42 U.S.C. § 2000g-2(b) ................................................................................................. 9

5 U.S.C. § 551(4) ......................................................................................................... 12

5 U.S.C. § 701(a)(2) ...................................................................................................... 8

5 U.S.C. § 706(2)(A) ................................................................................................... 18

Defendants' Cross-Motion for Judgment on the Pleadings, or, in the Alternative for Summary Judgment, Doc. No. 115 ("Opposition" or "Opp.") fails to engage with Plaintiffs' claims and the evidence in the Administrative Record. Instead, Defendants paint an untested picture of an operational CRS, ignoring the injuries Plaintiffs indisputably suffered from CRS's shutdown of services in 2025. The Court should not accept Defendants' unsupported characterizations, which are immaterial in any event. Defendants admit that in 2025 they caused CRS to stop offering all services as a result of what they call CRS's "reorganization" or "realignment," and have not reinstated those services to Plaintiffs. Moreover, whatever may be said about that decision, it is undisputed that it disabled CRS from being able to offer whole categories of services previously enjoyed by Plaintiffs. Moreover, even after Congress rejected Defendants' invitation to defund CRS for FY 2026 and directed Defendants to reinstate RIF-ed CRS employees, Defendants have still not permitted those reinstated employees to return to providing CRS services. None of this is consistent with an agency operating in good faith in accordance with its statutory mandate.

Defendants' decision to effectively shutter CRS, contrary to CRS's statutory mandate, is plainly reviewable. This is not changed by Defendants' post-suit conduct. Not only do Plaintiffs continue to be without the CRS services, but Defendants' conduct is a transparent attempt to present the appearance of compliance with CRS's statutory mandate, while functionally eliminating CRS.

In the alternative, should the Court deny Plaintiffs' Motion for Summary Judgment, Doc. No. 108 ("Mot."), Plaintiffs ask the Court, under Rule 56(d), to defer consideration of or deny Defendants' Opposition to allow Plaintiffs to undertake targeted discovery based on Defendants' reliance on witness testimony outside the Administrative Record. Plaintiffs have not been allowed to discover and probe the facts on which Defendants' Opposition relies in claiming that the

1

situation on the ground has meaningfully changed.

## I.  PLAINTIFFS' CASE IS JUSTICIABLE

### A.  Standing

Plaintiffs have suffered a classic Article III injury: they "have been and will continue to be injured by the defendants' failure to provide services on which the plaintiffs rely." *Rhode Island v. Trump*, 155 F.4th 35, 44 (1st Cir. 2025). It is undisputed that each Plaintiff organization lost access to CRS services as part of Defendants' across-the-board cessation of CRS service delivery in 2025. *See* Nam Decl. ¶ 28, Doc. No. 107-3 at 21 ("Between March and June of 2025, CRS withdrew all its engagements with communities . . . as a result of the planned closure of CRS."). This includes at least one organization, BRIDGE, that adapted its entire model in reliance on its ongoing receipt of CRS services over the course of fifteen years. Supp. VanSant Decl. ¶ 5, Doc. No. 107-15 at 2. It is equally undisputed that the withdrawal of CRS services occurred pursuant to, and because of, the challenged agency action at issue here—whether Defendants choose to label that action a "dissolution" or agency "elimination," as they did contemporaneously in RIF notices and budget materials, or instead a "reorganization" or "realignment." Nam Decl. ¶ 29, Doc. No. 96-3 at 23 ("Had it not been for CRS's planned dissolution . . . CRS would have continued to provide each stakeholder with the requested services."). Defendants' effort to recast Plaintiffs' injuries as merely "a generalized dispute over an agency's performance," (Opp. at 12), or a "generalized interest," *id.* at 13, fundamentally ignores the actual agency action being challenged and the concrete injuries it caused.

Defendants' conclusory claim (Opp. at 13) that the relief Plaintiffs seek "goes beyond remedying specific grievances arising from" the "loss of CRS services" also misconstrues standing principles. Whether an injunction is "broader than necessary to provide complete relief" is a distinct question from whether a plaintiff has "standing to sue." *See Trump v. CASA, Inc.*, 606 U.S.

831, 838 n.2 (2025). Plaintiffs have shown that their loss of access to CRS services, unlike a "programmatic" or a "generalized grievance" (Opp. at 13), gives them a "personal stake in the outcome of the controversy."[2] *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 224 (1974). And because Plaintiffs' injuries were proximately caused by an "across-the-board policy" about the fate of CRS as a whole, it is entirely appropriate that Plaintiffs seek to invalidate that agency policy; doing so does not turn their claim into an improper generalized grievance. *See Rhode Island*, 155 F.4th at 44 (finding that plaintiffs who lost services had standing to challenge agency-wide directive about grant terminations and staffing reductions); *cf. Lyman v. Baker*, 954 F.3d 351, 361 (1st Cir. 2020) (recognizing voter standing in the face of government's argument that their injury was too widely shared, because the voters had demonstrated a "disadvantage to themselves as individuals" as a result of the challenged policy).

Defendants' contention that Plaintiffs lack standing because CRS has purportedly "resumed providing services" to groups *other than Plaintiffs*, and because some Plaintiffs did not re-submit requests (Opp. at 14), fares no better. Standing is assessed at the time the complaint is filed, *see Becker v. FEC*, 230 F.3d 381, 389 (1st Cir. 2000), and at that time, Plaintiffs had already lost access to CRS services because of Defendants' "across-the-board terminations" of services, *see Rhode Island*, 155 F.4th at 44. Nothing in Article III requires Plaintiffs to continue submitting requests to an agency that has already been dismantled to the point that it lacks the personnel and operational capacity to provide the relevant mediation and conciliation services. *See* Pls.' Mot at 29.

