**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

ETHICAL SOCIETY OF POLICE; NAACP ST.
LOUIS COUNTY; MISSIONARY BAPTIST
STATE CONVENTION OF MISSOURI; OUT
ACCOUNTABILITY PROJECT; BERKSHIRE
RESOURCES FOR INTEGRATION OF
DIVERSE GROUPS AND EDUCATION;
NAACP STATE CONFERENCE COLORADO-
MONTANA-WYOMING; PEACEMAKERS
LODGE; PIKES PEAK SOUTHERN
CHRISTIAN LEADERSHIP CONFERENCE 1;
WELLSPRING HEALTH ACCESS; and
HAITIAN COMMUNITY HELP & SUPPORT
CENTER,

         *Plaintiffs*,

    v.

TODD BLANCHE, Acting Attorney General;
and U.S. DEPARTMENT OF JUSTICE,

         *Defendants*.

**Case No. 1:25-CV-13115 (IT)**

**PLAINTIFFS' RESPONSE TO
DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS**

Pursuant to Local Civil Rule 56.1 and the Court's May 18, 2026 Electronic Order, Doc.

No. 123, Plaintiffs submit the following response to Defendants' statement of material undisputed

facts, Doc. No. 126.  Each of Defendants' factual assertions are copied in whole, followed by

Plaintiffs' response.  As noted in Plaintiffs' Memorandum in Reply Re: Motion for Summary

Judgment, and In Opposition to Defendants' Cross-Motion for Judgment on the Pleadings or

Summary Judgment, Doc. No. 128 (Plaintiffs' Opposition), Plaintiffs believe that the Court can

dispose of Defendants' Cross-Motion for Judgment on the Pleadings, or, in the Alternative, for

Summary Judgment, Doc. No. 118 (Defendants' Motion), without resolving factual disputes

-1-

about the current operation of CRS created by the Second Nazaire Declaration, Doc. No. 116. If the Court determines otherwise, Plaintiffs should be permitted to test the assertions in that declaration and the Second Pelletier Declaration, Doc. No. 126-1, pursuant to Federal Rule of Civil Procedure 56(d).

1. When Congress created the Community Relations Service (CRS) through Title X of the Civil Rights Act of 1964, Public Law 88-352 (July 2, 1964), 42 U.S.C. § 2000g, *et seq*. (signed into law by President Lyndon Johnson), it looked to the Federal Mediation and Conciliation Service (FMCS), which it had created through the Taft-Hartley Act (Labor Management Relations Act of 1947, Pub. L. No. 80-101). *See* 110 Cong. Rec. 6561 (Mar. 30, 1964) (statement of Senator Kuchel); Civil Rights, Part III, Hearing Before Subcomm. No. 5 of the H. Comm. on the Judiciary, 88th Cong., at 2028, July 24, 1963 (testimony of Dr. Eugene Carson Blake, United Presbyterian Church in the U.S.A., on behalf of the National Council of Churches of Christ in the U.S.A.); *see also, generally*, 105 Cong. Rec. 876-77 (Jan. 20, 1959) (statements of then senator Lyndon Johnson in support of earlier bill to create Community Relations Service, based on example of FMCS); *compare* 42 U.S.C. § 2000g-1 (Functions of Service) with 29 U.S.C. § 173(a), (b) (Functions of Service).

**Response**: Undisputed that the legislative history suggests that certain Members of Congress looked to the Federal Mediation and Conciliation Service (FMCS) when creating CRS. *See, e.g.*, 110 Cong. Rec. 6561 (Mar. 30, 1964) (Senator Kuchels) (positing that the "theory of a community relations service is a good one" and explaining that CRS would "parallel[]" FMCS's "functions"); Civil Rights, Part III, Hearing Before Subcomm. No. 5 of the H. Comm. on the Judiciary, 88th Cong., at 2028, July 24, 1963 (testimony of Dr. Eugene Carson Blake) (noting FMCS was "one of the more successful agencies of the Federal Government," having "done

much, along with State, local, and private groups to insure labor peace.  In a similar fashion, staff skilled in the methods of intergroup relations can do much to insure creative and constructive adjustments among the races where they are needed, and they are needed everywhere."); 105 Cong. Rec. 877 (Jan. 20, 1959) (then-Senator Johnson) (noting notes that the FMCS "settles . . . many disputes before the participants get to a strike or a lockout" and that its conciliators "can be more effective than any other agency of government in the labor-management filed"). The significance of this legislative history is a legal conclusion, not a statement of fact.

2.        President Trump, upon taking office, issued an Executive Order, *Establishing and Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, instructing agency heads to identify, among other things, whether any agency subcomponents "should be eliminated or consolidated." Exec. Order No. 14,210, § 3(e), 90 Fed. Reg. 9669, 9670 (Feb. 11, 2025).

