# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ETHICAL SOCIETY OF POLICE, *et al.*,

        Plaintiffs,

    v.

TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, *et al.*,

        Defendants.

No. 1:25-cv-13115-IT

## DEFENDANTS' MEMORANDUM OF LAW IN REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

ARGUMENT ............................................................................................................... 2

I.   The Reply Does Not Overcome Threshold Justiciability Defects ..................................... 2

    A.   The Reply Fails to Establish Standing ................................................................... 2

    B.   The Reply Fails to Overcome Mootness ................................................................. 4

    C.   Plaintiffs Fail to Show their Claims are Prudentially Ripe ................................... 5

II.  The Reply Fails to Establish Requirements for APA Review ........................................ 7

    A.   The Reply Fails to Overcome the "Committed to Agency Discretion" Bar. .......... 7

    B.   The Reply Fails to Overcome the "Final Agency Action" Bar .............................. 9

        1.   The Reply fails to show "discrete agency action." .................................... 9

        2.   The Reply fails to establish finality. ..........................................................11

        3.   The Reply Fails to Meet the High Standard for a Section 706(1)
             Claim ..........................................................................................................11

III. The Reply is Unavailing on the Merits ...................................................................... 12

    A.   Plaintiffs' APA Claims Fail on the Merits ........................................................... 12

        1.   The Reply Does Not Establish Arbitrary and Capricious Conduct........... 12

        2.   The Reply Fails to Show that Defendants' Actions Are 'Not in
             Accordance with Law' or 'In Excess of Statutory Authority.'.................. 13

    B.   The Reply Effectively Concedes the *Ultra Vires* Claim, and Fails to
        Support the Freestanding Constitutional Claim ................................................... 14

IV.  Remedy ...................................................................................................................... 15

    A.   The Reply's (Belated) Arguments for a Permanent Injunction are
        Unavailing. ............................................................................................................ 15

    B.   The Reply Fails to Grapple with the Core Remedy Issues ................................... 17

V.   Court Should Reject Plaintiffs' Rule 56(d) Request for Sweeping Discovery .............. 18

CONCLUSION ........................................................................................................... 20

**TABLE OF AUTHORITIES**

**Cases**

*Am. Sav. Bank, FSB v. UBS Fin. Servs.*,
  347 F.3d 436 (2d Cir. 2003) ..................................................................... 6

*American Educational Research Ass'n v. Dep't of Education*,
  2025 U.S. Dist. LEXIS 111436 (D. Md. June 12, 2025) ...................................... 3, 4

*American Federation of Teachers v. Davis*,
  818 F. Supp. 3d 538 (S.D.N.Y. 2025) ......................................................... 8

*Anh Pham v. Scott*,
  787 F. Supp. 3d 1124 ......................................................................8, 19

*Association for Education Finance & Policy, Inc.v. McMahonI*,
  786 F. Supp. 3d 13 (D.D.C. 2025)........................................................10, 14

*Boston Bit Labs, Inc. v. Baker*,
  11 F.4th 3 (1st Cir. 2021) ..................................................................... 4, 5

*Carter v. U.S. Dep't of Educ.*,
  2025 U.S. Dist. LEXIS 97016 (D.D.C. May 21, 2025) ..................................... 10, 17

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
  370 F.3d 151 (1st Cir. 2004) .................................................................. 15

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024) ........................................................................... 14

*Costa Reg'l Med. Ctr. v. Kennedy*,
  2026 U.S. Dist. LEXIS 1890 (N.D. Cal. Jan. 6, 2026) ....................................... 13

*Dalton v. Specter*,
  511 U.S. 462 (1994) ........................................................................... 15

*Dunn v. CFTC*,
  519 U.S. 465 (1997) ............................................................................ 8

*Emigrant Residential LLC v. Pinti*,
  37 F.4th 717 (1st Cir. 2022) .................................................................. 18

*Ghasemi v. Rubio*
  812 F. Supp. 3d 129 (D. Mass 2025) .......................................................... 11

*Harbert Int'l, Inc. v. James*,
  157 F.3d 1271 (11th Cir. 1998) ............................................................... 20

*Illinois v. FEMA*,
  801 F. Supp. 3d 75 (D.R.I. 2025) .............................................................. 5

*K.I. v. Sullivan*,
  2026 U.S. Dist. LEXIS 41763 (N.D.N.Y. Mar. 2, 2026) .......................................... 6

*League of United Latin American Citizens v. Executive Office of the President*,
  2026 U.S. Dist. LEXIS 20358, 2026 WL 252420 (D.D.C. Jan. 30, 2026) ...................... 14, 15

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) .......................................... 15

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .......................................... 2

*Morgan v. McCotter*,
  365 F.3d 882 (10th Cir. 2004) .......................................... 6

*NAACP v. United States*,
  798 F. Supp. 3d 526 (D. Md. 2025) .......................................... 10, 17

*New York v. McMahon*,
  784 F. Supp. 3d 311 (D. Mass. 2025) .......................................... 3

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025) .......................................... 9

*New York v. Trump*,
  171 F.4th 1 (1st Cir. 2026) .......................................... 9

*Nulankeyutmonen Nkihtaqmikon v. Impson*,
  503 F.3d 18 (1st Cir. 2007) .......................................... 7

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998) .......................................... 7

*Resolution Trust Corp. v. North Bridge Assocs.*,
  22 F.3d 1198 (1st Cir. 1994) .......................................... 20

*Rhode Island v. Trump*,
  810 F. Supp. 3d 283 (D.R.I. 2025) .......................................... 10

*Rios v. Centerra Group LLC*,
  106 F.4th 101 (1st Cir. 2024) .......................................... 18

*Roman Catholic Bishop v. City of Springfield*,
  724 F.3d 78 (1st Cir. 2013) .......................................... 6

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  217 F.3d 8 (1st Cir. 2000) .......................................... 18

*Rural Development Innovations Limited v, Marocco*,
  2026 WL 710260 (D.D.C. 2026) .......................................... 14

*Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior*,
   2023 U.S. Dist. LEXIS 183483 (D. Mass. Oct. 12, 2023) ...................................... 19

*Somerville Pub. Sch. v. McMahon*,
   139 F.4th 63 (1st Cir. 2025) ...................................................................... 2

*Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd.*,
   282 F.3d 23 (1st Cir. 2002) ....................................................................... 18

*Town of Portsmouth v. Lewis*,
   813 F.3d 54 (1st Cir. 2016) ....................................................................... 5

*Troiano v. Aetna Life Ins. Co.*,
   844 F. 3d 35 (1st Cir. 2016) ...................................................................... 19

*Union of Concerned Scientists v. Wheeler*,
   954 F.3d 11 (1st Cir. 2020) ....................................................................... 8

*Webster v. Doe*,
   486 U.S. 592 (1988) ................................................................................. 9

*Wild Virginia v. Council on Env'tl Quality*,
   56 F.4th 281 (4th Cir. 2022) ..................................................................... 7

**Statutes**

5 U.S.C. app. 2 § 8 ................................................................................. 8, 9

5 U.S.C. § 704 ....................................................................................... 9

42 U.S.C. § 2000g-1 .............................................................................. 3, 9

42 U.SC. § 2000g .................................................................................. 20

50 U.S.C. § 403 ..................................................................................... 9

Federal Advisory Committee Act ("FACA"),
   Pub. L. No. 92-463, 86 Stat. 770 (1972) ................................................... 8

**Rules**

Fed. R. Civ. P. Rule 12 ......................................................................... 2, 20

Fed. R. Civ. P. Rule 56 .......................................................................... 20

This Court recently observed that "the factual record has developed significantly" since Autumn 2025, when Plaintiffs sought a preliminary injunction challenging the 'elimination' or 'shuttering' of CRS. *See* June 12, 2026 Minute Order (ECF No. 133). Indeed, after temporarily halting services in 2025, CRS resumed the provision of mandatory services, albeit at a lower volume, and through a single employee, Dr. Denise Nazaire. Plaintiffs' Reply re Motion for Summary Judgment, and Opposition to Defendants' Cross-Motion for Judgment on the Pleadings or Summary Judgment, ECF No. 128, at 2 ("Reply") argues this resumption is inconsistent "with an agency operating in good faith with its statutory mandate." But the Reply never identifies any specific statutorily-required duties that CRS is failing to undertake in the first place.

As a result, the Reply does not connect any statutorily-assigned functions with cognizable Article III injury, and thereby fails to establish standing. Even if there is standing, the Reply never shows how the relief sought would make a difference to Plaintiffs' "legal interests," so the case is therefore moot. Nor does the Reply establish prudential ripeness, where it is undisputed that most of the Plaintiffs never re-request their lost or denied services, after CRS's resumed services (and where CRS had legitimate reasons for denying those requests that Plaintiffs did make).

The Reply also fails to overcome the APA's "committed to agency discretion" and "final agency action"-bars. On the merits, the Reply fails to grapple with the APA's highly deferential review standard. The Reply does not even attempt to defend the *ultra vires* claim, and Plaintiffs' argument for their 'freestanding' constitutional claim is unavailing.

On remedies, the Reply fails to show irreparable harm for a permanent injunction (which Plaintiffs argue for the first time on reply). Fundamentally, Plaintiffs do not explain how the Court would craft an order for the "restoration" of CRS's operations (given the discretionary features in the CRS statute) without becoming a "monitor."

1

Finally, the Court should reject Plaintiffs' alternative Rule 56(d) request for sweeping discovery. Plaintiffs predicate this on a profound distortion of the record as to Dr. Nazaire's second declaration (ECF No. 116), which provides the Court necessary factual updates.

At base, the Reply is unavailing across the board. The Court should grant Defendants' Rule 12(c) motion or alternatively, grant it summary judgment, and deny Plaintiffs' cross motion.

ARGUMENT

**I.      The Reply Does Not Overcome Threshold Justiciability Defects**
**A.      The Reply Fails to Establish Standing**

Plaintiffs never disavow that they seek wholesale changes to the operations of CRS, including an order "compelling Defendants to resume services," *see* Pl. Br. 35 (ECF No 108).[1] But Plaintiffs do not identify any specific statutorily assigned functions in the (highly discretionary) authorizing CRS statute, and as a result, they fail to establish a cognizable legal interest in any allegedly unlawfully discontinued CRS services. Plaintiffs therefore never show, for the wholesale changes they seek, "an injury-in-fact": "an invasion of a legally protected interest which is . . . concrete and particularized . . . ." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

In *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 68 (1st Cir. 2025), the First Circuit addressed a similar challenge to the alleged dismantling of the Department of Education ("DOE"), and indicated that "plaintiffs would suffer a cognizable injury under Article III *if* the Department were unable—in consequence of actions taken to close it down—*to perform its statutorily assigned functions*." (emphasis added). Observing this, the district court in *American Educational Research Ass'n v. Dep't of Education*, 2025 U.S. Dist. LEXIS 111436, **1, 4, 19 (D. Md. June 12, 2025), concluded that plaintiffs "have not shown they have standing to seek the relief they are asking

---

[1] Abbreviations are generally as defined in Defendants' opening brief, ECF No. 117 ("Defs. Br.") except whether otherwise noted.

for"—where they challenged DOE's "efforts to dismantle its Institute of Education Sciences ('IES')," and sought to require IES to "operate precisely as it did before February, 2025." For standing, "[t]he right question to ask is what [agency] functions are required by statute, and how many staff members [and which contracts] are necessary for [the agency] to perform those functions"—and the court emphasized "that a careful parsing is required to avoid overbreadth…." *Id*. at *18.[2] The court concluded that plaintiffs lacked standing to seek return of RIF'd employees "to their roles carrying out IES functions," although 90% of IES's staff had been terminated:

> Plaintiffs' asserted injury does not give them standing to challenge the termination of every employee at IES impacted by the RIF. Where an employee was not performing a function necessary to the accomplishment of an *IES duty mandated by Congress*, their termination *could not have caused any legally cognizable injury to Plaintiffs*.

