| | |
|---|---|
| ETHICAL SOCIETY OF POLICE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, *et al.*,<br><br>Defendants. | No. 1:25-cv-13115-IT |

## DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Under Fed. R. Civ. P. Rule 56 and Local Rule 56.1, and the Court's May 18, 2026 Minute Order, Defendants hereby provide a response to Plaintiffs' Statement of Undisputed Material Facts ("Statement" or "SUMF"), ECF No. 130, filed in support of their Motion for Summary Judgment. Subject to the following recurring objections, Defendants respond to the Statement on the grounds identified in numbered paragraphs corresponding to the SUMF.

**Objection No. 1:** Defendants object to the Statement for failure to identify facts that are "material" to the Motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that a fact is "material" only if it "might affect the outcome of the suit under the governing law"). Some of Plaintiffs' "material" facts are not material to the resolution of Plaintiffs' Motion for Summary Judgment. Rather than complying with this Court's rule, Plaintiffs offer general background information and matters otherwise immaterial to this case. *See, e.g.*, *Terry v. SimplexGrinnell LP*, 2013 WL 1332240, at *1 (D. Mass. Mar. 28, 2013).

**Objection No. 2:** Defendants object to the Statement because Plaintiffs improperly assert

as facts the following: argument, opinions, characterizations, conclusory assertions, and conclusions of law. Local Rule 56.1 requires "a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried"; it does not allow a party to set forth conclusions of law masked as facts. *See, e.g.*, *Terry*, 2013 WL 1332240, at *1 (district court "will not consider" factual assertions in support of summary judgment "to the extent that they . . . constitute conclusions of law").

**Objection No. 3:** Defendants object to the Statement to the extent that Plaintiffs assert as facts Plaintiffs' speculation, or assert otherwise inadmissible evidence. A summary judgment motion must be supported by admissible evidence or evidence that is capable of being reduced to an admissible format. *See* Fed. R. Civ. P. 56(c)(2). Plaintiffs' summary judgment exhibits that contain hearsay without an exception or lack the clear ability for authentication are inadmissible and should not be considered in support of Plaintiffs' Motion. *See* Fed. R. Evid. 802 (hearsay not admissible except in circumstances not applicable here); *Davila v. Corporacion de P.R. Para La Difusion Publica*, 498 F.3d 9, 17 (1st Cir. 2007); *Goguen ex rel. Est. of Goguen v. Textron, Inc.*, 234 F.R.D. 13, 15 (D. Mass. 2006). Plaintiffs, as the parties introducing this evidence to support their Motion for Summary Judgment, bear the burden of establishing its admissibility. *See, e.g.*, *Fed. Deposit Ins. Corp. v. Roldan Fonseca*, 795 F.2d 1102, 1110 (1st Cir. 1986). To the extent Plaintiffs' Statement contains inadmissible material, the Court should not consider it in ruling on Plaintiffs' Motion for Summary Judgment.

### I. *Statutory Framework and Agency Background*

1. Congress established the Community Relations Service ("CRS") in the Civil Rights Act of 1964. 42 U.S.C. § 2000g-1.

   **<u>Response</u>**: Undisputed.

2.  The statute provides that "[i]t shall be the function of the Service to provide assistance to communities and persons therein in resolving disputes… relating to discriminatory practices." *Id*.

    **<u>Response</u>**: Defendants respectfully refer the Court to the cited statute for a true and accurate statement of its contents.

3.  CRS is authorized to provide such assistance "whenever, in its judgment, peaceful relations… are threatened." *Id*.

    **<u>Response</u>**: Legal conclusion. Defendants respectfully refer the Court to the cited statute for a true and accurate statement of its contents.

4.  CRS's statutory role is to provide conciliation services to the public, including mediation, facilitation, and related assistance to communities. *Id*.

    **<u>Response</u>**: Legal conclusion. Defendants respectfully refer the Court to the relevant statute for a true and accurate statement of its contents.

5.  In 2025, the Department of Justice expressed, in writing, hostility toward or disagreement with this basic statutory mission. *See* Ex. 2 to Freeny Decl. at p.20, Doc. No. 107-2 at 9.

    **<u>Response</u>**: Subject to recurring Objection No. 2, Defendants respectfully refer the Court to the cited document for a true and accurate statement of its contents.

6.  By law, CRS must conduct "conciliation assistance. . . in confidence and without publicity," "hold confidential any information acquired in the regular performance of its duties," and may not "engage in the performance of investigative or prosecuting functions of any department or agency in any litigation arising out of a dispute" handled by CRS. 42 U.S.C. § 2000g-2.

**Response**: Legal conclusion. Defendants respectfully refer the Court to the relevant statute for a true and accurate statement of its contents.

7. Several subsequent statutes expanded the role of CRS in violence prevention, hate crimes prevention, and civil rights conflict resolution: the Fair Housing Act, 42 U.S.C. § 3608(e)(4); the Church Arson Prevention Act, Pub. L. 104-155, § 6, 110 Stat. 1392, 1394 (1996); the Emmett Till Unsolved Civil Rights Crime Act and the Emmett Till Unsolved Civil Rights Crimes Reauthorization Act, Pub. L. 114-325, § 2, 130 Stat. 1965, 1967; see also Pub. L. 110-344, 122 Stat. 3934 (2007); and the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act, Pub. L. No. 111-84, §§ 4706, 4707, 123 Stat. 2190, 2838 (2009).