---

[2] Accordingly, the cases on which Defendants rely are plainly inapposite. *See Adim v. Bragg*, 2024 WL 4467193 (S.D.N.Y. Oct. 7, 2024) (plaintiff sought to vindicate Donald Trump's legal rights following Trump's New York conviction); *Anderson v. SUNY*, 2024 WL 3656551, at *2-3 (S.D.N.Y. July 29, 2024) (asserted injury was that the government was not adequately informing the public about climate change or educating students);

In any event, Defendants concede that multiple plaintiffs *did* submit new requests for CRS assistance earlier this year, only to have them denied, including on the ground that CRS no longer had the personnel or operational capacity to provide those previously available services. *See* Doc. 116-3 at 4 (advising BRIDGE that "CRS is unable to offer direct assistance at this time."); Doc. No. 116-1 at 13 (declining to provide mediation monitoring and implementation services); *cf.* AR at 270 (acknowledging that a one-person CRS would not have capacity to provide mediation services). That undisputed evidence decisively defeats Defendants' standing challenge, because the existence of even one plaintiff with standing is sufficient to satisfy Article III. *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

### B.      Ripeness

Defendants' ripeness argument suffers from the same basic flaw as their standing argument: it rests on a mischaracterization of Plaintiffs' claims and the agency actions under review. Plaintiffs are not challenging some abstract future agency conduct; they are challenging the completed agency decision to dissolve (or "reorganize") CRS, which directly cost them access to CRS services before this lawsuit was even filed. To the extent Plaintiffs point to CRS's continued inability to provide many of its former services in 2026 in this and prior briefing, that evidence merely confirms the practical effects of the challenged decision and underscores Plaintiffs' claims that Defendants effectively eliminated CRS as a functioning service agency. The agency decision under review remains the effective disabling of the agency in 2025. Defendants' own authority (Opp. at 20) confirms that "allege[d] harms from disrupted [services] that happened" already "can't be branded as speculative." *See Am. Fed. of Teachers, AFL-CIO v. Davis*, 818 F. Supp. 3d. 538 (S.D.N.Y. Dec. 30, 2025), a*ppeal filed sub nom., Am. Fed'n of Teachers, AFLCIO v. Goldstein*, No. 26-461 (2d Cir. Mar. 2, 2026) (observing, as here, that the government's ripeness argument "misunderstand[s] the nature of the plaintiffs' claims" and "do[es] not address plaintiffs' claims

that are rooted in the past").

Put simply, "[a] person with standing who is injured by a failure to comply with [a statute] may complain of that failure at the time the failure takes place, for the claim *can never be riper*." *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 32 (1st Cir. 2007) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998)) (emphasis added).  Defendants do not even contend that Plaintiffs filed suit before suffering injury.  Rather, they contend that events occurring after the complaint was filed—namely, CRS's purported resumption of some services and some Plaintiffs' decision not to resubmit new requests—undermine justiciability.  But such arguments sound in mootness, not ripeness.  Once Defendants' "reorganization" decision inflicted concrete injury on Plaintiffs, their claims became ripe, and subsequent events could not retroactively render that completed agency action "unripe."  Plaintiffs' claims are therefore plainly "fit[] . . . for judicial decision."  *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003) (citation omitted).

## C.    Mootness

The record likewise forecloses any claim of mootness.  To prevail on that theory, Defendants must show that subsequent events have "completely and irrevocably eradicated the effects of the alleged violation."  *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979).  Defendants have not come close to discharging this "heavy burden."  *See Lowe v. Gagné-Holmes*, 126 F.4th 747, 755 (1st Cir. 2025) (noting that defendant bears burden).

As described above, Plaintiffs have readily demonstrated a concrete injury traceable to Defendants' decision in 2025 to reduce CRS to a single-person shell organization incapable of providing the services Plaintiffs had previously enjoyed.  Defendants previously admitted, in sworn testimony submitted in connection with Plaintiffs' Motion for Temporary Restraining Order, that if Congress funded CRS for FY 2026, CRS—as constituted after its "reorganization"—would not be able to comply with Congress's direction; rather, they would need to "reassess and consider

5

how to comply." *See* Lauria Decl. ¶ 13, Doc. No. 15-1 at 3-4.  Defendants do not claim to have undertaken any effort to do so, however, even though Congress expressly allocated $20 million for CRS (and CRS alone) in FY 2026.  Indeed, although Defendants rescinded the near-total RIF of CRS employees, *none* of those employees is performing CRS functions.  Moreover, Defendants have not reinstated (nor even offered to reinstate) services to *any* of the Plaintiff organizations.  This includes multiple Plaintiffs who resubmitted requests for assistance in 2026.  *See* 2d Nazaire Decl. ¶ 11, Doc. No. 116 at 6-11.  Under these undisputed circumstances, Defendants have fallen far short of meeting their "heavy burden of showing mootness." *Lowe*, 126 F.4th at 755; *see also New York v. Trump*, 171 F.4th 1, 16 (1st Cir. 2026) (rejecting mootness challenge on appeal from preliminary injunction where rescission of challenged agency memorandum "failed to give [plaintiffs] all the relief that they were seeking").

Even taking at face value Defendants' claim that CRS "remains operational"—a fact that Plaintiffs should have an opportunity to test if it becomes material to the outcome in this case, *see* Part V., *infra*—that would not moot to the controversy in this case.  CRS remains a shell of an agency that cannot provide the types of "sustained engagements" from which Plaintiffs had previously benefited.  Admin. Record ("AR") at 270, Doc. No. 91-1 at 270; 2d Nazaire Decl. ¶ 12, Doc. No. 116 at 12.  CRS's sole employee admits that, following the decimation of CRS's staff, she has closed numerous requests for services not because she deemed them inappropriate for CRS action, but rather because of "limited staff availability."  Nazaire Decl. ¶ 8, Doc. No. 116 at 4.  And she has categorically "not pursued" any "requests for mediation" because of the limited staffing. *Id*.  This reference to "limited staff availability" is simply a sanitized way of describing the known and intended consequences of the challenged dissolution/reorganization.  Defendants reduced CRS from a roughly fifty-person agency to a single employee, fully aware that CRS could no longer

6

provide many of the services it had historically offered.