**Response**: Undisputed.

3.        In response, on March 25, 2025, the Deputy Attorney General issued a proposal addressing various DOJ components, including CRS, which stated in part: "Eliminating CRS: eliminating the Community Relations Service and moving some or all impacted employees to U.S. Attorneys' Offices." *See* Administrative R., ECF Nos, 92, 92-1, & 92-3 ("AR") AR0001-02 (*Soliciting Feedback for Agency Reorganization Plan and RIF*).

**Response**: Undisputed.

4.        In the weeks following the Executive Order, much of the CRS workforce voluntarily departed. *See* AR0443 ("33 employees have either resigned, retired, or been placed on administrative leave under the Deferred Resignation Program," while "22 employees remain in CRS").

**Response**: Undisputed as it pertains to the number of employees remaining at CRS and the number of employees who resigned, retired, or were placed on administrative leave under the Deferred Registration Program after the Executive Order and the Deputy Attorney General's proposal to eliminate CRS. Whether those departures were considered voluntary under the circumstances is a question of law, and one that is not material to this case.

5. CRS also began withdrawing from services and categorically denying new requests between May and October 2025. *See* Second Decl. of Denise W. Nazaire Decl. ("2nd Nazaire Decl.") ¶ 3, ECF No. 116.

**Response**: Undisputed that CRS was withdrawing from services and categorically denying new requests in May 2025. Plaintiff **disputes** the timeline, although it is also not material. CRS began withdrawing from all existing engagements and closing existing cases in late March 2025, completing that process in June 2025. Nam Decl. ¶¶ 27-28, Doc. No. 107-3 at 21. CRS did not accept any new cases after March 2025. *Id.* ¶ 29.

6. Around this time, CRS produced deliberative memoranda proposing different approaches to its future work. AR0443 (April 25 memorandum titled *Community Relations Service: Planned Elimination and Fulfillment of Its Statutory Functions*); *see also* AR0455.

**Response**: Plaintiffs object to Defendants' reliance on redacted materials in the administrative record. Relevant text of the first-cited memoranda is redacted, except for the header "CRS's Proposal in Light of Elimination." AR0443. Defendants have redacted almost all of the section in the second-cited memorandum. AR0458-463. This fact is also immaterial.

7. On May 30, 2025, DOJ's Justice Management Division (JMD) Budget Staff issued DOJ's 2025 Spend Plan, which explained in part that "the Department's [Agency RIF and Reorganization Plan (ARRP)] includes the disestablishment of . . . CRS [as well as Office for

Access to Justice (ATJ) and Organized Crime Drug Enforcement Task Force (OCDETF)] as standalone components in FY 2026." AR0004, at AR0022; *see also*, AR00147-149.

**Response**: Undisputed.

8.    On May 30, 2025, the White House, through OMB, issued a "Technical Supplement to the 2026 Budget: Appendix," which stated in part that "reorganization will eliminate [CRS] and its functions in FY 2025, so no funding is requested in FY 2026 for CRS[,]" and proposed statutory elimination of CRS. *See* OMB, *Technical Supplement to the 2026 Budget Appendix* at 607 (2025), *available at* https://perma.cc/8TPJ-WUHY (at pdf 613/1224); *id*. at 636 (at pdf 642/1224).

**Response**: Undisputed.

9.    On June 13, 2025, DOJ published a Budget and Performance Summary for FY 2026, which, consistent with the President's budget request, requested no funding for CRS for FY 2026 and outlined proposed ARRP actions, including for CRS: "The Department will eliminate CRS and its functions, a total of 56 positions. The CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities." Just. Mgmt. Div., U.S. Dep't of Just., *Fiscal Year 2026 Budget and Performance Summary* (June 13, 2025), at 8-9, 113, *available at* https://perma.cc/4F2P-XCE2 (at pdf 18-19/258 and 125/258, respectively).

**Response**: Undisputed.

10.    A July 3, 2025 CRS memorandum explained DOJ's "proposed reorganization plan for CRS consist[ing] of the elimination of the component as a stand-alone entity, transfer of CRS's statutory functions to EOUSA, and designation of a single employee in EOUSA to fulfill CRS's day-to-day functions." AR0269 (*Implementation Considerations for the Department's*

*Proposed [ARRP] for the [CRS]*), at AR0270.

**Response**: Undisputed that the July 3, 2025 memorandum stated the "Department's proposed reorganization plan for CRS consists of the elimination of the component as a stand-alone entity, transfer CRS's statutory functions to EOUSA, and designation of a single employee in EOUSA to fulfill CRS's day-to-day functions." AR0269.  Plaintiffs **dispute** that the July 3, 2025 memorandum provided an explanation for Defendants' decision to adopt that plan, as it starts from the conclusion that CRS would be reduced to a single-person entity.  AR0269. Plaintiffs also **dispute** that the memorandum's author, Denise Nazaire, has the knowledge necessary to explain DOJ's plans for CRS, as Ms. Nazaire was only "familiar with *limited aspects*" of the decisionmaking process.  Nazaire Decl. ¶ 4, Doc. No. 51-1 at 2 (emphasis added).