*Id*. at *17 (emphasis added). The court explained that "ordering IES to reinstate specific contracts—when all agree that IES could fulfill its statutory mandates in other ways—would be impermissible micromanagement of the agency's operations." *Id*. at *14.

Plaintiffs here likewise lack standing, because they never specifically identify "what [CRS] functions are required by statute." *See Id*. at *18. Plaintiffs never perform a "careful parsing" of the statute, *id*., but rather just quote a highly ellipsed version of 42 U.S.C. § 2000g-1 (Reply at 9), without considering the statute's triple-discretionary text, among other features. *See generally,* Def. Br. 3-4. The Reply argues that reinstated CRS employees are not performing duties at CRS, but never attempts to identify "which employees or types of employees performed tasks related to *statutorily mandated functions*." *See Am. Educ. Rsrch.,* 2025 U.S. Dist. LEXIS 111436 at *16 (emphasis added). Likewise, the Reply focuses on CRS's history of providing mediation services,

---

[2] The district court distinguished *New York v. McMahon*, 784 F. Supp. 3d 311 (D. Mass. 2025), explaining that "[p]laintiffs there sought an even broader injunction, without any parsing of what the DOE's statutory mandates are and what employees are necessary to accomplish them." Am. *Educ. Rsrch.*, 2025 U.S. Dist. LEXIS 111436, at *18.

but never grapples with the omission in the CRS statute, of any reference to mediation. Plaintiffs therefore lack standing to seek wholesale relief restoring these services.

**B.      The Reply Fails to Overcome Mootness**

Even if Plaintiffs have standing, the Reply fails to overcome mootness because CRS now is operational and providing the statutorily required functions.  The Reply never attempts to answer the "key question" for mootness: "whether the relief sought would, if granted, make a difference to [their] *legal interests* (as distinct from their psyches . . . )." *Boston Bit Labs, Inc. v. Baker,* 11 F.4th 3, 8 (1st Cir. 2021) (emphasis added); *see* Def. Br. 15. Plaintiffs appear to claim "legal interests" in CRS conciliation services, but the Reply does not show how the requested relief would impact those "legal interests," where CRS already is providing those services.  *See Boston Bit,* 11 F.4th at 9 (explaining there is "nothing left for us to do that would make a difference to [plaintiff's] legal interests," so its claims are moot).

The Reply attempts to evade mootness by arguing that CRS "cannot provide the types of sustained engagements from which Plaintiffs had previously benefited." Reply 6 (quotation omitted). But insofar as Plaintiffs claim a "legal interest" in "mediation" services (*id*. at 3), they fail to ground this in the CRS statute, and again, cannot carry their burden of showing that their requested relief would "make a difference to [their] legal interests." See *Boston Bit,* 11 F.4th at 9. While an order requiring CRS to provide mediation services may make a difference to Plaintiffs' "*psyches,"* that is extraneous to the mootness analysis. *See id.* at 8 (emphasis added).

The Reply takes surprising liberties with the facts in contesting mootness.  Dr. Nazaire never "admits" closing "numerous requests for services" because of limited staff availability. *See* Reply 6. In fact, Dr. Nazaire closed *only two* requests solely or partially for "limited staff availability." *See* Third Declaration of Denise W. Nazaire ("3rd Nazaire Decl.") ¶ 2, ECF No. 135. Nor is Dr. Nazaire "categorically" denying mediation requests. Reply 6. Only two matters

involving requests for mediation services were received thus far this fiscal year, and only in one was the decision made to prioritize services across other cases.  3rd Nazaire Decl., ¶¶ 3-5.[3]

The Reply also relies upon the voluntary cessation doctrine as an exception to mootness, but fails to come forward with any requisite evidence that Defendants are "scheming." "For openers, we question whether this case raises the kind of litigation-scheming suspicions typically associated with defendant-initiated mootness." *Id*. at 10 ("the voluntary-cessation doctrine exists to stop a scheming defendant from trying to immuniz[e] itself from suit indefinitely . . . ."). Defendants have been transparent about the President's proposal to eliminate CRS altogether, based on misalignment with Administration priorities, so that is not evidence of "scheming."

In any event, the Reply fails to explain how this exception could apply where the pre-litigation record clearly shows the government recognizing limits to the contemplated changes, and expressly disavowing, absent Congress repealing the statute, authority to eliminate CRS altogether. *See e.g.,* AR0307, AR0332.  *See Town of Portsmouth v. Lewis,* 813 F.3d 54, 59 (1st Cir. 2016) (explaining that "[t]n light of [the doctrine's] purpose [to deter scheming and manipulative conduct], the exception ordinarily does not apply where the voluntary cessation occurred for reasons unrelated to the litigation," and concluding  there is "little cause to believe" that defendant took the subsequent action at issue "in order to immunize its actions from judicial review.").  Notably, the Reply does not even claim that Defendants have attempt to evade these limits. *Cf, Illinois v. FEMA*, 801 F. Supp. 3d 75, 87 (D.R.I. 2025) (no showing that conduct cannot reasonably be expected to recur where agency "preserved its discretion" and "still asserts it was

---

[3] Nor is there any merit to the Reply's assertion that Defendants "admitted, in sworn testimony" that CRS "would not be able to comply with Congress's direction" if Congress funded CRS.  *See* Reply 5-6.  The cited declaration *(see* ECF No. 15-1), which Defendants provided in opposition to the TRO Motion in October 2025, does not say that.

authorized to impose" the challenged conditions).[4]  Plaintiffs therefore have not overcome mootness.