**Response**: Legal conclusion. Defendants respectfully refer the Court to the cited statutes for a true and accurate statement of the contents.

8. Until 2025, Congress and DOJ consistently understood these statutes to expand the jurisdiction of CRS. *See* Supp. Nam Decl. ¶ 16, Doc. No. 107-4 at 8. This understanding is reflected in annual reports to Congress that CRS submitted even during the first Trump Administration. Id. & Ex. D.

**Response**: Legal conclusion. Defendants respectfully refer the Court to the cited statutes and cited reports for a true and accurate statement of the contents.

9. CRS has quietly and without fanfare played a role in some of the most significant moments in this country's history over the last sixty years. Nam Decl. ¶¶ 13-18, Doc. No. 107-3 at 8-11. This includes its work in Selma in the aftermath of "Bloody Sunday" to its deployment nearly sixty years later in Milwaukee and Chicago during the Republican and Democratic National Conventions. *Id*.

**Response**: Subject to recurring Objection Nos. 1 and 2, Defendants specifically deny that the cited statements are material to this case. This purportedly material fact also relies on information in Plaintiffs' custody and control. Defendants lack the ability to determine whether this fact is in dispute, and therefore cannot dispute it.

10. Until the challenged agency actions, CRS was a "direct services component," meaning that it was responsible for delivering direct conciliation services, including mediation and facilitation, to citizens and communities throughout the United States. Administrative Record ("AR") at 344, Doc. No. 92-2 at 3.

**Response:** Legal conclusion. Subject to recurring Objection Nos. 1 and 2, Defendants specifically deny that the cited statements are material to this case.

11. CRS had a headquarters office in Washington, D.C. and 25 field offices across five different regions of the United States. *Id*. Pursuant to its statutory mandate, CRS provided four categories of services to state and local governments and partner organizations like Plaintiffs in advancement of its mission: facilitation of dialogue, mediation, training, and consultation. AR 427, Doc. No. 91-2 at 86. CRS considered these to be "core" activities. *Id*.

**Response:** Legal conclusion (with respect to "statutory mandate"). Subject to recurring Objection Nos. 1 and 2, Defendants respectfully refer the Court to the relevant statute. Subject to the foregoing, undisputed with respect to offices.

12. Each field office covered multiple federal Congressional and judicial districts and provided rapid response to offer critical assistance to communities to protect human life and property, including in emergency situations involving violent conflicts and civil disorder. AR at 332, Doc. No. 91-1 at 332.

**Response:** Subject to recurring Objection Nos. 1 and 2, Defendants respond that the cited document does not supported these purportedly material facts.

## II. *Decisionmaking Process with Respect to CRS's Elimination*

13. On January 20, 2025, President Trump issued an Executive Order titled *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* that directed agency heads to "undertake preparations to initiate large-scale reductions in force (RIFs)." *See* E.O. 14158 § 3(c), 90 Fed. Reg. 8441 (Jan. 20, 2025). That direction did not apply, among other things, to "functions related to public safety." *Id*.

    **Response:** As to the first sentence, undisputed. As to the second sentence, legal conclusion. Subject to recurring Objection Nos. 1 and 2, Defendants respectfully refer the Court to the relevant Executive Order and cited document, for a true and accurate statement of its content.

14. At least until early 2025—and including during the first term of Trump's presidency— CRS was considered to serve a public safety mandate. AR at 343, Doc. No. 92-2 at 2.

    **Response:** Legal conclusion. Subject to recurring Objection Nos. 1 and 2, Defendants respectfully refer the Court to the statutes referenced in the cited document.

15. In a memorandum dated March 7, then-head of CRS Julius Nam warned Defendants that CRS was "already at a near-minimum level of personnel." AR at 345, Doc. No. 92-2 at 3. In particular, he stated: "The 36 employees in field offices represent a near-minimum level necessary to provide rapid responses to emergency situations arising in different parts of the Nation, in fulfillment of CRS's statutory mandates." *Id.* at 347.

**Response:** Subject to recurring Objection Nos. 1 and 2, Defendants respectfully refer the Court to the relevant cited document, for a true and accurate statement of its content.

16. Mr. Nam also explained that, as a public safety agency, CRS was exempt from the reorganization by the plain terms of the Executive Order. *Id*. at 343.

    **Response:** Legal conclusion. Subject to recurring Objection Nos. 1 and 2, Defendants respectfully refer the Court to the Executive Order and the relevant cited document, for a true and accurate statement of the contents.

17. Notwithstanding this, on March 25, 2025, Deputy Attorney General Todd Blanche issued a memorandum entitled "Soliciting Feedback for Agency Reorganization Plan and RIF" to all DOJ department and component heads, soliciting feedback on proposed staffing reductions and agency reorganizations. AR at 1, Doc. No. 92-1 at 1. Among the proposals in that memorandum was "eliminating the Community Relations Service and moving some or all impacted employees to U.S. Attorneys' Offices." *Id.* at 2.