Moreover, *even if* Defendants could show that subsequent developments had eliminated Plaintiffs' injuries—which they plainly cannot—their mootness argument would still fail under the voluntary cessation exception. The voluntary cessation exception "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Am. C.L. Union of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 54 (1st Cir. 2013) (citation omitted). As the Supreme Court has stated, "maneuvers designed to insulate a decision from review . . . must be viewed with a critical eye" and, as a result, "[t]he voluntary cessation of challenged conduct does not ordinarily render a case moot." *Knox v. Serv. Emps. Int'l Union*, 132 S.Ct. 2277, 2287 (2012) (citation omitted).

Defendants' post-suit conduct reflects a textbook attempt to preserve the appearance of compliance while retaining the practical consequences of the disabling of CRS. After Congress required rescission of the CRS RIF, Defendants nominally reinstated personnel to CRS, while refusing to permit those personnel to perform the CRS work that Congress has funded over the Administration's objection. The result is that CRS remains functionally disabled from providing whole categories of services previously enjoyed by Plaintiffs, notwithstanding the formal rescission of the RIF and funding of CRS. The Administration's public statements further underscore the concern that CRS's purported change in status is manufactured rather than genuine. For example, the Administration's budget proposal for FY 2027 labels CRS a "woke enterprise" with a "long track record of . . . legitimizing riotous behavior that puts America's police in the crosshairs."[3] *See* 4th Freeny Decl. ¶ 9 & Ex. 1, Doc. No. 127 at 3 & 127-1 at 2.

---

[3] The Trump Administration has maintained this hostile posture towards CRS even while CRS Associate Director and Component Head, Julius Nam, provided a thorough memo responding to

Such rhetoric makes it exceedingly difficult to credit Defendants' assertion that they have abandoned the policies that resulted in CRS's functional dismantling.

Defendants try to escape the voluntary cessation doctrine by claiming that the limited resumption of CRS services (to parties other than Plaintiff) is "unrelated to the litigation." Opp. at 16. This is not supported by the record. As Defendants concede (Opp. at 27), CRS did, in fact, withdraw *all* of its services by Summer 2025. It was not until at least February 2026, well *after* this litigation was filed, that Ms. Nazaire resumed at least the appearance of these services. *Cf.* Pelletier Decl. ¶ 7, Doc. No. 85-1 (conceding that, as of February 11, 2026, "plans for resumption of operations of CRS" were "not yet set").

## II.    PLAINTIFFS ARE ENTITLED TO REVIEW UNDER THE APA

### A.    The Narrow Exception for Action "Committed to Agency Discretion" Does Not Apply

Defendants argue (Opp. at 19) that their decision to shutter CRS is unreviewable under 5 U.S.C. § 701(a)(2), a provision that exempts from APA review "agency action [that] is committed to agency discretion by law." But because the APA "embodies a basic presumption of judicial review," courts read this exemption "quite narrowly." *Dep't of Com. v. New York*, 588 U.S. 752, 771-72 (2019). Its application is restricted to those "rare circumstances" where "the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). The "few cases" in which the Supreme Court has applied the exception "involved agency decisions that courts have traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum appropriation." *Id.*

---

the Administration's criticisms and proposing ways in which CRS's services could advance the Administration's stated peacemaking and public safety goals. AR 424-35.

This case, in contrast, involves the kind of claims federal courts routinely review: a challenge to agency action that directly affects Plaintiffs' access to government services and implicates a statute with mandatory language.  CRS's statutory mandate is explicit: it "*shall be the function*" of CRS "to provide assistance to communities" in resolving civil rights "disputes, disagreements, or difficulties."  42 U.S.C. § 2000g-1.  Congress contemplated the provision of "conciliation services," not referral services.  *Compare id.* § 2000g-2(b) with AR 270-74. (describing a single-person CRS that cannot engage meaningfully with the community and effectively functions as a referral clearinghouse).  And even where the statute speaks in permissive terms—that the Service "may offer its services"—it provides guidelines for how CRS should exercise that discretion, namely, based on whether "in [CRS's] judgment, peaceful relations among the citizens of the community involved are threatened."  42 U.S.C. § 2000g-1.  Accordingly, this is not a case, like *Webster v. Doe*, 486 U.S. 592, 599 (1988), where there is "no law to apply."  *Id.* at 600 (statute expressly authorized agency head to terminate an employee "whenever [he] shall *deem* such termination necessary or advisable," without any command, limitation, or guiding principles) (emphasis in original).

Nor is the existence or continuity of operations of an agency like CRS a decision "traditionally" "regarded as committed to agency discretion."  *Dep't of Com.*, 588 U.S. at 772 (citation modified) (distinguishing *Webster* on this ground).  "The simple proposition that the President may not, *without Congress*, fundamentally reorganize the federal agencies is not controversial."  *AFGE, AFL-CIO v. Trump*, 782 F. Supp. 3d 793, 820 (N.D. Cal. 2025).  And Plaintiffs are not, as in *Lincoln*, 508 U.S. at 191, challenging the discretionary allocation of a lump sum appropriation.  *See Rhode Island v. Trump*, 810 F. Supp. 3d 283, 304 (D.R.I. Nov. 21, 2025) (distinguishing *Lincoln* from challenge to dismantling of agency specifically authorized and

funded by Congress).  Indeed, Congress rejected the Administration's request to zero out CRS's funding and expressly allocated $20 million for CRS's continued provision of services in FY 2026. The discretion to assess community conditions and focus resources allocated by Congress where they are most needed is not unfettered discretion to extinguish the agency or deny whole categories of services for any reason, however arbitrary.  *See Weyerhaeuser Co.*, 586 U.S. at 23-24.

Defendants' argument to the contrary rests primarily on what they call CRS's "triple discretion."  Opp. at 19.  But even where a statute "leaves a great deal of discretion to the agency," that does not "make actions taken pursuant to it unreviewable."  *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 19 (1st Cir. 2020).