11.     In July 2025, DOJ notified Congress that DOJ "intends to eliminate" CRS (along with ATJ and OCDETF) after September 30, 2025. AR0284.

**Response**: Undisputed.

12.     On September 16, 2025, the Attorney General signed the final ARRP, which "authoriz[ed] the transfers of functions and RIFs that were part of [DOJ's FY 2025 operating plans]," and included the transfer of CRS to EOUSA. AR0304 (*Implementation of the Fiscal Year (FY) 2025 [ARRP]*) ("This memorandum also transmits the request to authorize the transfers of functions and RIFs that were part of these plans.").

**Response**: Undisputed.

13.     The legal rationale on the CRS reorganization was set forth in a September 29, 2025 memorandum explaining the EOUSA realignment proposal and concluding that it "is occurring consistently with legal requirements." AR0331 (*Ability to Reorganize the Department of Justice Community Relations Service and the Office on Violence Against Women*) at AR0332;

-6-

AR0327.

**Response**: Undisputed that the September 29, 2025 memorandum purports to "have determined" that the "realignment of CRS" "is occurring consistently with legal requirements." AR0332.  Plaintiffs **dispute** that Defendants provided a legitimate "legal rationale."  The cited memorandum assumes, without providing an explanation, that one CRS employee, "is the minimum number of employees required to perform CRS's statutory functions."  AR0332. Indeed, Mr. Julius Nam, CRS Associate Director and Component Head, warned DOJ leadership in a March 7, 2025 memorandum, that when CRS had 50 employees it was "operating at a near-minimum level, far below the Congressionally authorized FTE of 98." AR0346-0347.  Mr. Nam further explained that the "36 employees in field offices represent a near-minimum level necessary to provide rapid responses to emergency situations arising in different parts of the Nation, in fulfillment of CRS's statutory mandates." AR0347.  Additionally, whether Defendants did, in fact, conduct themselves consistent with legal requirements is a matter of law, not of fact.

14.     On September 29, 2025, DOJ sent Reduction-in-Force (RIF) notices to fourteen of the remaining fifteen active CRS employees, to be effective on October 31. *See* Decl. of Jolene Ann Lauria ("Lauria Decl.") ¶¶ 3-4, ECF No. 75-1.

**Response**: Undisputed.

15.     On November 2, 2025, CRS and its functions were transferred to EOUSA. *See* Second Decl. of Denise W. Nazaire Decl. ("2nd Nazire Decl.") ¶ 1, ECF No. 116.

**Response**: Undisputed that on November 2, 2025, CRS, its sole remaining employee, and at least some of its functions were transferred to EOUSA.  Plaintiffs **dispute** that all of CRS's functions were transferred to EOUSA.  The record demonstrates that the "realigned" CRS is incapable of performing "sustained engagement[s]," including all mediations.  Nazaire Decl.

¶ 12(c), Doc. No. 116.  In addition, on February 11, 2026—after the supposed transfer of functions—Defendants submitted a status report representing that "specific plans for resumption of operations of CRS (as called for by the Court's Order) are not yet set."  Doc. No. 85 at 3 (internal punctuation altered); *see also* Pelletier Decl. ¶ 7, Doc. No. 83-1 at 3.  The government's own contemporaneous statements indicate that they intended to "eliminate CRS and its functions, a total of 56 positions," because "[t]he CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities."  Ex. 2 to Freeny Decl. at 20, Doc. No. 107-2 at 9; *see also* Ex. 1 to Freeny Decl. at 607, Doc. No. 107-1 at 19; Ex. C to Supp. Nam Decl., Doc. No. 107-4 at 10 (notifying employees in September 2025 they were being terminated "as a result of the dissolution of [CRS] in accordance with the reorganization and reconsolidation of [DOJ]").  Plaintiffs submit that they should have an opportunity to depose Ms. Nazaire and take relevant discovery related to CRS's supposed operational status, to the extent that fact is deemed material to adjudicating Defendants' Motion.  *See* Plaintiffs' Opposition at 20-25.

16.    Ms. Denise Nazire transferred with CRS to EOUSA, where she undertook administrative and operational duties in connection with the reorganization. *See id.* ¶¶ 1-2.

**Response**:  Undisputed that Ms. Nazaire transferred with CRS to EOUSA.  Plaintiffs **dispute** that, through Ms. Nazaire's actions, CRS has resumed operations in compliance with its statutory duties.  Plaintiffs also **dispute** that Ms. Nazaire undertook operational duties promptly upon her transfer.  As noted above, Defendants' February 11, 2026 status report represented that "specific plans for resumption of operations of CRS (as called for by the Court's Order) are not yet set."  Doc. No. 85 at 3 (internal punctuation altered); *see also* Pelletier Decl. ¶ 7, Doc. No. 83-1 at 3.  This fact, which post-dates the challenged agency decisionmaking, is also immaterial.