> ### C.  Plaintiffs Fail to Show their Claims are Prudentially Ripe

Plaintiffs espouse a rigid application of the ripeness doctrine, Reply 4-5, but overlook that this case is prudentially unripe. In contrast to constitutional ripeness, "[t]he prudential ripeness doctrine . . . is a more flexible doctrine of judicial prudence, and constitutes an important exception to the usual rule that where jurisdiction exists a federal court must exercise it." *Am. Sav. Bank, FSB v. UBS Fin. Servs.*, 347 F.3d 436, 439-40 (2d Cir. 2003) (quotation omitted); *id.* at 440 ("[t]he focus of the [hardship and fitness] questions is whether [plaintiff]'s claims would be better heard now or at some future point."). The Reply fails to show the claims are prudentially ripe, where "the factual record has developed significantly since" Plaintiffs moved for a preliminary injunction in Autumn 2025, when CRS had temporarily halting services.  *See* June 12, 2026 Minute Order.

The Reply does not dispute that most of the Plaintiffs never reinitiated contact with CRS since its resumption of services. Indeed, relying upon stale, half-year old declarations, most of the Plaintiffs provide no indication that they even still want or need services from CRS. Prudential ripeness is designed for this type of situation, "as a tool that [the] court[] may use to enhance the accuracy of [its] decisions," by waiting until the plaintiffs develop a clearer (and updated) record on which the Court can base its decision. *See K.I. v. Sullivan*, 2026 U.S. Dist. LEXIS 41763, *33-34 (N.D.N.Y. Mar. 2, 2026) (quotation omitted). *See generally, Roman Catholic Bishop v. City of Springfield*, 724 F.3d 78, 91 & n.10 (1st Cir. 2013) (claims unripe "under general principles of prudential ripeness," rejecting plaintiff's contention "that there are no further factual developments

---

[4] The First Circuit also noted, "[i]t goes without saying . . . that nothing prevents [plaintiffs] from seeking injunctive and declaratory relief if [defendants] were to engage in" "backsliding."  *See Boston Bit*, 11 F.4th at 10, 12 n.6.

that could be relevant to the outcome of this case" where plaintiff "never submitted an application" as relevant to its requests and "[defendant] had no opportunity to demonstrate whether or not it will accommodate" plaintiff's requests); *Morgan v. McCotter*, 365 F.3d 882, 891 (10th Cir. 2004) ("Action by this court in the face of such an undeveloped controversy would be exactly the type of anticipation of contingent events that the prudential doctrine of ripeness was intended to forestall."). Importantly, the Reply never asserts any hardship in waiting for the claims to ripen.

Finally, Plaintiffs critically mis-state the caselaw in arguing that "[a] person with standing who is injured by a failure to comply with [a statute] may complain of that failure at the time the failure takes place, for the claim *can never be riper*." Reply 5 (quoting *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 32 (1st Cir. 2007) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998)) (emphasis by Plaintiffs). Plaintiffs omit that in the quoted passage, the First Circuit is expressly referring to a "*procedural* injury," based on a failure to comply with a "statutory *procedure*."[5] Other courts even have expressly distinguished and limited "*Ohio Forestry* dicta" to procedural injury. *See Wild Virginia v. Council on Env'tl Quality*, 56 F.4th 281, 297-98 (4th Cir. 2022) (*citing, e.g., Nulankeyutmonen,* 503 F.3d at 32). Because Plaintiffs do not claim a procedural injury here, their reliance on this case line is entirely misplaced.

## II. The Reply Fails to Establish Requirements for APA Review
### A. The Reply Fails to Overcome the "Committed to Agency Discretion"-Bar.

The Reply does not dispute that (i) the CRS statute is triple-discretionary; (ii) Congress declined to explicitly impose any "duty" on CRS (as it did in the precursor FMCS statute), but

---

[5] The full passage states: "These claims of <u>procedural injury</u> are clearly ripe under *Ohio Forestry Ass'n, Inc. v. Sierra Club:* '[A] person with standing who is injured by a failure to comply with <u>[statutory] procedure</u> may complain of that failure at the time the failure takes place, for the claim can never get riper.'" *Nulankeyutmonen*, 503 F.3d at 32 (quoting 523 U.S. 726, 737 (1998)) (alteration by First Circuit) (emphasis added).

rather just specified CRS's "function" or purpose; and (iii) Congress imposed no specific mandatory functions across the remainder of the CSR statute, apart from an annual report. *See* Def. Br. 3-4. The Reply also does not identify any features in the CRS statute qualifying or limiting the discretionary feature. In this light, the Reply's attempt to evade the "committed to agency discretion"-bar is unavailing, in at least three ways.

First, the Reply incorrectly argues that Defendants claim "unfettered discretion . . . to deny whole categories of services for any reason, however arbitrary." *See* Reply 10. But Plaintiffs never identify any "categories of services" in the statute's plain text in the first place. The Supreme Court instructs that "the purposes underlying the [statute] are most properly fulfilled by giving effect to the plain meaning of the language as Congress enacted it." *Dunn v. CFTC*, 519 U.S. 465, 474 (1997). The Reply provides no reason for departing from the text's plain language.

Second, the Reply never shows why, under *American Federation of Teachers v. Davis*, 787 F. Supp d 538, 548 (S.D.N.Y. 2025) ("*AFT*"), the "committed to agency discretion"-bar would not apply here. The Reply does not dispute that Congress crafted the CRS statute tracking the discretionary features of the FMCS statute while providing CRS with multiple additional discretionary features. *See* Def. Br. 20-21. Where the court in *AFT* concluded that the FMSC statute affords the agency "some discretion," 818 F. Supp. 3d at 548, the Reply never explains why the undisputed, multiple, additional discretionary features in the CRS statute would not compel a different outcome.

Third, Plaintiffs citation to *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 19 (1st Cir. 2020) (cited at Reply 10) supports *Defendants*, because a close reading demonstrates (by way of contrast) the extraordinary level of discretion in the CRS statute. The relevant passage cited by Plaintiffs concerns the Federal Advisory Committee Act ("FACA"), Pub. L. No. 92-463, 86 Stat.

770 (1972), and states: "Nor does the fact that the statute leaves a great deal of discretion to the agency, *see* 5 U.S.C. app. 2 § 8(a), make actions taken pursuant to it unreviewable." *See id.* But the cited FACA statute includes multiple, mandatory "shall" commands, absent from the CRS statute, while including none of the triple-discretionary language in the CRS statute:

> Each agency head *shall* establish uniform administrative guidelines and management controls for advisory committees established by that agency, which *shall* be consistent with directives of the Administrator under [other sections of FACA]. Each agency *shall* maintain systematic information on the nature, functions, and operations of each advisory committee within its jurisdiction.