    **Response:** Subject to recurring Objection No. 2, undisputed.

18. The President's FY 2026 budget request for DOJ included zero funding for CRS and sought elimination of the statutory provision creating CRS. AR at 332, Doc. No. 91-1 at 332.

    **Response:** Undisputed.

19. Defendants' plan to eliminate CRS was not contingent on congressional approval of that proposal. OMB's Technical Supplement to that budget request stated that "[t]he Justice Department's reorganization **will eliminate the Community Relations Service (CRS) and its functions** <u>in FY 2025</u>, so no funding is requested in FY 2026 for CRS." Ex. 1 to Freeny Decl. at p.607, Doc. No. 107-1 at 19 (emphasis added).

**Response:** As to first sentence, legal conclusion. As to second sentence, undisputed.

20. Similarly, a FY 2026 Budget and Performance Summary that DOJ published on June 13, 2025, in connection with the President's FY 2026 budget, stated that "[t]he Department will eliminate CRS and its functions, a total of 56 positions," going on to state that "[t]he CRS mission does not comport with Attorney General and Administration law enforcement and litigating priorities." Ex. 2 to Freeny Decl. at p.20, Doc. No. 107-2 at 9.

    **Response:** Subject to recurring Objection No. 2, undisputed.

21. The administrative record contains no disavowal of the reasoning set forth in the DOJ FY 2026 Budget and Performance Summary for eliminating CRS.

    **Response:** Legal conclusion. Subject to recurring Objection Nos. 1 and 2, Defendants respectfully refer the Court to the administrative record for a true and accurate statement of its contents.

22. Between March and September 2025, CRS declined to accept new requests for—and actively withdrew from—mediation and other conflict resolution and de-escalation services that fell within CRS's jurisdiction. Nam Decl. ¶ 27, Doc. No. 107-3 at 21. This wholesale cessation of services was done at the direction of DOJ leadership in connection with Defendants' effective dissolution of CRS. *Id.*

    **Response:** Subject to recurring Objection Nos. 1 and 2, Defendants clarify, with respect to the first sentence, that the March-May period was a 'wind-down' period, whereas CRS had been categorically denying all new requests for service during the period approximately May through October 2025. *See* Declaration of Denise W. Nazaire, ECF No. 116 (2nd Nazaire Decl.), ¶ 3. With respect to the second sentence, subject to the recurring Objection Nos. 1 and 2, legal conclusion.

23. An internal memo, submitted by CRS employee Denise Nazaire, provided "implementation considerations" to DOJ leadership with respect to the proposal to reduce CRS to a single-employee office with EOUSA. AR at 269, Doc. No. 92-1 at 269. That memo outlines what services CRS could and could not provide with a single person. *Id.* It does not recommend reduction to a single person. *Id*. Nor does it address the prior input from Mr. Nam that CRS was already at near-minimum staffing levels. *Id*.

    **Response:** With respect to the first and second sentences, undisputed. With respect to the remaining sentences, subject to recurring Objection Nos. 1 and 2, Defendants respectfully refer the Court to the cited documents.

24. Ms. Nazaire was only "familiar with limited aspects of the Department's plan" for CRS. 1st Nazaire Decl. ¶ 4, Doc. No. 51-1 at 2.

    **Response:** Subject to recurring Objection Nos. 1 and 2, Defendants respectfully refer the Court to the cited declaration for a true and accurate statement of its contents.

25. Ms. Nazaire's memorandum concludes that a single-person CRS could not perform the same conciliation functions that CRS had been performing for years. AR at 269, Doc. No. 92-1 at 269. Among other things, it would not be able to offer mediation services or other services that require "sustained engagement, intensive case management, and the flexibility to respond to evolving dynamics between parties." *Id.* at 270.

    **Response:** Subject to recurring Objection Nos. 1 and 2, Defendants respectfully refer the Court to the cited memorandum for a true and accurate statement of its contents.

26. On September 18, 2025, the Attorney General approved a memorandum entitled *Implementation of Fiscal Year (FY) 2025 Agency Reduction in Force (RIFs) and Reorganization Plan (ARRP)* ("Final ARRP Memo"), which stated that CRS's functions

would be "realigned to the Executive Office for the U.S. Attorneys," and all CRS employees would be RIF-ed except one. AR 307, Doc. No. 91-1 at 307.

**Response:** With respect to the approval of the aforementioned memorandum, subject to recurring Objection No. 2, undisputed. With respect to what the memorandum states, Defendants respectfully direct the Court to the cited memorandum for a true and accurate statement of its contents.

27. That memo did not disavow DOJ's prior statement that CRS's mission was inconsistent with the agenda of the Department and Trump Administration. In fact, it reiterated the Administration's "plan" to ultimately eliminate CRS, while acknowledging that an Act of Congress would be required. *Id*. The memo stated that CRS "will reduce its functions to the statutory minimum," but did not explain what that minimum was determined to be, how or why that number was reached, nor why CRS was not deemed a public safety agency exempt from the Executive Order. *Id*.

**Response:** Legal conclusion. Subject to recurring Objection Nos. 1 and 2, Defendants respectfully refer the Court to the cited memorandum for a true and accurate statement of its contents.