Defendants' reliance on *Am. Fed'n of Teachers, AFL-CIO v. Davis* is also misplaced.  As Defendants concede (Opp. at 21), the court in *American Federation of Teachers* found **both** statutes there at issue reviewable under the APA, even where the more permissive of the two provided that the agency in question "***may*** proffer its services . . . whenever ***in its judgment***" a dispute required such.  *Am. Fed'n of Teachers*, 818 F. Supp. 3d. at 548 (emphases added).  The government was not free to exercise its discretion to establish categorical thresholds for when it would and would not offer services without engaging in reasoned decisionmaking.  *Id.*  After all, the court noted, "the APA explicitly charges courts with judging when agencies have abused their discretion."  *Id*. (citation modified).  So too here.[4]

---

[4] Defendants' effort to cabin to *American Federation of Teachers* to cases where an agency imposes a "numerical threshold" for providing services, rather than some other categorical threshold (such as refusal to provide mediation or other services requiring "sustained engagement") finds no support whatsoever in that decision.  Moreover, Defendants *did* impose an arbitrary numerical threshold here—concluding that a single employee could carry out the work of CRS that had previously been shouldered by dozens, even knowing it would preclude CRS from providing entire classes of assistance.

10

### B. Plaintiffs Challenge Final Agency Action

Defendants' argument that Plaintiffs do not challenge a "discrete" and "final" agency action—that they instead bring an improper "programmatic" challenge—similarly rests on a misunderstanding or mischaracterization of what is actually before the Court.   Plaintiffs challenge DOJ's "*definitive* plan to dismantle the agency," that is, to reduce it to a single-person agency that is incapable of providing the services it previously provided.  Mot. at 34 (citing Lauria Decl. ¶ 13, Doc. No. 15-1 at 3-4) (emphasis in original).  That decision was announced in a memorandum approved by the Attorney General on September 16, 2025, *see* AR at 311, Doc. No. 91-1 at 311— a memorandum that, while devoid of reasoned explanation, is no less discrete and final than the policies found to be reviewable in other similar cases.  *See, e.g.*, *New York v. Trump,* 171 F.4th at 9-10 (OMB memorandum freezing disbursement of funds); *Rhode Island v. Trump*, 810 F. Supp. 3d 283, 302 (D.R.I. 2025), *appeal filed*, No. 26-1070 (1st Cir. Apr. 4, 2026) ("policy to eliminate all non-statutorily required activities and functions and reduce their statutory functions and personnel to the bare minimum").  Indeed, the First Circuit has *twice* rejected similar efforts by the Administration to thwart judicial review by labeling an across-the-board agency policy or directive as a "programmatic attack."  *See New York v. Trump*, 171 F.4th at 17-18; *New York v. Trump*, 133 F.4th 51, 66-69 (1st Cir. 2025).

Defendants do not grapple with that controlling authority at all.  Instead, they cite case law that is both distinguishable and out-of-circuit.  For example, Defendants cite *Rural Development Innovations Limited v. Morocco*, 2026 WL 710260, at *4 (D.D.C. Mar. 13, 2026), but there, "plaintiffs [did] not identify a single decision" that shut down the U.S. African Development Foundation.  Far more probative is the decision in *New York v. Trump*, where the court concluded that an "agency-imposed suspension of certain activities constitutes final agency action."  811 F. Supp. 3d 215, 233 (D. Mass. 2025); *see also Rhode Island v. Trump*, 810 F. Supp. 3d at 301-02

11

(rejecting similar out-of-circuit authorities because the court was bound by First Circuit precedent, which had already "rejected Defendants' exact argument not once but twice"); *cf.* 5 U.S.C. § 551(4) (defining "rule" to include an "agency statement . . . describing the organization, procedure, or practice requirements of an agency" or describing "practices bearing on" the provision of agency services).

Defendants' suggestion that the finality of an agency action can be altered by subsequent agency decisionmaking that occurs during the pendency of litigation finds no support in the cases they cite or the law more generally. Even an "interim agency resolution" qualifies as a final agency action, despite the "potential for a different permanent decision" at some later date. *New York v. Trump*, 811 F. Supp. 3d 215, 233 (D. Mass. 2025). Here, more than "appear[ing]" to have shuttered, *id.* at 234, CRS withdrew all services to the public; adopted a new structure for a one-person agency that concededly could not comply with Congress's reauthorization of the agency's eight-figure budget, *see* Lauria Decl. ¶ 13; and disabled the agency from providing services that Plaintiffs had been receiving, including mediation and facilitated dialogue services. *See* AR at 270. Accordingly, Defendants' claim that CRS is subject to an "unfolding, developing plan," (Opp. at 28), does not render those actions any less final for purposes of APA review. Nor does Defendants' contention (Opp. at 27) that "CRS continues to exist and to perform its statutory functions" speak to finality. That argument instead goes to the merits.

### III.    Merits

#### A.    Defendants Violated the APA in Multiple Ways

Under the APA, this Court's review "is not a rubber stamp." *Citizens Awareness Network, Inc. v. NRC*, 59 F.3d 284, 290 (1st Cir. 1995). An agency's action must be "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted).

### i.    Defendants' Decisionmaking Was Arbitrary & Capricious

Defendants' decision to dissolve CRS was arbitrary and capricious because Defendants did not, and cannot, "cogently explain why [they] exercised [their] discretion in [the] manner" they have. *Ass'n of Am. Univs. v. Dep't of Defense*, 806 F. Supp. 3d 79, 114 (D. Mass 2025) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983)).  This is unsurprising, of course, because Defendants harbor open hostility to the statutory mission and very existence of CRS.  Ex. 2 to 3rd Freeny Decl. at p.20, Doc. No. 107-2 at 9 ("[t]he CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities.").