17.    In December 2025, CRS launched a new phone number and email address,

resumed review of service requests dating back to November 2, and continued reviewing new requests, subject to realignment-related delays. *Id.* ¶¶ 2-3.

**Response**:  Undisputed that CRS posted a phone number and email address on its website. Plaintiffs **dispute** that CRS resumed review of service requests in December 2025.  On February 11, 2026, Defendants represented to the Court that "specific plans for resumption of operations of CRS (as called for by the Court's Order) are not yet set."  Doc. No. 85 at 3 (internal punctuation altered); *see also* Pelletier Decl. ¶ 7, Doc. No. 83-1 at 3.  In addition, based on the evidence available to Plaintiffs in the absence of discovery, Plaintiffs **dispute** that CRS has "resumed review of service requests" in good faith (as opposed to doing so only temporarily and notionally, for the purpose of defeating judicial review in this case).  As Ms. Nazaire admits in her affidavit, she has closed numerous requests for services and CRS continues to categorically "not pursue[]" any "requests for mediation" because of limited staffing.  Nazaire Decl. ¶¶ 8, 12(c), Doc. No. 116.  Additionally, CRS has not resumed services to Plaintiffs, even though Plaintiffs' loss of services was the direct result of Defendants' unlawful and categorical shutdown of CRS operations in 2025.  Nam Decl. ¶ 29, Doc. No. 96-3 at 23 ("Had it not been for CRS's planned dissolution . . . CRS would have continued to provide each stakeholder with the requested services.").  And, even after Congress ordered DOJ to reinstate terminated CRS employees, Defendants continued to bar those employees from engaging in *any* CRS duties.  *See* Doc. No. 85 at 3; *see also* Pelletier Decl. ¶¶ 2-4, Doc. No. 126-1 at 1-2 (explaining none of the reinstated CRS employees are performing CRS duties and there are no plans to return them to such duties).  The notion that CRS is operating, and will continue to operate, in good faith is contradicted by the Administration's naked condemnation of CRS in its 2027 budget proposal.  *See* Ex. 1 to 4th Freeny Decl., Doc. 127-1 at 2 (labeling CRS a "woke enterprise" with a "long track record of . . .

legitimizing riotous behavior that puts America's police in the crosshairs"). This fact, which post-dates the challenged agency decisionmaking, is also immaterial, as set forth in Plaintiffs' Opposition. If the Court deems this fact material and is inclined to consider the allegations in Ms. Nazaire's Second Declaration (Doc. No. 116), Plaintiffs should be afforded the opportunity to test Ms. Nazaire's statements, pursuant to Federal Rule of Civil Procedure 56(d). The need for such discovery is highlighted by Defendants' submission of a new declaration with their Statement of Undisputed Material Facts by Mr. Pelletier to update and correct prior representations to the Court. Doc. No. 126-1.[1]

18.     On January 9, 2026, RIF recission notices were sent to the thirteen CRS employees who were separated by RIF, resignation, or retirement (the RIF recission notice for one of these employees later was rescinded at that employee's request). *See* Decl. of Jonathan Pelletier ("First Pelletier Decl.") ¶ 4 n.1, ECF No. 85-1.

**Response**: Undisputed.

19.     Ultimately, twelve CRS employees were reinstated retroactive to November 1, 2025, with the choice to report to duty on February 9, 2026. *See id.*

**Response**: Undisputed.

20.     Nine CRS employees accepted their reinstatements, reported to work on February 9, 2026, and began details within EOUSA—with an expected duration of approximately 90

---

[1] Because the Second Pelletier Declaration was filed simultaneously with Plaintiffs' Opposition/Reply Brief, this is the first opportunity Plaintiffs have had to address that declaration. Among other things, it strongly supports the inference that the EOUSA "details" that reinstated CRS employees have been placed on—which have now been extended, potentially indefinitely— are a sham to avoid admitting that Defendants have no intention of returning those employees to CRS duties, despite Ms. Nazaire's identification of staffing limitations as a key limit on CRS's functions. It also underscores that Defendants are willfully taking steps to ensure that CRS is not able to spend the $20 million Congress has earmarked for it in FY 2026. *See id.* ¶¶ 3-5.

days—undergoing developmental training for integration into EOUSA. *See* Second Decl. of Jonathan Pelletier ("2nd Pelletier Decl.") ¶ 2 (attached hereto).

**Response**: Undisputed that nine CRS employees accepted reinstatements, reported to work on February 9, 2026, and were purportedly assigned to 90-day details in EOUSA. Plaintiffs **dispute** that these details were for the purpose of "developmental training for integration into EOUSA" rather than for making the reinstated employees unavailable to perform CRS work, which Defendants have called a "woke" enterprise. *See* Ex. 1 to 4th Freeny Decl., Doc. 127-1 at 2. The purpose of the detail, however, is not material to the resolution of Defendants' motion for summary judgment. Should this fact be deemed material, Plaintiffs submit that they should have the opportunity to take discovery related to this statement, pursuant to Rule 56(d).