*See* 5 U.S.C. app. 2 § 8(a) (emphasis added).

Finally, the parameters in the CRS statute, 42 U.S.C. § 2000g-1 (*e.g.,* "disputes, disagreements, or difficulties"), as emphasized in the Reply, do not preclude the "committed to agency discretion" bar. *See* Reply 9. Even in *Webster v. Doe*, 486 U.S. 592, 599 (1988) the relevant statute *did* contain a limitation and guiding principle (omitted by Plaintiffs): "whenever he shall deem such termination necessary or advisable in *the interests of the United States* . . . ." 50 U.S.C. § 403(c) (emphasis added)

**B.      The Reply Fails to Overcome the "Final Agency Action"-Bar**

The Reply evidently relies upon a different final agency action than the Complaint. While the Complaint identifies the final agency action as "Defendants' dissolution of CRS," Compl. ¶ 78, the Reply asserts that "Plaintiffs challenge DOJ's *definitive* plan . . . to reduce [CRS] to a single-person agency that is incapable of providing the services it previously provided." Reply 11 (quotations omitted, emphasis in Reply). Even under this new theory, Plaintiffs fail to establish (a) "discrete agency," that is (b) "final." *See* 5 U.S.C. § 704.

**1.      The Reply fails to show "discrete agency action."**

Plaintiffs rely almost exclusively on two First Circuit cases that have little to do with challenges to the (alleged) dismantling of an agency—rather, both address grant cuts, and the

(different) issue of whether alleged, categorical federal funding freezes constitute discrete agency actions challengeable under the APA. See Reply 11 (citing *New York v. Trump*, 133 F.4th 51, 67-68 (1st Cir. 2025) (declining to stay a preliminary injunction); *New York v. Trump*, 171 F.4th 1, 16-18 (1st Cir. 2026) (direct appeal). These cases have little application here, where plaintiffs challenge the alleged "dissolution" or effective "dismantling" of an agency, and seek an order requiring Defendants to restore the prior level of operations.

By contrast, the Reply never grapples with the line of cases addressing the "discrete agency action" requirement in the context here, of a challenge to the "dissolution" or "dismantling" of an agency, where the issue of the Court becoming a "monitor" comes to a head. As explained in *Association for Education Finance,* 786 F. Supp.3d 13, 30-31 (D.D.C. 2025):

> APA challenges must focus on specific agency actions and seek equally targeted remedies. But the challenges here bundle together broad lists of grievances and seek **wholesale modifications to agency operations writ large**. It is not this Court's place to breathe life back into wide swathes of the Institute's cancelled programs and then **monitor the agency's day-today statutory compliance**; essentially what Plaintiffs seek. **Such widespread modification to agency operations** must come instead from the offices of the Department or the halls of Congress, where programmatic improvements are normally made.

(emphasis added). *See also, e.g., Carter v. U.S. Dep't of Educ*., 2025 U.S. Dist. LEXIS 97016, *28 (D.D.C. May 21, 2025) (explaining that "the relief plaintiffs request in their motion for a preliminary injunction further illustrates that they seek correction of the entire operation of [the DOE's Office of Civil Rights (OCR)]," such that it, "in effect, place[s] the Department's OCR operations into receivership"—concluding that "such sweeping relief is not contemplated by the APA, nor is it compatible with a court's role") (quotation omitted); *NAACP v. United States*, 798 F. Supp. 3d 526, 550 (D. Md. 2025) (finding no qualifying discrete final agency action, in challenge to cuts at DOE, because "Plaintiffs' requested relief would put the court in the ill-advised role of essentially overseeing an agency's compliance with congressional directives and

supervising its administrative functions," explaining that "the Supreme Court's caution in *Norton v. Southern Utah Wilderness Alliance* rings true"). The Reply never addresses these concerns.[6]

### 2. The Reply fails to establish finality.

The Reply does not dispute that final agency action is a jurisdictional requirement under the APA, yet the Reply expends just a single paragraph on finality, and does not even reference the two-part *Bennett* test for finality. Reply 12. By resorting to a new "final agency action" theory, as explained above, Plaintiffs appear to concede that the "final agency action" identified in paragraph 78 of their complaint (the "dissolution of CRS") does not hold up. *See* Def. Br. 27 (explaining, for example, that Plaintiffs' theory of a "gamble" could not support "final agency action"). Plaintiffs proffer no authority for changing the final agency action, without amending or supplementing their operative pleadings. In any event, the Reply never shows how this new theory of agency action is final under *Bennett*. And to be clear, Defendants never suggested that "the finality of an agency action can be altered by subsequent agency decisionmaking . . . ." *See* Reply 12. Defendants' point is simply that Plaintiffs failed to show that the "agency action," as alleged in the Complaint, was ever final—*in the first place*—under *Bennett*.

### 3. The Reply Fails to Meet the High Standard for a Section 706(1) Claim

The Reply does not dispute the high standard for a Section 706(1) claim to compel agency action. *See* Def. Br. 28; *Ghasemi v. Rubio* 812 F. Supp. 3d 129, 137 (D. Mass 2025) ("A claim under § 706(1) . . . can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.") (citation omitted). Nevertheless, the Reply fails to point

---

[6] *Rhode Island v. Trump*, 810 F. Supp. 3d 283, 301-302 (D.R.I. 2025), *appeal filed*, No. 26-1070 (1st Cir. Jan. 21, 2026) (cited at Reply 11-12) is unavailing, because that case does not involve the "monitor" problem present here. Plaintiffs there sought a different relief: an injunction against complying with or carrying out the directives contained in a *specific* Executive Order (the so-called "Reduction EO").

to any discrete command within the CRS statute for the Section 706(1) claim.  Plaintiffs instead make a passing reference to *Heckler v. Chaney*, pointing to CRS's temporary halting of services in 2025 (Reply 16). The Reply does not develop this argument, and in any event, because CRS now *is* providing services, this argument is moot. *See* 2nd Nazaire Decl., ¶ 9(a)-(c) (ECF No. 116).