28. In this litigation, Defendants have taken the position that CRS's "only true statutory mandate" is to file an annual report with Congress. Doc. No. 15 at 3.

**Response:** Subject to recurring Objection Nos. 1 and 2, Defendants respectfully refer the Court to the cited document (Defendants' Opposition to Plaintiffs' Motion for an Emergency Temporary Restraining Order, dated October 28, 2025) for a true and accurate statement of its contents. Subject to the foregoing, immaterial.

29. On September 29, 2025, the Justice Department sent RIF notices to fourteen of the remaining 15 active employees of CRS, including the head of CRS, with an effective date of October 31, 2025. Ex. C to Supp. Nam Decl., Doc. No. 107-4 at 10. The notice advised that RIFs were being taken "as a result of the **dissolution of the Community Relations Service** (CRS) in accordance with the reorganization and reconsolidation of [DOJ]." *Id.*

   **Response:** Undisputed. (Apart from Plaintiffs' added emphasis in the quotation)

30. In adopting their so-called "realignment" or "reorganization" plan for CRS, Defendants knew that they would not be able to comply with congressional direction if Congress instead chose to fund CRS, over their objections. *See* Lauria Decl., Doc. No. 15-1 ¶ 13.

   **Response:** Speculative. Legal Conclusion. Subject to recurring Objection Nos. 1, 2, and 3, Defendants respectfully refer the Court to the cited declaration for a true and accurate statement of its contents.

31. In particular, in a declaration submitted with their opposition to Plaintiffs' Motion for Temporary Restraining Order, a DOJ administrator confirmed that DOJ lacked any plan for operating CRS if Congress decided to fund CRS for FY 2026. Lauria Decl., Doc. No. 15-1 ¶ 13. Instead, the official averred, "[i]f funding is provided for CRS for fiscal year 2026," DOJ would need to "reassess and consider how to comply with any funding enactment and legally expend such funds consistent with the enactment." *Id.*

   **Response:** Speculative. Subject to recurring Objection Nos. 1, 2, and 3, Defendants respectfully refer the Court to the cited declaration for a true and accurate statement of its contents.

### III. *Plaintiffs' Injuries as a Result of CRS's Shuttering*

32. Each of the Plaintiff organizations had been receiving CRS's services until CRS ceased providing assistance to the public as a result of the decision to "realign" CRS to a single-person agency with EOUSA. Doc. Nos. 5-16.

**<u>Response</u>:** Defendants clarify that the Plaintiff organizations either had been receiving CRS services, or were in discussions with CRS about services. *See, e.g.,* Decl. of Melissa Combs ¶ 7, ECF No. 107-8 (Plaintiff OAP and CRS "agreed to reconnect at the beginning of 2025," following a conversation in 2024); Decl. of Thomas Mayes Decl. ¶ 4, ECF No. 107-10 (explaining that Plaintiff Tri-State NAACP and CRS had an "action plan for future engagement, to include an October 25, 2025 community dialogue"). Subject to the foregoing clarification, undisputed.

33. As Former CRS Director Julius Nam explained, "Between March and June of 2025, CRS withdrew all its engagements with communities . . . as a result of the planned closure of CRS." Nam Decl. ¶ 28, No. 107-3 at 21.

**Response**: Defendants clarify that the March-May period was a 'wind-down' period, whereas CRS had been categorically denying all new requests for service during the period approximately May through October 2025. *See* Declaration of Denise W. Nazaire, ECF No. 116 (2nd Nazaire Decl.), ¶ 3. Subject to the foregoing clarification, undisputed.

34. *Plaintiff Ethical Society of Police ("ESOP")*, *Missionary Baptist State Convention of Missouri ("MBSC")*, and *NAACP St. Louis County*. ESOP, MBSC, and NAACP St. Louis County participated in a CRS-led engagement with St. Louis County law enforcement in the wake of a September 2024 incident where a Black off-duty officer with the St. Louis County Police Department was beaten by three White construction

workers in Clayton, Missouri. *See generally* Doc. Nos. 5-7. When the responding officers, who worked in the same Department as the victim, arrived on the scene, they handcuffed the off-duty officer despite clear indications that he was the victim, and they failed to provide or ensure timely medical assistance to the injured officer. The incident raised serious concerns within the community and among civil rights organizations about racial bias, officer treatment, and procedural failures within the police department. Decl. of Rev. Duvall ¶ 10, Doc. No. 107-16 at 3. ESOP, MBSC, and NAACP St. Louis County participated in CRS-led discussions with the St. Louis County Police Department about addressing these concerns, but CRS withdrew from the engagement before its completion. *Id.* at 4. CRS's withdrawal meaningfully hampered the ability of the Plaintiffs to have their concerns addressed by the police department, resulting in the department's failure to carry through on its commitments. *Id.* at 5-7.

**Response**: With respect to the penultimate sentence, undisputed that CRS withdrew from engagement before completion. The remainder of the purportedly material facts in this paragraph relies on information in Plaintiffs' custody and control. Defendants lack the ability to determine whether this fact is in dispute, and therefore cannot dispute it.

35. As explained by former Director Name [*sic*], "had CRS not ceased operations, it would have played a significant role in implementation of [the] agreement" between the St. Louis County Policy Department and multiple Plaintiffs. Supp. Nam. Decl. ¶ 9, Doc. No. 107-4 at 5.