In their brief, Defendants point to an *ipse dixit* in the ARRP Memo that one person "is the minimum number of employees required to perform CRS' [sic] statutory functions."  Opp. at 30 (citing AR 332).  But Defendants "do not point to any part of the record where they provide any explanation as to how th[at] limit[ was] determined." *Am. Fed. of Teachers*, 818 F. Supp. 3d at 549.  Ms. Nazaire's July 13, 2025 memorandum may, as Defendants suggest (Opp. at 30), "explain[] how [a single-person CRS] would work," but nowhere does it recommend such a radical decimation of CRS's operations.  AR 270.  That is no surprise, since Ms. Nazaire was directed to start with the conclusion that CRS would be reduced to a single person, and in any event, Ms. Nazaire was only "familiar with *limited aspects*" of the decisionmaking process, Nazaire Decl. ¶ 4, Doc. No. 51-1 at 2.  Nor does her memo or that of the Attorney General (nor Defendants in their briefing) address input from CRS's then-Director that at 36 people, CRS was already at "a near-minimum level necessary" to offer critical services.  AR at 345, Doc. No. 92-2 at 6.

For similar reasons, Defendants' claim that they accounted for stakeholders' reliance interests (the existence of which Defendants do not dispute) also fails.  Defendants point to isolated references in Ms. Nazaire's July 13 memorandum to "stakeholders, such as law enforcement and

13

community leaders," but the memorandum does not purport to take them into account in recommending an appropriate scope for the agency's operations (since no such recommendation was actually made). And in admitting that "CRS would no longer be positioned to offer facilitated dialogues and mediation services," the memorandum disregards any reliance interests—even those mediations that were ongoing—concluding that these "services may need to be deprioritized or transitioned to external partners." AR0270. The memo provides no "reasoned explanation" for why Defendants prioritized wholesale decimation of CRS's workforce over those substantial reliance interests. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

Defendants' Opposition also makes it clear that Defendants did not consider whether and how CRS's dissolution or "realignment"—whichever term is used—advanced, or even was consistent with, CRS's mission. *State Farm*, 463 U.S. at 43 (requiring agencies provide a "rational connection between the facts found and the choices made" (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962))). Nor did Defendants address legitimate concerns raised about moving CRS to EOUSA, a litigation and prosecutorial arm of the DOJ. Mot. at 30; *State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious where "failed to consider an important aspect of the problem"). And that, too, should come as no surprise. Defendants have repeatedly aired their disdain for the organization—even though it is one that Congress has repeatedly funded and expanded its jurisdiction. *See* Mot. at 4, 21. Because Defendants' actions are "not . . . reasonably consistent with" Congress's goal in the Civil Rights Act—indeed, by Defendants' own contemporaneous telling, their actions were directly hostile to those goals—this "court[] must invalidate [them]." *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985).

### ii. Defendants' Actions Are Not in Accordance with Law and Are In Excess of Statutory Authority

Defendants' effective dismantling of CRS—resulting in its refusal to provide any services

14

for a period of more than six months and its continued inability to provide any "sustained engagements" to communities—is also contrary to the congressional directive that it "*shall be the function* of the Service to provide assistance to communities" in resolving disputes related to discriminatory practices, 42 U.S.C. § 2000g-1 (emphasis added).  This is all the more so because the *only* available explanation for Defendants' action is their disagreement with CRS's mission.  Ex. 2 to 3rd Freeny Decl. at p.20, Doc. No. 107-2 at 9.

Defendants do not contest that their decision to "reorganize" CRS resulted in the wholesale cessation of any "assistance to communities," 42 U.S.C. § 2000g-1, in mid-2025.  Instead, they again point to recent post-litigation conduct that, should it be material to this litigation, Plaintiffs must have an opportunity to test, *see* Part V., *infra*.  This is an argument about mootness, however, which fails for the reasons stated in Part I.(C) above.  Whatever may be said about CRS's operations after this lawsuit was filed, there is no dispute that Defendants ceased providing *any* assistance to communities in mid-2025, 2d Nazaire Decl. ¶ 3, Doc. No. 116 at 2, after DOJ announced that would "eliminate" CRS out of disagreement with its statutory mission. *See* Pls.' Mot. at 13.

Moreover, as set forth in greater detail in prior briefing, *see, e.g.*, Pls.' Mot. at 22, 25, this Court need not, and should not, accept Defendants' characterizations of their decision, nor ignore Defendants' own contemporaneously admissions about what they were doing—functionally dissolving CRS so that it could no longer carry out the core civil rights mission of CRS that this Administration (inexplicably) finds to be so odious.  In asking this Court to believe that "CRS continues to exist and to perform its statutory functions" (Opp. at 27) while the Administration openly accuses CRS of promoting riots and endangering law enforcement, Defendants ask this Court to exhibit "a naivete from which ordinary citizens are free." *Dep't of Com.*, 588 U.S. at 785.

15

The Court should decline that invitation and should evaluate Defendants' actions based on what Defendants themselves contemporaneously said they were doing—eliminating CRS and its functions—something Defendants concede to be unlawful, Doc. No. 118 at 15 (acknowledging CRS must "remain[] operational absent an act of Congress").

Finally, Defendants' unwillingness to admit, in this litigation, that a single-person CRS cannot conduct mediation—claiming, instead, that "whether [CRS] provides mediation services in the future remains to be seen" (Opp. at 32)—only highlights the extent to which Defendants' position rests on litigation abstractions rather the actual operational reality Defendants deliberately created. *See* 2d Nazaire Decl. ¶ 12(c), Doc. No. 116 at 12 ("I cannot take on mediations while also providing meaningful service across other cases").

### iii.    Services Unlawfully Withheld

Contrary to Defendants' conclusory assertions (Opp. at 29), this is a case where the agency's wholesale cessation of agency operations is "so extreme as to amount to an abdication of its statutory responsibilities." *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985); *see also* 2d Nazaire Decl. ¶ 3 ("CRS had been *categorically* denying all new requests for service during the period approximately May through October") (emphasis added). Although Defendants allege they have resumed services to entities other than Plaintiffs, they have not resumed services to Plaintiffs—even though Plaintiffs' loss of services was the direct result of Defendants' unlawful and categorical shutdown of CRS operations in 2025. Accordingly, and for the reasons set forth above, this claim is not moot. *Cf. Wyo-Ben Inc. v. Haaland*, 63 F.4th 857, 874 (10th Cir. 2023) ("[I]f the actor under the affirmative duty keeps failing to act while the underlying problem remains unremedied," then the repeated instances of inaction constitute new violations.).