21.    Presently, five reinstated CRS employees are expected to continue their details through September 30, 2026 (with their salaries not charged to CRS during that period). Duties for the other four reinstated CRS employees are to be determined. *See id.* ¶ 3.

**Response**: Undisputed, based on the limited facts available to Plaintiff.

22.    CRS is actively reviewing and undertaking service requests, having received 22 service requests in 2026 to date. *See* 2nd Nazaire Decl., ¶¶ 7-8.

**Response**: Based on the limited facts available to them, Plaintiffs are not in a position to dispute that CRS received 22 service requests in 2026. Plaintiffs **dispute** that CRS is "reviewing and undertaking service requests" in good faith and as required under its statutory mandate. As Ms. Nazaire admits in her affidavit, she has closed numerous requests for services and CRS continues to categorically "not pursue[]" any "requests for mediation" because of limited staffing. Nazaire Decl. ¶¶ 8, 12(c), Doc. No. 116. CRS has not resumed services to Plaintiffs, even though Plaintiffs' loss of services was the direct result of Defendants' unlawful and categorical shutdown

of CRS operations in 2025.  Nam Decl. ¶ 29, Doc. No. 96-3 at 23 ("Had it not been for CRS's planned dissolution . . . CRS would have continued to provide each stakeholder with the requested services.").    Even after Congress ordered DOJ to reinstate terminated CRS employees, Defendants continued to bar those employees from engaging in *any* CRS duties.  *See* Doc. No. 85 at 3; *see also* Pelletier Decl. ¶¶ 2-4, Doc. No. 126-1 at 1-2 (explaining none of the reinstated CRS employees are working on CRS services and there are no plans to return them to such details).  The notion that CRS is operating, and will continue to operate, in good faith is contradicted by the Administration's naked condemnation of CRS in its 2027 budget proposal. *See* Ex. 1 to 4th Freeny Decl., Doc. 127-1 at 2 (labeling CRS a "woke enterprise" with a "long track record of . . . legitimizing riotous behavior that puts America's police in the crosshairs"). This fact—which post-dates the challenged decisionmaking—is also not material to resolution of Defendants' Motion as explained in Plaintiffs' Opposition.  Finally, if the Court deems this fact material and is inclined to consider Ms. Nazaire's Second Declaration (Doc. No. 116), Plaintiffs should be afforded the opportunity to test Ms. Nazaire's statements, pursuant to Rule 56(d).

23.    Three of these requests, each from February 2026, progressed to a "case stage" whereby CRS provided various services:

- A now-completed U.S. Attorney's Office request for assistance in planning a forum addressing religious discrimination and hate crimes against faith communities.
- A now-completed local government organization request for help supporting community dialogue and meetings to strengthen conflict prevention, community engagement, and de-escalation strategies amid protests and community tensions.
- An ongoing request from a U.S. armed forces entity seeking assistance in addressing reports of harassment and discrimination based on race, national origin, and religion experienced by service members and their families.

*Id.* ¶¶ 8, 9(a)-(c) (explaining CRS role and actions in each of these cases).

**Response**: Based on the limited facts available to them, Plaintiffs are not in a position to

-12-

dispute that CRS advanced three requests to the "case stage." Plaintiffs **dispute** any implication that these three instances, standing alone, evidence that CRS is operating in good faith or in compliance with its statutory mandate. As Ms. Nazaire admits in her affidavit, she has closed numerous requests for services and CRS continues to categorically "not pursue[]" any "requests for mediation" because of limited staffing. Nazaire Decl. ¶¶ 8, 12(c), Doc. No. 116. Additionally, CRS has not resumed services to Plaintiffs, even though Plaintiffs' loss of services was the direct result of Defendants' unlawful and categorical shutdown of CRS operations in 2025. Nam Decl. ¶ 29, Doc. No. 96-3 at 23 ("Had it not been for CRS's planned dissolution . . . CRS would have continued to provide each stakeholder with the requested services."). Even after Congress ordered DOJ to reinstate terminated CRS employees, Defendants continued to bar those employees from engaging in *any* CRS duties. *See* Doc. No. 85 at 3; *see also* Pelletier Decl. ¶¶ 2-4, Doc. No. 126-1 at 1-2 (explaining none of the reinstated CRS employees are working on CRS services and there are no plans to return them to such details). Indeed, the notion that CRS is operating, and will continue to operate, in good faith is contradicted by the Administration's naked condemnation of CRS in its 2027 budget proposal. *See* Ex. 1 to 4th Freeny Decl., Doc. 127-1 at 2 (labeling CRS a "woke enterprise" with a "long track record of . . . legitimizing riotous behavior that puts America's police in the crosshairs"). This fact—which post-dates the challenged decisionmaking—is also not material to resolution of Defendants' Motion as explained in Plaintiffs' Opposition. Finally, if the Court deems this fact material and is inclined to consider the second Ms. Nazaire's Second Declaration (Doc. No. 116), Plaintiffs should be afforded the opportunity to test Ms. Nazaire's statements, pursuant to Rule 56(d).