**III.     The Reply is Unavailing on the Merits.**

      **A.     Plaintiffs' APA Claims Fail on the Merits**

            **1.     The Reply Does Not Establish Arbitrary and Capricious Conduct**

In their Reply, Plaintiffs continue to overlook the "great deference" and "narrow" review of agency actions under the APA.  *See Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior,* 2023 U.S. Dist. LEXIS 183483, *14 (D. Mass. Oct. 12, 2023) (Talwani, J.), *aff'd*, 123 F.4th 1 (1st Cir. 2024). "[A]n agency's action should only be vacated where the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. *(*quotations omitted).  The Reply fails to identify any of these circumstances here, and instead makes a handful of attacks on the record that do not hold up.

First, the Reply argues that Defendants failed to explain why one employee is the minimum to perform CRS's statutory functions. Reply. 13. But Defendants considered what CRS's statutory scheme required, and explained how one employee could discharge these duties, albeit with certain changes and limitations. *See* AR0269-75.

*Second*, the Reply asserts that the July 3 Implementation Memorandum failed to address the statement by the then-CRS Director about a supposed "near-minimum level" of staffing.  Reply 13. But this statements reflects Mr. Nam's view of CRS "statutory mandates" which Defendants do not share.  *See, e.g.,* AR0347 (statement by Mr. Nam about "a near-minimum level necessary

to provide rapid responses . . . *in fulfillment of CRS's statutory mandates*") (emphasis added). In any event, "[w]hile an agency must consider important aspects of the problem, it need not explicitly address every argument for and against its position." *Contra Costa Reg'l Med. Ctr. v. Kennedy,* 2026 U.S. Dist. LEXIS 1890, *13 (N.D. Cal. Jan. 6, 2026) (citation omitted).

*Third*, the Reply argues that Dr. Nazaire's Implementation Memorandum fails APA review because it does not explicitly recommend or endorse the approach under consideration. *See* Reply 13-14. But this makes little sense, because the memorandum never purports to provide a recommendation in the first place.

*Fourth*, the Reply argues that the Implementation Memorandum did take into account reliance interests. In fact, it includes an entire section entitled, "Stakeholder Engagement" that explains that "the NPM could work to equip" "partners"—including "community leaders [and] national civil rights organizations"—"with the skills and tools necessary to prevent, de-escalate, and resolve violence and community tensions. . . ." AR0273, AR 0274 ("The intent is to cultivate a network of informed, skilled stakeholders who can serve as first responders . . . thereby reducing the need for intensive CRS intervention . . . ")

*Finally*, Defendants did take CRS's overall mission into account (cf, Reply 14): The Implementation Memorandum repeatedly discusses how to "further advance CRS's mission," and "ensur[e] that CRS's core mandates continued to be advanced"—and how CRS's "services are designed to help prevent, resolve, and reduce the potential for violence, civil rights violations, and hate crimes in communities," and how "to fulfill the day-to-day conciliation function of CRS as mandated by the CRA . . . ." AR269-275.

### 2. The Reply Fails to Show that Defendants' Actions Are 'Not in Accordance with Law' or 'In Excess of Statutory Authority.'

The Reply argues that the reductions at issue have left "CRS so that it could no longer carry

out the core civil rights mission." Reply 15. But again, Plaintiffs never identify any text in the CRS statute showing how Congress supposedly directed CRS to carry out this "mission." "As [the Supreme Court] has repeatedly stated, the text of a law controls over purported legislative intentions unmoored from any statutory text"; the Court "may not replace the actual text with speculation as to Congress' intent." *See Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) (quotation omitted). Nor are Defendants are asking the Court to exhibit "naivete" (Reply 15). To the contrary, Defendants repeatedly have acknowledged the Administration's view that CRS is inconsistent with its priorities and its desire to eliminate the agency altogether, if and when Congress amends the statute. *See e.g.,* AR0332. Finally, Defendants never have stated that mediation is categorically precluded. *Cf,* Reply 16; s*ee* 2nd Nazaire Decl. ¶ 12(c). As explained above, only two matters involving requests for mediation services were received so far this fiscal year, and only in one of those did it determine that it did not currently have resources to devote to the matter. *See* 3rd Nazaire Decl., ¶ 4.

  **B.**   **The Reply Effectively Concedes the *Ultra Vires* Claim, and Fails to Support the Freestanding Constitutional Claim**

  The Reply also fails to support the merits on Plaintiffs' non-APA claims. First, the Reply does not respond to *any* of Defendants' arguments about the *ultra vires* claim (see Def. Br. at 34). Plaintiffs therefore effectively concede their *ultra vires* claim. *See* Reply 17-18 (sole reference to *ultra vires* argument is in header). Second, for the freestanding constitutional claim, the Reply never grapples with the authority dismissing separation of powers claims that challenge the alleged "dismantling" of agencies. *See* Def. Br. at 33 (discussing *Rural Dev. Innovations Ltd. v. Marocco,* 2026 WL 710260, *4 (D.D.C. Mar. 13, 2026); *Ass'n for Educ. Finance & Policy, Inc.,* 786 F. Supp. 3d at 29). Instead, the Reply misrelies upon *League of United Latin American Citizens v. Executive Office of the President*, 818 F. Supp. 3d 34 (D.D.C. 2026), addressing a constitutional

challenge to an Executive Order concerning citizenship, where plaintiffs' theories of relief "are not predicated on underlying statutory violations, or on whether any purported statutory duties were mandatory." *Id.* at 82 *(*quotations omitted). The Reply also argues that "Defendants claim no statutory authority for their actions to *dismantle* CRS" (Reply 17) (citation, modified, emphasis in original). Defendants have not dismantled the agency, but rather, have reduced the level of operations down to the statutory minimum. Finally, this case is unlike *Youngstown* (*cf,* Reply 17), where the Government did not rely upon on any statutory authorization for its actions—the case "involved the *conceded absence of any statutory authority*, not a claim that the President acted in excess of such authority." *Dalton v. Specter*, 511 U.S. 462, 473 (1994) (emphasis added).