 **Response**: Speculative. Subject to recurring Objection Nos. 1, 2, and 3, Defendants dispute that CRS has ceased operations.

36. Plaintiff Out Accountability Project ("OAP"). OAP reached out to CRS in the fall of 2024 and early 2025 to discuss harassment and bullying concerns of LGBTQ+ students in Connecticut. Combs Decl. ¶ 7, Doc. No. 107-8 at 3. OAP and CRS discussed the different services CRS could provide, but as a result of CRS's dismantlement, CRS discontinued that engagement in early 2025. *Id*. OAP continues to regard CRS's service as important to their organization's mission. *Id*. at 4.

    **Response**: Legal conclusion ("dismantlement"). Subject to recurring Objections Nos. 1 and 2, Defendants clarify that there was no "engagement in early 2025," and the cited declaration does not support the purportedly material facts. *See* Combs ¶ 7, ECF No. 107-8 (Plaintiff OAP and CRS "agreed to reconnect at the beginning of 2025," following a conversation in 2024). Also, the purportedly material facts in this paragraph rely on information in Plaintiffs' custody and control. Defendants lack the ability to determine whether this fact is in dispute, and therefore cannot dispute it.

37. *Plaintiff Berkshire Resources for Integration of Diverse Groups and Education, ("BRIDGE")*. BRIDGE partnered with CRS repeatedly over the course of fifteen years, to the point where BRIDGE adapted its model for delivering services to its constituents in reliance on its ongoing partnership with CRS. Supp. VanSant Decl. ¶ 5, Doc. No. 107-15 at 2. At BRIDGE's request and with their assistance, CRS conducted a School-SPIRIT program in February 2025 at W.E.B. DuBois Middle School in Great Barrington, Massachusetts. *Id.* School-SPIRIT is a proven program used by schools around the country to empower students and divert them from involvement with law enforcement. *Id.* At the request of youth leaders, BRIDGE sought an additional School-SPIRIT program for public schools in Stockbridge, Massachusetts but was denied

because of CRS's winddown. *Id.* at 3. Until the challenged agency dissolution, BRIDGE relied on CRS for its safety plan. *Id.*

**<u>Response</u>**: Subject to recurring Objections Nos. 1 and 2, Defendants state that the purportedly material facts in this paragraph relies on information in Plaintiffs' custody and control. Defendants lack the ability to determine whether these facts are in dispute, and therefore cannot dispute it. Subject to the foregoing, with respect to the denial of the request as set forth in the penultimate sentence, undisputed.

38. *Plaintiff NAACP State Conference Colorado-Montana-Wyoming ("Tri-State NAACP").* CRS began assisting Tri-State NAACP in 2024 by facilitating a series of community and law enforcement dialogues to build trust between police and diverse communities, strengthen problem-solving communications, and to increase community member collaboration with law enforcement. Mayes Decl. ¶ 4 Doc. No. 107-10 at 2. Two dialogues were held in January and July of 2024, resulting in the creation of an action plan for future engagement, to include an October 25, 2025 community dialogue with Tri-State NAACP. *Id.* CRS terminated planning for that dialogue as a result of its impending dissolution. *Id.* ¶ 5.

**<u>Response</u>**: Legal conclusion ("dissolution"). Subject to recurring Objections Nos. 1 and 2, Defendants state that the purportedly material facts in this paragraph rely on information in Plaintiffs' custody and control. Defendants lack the ability to determine whether these facts are in dispute, and therefore cannot dispute them. Subject to the foregoing, undisputed with respect to CRS's termination of the planning as referenced in the last sentence.

39. *Plaintiff Pikes Peak Southern Christian Leadership Conference 1 ("Pikes Peak SCLC").* Pikes Peak SCLC, a branch of the organization Martin Luther King, Jr. founded to coordinate civil rights protests through nonviolent action, has partnered with CRS on multiple occasions to address community tensions and conflicts arising from racial profiling incidents and excessive force by law enforcement in Colorado. Nelson Decl. ¶ 3, Doc. No. 107-11 at 1. Recently, this effort included a dialogue that CRS convened between Pikes Peak SCLC and the District Attorney for the Fourth Judicial District in Colorado, an area that includes Colorado Springs. *Id.* at 2. In June 2025, Pikes Peak SCLC requested CRS's assistance in facilitating another dialogue with law enforcement, in response to an incident involving allegations of excessive use of force against Black youth. But because of the planned dissolution of the agency, CRS declined the request. *Id.*

    **Response**: Legal conclusion ("dissolution"). Subject to recurring Objections Nos. 1 and 2, Defendants state that the purportedly material facts in this paragraph relies on information in Plaintiffs' custody and control. Defendants lack the ability to determine whether these facts are in dispute, and therefore cannot dispute it. Subject to the foregoing, with respect to the denial of the request as set forth in the last sentence, undisputed.

40. *Plaintiff Peacemakers Lodge.* In March 2025, Peacemakers Lodge, located on the Wind River Indian Reservation in Wyoming, requested CRS assistance in opening communications with a local school district, after the school district stopped engaging with the Lodge in a dialogue about the schools' disciplinary practices, which the Lodge was concerned were biased against Native American students. Olsen Decl. ¶ 4-5, Doc.