Moreover, should the Court decide that the current status of CRS's operation is material to deciding this claim, Plaintiffs should be permitted to probe that question through discovery, as

16

explained further in Part V. below.  *See Sierra Club v. Dep't of Energy*, 26 F. Supp. 2d 1268, 1271 (D. Colo. 1998), aff'd, 1998 WL 895927 (D. Colo. Oct. 22, 1998) ("Extra record evidence may be allowed in cases where an agency is being sued for failure to act if the record before the court is insufficient for the court to determine whether the agency unlawfully withheld compliance with a statutory mandate.").

### B.  Plaintiffs Should Also Prevail on Their Constitutional and Ultra Vires Claims

Contrary to Defendants' articulation of governing law, "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).  As the Supreme Court has "explained on many prior occasions," that is because "the separation of powers is designed to preserve the liberty of all the people." *Id*.

Far from being a bar to Plaintiffs' claims here (*see* Opp. at 32-33), the Court's holding in *Dalton v. Specter*, 511 U.S. 462 (1994), "merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains *no limitations* on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023), *cert. denied*, --- U.S. ---, 144 S. Ct. 1110 (2024) (citation modified).  "Unlike the base-closure statute at issue in *Dalton*, the statutes at issue [here] assign no relevant role to the President" in operating CRS.  *League of United Latin Am. Citizens v. Executive Office of the President*, 818 F. Supp. 3d 34, 82 (D.C. Cir. 2026) (concluding plaintiffs asserted separation-of-powers claim).  And, like in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), Defendants here "claim[]" "no statutory authority" for their actions to **dismantle** CRS.  *Dalton*, 511 U.S. at 473.  It is uncontroversial that the executive "may not, *without Congress*, fundamentally reorganize the federal agencies." *AFGE*, 782 F. Supp. 3d at 820 (citing "constitutional commentators and politicians across party lines").  Indeed,

Defendants concede that "absent an act of Congress," CRS must "remain[] operational." Opp. at 15. Accordingly, Defendants have "wrongly exercised powers that the Constitution vests in Congress . . . alone." *League of United Latin Am. Citizens*, 818 F. Supp. 3d at 82.

## IV. VACATUR AND A PERMANENT INJUNCTION ARE APPROPRIATE REMEDIES

*Vacatur.* "The normal remedy for a successful APA challenge is vacatur of the [final agency action] and its applicability to all who would have been subject to it." *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 329 (D. Mass. 2025). Indeed, the APA itself "instructs a reviewing court to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Doe v. Noem*, 152 F.4th 272, 287 (1st Cir. 2025) (quoting 5 U.S.C. § 706(2)(A)). As discussed above, Defendants' decision to dissolve CRS is a discrete, final action. *Supra* at Part II.(B). Additionally, Defendants have not shown how the retention of one CRS employee who has supposedly resumed offering some CRS services was a reasoned decision and assures continued compliance with CRS's statutory mandate. *Supra* at Part III.(A)(i). And while Defendants claim that the "RIF actions have been reversed," (Opp. at 36), those reinstated employees were either reassigned throughout the Department of Justice or are detailed elsewhere for "training for integration into EOUSA." Opp. at 10. Defendants at no point indicate that these employees will return to providing CRS services. Thus, Plaintiffs seek the vacatur of Defendants' unreasoned and unlawful decision to effectively eliminate CRS and its functions through the purported "realignment" of CRS.

*Permanent Injunction.* Defendants' claim that Plaintiffs abandoned their request for a permanent injunction is without merit. Plaintiffs explained in their opening brief that, in addition to the remedy of vacatur, "injunctive relief is separately appropriate" to remedy the "disabling of CRS and resulting wholesale cessation of services," because "vacatur alone will not fully remedy

18

without affirmative relief restoring those functions." Pls.' Mot. at 36 & n.5.

Defendants' claim that an injunction would be "impermissibly broad" under *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), misunderstands that authority. "Nothing in CASA provides that, as a categorical matter, it is improper for a district court to impose an injunction of [sufficient] breadth" "to provide the plaintiff with complete relief." *Doe v. Trump*, 157 F.4th 36, 80-81 (1st Cir. 2025). Plaintiffs do not seek an order of relief for a nonparty. But because Plaintiffs' injuries arise from Defendants' disabling of CRS and the resulting wholesale cessation of services, there is "no workable, narrower alternative." *Id.* at 81.

Plaintiffs have and will continue to suffer irreparable harm absent a permanent injunction. *Cf.* Pls. Mem. on PI, Doc. No. 35 at 29-35; Pls. PI Reply, Doc. No. 63 at 1-3. Plaintiff organizations have had to "diminish or halt services," causing irreparable injury. *Rhode Island v. Trump*, 155 F.4th 35, 49 (1st Cir. 2025) (citation modified); *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) ("An organization is harmed if the actions taken by the defendant have perceptibly impaired the organization's programs.") (citation modified). For example, CRS served as a key parter to BRIDGE in the delivery of civil rights programming to its constituents for the last fifteen years. Supp. VanSant Decl. ¶ 5, Doc. No. 33-23 at 2. As soon as BRIDGE learned that CRS was accepting requests by email, BRIDGE reached out, noting that they were "thrilled to know about the re-opening of the CRS office" and "believe that resuming CRS services would be both timely and impactful." Doc. No. 116-3 at 2. BRIDGE's optimist was rewarded with a terse denial: "CRS is unable to offer direct assistance at this time." *Id.* at 4.