24.    Ms. Nazaire is the sole CRS employee discharging statutorily mandated CRS responsibilities at this time. 2nd Pelletier Decl. ¶ 2; *see also* 2nd Nazire Decl. ¶¶ 1-12.

**Response**:  Undisputed that Ms. Nazaire is the sole CRS employee discharging any CRS responsibilities.  Plaintiffs **dispute** that Ms. Nazaire is discharging CRS's statutorily mandated duties for the reasons stated in Paragraphs 17 and 18 above.

25.    While the Department has resumed the provision of many CRS services, CRS is providing a lower volume of services than it did before, and is not presently providing mediation services. *Id.* ¶ 12.

**Response**:  Undisputed that CRS is not providing mediation services and is providing a lower volume of services than it did before.  Based on the limited information available to Plaintiffs, Plaintiffs are not in a position to dispute that CRS was providing some minimal services as of May 2026.  Plaintiffs **dispute** that "the Department has resumed the provision" of "many" CRS services.  According to Ms. Nazaire's untested declaration, she has approved only three requests for services.  Meanwhile, she rejected requests for resumption of services from all Plaintiffs who requested them, even though their loss of services was the direct result of Defendants' unlawful shutdown of CRS operations.  Nam Decl. ¶ 29, Doc. No. 96-3 at 23 ("Had it not been for CRS's planned dissolution . . . CRS would have continued to provide each stakeholder with the requested services.").  Ms. Nazaire also admits that she has closed numerous other requests for services because of limited staffing.  Nazaire Decl. ¶ 8, Doc. No. 116.  This fact—which post-dates the challenged decisionmaking—is not material to resolution of Defendants' Motion as explained in Plaintiffs' Opposition.  Finally, if the Court deems this fact material and is inclined to consider Ms. Nazaire's Second Declaration (Doc. No. 116), Plaintiffs should be afforded the opportunity to test Ms. Nazaire's statements, pursuant to Rule 56(d).

26.    Plaintiffs Ethical Society of Police, NAACP State Conference Colorado-Montana-Wyoming, Pikes Peak Southern Christian Leadership Conference 1, Peacemakers

Lodge, Wellspring Health Access, and Haitian Community Help & Support Center, have not submitted new requests for CRS services or reinitiated contact with CRS following its temporary 2025 cessation of services. *Id*. ¶ 11 (e)-(i); *see also* Decl. of Viles Dorsainvil, ECF No. 107-14.

**Response**: Undisputed, except Plaintiffs **dispute** that listed Plaintiffs have not "reinitiated contact with CRS following its temporary cessation of services." Plaintiffs submit that the filing of this lawsuit to compel the resumption of services represents decisive reinitiation of contact. Plaintiffs also **dispute** that they are required to submit "new" requests, having filed this lawsuit, and **dispute** the characterization of the cessation of services as "temporary." Defendants have not resumed, or offered to resume, services to these Plaintiffs despite the pending lawsuit. This fact is also immaterial for the reasons stated in Plaintiffs' Opposition.

27. Since resuming services, CRS has declined certain service requests for obstacles to provision of service or failures specific to those requests. *See* 2nd Nazaire Decl., ¶¶ 11(a)-(d).

**Response**: Based on the limited information available to them, Plaintiffs are not in a position to respond to why CRS may have declined any particular request. But the available evidence suggests that recent service denials is a known and intended result of reducing CRS to a single-person entity. *See* AR0269. Ms. Nazaire admits in her affidavit that she has closed numerous requests for services and that CRS continues to categorically "not pursue[]" any "requests for mediation" because of limited staffing. Nazaire Decl. ¶¶ 8, 12(c), Doc. No. 116. Evidence also suggests that CRS's declination of services that had previously been approved also stems from this Administration's hostility to CRS's mission, more so than failures specific to any given request. *See* Ex. 1 to 4th Freeny Decl., Doc. 127-1 at 2 (labeling CRS a "woke enterprise" with a "long track record of . . . legitimizing riotous behavior that puts America's police in the crosshairs."). Plaintiffs **dispute** that CRS has truly "resum[ed] services" for the reasons set forth

in Paragraphs 17 and 18, above.  This fact is also immaterial to resolving Defendants' Motion as stated in Plaintiffs' Opposition.  Finally, if the Court deems this fact material and is inclined to consider Ms. Nazaire's Second Declaration (Doc. No. 116), Plaintiffs should be afforded the opportunity to test Ms. Nazaire's statements, pursuant to Rule 56(d).