## IV. Remedy

### A. The Reply's (Belated) Arguments for a Permanent Injunction are Unavailing.

The Reply makes a belated argument for a permanent injunction (not made in Plaintiffs' opening motion). The argument is unavailing.

First, while Plaintiffs assert they were injured from CRS's withdrawal or denial of services in 2025, they fail to show *actual* or *imminent* irreparable harm. *See* Appendix A to Defendants' opening brief (*see* ECF No. 117-1). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (quotation omitted). Indeed, *League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (cited at Reply 19) indicates that the harm is irreparable when there is "no do over and no redress." ("*And that harm is irreparable because* after the registration deadlines for the November election pass, *there can be no do over and no redress*."). (emphasis added). The Reply fails to show there is "no do over and no redress here" so as to justify a permanent injunction. *See id.*

Second, the Reply never squares the irreparable harm requirement with Plaintiffs' failure

15

to re-request services. The Reply's reference to "practical futility" (Reply 20) is just *ex-post* lawyering; none of the Plaintiffs actually proffer any evidence or declaration claiming "futility." In any event, the Reply does not show "futility" where other entities (besides Plaintiffs) have been requesting and receiving CRS services in 2026. See 2nd Nazaire Decl., ¶ 9.

For the Plaintiffs that did reinstate their requests, the Reply mischaracterizes or ignores CRS's actual response:

- **BRIDGE**: CRS's response was not a "terse denial" (Reply 19). Rather, in the course of meeting with BRIDGE, Dr. Nazaire explained the reasons for what she viewed as potential obstacles, as set forth in her declaration. *See* 2nd Nazaire Decl. ¶ 11.c. ("during this call [with BRIDGE] I also identified a few obstacles . . . I advised BRIDGE under these circumstances…."); *id*. 11.c. (i) –(vi).

- **MBSC and NAACP St. Louis**: CRS did not unreasonably "refuse[]" requests of MBSC and NAACP of St. Louis. Reply 19. Dr. Nazaire had explained that because MBSC and NAACP had finalized and fully executed the MOA (that CRS previously had mediated), CRS did not have statutory authority to serve as a monitor or to ensure compliance, as requested. *See* 2nd Nazaire Decl. ¶¶ 11(a)(i)-(iii); 11(b).

- **OAP**: Plaintiffs create the misimpression that, when OAP did not respond to Dr. Nazaire's follow-up email offering alternative meeting times after OAP requested a rescheduling of their meeting, Dr. Nazaire preemptively "closed the inquiry" before OAP was able to reconnect. See Plaintiffs' Statement of Undisputed Material Facts ("SUMF"), ¶ 63, ECF No. 130. Dr. Nazaire had not communicated to this stakeholder whether the matter was opened or closed (apart from through this court filing). *See* 2nd Nazaire Decl. ¶ 11.d.; Ex. 4.

Even looking past "irreparable harm," the Reply does not support a permanent injunction. Plaintiffs' "public interest" argument (Reply 20) presupposes Plaintiffs' view about CRS's "statutory duties." The Reply also overlooks that CRS has been providing services to other entities that requested services in 2026. And the Reply minimizes CRS's legitimate reasons for declining service, for those Plaintiffs that did re-initiate contact. *See* 2nd Nazaire Decl. ¶ 11. Finally*,* even if Plaintiffs meet the requirements for a permanent injunction, they never explain why that remedy should supplant the "normal" APA remedy that Plaintiffs' otherwise espouse. *See* Reply 18. *See generally, Wash. Area Bicyclist Ass'n v. Burgum*, U.S. Dist. LEXIS 87803, *90 (D.D.C. Apr. 21,

2026) ("[T]he Court will decline plaintiff's invitation to step outside the boundaries of ordinary practice in an APA case and enter a permanent injunction.")

**B.    The Reply Fails to Grapple with the Core Remedy Issues**

Apart from arguing a permanent injunction, the Reply appears to concede Plaintiffs' core remedy arguments, as the remainder of the Reply is just a single paragraph, *see* Reply 18 (re vacatur), almost entirely unresponsive to Defendants' arguments. In any event, several points warrant emphasis.

First, Plaintiffs never explain how the Court would craft a remedy in light of the text and the discretionary features in the CRS statute. *See* Def. Br. 36-37. They never connect a remedy with the statute they claim they are "enforcing." *See Somerville Public Schools v. McMahon*, 139 F.4th 63, 74 (1st Cir. 2025) (approving district court injunction that "applies only insofar as it is necessary to restore the Department to the status quo <u>such that it is able to carry out its statutory functions,</u> and not for the purpose of ensuring a particular level of staffing as adopted by a prior administration," where agency was disabled from performing its "statutorily assigned functions") (emphasis added by First Circuit; citation omitted).

Second, as explained above, the Reply never addresses how the Court would impose the sought relief without becoming a "monitor." *See* Def. Br. at 36-37. *See, e.g., Ass'n for Education Finance & Policy* (quoted in Def. Br. 37);  *NAACP,* 798 F. Supp. 3d at 559 ("Plaintiffs' requested relief would put the court in the ill-advised role of essentially overseeing an agency's compliance with congressional directives and supervising its administrative functions."); *See also, Carter*, 2025 U.S. Dist. LEXIS 97016, *28 (explaining that  plaintiffs' requested relief "in effect, place[s] the Department's OCR operations into receivership").

Third, the Reply never shows that Plaintiffs' service requests even would require any change in service level or staffing, beyond the one-person model currently in place.  Plaintiffs

never grapple with the requirement that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs, and should be closely tailored to the harm that they address. *Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd*., 282 F.3d 23, 40 (1st Cir. 2002); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 217 F.3d 8, 14 (1st Cir. 2000).