No. 107-12 at 1. CRS convened an initial meeting with the Lodge in March 2025 to hear their concerns, including about perceived lack of sensitivity within the school district to the concerns of Native Americans and the impact that can have on the learning environment for Native American students. *Id.* In or about May 2025, CRS convened a meeting between the Lodge and school officials to discuss ways to address these concerns. But once again, because of the agency's impending dissolution, CRS thereafter ceased providing services to the Lodge. *Id.* ¶ 6.

**<u>Response</u>***:* Subject to recurring Objections Nos. 1 and 2, Defendants state that the purportedly material facts in this paragraph relies on information in Plaintiffs' custody and control. Defendants lack the ability to determine whether these facts are in dispute, and therefore cannot dispute it. Subject to the foregoing, with respect to the denial of the request as set forth in the penultimate sentence, undisputed.

41. *Plaintiff Wellspring Health Access* ("Wellspring"). Wellspring operates a reproductive healthcare clinic located in Casper, Wyoming, that was the victim of an arson attempt in 2022 that delayed the clinic's opening. Burkhart Decl. ¶ 4, Doc. No. 107-13 at 1-2. Beginning that year, CRS provided facilitation and communications services between Wellspring and Casper law enforcement, following anti-abortion protests at Wellspring. *Id.* ¶ 5. The aim of that dialogue was to identify ways to allow the clinic to safely operate and to manage protesters without interruption of the clinic's services. CRS withdrew its assistance to Wellspring on or about May 2025, despite ongoing safety concerns at the clinic, as a direct result of the agency's planned shutdown. *Id.* ¶ 6.

**<u>Response</u>***:* Subject to recurring Objections Nos. 1 and 2, Defendants state that the purportedly material facts in this paragraph relies on information in Plaintiffs' custody

and control. Defendants lack the ability to determine whether these facts are in dispute, and therefore cannot dispute it. Defendants further state that the cited declaration (Burkhart Decl. ¶ 6, Doc. No. 107-13) does not support the purportedly material facts in the last sentence above.

42. *Plaintiff Haitian Community Help & Support Center.* On or about February 2024, at the request of the U.S. Attorney's Office for the Southern District of Ohio, CRS convened a forum, dubbed "United Against Hate," to bring together faith-based leaders and members of the Haitian community to discuss issues arising from the conviction and sentencing of an African-American assailant for robberies and hate crime assaults against Haitian immigrants in Springfield, Ohio. Dorsainvil Decl. ¶¶ 6–9, Doc. No. 107-14 at 2-3. Haitian Support Center participated in this forum. *Id.* CRS continued to engage with Haitian Support Center through the end of 2024 and beginning of 2025, with the goal of supporting the Haitian community's desire to improve communications and relations with civic leaders and address concerns about the policing of the Haitian community. *Id.* This engagement was poised to culminate in a Memorandum of Understanding ("MOU") between the Springfield Police Department and the Center and other community groups regarding policing practices. *Id.* After agreeing to facilitate and consult on this MOU, however, CRS abruptly withdrew the provision of all services to the Center, preventing the MOU from being finalized.

**Response**: Speculation. Subject to recurring Objections Nos. 1, 2, and 3, Defendants state that the purportedly material facts in this paragraph relies on information in Plaintiffs' custody and control. Defendants lack the ability to determine whether these

facts are in dispute, and therefore cannot dispute it. Subject to the foregoing, as to the last sentence, undisputed.

43. Plaintiffs lost access to CRS's services because of Defendants' planned elimination, or "realignment," or CRS. As explained by former CRS Director Julius Nam, "[h]ad it not been for CRS's planned dissolution . . . CRS would have continued to provide each stakeholder with the requested services." Nam Decl. ¶ 29, Doc No. 96-3 at 23.

**Response**: Speculation. Subject to recurring Objections Nos. 1, 2, and 3, Defendants do not dispute that Plaintiffs lost or were denied services as a result of CRS's temporary halting of services in 2025.

## IV. Post Lawsuit Developments

44. The RIF of all but one CRS employee became effective October 31, 2025. Ex. C to Supp. Nam Decl., Doc. No. 107-4 at 11.

**Response**: Subject to clarification that the CRS RIF was rescinded and the removed employees were offered reinstatement, *see* Second Declaration of Jonathan Pelletier, ¶ 2, ECF 126-1; Declaration of Jonathan Pelletier, ¶ 4 n.1, ECF No. 85-1, undisputed.

45. On November 12, 2025, not long after the RIF of CRS employees took effect, Congress enacted a Continuing Resolution that funded CRS and other federal agencies at FY2025 levels through January 31, 2026. That Continuing Resolution also provided that "any reduction in force proposed, noticed, initiated, *executed, implemented, or otherwise taken* by an Executive Agency between October 1, 2025, and the date of enactment [Nov. 12, 2025], *shall have no force or effect*." *See* Public Law No. 119-3 § 120(e) (2025) (emphasis added). It directed agencies to provide notice, within five days, to affected employees of their reinstatement. *Id.*

**Response***:* Subject to recurring Objection Nos. 1 and 2, Defendants specifically deny that the cited statements are material to this case.