Similarly, Missionary Baptist State Convention of Missouri and the NAACP of St. Louis County both asked CRS to resume its role in implementation of the mediation agreement with the St. Louis County Police Department. CRS's absence from the process had "weaken[ed] [the]

19

prospects for effectuating real change" through the agreement.  Duvall Decl. ¶ 16, 17, Doc. No. 33-24 at 4-7.  CRS refused.[5]  And "there are no other alternative resources that could substitute for CRS's assistance."  *See* Duvall Decl. ¶ 23, Doc. No. 107-16 at 7.

Defendants' contention (Opp. at 35) that, because some Plaintiffs have not reengaged with CRS now that Ms. Nazaire has allegedly resumed offerings CRS services, Plaintiffs' injuries are not "genuine[]" finds no legal support.  Defendants denied the requests of every Plaintiff who made one, and made it clear that CRS could not provide many categories of services Plaintiffs had been receiving; moreover, the timeline of events—including the reinstatement of CRS employees followed by Defendants' refusal to allow them to actually perform CRS work—highlights the practical futility of making new requests, after Plaintiffs already filed this lawsuit to force resumption of services and Defendants refused.

*Finally,* "there is generally no public interest in the perpetuation of unlawful agency action." *Trump*, 155 F.4th at 50 (quoting *Somerville Pub. Schools v. McMahon*, 139 F.4th 53, 76 (1st Cir. 2025)).  Comparatively, Plaintiffs here seek to vindicate that "substantial public interest in having governmental agencies abide by federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (citation modified).

## V.    IN THE ALTERNATIVE, IF THE COURT DOES NOT GRANT SUMMARY JUDGMENT TO PLAINTIFFS, RELIEF SHOULD BE GRANTED UNDER RULE 56(D)

For all the foregoing reasons and those set forth in prior briefing, Plaintiffs are entitled to summary judgment in this case based on the law, the administrative record, and the undisputed facts. *See Michigan v. EPA*, 576 U.S. 743, 758 (2015) ("A court may uphold agency action only

---

[5] CRS claimed that mediation implementation was outside its scope, Nazaire Decl. ¶ 11(a)(iii), but the record shows that "had CRS not ceased operations, it would have played a significant role in implementation of that agreement."  Supp. Nam Decl. ¶ 9, Doc. No. 107-4 at 5.

on the grounds that the agency invoked when it took the action."); *see also Dep't of Com.*, 588 U.S. at 781, 785 (citation omitted) (approving of extra-record evidence on the question of pretext or agency intent where, as here, there is "strong showing of bad faith or improper behavior" by an agency or a "disconnect between the decision made and the explanation given").  But even if this Court were to conclude otherwise, it should not enter summary judgment for Defendants, because Defendants' position is premised, at every turn, on the disputed allegations that Defendants "restored CRS operations" in early 2026, that CRS "has been responding to and evaluating requests for services and delivering services *as appropriate*," and that CRS "will continue to operate unless and until Congress legislatively eliminates it."  Opp. at 1 (emphasis added).  Defendants rely on a new declaration from Ms. Nazaire for thes propositions, *even after* Defendants represented to this Court that they "intend[e]d to defend this case on the basis of the administrative record, not witnesses."  Defs.' Notice Re: Witness Testimony, Doc. No. 89 at 1.

To be sure, Defendants' rosy new allegations are undermined by other facts already before the Court, including that after Congress ordered DOJ to reinstate terminated CRS employees, Defendants continued to bar those employees from engaging in *any* CRS duties.  *See* Doc. No. 85 at 3.  These employees are kept from carrying out CRS's function, even though the sole CRS employee concedes that "staffing constraints" are preventing her from providing a wide range of core conciliation services.  2d Nazaire Decl. ¶ 12, Doc. No. 116 at 12.  The notion that CRS is operating, and will continue to operate, in good faith compliance with its mandate is also difficult to square with the Administration's naked condemnation of CRS in its 2027 budget proposal; that condemnation is far more consistent with the conclusion that any recent and limited resumption of CRS services is a façade erected to defeat this Court's review of Defendants' unlawful actions.

Nonetheless, if the Court is inclined to consider the allegations set forth in Ms. Nazaire's

21

declaration in adjudicating Defendants' motion for summary judgment, Plaintiffs must have the opportunity to test them first, pursuant to Rule 56(d).[6]  Rule 56(d) "protect[s] a litigant who justifiably needs additional time to respond in an effective manner to a summary judgment motion." *Emigrant Residential LLC v. Pinti*, 37 F.4th 717, 724 (2022) (citation modified).  In addition to being timely and supported by an affidavit or declaration, a motion must "show good cause for failure to discover the relevant facts earlier," "establish a plausible basis for believing that the specified facts probably exist," and "indicate how those facts will influence the outcome of summary judgment." *Rios v. Centerra Group LLC*, 106 F.4th 101, 121 (1st Cir. 2024).  There is no dispute that Plaintiffs' request under Rule 56(d) is timely, as it is submitted contemporaneously with their opposition to Defendants' motion for summary judgment, to which the new Nazaire Declaration was appended.

*Good Cause*.  Good cause exists for why Plaintiffs have been able to discover additional facts to contest Defendants' characterization of CRS's post-litigation operations.  On December 22, 2025, Plaintiffs moved this Court to allow limited discovery to "probe whether Defendants' explanations for the challenged actions are pretextual." Docs. Nos. 65 & 67 at 1.  The Court denied Plaintiffs' request as premature.  Doc. No. 90 at 11.  In doing so, the Court relied on Defendants' representation that they "intend[ed] to defend this case on the Administrative Record alone and [would] not rely on any witness testimony." *Id*. at 10.  Defendants should not now be permitted to rely on testimony Plaintiffs have had no opportunity to test.  This is all the more so where the declarant has admitted that she was not a decisionmaker about CRS's strategic direction, 1st Nazaire Decl. ¶ 2, Doc. No. 51-1 at 4, and those officials who *do* have a say over that direction

---

[6] In the alternative, the Court should strike the new Nazaire Declaration to avoid unwarranted prejudice to Plaintiffs.

have repeatedly demonstrated open hostility towards CRS's continuing operation. *See Emigrant Residential*, 37 F.4th at 726-28 (movant established good cause where court initially denied discovery on issue related to ultimate grounds for dismissal and movant cast doubt on sincerity of nonmovants' actions).