28.    Plaintiff Missionary Baptist State Convention of Missouri (MBSC) submitted, on or around January 22, 2026, a new service request, which CRS declined because no identifiable CRS action was needed, and the additional service requested did not appear to be appropriate. *Id.* ¶ 11(a).

**Response**: Undisputed that CRS declined to provide MBSC with the requested services, but Plaintiffs **dispute** the basis for that denial.  MBSC contacted CRS requesting "CRS's help in monitoring and assuring compliance" with a Memorandum of Agreement (MOA) among various community groups and to discuss "having CRS provide its Strengthening Police and Community Partnerships (SPCP)" program to a community.  Doc. No. 116-1 at 2-3.  Ultimately, Ms. Nazaire wrote to MBSC denying their request for services, noting that "CRS does not have the statutory authority to monitor or ensure compliance with the MOA," which was "not legally binding" and that the "SPCP program is primarily designed to facilitate community and law enforcement engagement in the development of a community action plan or MOA; and is less suitable after agreements between parties have already been finalized." *Id*. at 13.  This conclusion represents an unexplained departure from prior policy and practice, suggestive of pretext. *See* Supp. Nam Decl. ¶ 5, Doc. No. 107-4 at 5 ("Had CRS not ceased operations, it would have played a significant role in implementation of [the MOU], including by monitoring and ensuring that the commitments set forth in the agreement were timely met.").  This fact is immaterial to resolving Defendants' motion as stated in Plaintiffs' Opposition.   But if the Court deems this fact material

and is inclined to consider Ms. Nazaire's Second Declaration (Doc. No. 116), Plaintiffs should be afforded the opportunity to test Ms. Nazaire's statements, pursuant to Rule 56(d).

29.    Plaintiff NAACP St. Louis County submitted, on or around January 22, 2026, a new service request, which CRS declined because no identifiable CRS action was needed. *Id.* ¶ 11(b).

**Response**:  Undisputed that CRS declined to provide NAACP St. Louis County with the requested services, but Plaintiffs **dispute** the basis for that denial.  NAACP St. Louis County contacted Ms. Nazaire to request "CRS resume the services they had previously approved" for the organization.  Doc. No. 116-2 at 4.  Because the groups involved in the relevant Memorandum of Agreement (MOA) had all executed the MOA, Ms. Nazaire stated that since there were "no other requests for assistance, CRS will close this request." *Id*. at 13.  This conclusion represents an unexplained departure from prior policy and practice, suggestive of pretext. *See* Supp. Nam Decl. ¶ 5, Doc. No. 107-4 at 5 ("Had CRS not ceased operations, it would have played a significant role in implementation of [the MOU], including by monitoring and ensuring that the commitments set forth in the agreement were timely met.").  This fact is also immaterial to resolving Defendants' Motion as stated in Plaintiffs' Opposition.  But if the Court deems this fact material and is inclined to consider Ms. Nazaire's Second Declaration (Doc. No. 116), Plaintiffs should be afforded the opportunity to test Ms. Nazaire's statements, pursuant to Rule 56(d).

30.    Plaintiff Out Accountability Project ("OAP") submitted, on or around January 26, 2026, a request to resume CRS's prior work, but OAP ultimately failed to respond to CRS's follow-up offering for an assessment meeting. *Id.* ¶ 11(d).

**Response**: Undisputed that CRS declined to provide OAP with the requested services, but Plaintiffs **dispute** the basis for that denial.  OAP contacted Ms. Nazaire explaining that the

organization had been "collaborating" with CRS's Boston office "to develop and deliver trainings for school resource officers in Connecticut's public schools" "designed to strengthen relationships with LGBTQ+ students and to equip officers with the tools to better support young people who are disproportionately subjected to discrimination and harassment." Doc. No. 116-4 at 4. OAP and CRS found time to meet to discuss the request, but the OAP representative needed to reschedule the call with CRS due to a family emergency. *Id*. at 6. Without any notice to OAP, Ms. Nazaire then elected to close OAP's request for CRS services before OAP could reschedule the meeting. *See generally id*. This fact is also immaterial to resolving Defendants' motion for the reasons stated in Plaintiffs' Opposition. But if the Court deems this fact material and is inclined to consider Ms. Nazaire's Second Declaration (Doc. No. 116), Plaintiffs should be afforded the opportunity to test Ms. Nazaire's statements, pursuant to Rule 56(d).

31.    Plaintiff Berkshire Resources for Integration of Diverse Groups and Education submitted, on or around January 22, 2026, a request to resume CRS services and to provide SPIRIT facilitation assistance to a Massachusetts public school district, which CRS declined because of obstacles related to this request. *Id*. ¶ 11(c)(i)-(iv).