## V. Court Should Reject Plaintiffs' Rule 56(d) Request for Sweeping Discovery

The Court should outright reject Plaintiffs' alternative request under Rule 56(d) to undertake what amounts to sweeping discovery (hardly "targeted" or "limited" as claimed)—which would "include, at a minimum":

> (a) written discovery on the allegation that CRS is "operational," (b) the opportunity to depose Ms. Nazaire and obtain any relevant emails of hers; (c) the opportunity to depose members of the "leadership team" who are actually making decisions for and about CRS and obtain any relevant emails of theirs; and (d) the opportunity to depose reinstated CRS employees.

Reply 25.  Plaintiffs' request here turns Rule 56 on its head, where its "proper office . . . is to ensure that a party opposing a motion for summary judgment has an adequate opportunity to access facts that would meaningfully inform her efforts to oppose that motion." *Emigrant Residential LLC v. Pinti*, 37 F.4th 717, 728 (1st Cir. 2022).  Their request should be denied because they cannot establish the "five elements": "authoritativeness, timeliness, good cause, utility, and materiality"—specifically the last three elements, as explained below.[7]  *See id.* at 725.

***The Request Fails to Show "Good Cause"***: Plaintiffs' 'good cause' rests upon a fundamental distortion of the record.  According to Plaintiffs, Defendants' submission of Dr. Nazaire's declaration essentially amounts to a 'breach' of Defendants' earlier representation, in

---

[7] "To succeed, a party's Rule 56(d) motion typically must: "1) be timely; 2) be authoritative; 3) show good cause for failure to discover the relevant facts earlier; 4) establish a plausible basis for believing that the specified facts probably exist, and 5) indicate how those facts will influence the outcome of summary judgment." *Rios v. Centerra Group LLC*, 724 F.4th 101, 121 (1st Cir. 2024) (citation omitted).

their "Notice Regarding Witness Testimony" (ECF No. 89) that they intend to defend the merits of this case on administrative record (as opposed to witness testimony). But that Notice did not limit the submission of a *factual update,* like Dr. Nazaire's second declaration. In fact, as Plaintiffs emphasize, at the time of the Notice, Plaintiffs were seeking discovery "to 'probe whether Defendants' explanations *for the challenged actions are pretextual."* See Reply 22 (quotation omitted, emphasis added). In response, and as directed by the Court, the Notice clarified that Defendants would rely upon the administrative record—rather than live witness testimony—to refute that charge and defend the decision on the merits.

Ironically, Plaintiffs attempt to leverage the Second Nazaire Declaration as "good cause" for Rule 56(d), meanwhile extensively relying upon multiple declarations of Mr. Julius Nam (which they apparently do not count as extra-record evidence). *See, e.g.,* Reply 20, n.5 (citing Mr. Nam's declaration to establish what "the record shows"—specifically, purporting to use that "record" to refute Dr. Nazaire's declaration). Plaintiffs provide no basis for having it both ways.

In any event, Plaintiffs have not shown as a predicate for "good cause," that they have satisfied an exception to take discovery in this administrative record case. *See Pham v. Scott,* 787 F. Supp. 3d 1124, 1139 (S.D. Cal. 2025) ("Plaintiffs' Rule 56(d) motion does not explain how the requested discovery satisfies the statutory exceptions permitted by section 706.")

***The Request Fails to Establish Utility***: Under Rule 56(d), Plaintiffs must show that they "cannot present facts <u>essential</u> to justify [their] opposition [to a summary judgment motion]." *See Troiano v. Aetna Life Ins. Co.*, 844 F.3d 35, 45 (1st Cir. 2016) (emphasis in original, citation omitted). But Plaintiffs do not take into account the posture here, where summary judgment serves "to determine whether the agency action was arbitrary and capricious." *Seafreeze*, 2023 U.S. Dist. 183483 at *14 (quotation omitted) (explaining that "a summary judgment motion has a special

twist in the administrative law context"). In any event, to the extent Plaintiffs seek to probe "the degree of CRS's operations," (Reply 25), Plaintiffs are positioned to develop the record themselves by re-initiating requests to CRS (where the majority have not done so).

***The Request Fails to Show Materiality***: Plaintiffs point to no contradiction in Dr. Nazaire's declaration, or to any other evidence casting doubt on her statements (where Dr. Nazaire has years of experience at CRS). "[T]he facts that [Plaintiffs] seek[] to discover [through Rule 56(d)] must be foreseeably capable of breathing life into his claim or defense." *Resolution Trust Corp. v. N. Bridge Assocs.*, 22 F.3d 1198, 1207 (1st Cir. 1994) (citation omitted). Plaintiffs argue that CRS's resumption of service is a "façade" to evade review (Reply 21), but proffer nothing to support this.

Finally, at base, the Rule 56(d) request—far from seeking just "limited discovery"—is a massive fishing expedition which would be extraordinarily burdensome to Dr. Nazaire (whom they seek to depose), as well as to Defendants generally.[8] See *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1280 (11th Cir. 1998). ("Whether to grant or deny a Rule 56(f) motion for discovery requires the court to balance the movant's demonstrated need for discovery against the burden such discovery will place on the opposing party." The Court should deny the request (and Plaintiffs' passing alternative request to strike Dr. Nazaire's declaration). *See* Reply 22, n.6.

### CONCLUSION

For these reasons, the Court should grant Defendants' motion for judgment on the pleadings, or alternatively, grant their motion for summary judgment, and deny Plaintiffs' motion for summary judgment. The Court should also deny Plaintiffs' Rule 56(d) request.

---

[8] Any hypothetical discovery concerning requests for services and case activity would potentially need to be subject to the confidentiality provision of 42 U.S.C. § 2000g-2(b).

Dated: June 23, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

CHRISTOPHER HALL
Assistant Branch Director
Federal Programs Branch

*s/ Steven M. Chasin*

Steven M. Chasin (D.C. Bar# 95853)
Jessica A. Lundberg
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-0747
Email: steven.m.chasin2@usdoj.gov

*Counsel for Defendants*