46. Although *RIF notices* were issued to CRS employees on September 29, 2025, those notices stated that the RIF would be "conducted effective October 31, 2025," and that employees would be "separated from the Federal service by reduction in force on October 31, 2025." Ex. C to Supp. Nam Decl., Doc. No. 107-4 at 11.

**Response***:* Subject to recurring Objection Nos. 1 and 2, Defendants respectfully direct the Court to the cited RIF notices for a true and accurate statement of the contents. Subject to the foregoing, undisputed.

47. DOJ did not issue RIF rescission notices to terminated CRS employees until January 9, 2026, see Doc. No. 75 at 1.

**Response***:* Subject to recurring Objection Nos. 1 and 2, undisputed.

48. This reinstatement was announced in the wake of a California district court decision that rejected the government's argument that it was not required to reinstate employees who received RIF notices before October 1, 2025. *See AFGE v. OMB*, Case No. 3:25-cv-08302, 2025 WL 3654116, at *10-11, 14 (N.D. Cal. Dec. 17, 2025).

**Response***:* Subject to recurring Objection Nos. 1 and 2, Defendants specifically deny that the cited statements are material to this case.

49. In the aftermath of the rescissions of the CRS RIF, DOJ initially stated that CRS was back up and operational, because "CRS website has been updated with a new telephone number and email address, both of which are now operational." Doc. No. 75 at 3.

**Response***:* Subject to recurring Objection Nos. 1 and 2, Defendants specifically deny that the cited statements are material to this case. Defendants further dispute the

purportedly material statements. The cited Joint Status Report (ECF No. 3) nowhere states that "CRS was back up and operational."

50. In a February 11, 2026 Status Report, Defendants represented that, as a result of that RIF rescission and others, there were 32 CRS employees "in services." Doc. No. 85 at 2. This included 31 reinstated employees (from CRS and other offices) and the single CRS employee who was not subject to the original RIF. *Id*.

**Response***:* Subject to recurring Objection Nos. 1 and 2, Defendants respectfully direct the Court to the (apart from typo, "in service").

51. These reinstated employees, though purportedly "in service" at CRS, are not being paid out of CRS funds. *Id.* Nor are they assigned to any CRS duties or functions. *Id.* They have all been placed on "detail," purportedly to be trained for work at EOUSA, for a period of approximately 90 days. *Id.*

**Response***:* Subject to recurring Objection Nos. 1 and 2, Defendants respectfully direct the Court to the Joint Status Report (ECF No. 85) for a true and accurate statement of the contents, and to the accompanying Declaration of Jonathan Pelletier, ¶¶ 4-5, ECF 85-1, which explained in part that "[i]n total, CRS now has 32 employees in service," and that the "31 reinstated employees are on detail to jobs within EOUSA, outside of CRS, undergoing developmental training for integration into EOUSA (almost all of these employees have no prior experience with EOUSA)," and that "the employees salary will not be charged to CRS during the detail period." Subject to the foregoing clarification, undisputed.

52. Although that 90-day detail period for reinstated CRS employees has now elapsed, these employees have not been returned to CRS work. *See* Doc. No. 117 at 10.

**Response**: Subject to recurring Objection Nos. 1 and 2, Defendants respectfully direct the Court to the Second Declaration of Jonathan Pelletier, ¶ 3, ECF 126-1, which explained that with respect to the nine reinstated CRS employees: "Presently, five of those nine reinstated CRS employees are continuing their detail. At this time, those details are expected to continue through September 30, 2026. These employees' salaries will not be charged to CRS during the detail period. The roles of and /or any further detail for the other four reinstated CRS employees remains to be determined." Defendants further respectfully direct the Court to paragraph 4 of that declaration, which further explained that "[t]he 22 other employees . . . are no longer considered CRS employees."

53. On January 23, 2026, Congress passed a full appropriations bill for DOJ for FY 2026. *See* Public Law No. 119-74 (Jan. 23, 2026). Congress expressly appropriated $20 million for CRS for FY 2026.

    **Response**: Undisputed.

54. As of February 23, 2026, DOJ indicated that "specific plans for resumption of operations of CRS . . . are not yet set." Doc. No. 89 at 2 (cleaned up); see also Pelletier Decl. ¶ 7, Doc. No. 85-1 at 3.

    **Response**: Defendants respectfully direct the Court to the cited Notice (ECF 89), which states, "And as Defendants explained in the last Joint Status Report, specific 'plans for resumption of operations of CRS' (as called for by the Court's order (ECF No. 79)) are not yet set." Subject to the foregoing, undisputed.

55. As of the date of Defendants' summary judgment filing, Opp. at 10 Ms. Nazaire "is the sole CRS employee discharging [CRS's] responsibilities." Doc. No. 117 at 10.

**Response**: Defendants respectfully direct the Court to the cited document (ECF No. 117) for a true and accurate statement of the contents, and further clarify that Dr. Nazaire is the sole employee who is discharging CRS statutorily mandated responsibilities. *See* Second Decl. of Jonathan Pelletier, ¶ 2, ECF No. 126-1. Subject to the foregoing, undisputed.