*Likely Existence*. Defendants' own briefing, along with Ms. Freeny's declaration, establishes the likely existence of facts justifying denying Defendants' summary judgment pending the completion of discovery, should the Court find Ms. Nazaire's declaration material. Ms. Nazaire's declaration asserts that she has "resumed reviewing service requests," (Doc. No. 116 ¶ 3), at what Defendants assert is an "appropriate" level, (Opp. at 16). And yet, Ms. Nazaire admits that she closed requests because of CRS's "limited staff availability," (Doc. No. 116 ¶ 8), and has not considered any "requests for mediations," which CRS "historically . . . performed," (*Id*. ¶ 12(c)). Additionally, Defendants claim that "nine of twelve affected employees have returned to CRS," (Opp. at 15 n.6), but simultaneously admit that those employees are not doing CRS work, rather are "undergoing" "training for integration into EOUSA," while never confirming any plans for those employees' return to CRS, (*Id*. at 10). Defendants have exclusive access to reinstated CRS employees, whose testimony is expected to undermine Defendants' portrayal. *See* 4th Freeny Decl. ¶¶ 11-15, Doc. No. 127 at 3-4 (recounting hearsay reports that employees have been told that they would not be returned to service at CRS).[7]

Moreover, there are strong indications that Ms. Nazaire does not have final responsibility for the direction of CRS, or even for decisions about whether to grant particular requests for

---

[7] Plaintiffs submit this hearsay information not for direct consideration on their Motion for Summary Judgment but in support of their Rule 56(d) request, to illustrate Plaintiffs' lack of access to facts—including knowledge of current CRS employees—necessary to rebut Defendants' new factual allegations. The inability to obtain first-hand testimony is itself a reason Rule 56(d) relief is appropriate.

assistance.  In her first declaration, she indicated that she was "familiar with *limited* aspects of the Department's plan to downsize and realign the CRS."  1st Nazaire Decl. ¶ 4, Doc. No. 51-1 at 2. To be sure, in her second declaration, Ms. Nazaire states that she "oversee[s] and manage[s] all CRS operations." 2d Nazaire Decl. ¶ 3, Doc. No. 116 at 2.  But in her initial response to BRIDGE's request for assistance—before she finally reported that "CRS would not provide direct assistance"—Ms. Nazaire informed BRIDGE that their "service request is still with [her] leadership team." Doc. No. 116-3 at 4.  This comports with hearsay reporting that at some point this year, Valorie Smith, director of EOUSA's Legal Programs office, represented to certain employees that she was the acting director of CRS.  4th Freeny Decl. ¶ 14, Doc. No. 127 at 4.

*Influence*.  Discovery of these facts will unquestionably impact the outcome of summary judgment in the (hopefully unlikely) event that the Court decides that the facts set forth in the Second Nazaire Declaration are material.  Defendants claim the "factual record" today "tells a far different story" from the state of play when Plaintiffs filed the instant litigation.  Opp. at 1.  They also claim that "the reality of CRS's operations today" "refutes" Plaintiffs' "characterization" that Defendants reduced CRS to "little more than a webinar platform and referral clearinghouse." *Id*. at 31.  And they dispute that "CRS has been dismantled in contravention of its statute," because the "facts show otherwise." *Id*. at 15 (citing 2d Nazaire Decl. ¶¶ 6-8.").

To be clear, Plaintiffs contend that the Court can and should grant summary judgment to Plaintiffs and deny it to Defendants based on the Administrative Record (as supplemented by submissions by Plaintiffs that the Court may consider, *see* Pls. Mot at 22).  It is undisputed that CRS withdrew all services and denied all requests for services when Defendants decided to dissolve CRS.  But in their Opposition, at every turn, Defendants have put at issue the degree of CRS's operations.  These are the very facts Plaintiffs have been unable yet to discover.

24

With all five requirements established, Plaintiffs are entitled to "a strong presumption" "in favor of relief." *Resolution Trust Corp. v. North Bridge Assoc., Inc.*, 22 F.3d 1198, 1203 (1st Cir. 1994). Plaintiffs request that, *only if* the Court denies Plaintiffs' motion for summary judgment, it delay consideration of Defendants' cross-motion under Rule 56(d) and permit Plaintiffs to seek discovery related to the facts that Defendants have put at issue. This would include, at a minimum: (a) written discovery on the allegation that CRS is "operational," (b) the opportunity to depose Ms. Nazaire and obtain any relevant emails of hers; (c) the opportunity to depose members of the "leadership team" who are actually making decisions for and about CRS and obtain any relevant emails of theirs; and (d) the opportunity to depose reinstated CRS employees.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask the Court to grant their motion and deny Defendants' cross-motion; or, in the alternative, defer ruling under Rule 56(d) to allow discovery.

Dated: June 1, 2026                    Respectfully submitted,

/s/ *Kyle R. Freeny*
Kyle R. Freeny
(DC Bar No. 1684764 – admitted *pro hac vice*)
Rosa L. Baum
(DC Bar No. 90032839 – *pro hac vice forthcoming*)
WASHINGTON LITIGATION GROUP
1717 K Street, NW, Suite 1120
Washington, DC 20006
202-521-8750
KFreeny@washingtonlitigationgroup.org

Ana Muñoz
(Mass Bar No. 569233)
ZALKIND DUNCAN & BERNSTEIN LLP
2 Oliver Street, Suite 200
Boston, MA 02110
Telephone: (617) 742-6020
AMunoz@ZalkindLaw.com
*Counsel for Plaintiffs*

25

June 1, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon all attorneys of record by electronic filing on the above date.

/s/ Kyle R. Freeny
Kyle R. Freeny