**Response**: Undisputed that CRS declined to provide Berkshire Resources for Integration of Diverse Groups and Education (BRIDGE) with the requested services, but Plaintiffs **dispute** the basis for that denial. Plaintiffs **dispute** any suggestion that "obstacles related to [BRIDGE's] request" involved anything other than CRS's operating status and willingness to provide services. Following BRIDGE's meeting with Ms. Nazaire, BRIDGE awaited a response from CRS while the service request was "with [Ms. Nazaire's] leadership team." Doc. No. 116-3 at 4. Over a month after that meeting, BRIDGE received a terse email from Ms. Nazaire saying only that CRS was "unable to offer direct assistance at this time." *Id*. Ms. Nazaire provided no further

explanation. Accordingly, the denial of services to BRIDGE is the direct result of Defendants' unlawful actions. *See* Nam Decl. ¶ 29, Doc. No. 96-3 at 23 ("Had it not been for CRS's planned dissolution . . . CRS would have continued to provide each stakeholder with the requested services."). Indeed, the available evidence shows that if Defendants had not refused to assign reinstated conciliators back to CRS duties, CRS would be able to provide services to BRIDGE. *See* Supp. Nam Decl. ¶ 10, Doc. No. 107-4 at 6 (noting that reinstated CRS conciliators "would be able to resume the consultation, coordination, training, and dialogue facilitation services that [BRIDGE] lost because of CRS's wind-down in 2025"). This fact is also immaterial to resolving Defendants' motion as stated in Plaintiffs' Opposition. But if the Court deems this fact material and is inclined to consider Ms. Nazaire's Second Declaration (Doc. No. 116), Plaintiffs should be afforded the opportunity to test Ms. Nazaire's statements, pursuant to Rule 56(d).

32.    On January 23, 2026, Congress enacted the FY 2026 appropriations act for DOJ, which provided $20 million to CRS. *See* Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, 140 Stat. 5.

**Response**: Undisputed.

33.    Although the President has proposed elimination of CRS altogether based on misalignment with Administration priorities, *see, e.g.*, OMB, Technical Supplement to the 2026 Budget Appendix at 607, 639, *supra* at ¶ 8, CRS will continue to operate unless and until Congress legislatively eliminates it. *See* Final ARRP memorandum, AR0304 at AR0307; legal rationale memorandum, AR0331 at AR0332 ("We recognize that a statutory change will be necessary to eliminate CRS . . . .").

**Response**: Plaintiffs **dispute** that Defendants intend that CRS "will continue to operate."

The record shows that CRS cannot meaningfully operate in accordance with its statutory mandate as currently constituted. *See* AR0270 (noting multiple serious limitations on CRS's ability to operate as a single-person entity, including that CRS cannot provide "sustained engagements" or any mediation); AR0346-0347 (noting that at 50 full-time equivalent employees, CRS was "already operating at a near-minimum level, far below the Congressionally authorized FTE of 98"). And Ms. Nazaire admits that she has closed numerous requests for services and that CRS continues to categorically "not pursue[]" any "requests for mediation" because of limited staffing. Nazaire Decl. ¶¶ 8, 12(c), Doc. No. 116.

The fact that Defendants have not permitted reinstated CRS employees to return to CRS duties, despite a $20 million line-item appropriation for CRS, further undermines Defendants' assertion that they intend to operate CRS in good faith. *See* Doc. No. 85 at 3; *see also* Pelletier Decl. ¶¶ 2-4, Doc. No. 126-1 at 1-2 (explaining none of the reinstated CRS employees are working on CRS services and there are no plans to return them to such details). Defendants' open hostility to CRS's congressional mission further undermines the untested suggestion that Defendants intend to allow CRS to operate in pursuit of its statutory mission. *See supra* ¶ 9 at 5 ("The CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities"); *see also See* Ex. 1 to 4th Freeny Decl., Doc. 127-1 at 2 (labeling CRS a "woke enterprise" with a "long track record of . . . legitimizing riotous behavior that puts America's police in the crosshairs").

\*\*\*

If the Court deems the above disputed facts material to adjudicating Defendants' motion for summary judgment, Plaintiffs submit that they should be afforded the opportunity to test it in discovery pursuant to Rule 56(d).

Dated:  June 23, 2026

Respectfully Submitted,

*/s/ Kyle R. Freeny*
Kyle R. Freeny
(DC Bar No. 1684764 – *admitted pro hac vice*)
Rosa L. Baum
(DC Bar No. 90032839 – *pro hac vice forthcoming*)
WASHINGTON LITIGATION GROUP
1717 K Street NW
Washington, DC 20006
Telephone: (202) 521-8750
KFreeny@WashingtonLitigationGroup.org

Ana Muñoz
(Mass. Bar No. 569233)
ZALKIND DUNCAN & BERNSTEIN LLP
2 Oliver Street, Suite 200
Boston, MA 02110
Telephone: (617) 742-6020
AMunoz@ZalkindLaw.com

*Counsel for Plaintiffs*

June 23, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon all attorneys of record by electronic filing on the above date.

*/s/ Kyle R. Freeny*
Kyle R. Freeny