56. Open-source information shows that, out of the $20 million appropriated by Congress, OMB approved expenditure of up to $972,561 for Q1 of FY 2026; just over $2 million for Q2; only $70,000 for Q3; and the remainder (ostensibly) for Q4. *See* 3rd Freeny Decl. ¶ 18, ECF No. 107 at 3-4.

    **Response**: Defendants specifically deny that the cited statements are material to this case.

57. This data confirms that Defendants decided to functionally dissolve and/or eliminate CRS in 2025, regardless of what label they attached to that decision. It also confirms that Defendants have no intent to depart from this decision now, despite the rescission of the CRS RIF and the availability of dozens of employees to perform CRS functions using funds specifically appropriated by Congress for CRS. *Id*.

    **Response**: Disputed. *See* 2nd Nazaire Declaration, ¶¶ 7-12; 3rd Nazaire Declaration ¶¶ 2-5, ECF No. 135.

58. The Administration's budget proposal for FY 2027 labels CRS a "woke enterprise" with a "long track record of . . . legitimizing riotous behavior that puts America's police in the crosshairs." 4th Freeny Decl. ¶ 9 and Ex. 1 thereto, Doc. No. 127 & 127-1.

    **Response**: Defendants specifically deny that the cited statements are material to this case.

59. In 2026, CRS has denied requests for services because of "limited staff availability." 2nd Nazaire Decl. ¶ 6, Doc. No. 116 at 3.1 And as the sole CRS employee, Ms. Nazaire has categorically "not pursued" any "requests for mediations," even though she has received such requests. 2nd Nazaire Decl. ¶ 12(c), Doc. No. 116 at 12.

**Response**: Disputed. See 3rd Nazaire Decl., ¶¶ 2-5.

60. In January 2026, Plaintiff Missionary Baptist State Convention of Missouri ("MBSC") requested that CRS resume providing it with services that were in CRS's jurisdiction. Ms. Nazaire initially engaged with MBSC but ultimately closed MBSC's request without providing any CRS Services. 2nd Nazaire Decl. ¶ 11(a), Doc. No. 116 at 6-8.

**Response**: Subject to Recurring Objections 1 and 2, Defendants respectfully direct the Court to the cited 2nd Nazaire Decl., and to the 3rd Nazaire Decl., ¶¶ 4 -5. Subject to the foregoing, undisputed.

61. In January 2026, Plaintiff NAACP St. Louis County requested that CRS resume providing it with services that were in CRS's jurisdiction. CRS also denied this request. 2nd Nazaire Decl. ¶ 11(b), Doc. No. 116 at 8-9.

**Response**: Subject to Recurring Objections 1 and 2, Defendants respectfully direct the Court to the cited 2nd Nazaire Decl., and to the 3rd Nazaire Decl., ¶¶ 4-5. Subject to the foregoing, undisputed.

62. Also in January 2026, Plaintiff Berkshire Resources for the Integration of Diverse Groups and Education requested that CRS resume providing services within CRS's jurisdiction. CRS closed this request, at least in part, because of "internal staff availability." 2nd Nazaire Decl. ¶ 11(c), Doc. No. 116 at 9-11.

**Response**: Subject to Recurring Objections 1 and 2, Defendants respectfully direct the Court to the cited 2nd Nazaire Decl., and to the 3rd Nazaire Decl., ¶ 2. Subject to the foregoing, undisputed.

63. Plaintiff Out Accountability Project ("OAP") also contacted Ms. Nazaire in January 2026 to request the resumption of CRS services. 2nd Nazaire Decl. ¶ 11(d), Doc. No. 116 at 11. However, due to scheduling issues, OAP was not able to connect with Ms. Nazaire before she closed the inquiry. *Id*.

**Response**: Subject to Recurring Objections 1 and 2, Defendants respectfully direct the Court to the cited 2nd Nazaire Declaration. Defendants respectfully state that this purported statement of fact creates the misimpression that, when OAP did not respond to Dr. Nazaire's follow-up email offering alternative meeting times after OAP requested a rescheduling of their meeting, Dr. Nazaire preemptively "closed the inquiry" before OAP was able to reconnect. In fact, Dr. Nazaire had not communicated to the stakeholder whether the matter was opened or closed. *See* 2nd Nazaire Decl. ¶ 11.d.; Ex. 4. Rather, the closure of this alert (*i.e.,* the closed status) became public later, through court filings. Subject to the foregoing, undisputed.

64. CRS has not resumed its services to any of the Plaintiff organizations. 2nd Nazaire Decl. ¶ 11, Doc. No. 116 at 6-11.

**Response**: Subject to recurring Objections 1 and 2, Defendants state most of the Plaintiff reorganizations did not re-initiate requests after CRS resumed services. For those Plaintiff organizations that did, CRS declined the request for legitimate reasons. *See* 2nd Nazaire Decl.; ¶ 11; 3rd Nazaire Decl., ¶¶ 2-5.

Dated: June 23, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Branch Director
Federal Programs Branch

*s/ Steven M. Chasin*

Steven M. Chasin (D.C. Bar# 495853)
Jessica A. Lundberg
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-0747
Email: steven.m.chasin2@usdoj.gov

*Counsel for Defendants*